**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN WOODARD, individually and on behalf of all others similarly situated, <br> Plaintiff, <br><br> v. <br><br> RAYMOND JAMES FINANCIAL, INC., THOMAS A. JAMES, JEFFREY P. JULIEN, STEVEN RANEY, and MARK MOODY <br> Defendants. | Civil Action No.09-5347 (RPP) <br><br> ECF CASE |

**AMENDED CLASS ACTION COMPLAINT**

U.S. DISTRICT COURT
S.D.N.Y.

09 NOV 25 PM 5:13

RECEIVED

## TABLE OF CONTENTS

I.     BASIS OF ALLEGATIONS ................................................................. 1

II.     JURISDICTION AND VENUE ........................................................... 6

III.     THE PARTIES ..................................................................................... 6

     A.     Lead Plaintiff  Louisiana School Employees' Retirement System ........................ 6
     B.     Named Plaintiff ................................................................................ 7
     C.     Defendants ...................................................................................... 7
         1.     Raymond James Financial ........................................................ 7

         2.     Thomas A. James ...................................................................... 7

         3.     Jeffrey P. Julien ........................................................................ 7

         4.     Steven Raney ............................................................................ 7

         5.     Mark Moody .............................................................................. 7

IV.     GROUP PLEADING .......................................................................... 8

V.     HISTORY OF RJBANK ..................................................................... 10

     A.     RJF Is Created and Then Creates RJBank ......................................... 10
     B.     RJF Rapidly Expands RJBank ........................................................ 11
     C.     RJBank Records Loan Loss Provisions In Fiscal Year 2007 Commensurate With Increased Risk .............................................................................. 16
         1.     Real Estate Markets Deteriorate And Problems Spread To Other Sectors Of The Economy ..................................................... 16

         2.     RJBank Records Higher Loan Loss Provisions In Fiscal 2007 In The Face Of Loan Growth And Increasing Portfolio Risks ..................................... 17

     D.     Other RJF Subsidiaries' Earnings Suffer As Credit Crisis Deepens ................... 19

VI.     DEFENDANTS' FRAUDULENT SCHEME ................................... 20

     A.     RJBank Appears To Offset  Declines In RJBank's Non-Bank Segments By Taking Inadequate Loan Loss Provisions ........................................... 20
     B.     Defendants Concealed Information That Would Have Shown the Extent Of Risk In RJBank's Loan Portfolio .......................................................... 25
         1.     Defendants Concealed RJBank's Continued Expansive Growth In Risky Areas .............................................................................. 25

         2.     Defendants Concealed The Extent Of Loss That One Poorly Performing Loan Could Cause RJBank And The Company ....................... 28

3.      Defendants Concealed That The LTV Ratios Should Have Been Updated
        To Reflect Falling Housing Prices .......................................................... 30

C.   Defendants Misrepresented Risks In RJBank's Loan Portfolio As Well As The
     Company's Risk Management And Loan Underwriting Practices ...................... 31
     1.      Defendants Misrepresented The Risks In RJBank's Residential Mortgage
             Portfolio ............................................................................................. 31

     2.      Defendants Misrepresented The Risks In RJBank's Commercial Loan
             Portfolio ............................................................................................. 33

     3.      Defendants Misrepresented The Adequacy Of RJBank's Risk
             Management And Loan Underwriting Practices ...................................... 34

             a.      RJF Misrepresented RJBank's Loan Underwriting Practices ....... 35
             b.      The Company Knowingly Or Recklessly Devoted Inadequate
                     RJBank Resources To Risk Management ................................. 36

D.   Defendants Deliberately Ignored Economic Data And Regulators' Warnings And
     Analysis In Assessing The Adequacy Of RJBank's Loan Loss Reserves In Order
     To Create The Appearance Of Profitability ........................................................ 37
     1.      RJF Knowingly And/Or Recklessly Disregarded Regulatory Warnings
             And Assessments .................................................................................. 39

     2.      Defendants Ignored Severe Declines In Commercial And Residential  Real
             Estate .................................................................................................. 41

     3.      Defendants Knowingly Disregarded Broader Macroeconomic Indicators
             That Signaled That Widespread Losses Were Imminent .......................... 43

     4.      Defendants Ignored The Risks Inherent In RJBank's Growth Which
             Defied Industry Trends ......................................................................... 46

     5.      Defendants Recklessly Disregarded The Risks That Ongoing
             Manipulation Of RJBank Would Ultimately Imperil The Company ........ 47

             a.      Quarter Ended March 31, 2008 .................................................. 47
             b.      Quarter Ended June 30, 2008 .................................................... 48

VII.  RJF FALTERS BUT DEFENDANTS CONTINUE TO CONCEAL THE
      EXTENT OF THE PROBLEMS ....................................................................... 49

A.   RJF Announces Q4 Earnings That Fall Short Of Analyst Projections, Despite
     Continued Manipulation of Loan Loss Reserves ............................................... 49
B.   RJF Issues Misleading Press Release To Counter Questions Raised in The Media
     ......................................................................................................................... 50
     1.      November 10 *Barron's* Article Questions RJBank's Strength ................. 50

     2.      RJF Issues False And Misleading Press Release In Response ................. 51

**VIII.**    RJF APPEARS TO MAKE A REBOUND ...................................................... 52

**IX.**    THE TRUTH IS REVEALED, AND THE BOTTOM FALLS OUT ............................. 53

**X.**    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR
OMISSIONS DURING THE CLASS PERIOD ............................................................ 55

    **A.**    Second Quarter Ending March 31, 2008.................................................. 56
        1.    April 22, 2008 Press Release ...................................................... 56

        2.    April 22, 2008 CNBC Interview ................................................... 57

        3.    April 23, 2008 Quarterly Analysts Conference Call.................... 57

        4.    RJF's Statements Made In Relation To Its Q2 2008 Results Were False
and Misleading ............................................................................ 58

        5.    RJF's Second Quarter 2008 SEC Form 10-Q .............................. 60

    **B.**    April 25, 2008 Investor Day Presentation................................................ 63
    **C.**    Third Quarter Ending June 30, 2008........................................................ 63
        1.    July 22, 2008 Earnings Press Release......................................... 63

        2.    July 22, 2008 CNBC Interview ................................................... 64

        3.    July 23, 2008 Raymond James Financial Analyst Conference Call ......... 65

    **D.**    Fourth Quarter Ending September 30, 2008 ............................................ 67
        1.    October 21, 2008 Earnings Release ............................................. 67

        2.    October 22, 2008 Quarterly Analysts Conference Call ............... 67

        3.    RJF's Statements Made In Relation To Its Q4 2008 Results Were False
and Misleading ............................................................................ 68

    **E.**    November 11, 2008 Press Release ........................................................... 68
    **F.**    Fiscal Year 2008 10-K ............................................................................ 70
    **G.**    First Quarter Ending December 31, 2008 ................................................ 70
        1.    January 21, 2009 Press Release .................................................. 70

        2.    January 22, 2009 Analyst Conference Call.................................. 71

**XI.**    RJF'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND
SEC REGULATIONS ............................................................................................ 73

    **A.**    Overview Of GAAP Regulations............................................................. 74
    **B.**    RJBank's Mounting Loan Losses Went Unrecorded................................ 76
    **C.**    RJF Intentionally Misstated Its Financial Statements............................. 81
    **D.**    RJF Did Not Have Adequate Internal Controls ...................................... 82

iii

  **E.** Defendants Violated MD&A Disclosure Requirements .......................... 84
  **F.** RJF's Financial Statements Should Have Been Restated ...................... 85
  **G.** RJF Misstated RJBank's "Well Capitalized" Status .............................. 87

**XII.** SCIENTER ................................................................................................ 88

  **A.** General Allegations Of Scienter ........................................................ 88
  **B.** Circumstances Surrounding RJBank's Loss Provisions Strongly Indicate That Defendants Deliberately Manipulated RJBank's Reserves In Order To Beat Earnings Expectations And Maintain The Appearance Of Profitability .............. 89
  **C.** Economic Reports Issued By RJA Create A Strong Inference Of Scienter ......... 90
  **D.** Poor Performance At RJF's Non-Bank Divisions Provided Motive For Defendants To Commit Fraud ................................................................ 92
  **E.** RJF's Auction Rate Securities Liability Provided Motive For RJF To Artificially Boost RJF's and RJBank's Income .................................................... 92
  **F.** The Need to Keep RJBank Well Capitalized Provided Motive For Defendants To Commit Fraud ................................................................ 95
  **G.** RJF Deviated From Its History of Stock Repurchases ......................... 96
  **H.** Highly Suspicious Stock Sales By Julien And Other Insiders At RJF Create a Strong Inference of Scienter ............................................................ 97
    1. RJTrust ...................................................................... 97

    2. Jeffrey P. Julien ......................................................... 97

    3. Dennis Zank ............................................................... 98

  **I.** RJF's Bonus Compensation Structure Provided Motive For The James And Julien To Defraud Shareholders .......................................................... 98
  **J.** RJF's Numerous Violations Of GAAP And SEC Violations In Its Financial Reports Create A Strong Inference of Scienter ..................................... 99

**XIII.** FRAUD ON THE MARKET ...................................................................... 100

**XIV.** NO SAFE HARBOR ................................................................................ 101

**XV.** LOSS CAUSATION ................................................................................ 101

**XVI.** CLASS ACTION ALLEGATIONS ............................................................ 105

**XVII.** PRAYER FOR RELIEF ............................................................................ 111

**XVIII.**JURY DEMAND .................................................................................... 112

The Louisiana School Employees' Retirement System ("LSERS"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Raymond James Financial, Inc. ("RJF" or the "Company"), between April 22, 2008 and April 14, 2009 (the "Class Period"), by their undersigned attorneys, bring this action against RJF, Thomas A. James, Jeffrey P. Julien, Steven Raney, and Mark Moody (collectively, "Defendants").    The allegations against Defendants are based on the personal knowledge of LSERS as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel ("Lead Counsel"), which included, but was not limited to: (i) review and analysis of RJF's public filings with the U.S. Securities and Exchange Commission ("SEC") and certain other regulatory filings; (ii) review and analysis of certain press releases, public statements, news articles, and other publications disseminated by or concerning RJF; (iii) review and analysis of analyst reports, conference call transcripts, speeches, interviews; (iv) interviews with former employees of RJF and its subsidiaries and affiliates and other persons with knowledge of the matters alleged herein, some of whom have provided information in confidence (these confidential witnesses ("CW"s) will be identified herein by number ("CW 1" and "CW 2"); and (v) analyses of RJF insiders' trading in RJF securities.

## I.    BASIS OF ALLEGATIONS

1.    In early 2008, as the financial industry in general was reeling from the credit crisis, RJF's brokerage, asset management, and investment banking units began to suffer from greatly reduced income in connection with the economic downturn and the associated decline in investment activity.  Nevertheless, RJF sought to present the Company as profitable, and looked to one of its subsidiaries, Raymond James Bank ("RJBank" or the "Bank"), to offset losses

incurred by its non-bank divisions, and to fraudulently create the appearance of a Company immune from the forces wreaking havoc on RJF's peers.

2.      More specifically, Defendants turned to the one aspect of RJBank's performance that was both material and readily susceptible to manipulation:  the Bank's loan loss reserves. Like other lenders, RJBank sets aside reserves to cover losses associated with non-performing loans, considering loan-specific information as well as macroeconomic factors and other variables in order to determine whether its existing reserves are sufficient.  The highest level executives within both RJBank and the Company make these determinations.  If they determine that the conditions require a larger reserve, the Bank is required to add to the reserve through a loan loss provision, which is deducted from that fiscal period's earnings.  Accounting rules and banking regulations provide guidance on how the Bank should calculate the required reserves; however, only Company and Bank insiders have the detailed knowledge of the Bank's lending portfolio that is needed to determine the correct level of reserves.  Thus, the level of reserves RJF reports for the Bank may seem appropriate based on representations regarding RJBank's portfolio, yet in fact be inadequate.

3.      Defendants deliberately manipulated the Bank's levels of reserves in order to artificially inflate revenues at the parent, RJF.  Whereas accounting for the fees and commissions generated by RJF's brokerage and asset management units is straightforward, offering little opportunity to manipulate the results, Defendants conceived a plan to manipulate and distort the level of reserves at RJBank without creating suspicion.  Their fraud had three elements: concealing material facts, misrepresenting material facts, and deliberately ignoring information that they knew required much higher levels of reserves   Through this scheme, Defendants were able to set aside and maintain loan loss reserves that they knew were completely inadequate, and in a manner that would not arouse suspicion among investors and analysts.  Through this

scheme, Defendants were able to overstate RJF's earnings and maintain the appearance of the Company's profitability, despite the turmoil rocking the financial sector.

4.    Defendants implemented this scheme in several ways. **First**, the Company and RJBank concealed material information regarding the quality of the Bank's loan portfolio. Most significantly, throughout the Company's 2008 fiscal year, Defendants concealed the fact that the Bank was significantly increasing the dollar amount of loans extended to borrowers in the commercial real estate sector, at a time when commercial real estate values were plummeting and such borrowers were increasingly likely to default. Additionally, Defendants concealed the fact that losses incurred from one significant, non-performing loan could have a significant impact on the Bank's reserves – and earnings.

5.    **Second,** Defendants misrepresented the nature and extent of risks embedded within the Bank's portfolio. As a general matter, Defendants falsely touted the Company's and the Bank's conservative risk management practices, which were in fact quite risky. Additionally, Defendants misrepresented to investors that they independently underwrote all loans in which the Bank was a joint lender, when they did not.

6.    Defendants also misled investors by citing outdated information regarding the Bank's residential loans, emphasizing the loans' low average loan-to-value ("LTV") ratio. A low LTV ratio indicates that the homeowner has a high percentage of equity in the home and, accordingly, the homeowner has a strong incentive to repay the loan. Since RJBank's LTV ratios were calculated at the loans' inception, but home values had plummeted throughout the country, those outdated values were no longer reliable indicators of the likelihood of default. Yet Defendants continued to stress the Bank's low average LTV ratio in justifying their decision to keep lower than average loan loss reserves (compared to the industry).

7.     Similarly, Defendants overstated the difference between the Bank's loan portfolio and those of other banks.  As Defendants knew, but did not disclose, RJBank was vulnerable to substantial losses resulting from the weakening commercial sector, where its lending was concentrated.  As the Defendants knew, the Bank was also suffering increased losses as the recession progressed, requiring much higher reserves.

8.     ***Third***, Defendants deliberately and/or recklessly disregarded information they were required to consider in determining the appropriate level of loan loss reserves for the Bank. Industry trends and regulator warnings required Defendants to increase loan loss reserves significantly, but they deliberately ignored these factors.  Defendants also deliberately disregarded macroeconomic trends – in the real estate industry in particular, but also in other sectors affecting the Bank's commercial borrowers – that indicated that no matter how sound the credit of RJBank's borrowers, large losses were likely.  Defendants also deliberately ignored data showing vast differences between RJBank and industry trends, particularly with regard to the Bank's loan growth and loan loss reserve levels.  Yet Defendants deliberately refused to take any of this information into account, as doing so would have required taking larger loan loss provisions, which would have undermined Defendants' plan to artificially inflate the Company's earnings.  Indeed, CW 1 (described below) confirmed that RJBank had access to, and would utilize, this information in its loan loss determinations.

9.     In the second and third quarters of fiscal year 2008, RJF successfully implemented this scheme.  RJF's results for the second quarter (ending March 31, 2008) exceeded analyst expectations, resulting in a 20% jump in RJF's stock price, which went from $22.96 on April 22, 2008, to $27.56 on April 23, 2008.  Similarly, in the third quarter, RJF reported healthy profits that exceeded analysts' expectations.

10.     But, by the fall of 2008, the façade began to crack.  RJF's earnings failed to meet analysts' expectations for the quarter ending September 30, 2008, causing a 10% drop in RJF's stock price, going from $23.18 on October 21, 2008, to $20.83 on October 22, 2008.  While a November 10, 2008 article in *Barron's* raised some red flags about the imminent problems that would develop as the performance of RJBank's loans deteriorated, investors' concerns were allayed as Defendants repeatedly assured that the Bank's loan loss reserves were sufficient to account for any future losses at the Bank.

11.     RJF managed a perceived temporary turn-around for the quarter ending December 31, 2008, again reporting earnings above analyst expectations, attributed to RJBank's "conservative lending practices."  But RJF could only mislead investors for so long, as the disparity between the Bank's reserves and those they should have recorded grew to unmanageable proportions.

12.     On April 14, 2009, RJF announced its results for the quarter ending March 31, 2009.  The Company stunned investors by reporting that RJBank would be forced to record huge increases in its loan loss reserves, with the loan loss provision ***tripling*** from the previous quarter and more than the entire amount recorded for all of 2008.  Significantly, RJF did not state that this huge increase in reserves was required by recent events; it clearly was a correction required by many quarters of deliberately inadequate provisions and loan loss reserves

13.     The truth revealed, investors sent RJF shares plummeting.  In response to RJF's news, the stock dropped from $19.06 per share on April 14, 2009 to $16.49 on April 15, 2009, more than 50% off the class period high of over $38 per share.  Investors, including Lead Plaintiff, lost approximately $2 billion as a consequence of Defendants' fraud.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder by the SEC.

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts and transactions forming the basis for the claims in this action, including the dissemination of materially false and misleading statements, and the failure to disclose material information, occurred in substantial part in this District.

17.    In connection with the acts and omission alleged in this Complaint, the Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, interstate telephone communications, the mails, and the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.    LEAD PLAINTIFF LOUISIANA SCHOOL EMPLOYEES' RETIREMENT SYSTEM

18.    Louisiana School Employees' Retirement System ("LSERS"), founded in 1946, is one of four state government retirement systems serving non-instructional personnel of the Louisiana public school system.  LSERS has over 25,000 active and retired members, and is administered by a professional staff of state employees who oversee assets valued at approximately $1.07 billion, as of March 31, 2009.  LSERS purchased shares of RJF securities during the Class Period and was injured as a result of Defendants' fraud.

B.    **NAMED PLAINTIFF**

19.    Named Plaintiff John ("Woodward ") is an individual residing in New York, New York.  Woodward purchased shares of RJF securities during the Class Period and was injured as a result.

C.    **DEFENDANTS**

**1.    Raymond James Financial**

20.    Defendant RJF is a Florida corporation with its principal executive offices located at 880 Carillon Parkway, St. Petersburg, Florida 33716.  RJF is a holding company whose subsidiaries are engaged in various financial services businesses.  During the Class Period, RJF issued false and misleading statements to investors.

**2.    Thomas A. James**

21.    Thomas A. James ("James") is, and was at all relevant times, Chairman of the Board and Chief Executive Officer of RJF.  James also serves on the RJF Operating Committee.

**3.    Jeffrey P. Julien**

22.    Jeffrey P. Julien ("Julien") is, and was at all relevant times, Senior Vice President and President of Finance and Chief Financial Officer of RJF.  In addition, Julien is the Chairman of RJBank and Raymond James Trust, National Association ("RJTrust" or the "Trust").

**4.    Steven Raney**

23.    Steven Raney ("Raney") is, and was at all relevant times, President and CEO of RJBank.  Raney also serves on the board of RJTrust and on the RJF Operating Committee.

**5.    Mark Moody**

24.    Mark Moody ("Moody") is, and was at all relevant times, Senior Vice President and Senior Credit Risk Executive at RJBank.

25.     Defendants James, Julien, Raney, and Moody are herein referred to as the "Individual Defendants."

## IV.    GROUP PLEADING

26.     During the Class Period, the Individual Defendants, by virtue of their senior executive positions at RJF, had access to confidential and proprietary information concerning RJF, its business, operations, operational trends, finances, financial condition and present and future business prospects.  The Individual Defendants were privy to this information through internal corporate documents, conversations, communications and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and board of directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as RJF officers and/or directors.

27.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants were and are "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of RJF's business.

28.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the RJF's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the RJF, directly participated in the management of the Company, were directly involved in the day-to-day operations of the

Company at the highest levels and were privy to confidential and proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

29.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein.  The Individual Defendants knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of federal securities laws.

30.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions violated these specific requirements and obligations.

31.    The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or the

opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are responsible for the accuracy of the public reports and statements detailed herein.

## V.    HISTORY OF RJBANK

### A.    RJF IS CREATED AND THEN CREATES RJBANK

32.    From its inception in 1962, RJF and its affiliated companies have primarily operated on the investment side of the financial services industry, offering, among other things, financial planning, asset management and investment research to their clients.

33.    Historically, three divisions have comprised the majority of RJF's business: (1) Private Client Group; (2) Capital Markets; and (3) Asset Management.  The Company's Private Client Group segment offers broker-dealer services through certain of the Company's subsidiaries, including Raymond James & Associates, Inc. ("RJA") and Raymond James Financial Services, Inc. ("RJFS").  In addition, the Private Client Group provides securities transaction and financial planning services to clients of these subsidiaries.  Among other things, the Private Client Group's earnings are derived from commissions and fees generated by RJA's and RJFS's brokers and financial planners.

34.    Capital Markets is RJF's equity and fixed income division, which engages in investment banking services, institutional sales, and equity and fixed income trading through various RJF subsidiaries.  Capital Markets generates revenues through commissions and fees earned on investment banking and sales services, as well as through stock and bond trading on the Company's account.

35.    Asset Management is RJF's investment advisory division. Asset Management includes Company-sponsored mutual funds, which are managed by RJF subsidiaries such as Eagle Asset Management, Inc. and Eagle Fund Services, Inc., as well as portfolio management

services offered through other RJF subsidiaries.  Asset Management's revenues are derived from portfolio management fees.

36.     In 1994, RJF expanded its operations and created RJBank.  Throughout its first decade, the Bank contributed only a small percentage of the Company's earnings.  By the end of fiscal year 2004, this breakdown had not changed.  As illustrated in the chart below, which shows each division's contribution to RJF's pre-tax earnings, for fiscal 2004, Private Client Group, Capital Markets, and Asset Management generated the lion's share of the Company's earnings.



**B.     RJF RAPIDLY EXPANDS RJBANK**

37.     In 2005, with the booming real estate market enabling ever-greater profits among banks, RJF saw opportunities for greater profits.  Accordingly, in that year, RJF made a push to expand RJBank.  Although RJBank remained a very small company, with approximately 60 employees (compared to the some of the Company's other subsidiaries, which employ thousands of individuals), it began a period of astronomical growth.  RJBank held less than $700 million in loans outstanding at the end of fiscal year 2004, and increased this amount to roughly $1 billion

by the end of fiscal year 2005.  It then more than doubled that figure in the next year, ending

fiscal year 2006 with approximately $2.3 billion in loans outstanding.

      38.    As a federally chartered savings bank or "thrift," federal regulations required

RJBank to focus on loans to individual borrowers, *i.e.*, residential and consumer loans.  The

Bank initially maintained that focus, with roughly two-thirds of its loans outstanding in

residential real estate and consumer loans in fiscal years 2004 and 2005.  But in 2006, RJBank

began to shift the balance in favor of commercial lending, which it viewed as more profitable

than individual lending, making loans to borrowers operating in the healthcare,

media/communications, consumer products and services, commercial real estate (including retail,

office space and warehouses), industrial manufacturing, and telecommunications industries.  By

the end of the 2006 fiscal year, the proportion of loans to individuals had fallen to approximately

58%, and would decline further in each of the next two years as well, as shown in the following

chart:

### RJBANK LOAN BREAKDOWN: FY 2004-FY 2008
(in 000s)

|  | FY 2005 | FY 2006 | FY 2007 | FY 2008 |
|---|---|---|---|---|
| **Total Commercial** | $313,192 | $960,977 | $2,785,287 | $4,601,420 |
| **% of Total** | 31.1% | 42.0% | 58.9% | 63.7% |
|  |  |  |  |  |
| **Total Individual** | $692,994 | $1,324,825 | $1,939,186 | $2,623,345 |
| **% of Total** | 68.9% | 57.9% | 41.1% | 36.3% |
|  |  |  |  |  |
| **Total** | **$1,006,186** | **$2,285,802** | **$4,724,473** | **$7,224,765** |

      39.    Because the limits on commercial lending were hampering the Bank's growth, in

the early part of 2007, RJBank applied to its primary federal regulator, the Office of Thrift

Supervision ("OTS"), for permission to exceed the commercial lending limitations normally

placed on thrifts.  By law, a thrift's commercial loans cannot exceed 300% of its tangible book

value.  In May of 2007, OTS granted RJBank a waiver, allowing its nonresidential loans to equal up to 600% of its total capital.

40.     Shortly after RJBank received its OTS waiver, RJF announced that it was taking steps to convert its form to a bank holding company, and to convert RJBank from a thrift to a commercial bank.  With this change, RJBank could engage in an even higher proportion of commercial lending, which RJF justified as having historically been more profitable and bearing less interest rate risk.

41.     As RJBank was undertaking its expansion, broader macroeconomic trends were beginning to reverse course.  Although the commercial real estate industry was still booming in mid-2006, with low vacancy rates, surging rents and construction flourishing, bank regulators were concerned that a downturn in commercial real estate was looming, and that the industry would soon follow the path of the falling housing market.  In fact, by the end of 2006, federal bank regulators were already concerned with levels of commercial lending, particularly in commercial real estate, and warned banks about high concentrations in this industry, particularly to the extent that the banks had expanded their lending without adapting and expanding the associated risk management practices.

42.     Specifically, the four federal banking agencies ("FBAs" or the "Agencies") – the Board of Governors of the Federal Reserve System (the "Fed"), the Office of the Comptroller of Currency (the "OCC"), the Federal Deposit Insurance Corporation ("FDIC") and the OTS issued a report in December 2006 entitled "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices" in which the Agencies warned banks regarding their "commercial real estate (CRE) concentrations[,] [which] ha[d] been rising over the past several years and ha[d] reached levels that could create safety and soundness concerns in the event of a significant economic downturn."  According to the Agencies, *all* commercial and savings banks had been

undergoing inordinate increases in commercial loan exposure. In the Agencies' view, this growth was a cause for serious concern, and accordingly, the Agencies issued the following message to lenders:

> [P]ast history has demonstrated that commercial real estate markets can experience fairly rapid changes. For institutions with significant concentrations, the ability to withstand difficult market conditions will depend heavily on the adequacy of their risk management practices and capital levels. In recent examinations, the Agencies' examiners have observed that some institutions have relaxed their underwriting standards as a result of strong competition for business. Further, examiners also have identified a number of institutions with high CRE concentrations that lack appropriate policies and procedures to manage the associated risk arising from a CRE concentration. For these reasons, the Agencies are concerned with institutions' CRE concentrations and the risks arising from such concentrations.

43.     RJBank, like the banks addressed by the Agencies, had similarly increased its exposure to commercial loans, particularly in loans secured by real estate. The Agencies categorized institutions that had doubled their commercial real estate exposures in the previous year as at risk. Based on this standard, RJBank was also at risk, because by the end of fiscal year 2006 (*i.e.*, the year ending September 30, 2006), RJBank increased its commercial loans secured by real estate by almost ***five times*** the value of such loans held just one year earlier. Despite the fact that this rapid expansion put the Bank at risk in the Agencies' view, the Bank did not take steps to expand its risk management capabilities accordingly. Thus, as discussed below, the conditions were ripe for the fraud that occurred in 2008 and 2009.

44.     Despite the new emphasis on commercial lending, RJBank still aggressively grew its residential loan portfolio. At the end of fiscal year 2005, RJBank had purchased or originated $689 million in residential mortgages. By the quarter ended December 31, 2007, RJBank carried nearly $2.3 billion worth of residential mortgages on its books, an increase of more than 50% from the $1.47 billion total a year prior.

45.    Although RJBank touted its stringent underwriting standards, its growth in residential mortgages was not without significant risk.  More than 75% of the Bank's residential loans were adjustable-rate "interest-only" mortgages, which are loans where the borrower makes interest payments for a specified period, *e.g.*, five years, but makes no payments toward the loan's principal balance.  As housing prices surged, interest-only mortgages became popular as they offered borrowers far lower monthly loan payments than conventional loans.

46.    But interest-only mortgages carried serious dangers.  As with other adjustable-rate loans, once the interest-only period ends, the borrower is then faced with a higher loan payment, as the payment would then include required reductions in outstanding principal.  While housing prices were soaring, banks and borrowers had assumed that the borrowers could simply refinance their homes when their interest-only period ended, taking advantage of the appreciation in value that had occurred while the payments included only interest.  This plan worked while the housing boom continued, but it began to fall apart once prices started to fall and interest rates started to climb.  Then, the borrowers who needed to refinance found that they could not do so, because they could not qualify for the higher interest rate financing.

47.    An additional risk of interest-only mortgages came with the fact that the borrowers were not reducing the loans' principal balance.  In a market with falling prices, a borrower who does not pay down any of his principal balance faces the risk that he will be "under water" at the end of the interest-only period, *i.e.*, the borrower will owe more on his loan than his home is actually worth.  When this situation occurs, the borrower has little incentive to repay the loan, leaving the lender to foreclose on a property worth less than the mortgage.

48.    The risks of interest-only mortgages were especially acute in real estate markets that experienced rapid but unsustainable increases in housing values followed by precipitous

falls, such as California and Florida.  Historically, around 10% of RJBank's total assets were loans to residential borrowers in those two states.

      **C.     RJBANK RECORDS LOAN LOSS PROVISIONS IN FISCAL YEAR 2007 COMMENSURATE WITH INCREASED RISK**

          **1.     Real Estate Markets Deteriorate And Problems Spread To Other Sectors Of The Economy**

    49.    By the end of 2007, the collapse of the U.S. housing market was more than apparent.  The median sale price for an American single-family house had *fallen*, the first such annual decline since the Great Depression.  Since 2005, the number of new and existing home sales had declined 30%, and housing starts had dropped 40%.  Moreover, in 2007, Moody's reported that the number of home sales was expected to decline by over 40% in early 2008, that housing starts would fall an additional 10%, and that home prices were expected to decline an additional 12% through early 2009.  Moody's also reported on the surge in home loan defaults through 2006 and 2007, with the number of defaults roughly doubling between the first quarter of 2006 and the fourth quarter of 2007.  Additionally, housing construction fell, with permits to build new homes at their lowest levels since 1995.  Several leading mortgage lenders sought emergency financing to stay afloat, but others were forced to file for bankruptcy protection.

    50.    Additionally, by 2007, the turmoil in the housing market had spread to other sectors.  Financial institutions that were not directly involved with mortgage lending were impacted.  Firms such as Bear Stearns and Goldman Sachs faced losses stemming from investments in mortgage-backed securities.  By early August 2007, the Federal Reserve Open Market Committee decided not to raise interest rates, citing tightening credit markets.  Two weeks later, the Fed cut the discount rate by half a point.

    51.    In the fall of 2007, the deterioration accelerated.  In early September, the Department of Labor reported a net loss in jobs for the month of August – the first time since

2003 – sending the Dow Jones Industrial average down 200 points in one day.  By mid-October, Federal Reserve Chairman Ben Bernanke predicted that the housing crisis would create "significant drag" on overall economic growth in 2008, a prediction that quickly came true. Throughout the fall of 2007, nearly every major financial institution reported enormous losses. In late November, the Commerce Department reported declining factory orders for the third consecutive month, the longest slump in close to four years.  Capping off the year, retailers reported the weakest December sales figures since 2002.  Then, in January 2008, the Labor Department reported the unemployment rate had risen from 4.7% to 5% in December, the largest increase since the immediate aftermath of September 11, 2001.

52.     RJBank's commercial borrowers were impacted by these trends.  The Bank's corporate and commercial loans were extended to borrowers in a range of industries, including consumer products and services, retail real estate, industrial manufacturing, telecommunications, media, and healthcare, all of which suffered from the fall-out of the housing crisis – which had morphed into a broader credit crisis –  and impacted the economy as a whole.

### 2.     RJBank Records Higher Loan Loss Provisions In Fiscal 2007 In The Face Of Loan Growth And Increasing Portfolio Risks

53.     Like other banks, RJBank records what is known as a reserve or allowance for loan losses.  A reserve for loan losses is capital that RJBank has set aside to account for potential losses stemming from the Bank's loans, specifically the risks of borrowers encountering difficulties in meeting their loan payment obligations.  RJBank's loan loss reserve is supposed to reflect the Company's evaluation of *all* relevant risk factors inherent in the Bank's loan portfolio, including the following: (1) economic conditions that may impact borrowers' ability to repay their loans; (2) regulatory and industry guidance; (3) default and foreclosure rates on similar loans; and (4) collateral values, *e.g.,* declines or increases in real estate values.  In addition, in calculating the appropriate reserve level, RJBank is required to account for growth in the Bank's

loan portfolio, as well as the risk concentration, *i.e.*, exposure to significant volumes of the same types of loans (*e.g.,* loans in the same industry, geographic location, etc.).

54.    Each quarter, RJBank makes a "provision for loan losses," adding to the Bank's total reserves as needed, to ensure that the Bank's reserves are at sufficient levels to account for all potential and foreseeable risks associated with the Bank's loans.  Every provision for loan losses is recorded as an expense on the RJF income statement; thus, a lower quarterly provision for loan losses results in a higher quarterly profit.  RJF also reports the loss provision and total loan loss allowance in its financial statements.

55.    In addition to reporting loan loss provisions and loan loss reserves, RJF reports RJBank's loan loss reserves as a percentage of the Bank's total loans.  The loan loss reserve percentage is an important metric for regulators, analysts, and investors, in assessing whether the dollar amount of the reserves is sufficient in light of the size of the overall loan portfolio.

56.    In fiscal year 2007, as RJBank aggressively grew its loan portfolios and faced regulators' warnings about commercial real estate, indications that the residential real estate markets were in serious trouble, and broader macroeconomic trends raising the prospect of a recession , RJBank recorded larger quarterly provisions to build up its loan loss reserves.  In particular, from the Company's third quarter to its fourth quarter of fiscal 2007, RJBank's total loans increased from $3.5 billion to $4.7 billion.  Accordingly, the Bank recorded a $19.1 million loan loss provision in its fourth quarter compared to a $6.2 million provision in the prior quarter, bringing the Bank's loan loss reserves from $35.6 million to $53.8 million.  Additionally, RJBank's loan loss reserve as a percentage of its total loans increased from 1.03% in the third quarter to 1.15% in the Company's fourth quarter.

57.    In contrast to fiscal year 2007, when RJBank set aside larger reserves in the face of increased risks in its growing loan portfolio, in fiscal year 2008, the Bank began to

intentionally record provisions that the Company knew were too low given the deteriorating economy and concomitant risks. As set forth below, through this scheme, Defendants sought to improperly boost RJF's profits.

### D.    OTHER RJF SUBSIDIARIES' EARNINGS SUFFER AS CREDIT CRISIS DEEPENS

58.    In the first quarter of fiscal year 2008 (*i.e.*, the quarter ending December 31, 2007), RJF started to feel the effects of the financial crisis as its principal non-bank segments – Private Client Group, Capital Markets, and Asset Management – began posting declining results. In the previous quarter, the Company's results had been boosted by Private Client Group, which had reported pretax income of more than $58 million and accounted for over 60% of the Company's earnings. In addition, in the previous quarter of fiscal year 2007 (ended September 30, 2007) earnings at all three segments helped to offset a more than $19 million loan loss provision recorded at RJBank.

59.    But in the first quarter of fiscal 2008, RJF's primary non-bank divisions began to falter. Overall, the three divisions reported total pretax income of $79 million, down from more than $88 million in the prior quarter. Capital Markets' pretax earnings were off by 70%, falling from $15.9 million in the fourth quarter of fiscal 2007 to $4.6 million in the first quarter of fiscal 2008. Private Client Group's earnings also declined by $2 million. James was quoted in a Company press release expressing the uncertainty faced by the financial services sector as a result of general market turmoil:

> The real question is whether the current market decline will worsen as a result of a combination of increasing risk of a recession and higher rates of inflation. Although I do not claim to have a crystal ball, that risk has certainly escalated in recent weeks as employment statistics have weakened. If investor perception worsens and/or actual corporate earnings results manifest that reality, results in the financial services sector will continue to disappoint.

60.    The day after releasing results for its first fiscal quarter, RJF held its quarterly conference call with analysts. During the call, James again expressed concern regarding the

broader market's impact on some of the Company's divisions, saying, "I don't need to tell you if the stock market goes down, assets under management go down, investment banking activities go down. Eventually, commissions recede."

61. Indeed, in the following fifteen months, RJF's primary non-bank divisions continued on a course of decline, generally contributing lower earnings to RJF's bottom line. For instance, Private Client Group, which had accounted for more than half of RJF's pretax income in fiscal 2006 and 2007, suffered a reversal in fiscal 2008. From the first to second fiscal quarters, Private Income Group's pretax income declined by $3 million, from $56 million to $53 million. At the end of the Company's third quarter, Private Client Group's income had fallen an additional $17 million dollars, from $53 million to $36 million, accounting for a mere 32% of RJF's total income, compared to 54% in the prior quarter.

62. Defendants desperately sought a way to stay afloat in the financial crisis that was rocking, and sinking, numerous banks and other financial institutions. Defendants needed to differentiate RJF from its peers, and they needed to find earnings somewhere to offset the shrinking earnings in RJF's Private Client Group, Capital Markets and Asset Management segments. Defendants turned to RJBank and its loan loss reserves as the solution.

## VI. DEFENDANTS' FRAUDULENT SCHEME

### A. RJBANK APPEARS TO OFFSET DECLINES IN RJBANK'S NON-BANK SEGMENTS BY TAKING INADEQUATE LOAN LOSS PROVISIONS

63. In the face of weakening performance at the Company's primary subsidiaries, RJF turned to one place where it could manipulate the data to produce the desired outcome – the Bank's loan loss reserves, which were determined based on public information as well as information only Company insiders possessed.

64. Confidential Witness #1 ("CW 1"), a Vice President in RJBank's commercial real estate department from July 2005 through June 2009, confirms that loan loss provisions and

reserves were an "integral part of operating" RJBank and were discussed "pretty extensively" at the highest levels of the Company and RJBank.  CW 1 also confirms that a "group" at RJBank discussed any loan loss reserve determinations with RJBank's Operating Committee, which includes, among others, top Company executives, including Defendants James, Julien, and Raney.  Confidential Witness #2 ("CW 2"), a former RJBank employee who started at the Bank well prior to the Class Period and was promoted to Senior Vice President at RJBank in February 2008 and remained in that position through July 2009, also confirmed that RJF was directly involved in RJBank's determinations of its quarterly loan loss provisions.

65.    RJBank's loan loss reserve, quarterly loan loss provisions, and loan loss reserve ratio were important figures on which investors focused. Thus, if these numbers deviated significantly from those reported by other banks (in relation to the size of the Bank's portfolio), investors and analysts would question whether the reserves were adequate.  However, as long as Defendants fraudulently conveyed the sense that the Bank was not vulnerable to the broader economic forces that were devastating other banks, Defendants could justify the Bank's minimal loan loss provisions.  In sum, by taking artificially low loan loss provisions, Defendants could ensure that RJBank reported more favorable results and thereby boost earnings for RJF as a whole.

66.    Throughout the Class Period, as part of the Company's fraudulent scheme, Defendants issued a series of materially misleading statements concerning RJBank's loan portfolio, loan loss reserves, and risk management practices, and intentionally concealed material facts known only to the Company that would have enabled investors to determine that RJBank's loan loss reserves were, in fact, inadequate.

67.    In particular, Defendants concealed the following: (1) the fact that the Bank was increasing risky commercial real estate lending at a time when that industry was contracting in

this area; (2) the risk that if one large loan defaulted, the Bank could take a substantial hit to its earnings – which risk materialized in April 2009, causing the Bank's previously-impressive earnings to fall into the red and causing the Company to miss analysts' forecasts; and (3) the fact that in order to provide meaningful guidance on the likelihood of default, the LTV ratios for the Bank's residential loans should have been adjusted to account for falling home prices.

68.    Defendants also misrepresented the extent that RJBank was better positioned than other banks to withstand the economic downturn, through misleading statements regarding (1) the Bank's purportedly conservative underwriting standards and avoidance of subprime residential mortgages; (2) the extent that the low average LTV ratio in the Bank's residential mortgages reliably indicated that the Bank's borrowers were unlikely to default; and (3) the Bank's purportedly minimal exposure to the same factors that were decimating the industry – residential mortgages to borrowers at risk of default and commercial loans to borrowers suffering as commercial real estate values plummeted and the recession's impact spread across the economy.

69.    Additionally, Defendants misrepresented the likelihood of extensive losses, through misleading statements regarding (1) the diligence of its risk management efforts; and (2) the Bank's purported practice of independently reviewing all loans on its books, regardless of whether the Bank originated the loans, including syndicated corporate loans in which the Bank was a participant.

70.    Lastly, Defendants deliberately and/or recklessly ignored information they regularly reviewed and evaluated (and were required to review and evaluate) in determining RJBank's proper loan loss reserve level, including: (1) warnings and assessments from federal regulators concerning deterioration of commercial real estate and other commercial loans; (2) information showing both the commercial and residential real estate markets continuing on steep

declines; (3) economic data indicating that the recession's impact had spread throughout the economy, hitting the retail, manufacturing, and services sectors – industries to which RJBank was heavily exposed through its corporate borrowers; and (4) information indicating vast disparities between RJBank and industry averages, including significant differences between RJBank's loan growth and its loan loss reserves and those of other banks.

71.    Significantly, RJF, in its 2008 10-K, stated that it takes these factors into consideration. Moreover, federal banking regulations mandated that Defendants consider this type of information, among other things, in assessing the adequacy of RJBank's loan loss reserves. For instance, in December 2006, the Agencies issued a bulletin to "Chief Executive Officers of All National Banks" requiring that all banks consider "qualitative or environmental factors that are likely to cause . . . losses" including "national, regional, and local economic and business conditions and developments . . . [and] the condition of various market segments" when making their loan loss determinations.

72.    Thus, from the Company's second quarter of fiscal year 2008 through its first quarter of fiscal year 2009, and with only one exception, RJF reported generally impressive financial results based on the purportedly strong performance of RJBank. Through Defendants' fraud, RJF was able to routinely exceed analysts' expectations for the Company during this time.

73.    For example, in the second quarter of fiscal 2008, RJF reported earnings of $0.50 per share, far higher than analysts' average estimate of $0.42 per share, based largely on the performance of RJBank, whose pretax income had nearly tripled from the same period in the prior year. In public statements, CEO James stated that the Bank's earnings were not "going to change" and that investors could expect "growth in those numbers."

74.    In the following quarter, RJF again managed to beat analysts' expectations as RJBank's pretax income rose by $12 million from the prior quarter, and *more than quadrupled*

from the same period in the previous year.   James publicly attributed the Company's performance to RJBank which, according to James, was "doing extremely well."

75.    Similarly, for the first quarter of fiscal 2009, RJF smashed analysts' estimates of $0.35 per share by reporting earnings of $0.52 per share.   RJF publicly attributed the results to the "outstanding performance by Raymond James Bank," whose pretax income increased more than $20 million from the prior quarter and accounted for 54% of the Company's pretax earnings, compared to 16% in the same period in the previous year.

76.    But this shift in RJBank's performance was illusory. It was solely the product of a concerted effort by Defendants and RJBank's executives to manipulate RJBank's results and counteract declines at the Company's primary non-bank divisions.

77.    As RJF reported outstanding quarterly results based on purported strong earnings of RJBank, the Company also reported loan loss reserves for RJBank that were out of line and *far lower* than the banking industry.   Indeed, for the second quarter of fiscal 2008, RJF barely increased[1] RJBank's loan loss provision from the previous quarter, despite a near-doubling of its non-performing loans, bringing the Bank's loss reserves to only 1.24% of the Bank's loans, compared to the industry average of 1.52%.   Similarly, the following quarter, when the non-performing loans more than tripled, RJBank's loan loss provision barely nudged up to 1.26% of all loans, compared to 1.80% at all FDIC-insured banks.

78.    To allay any potential investor concern that the Bank's loan loss reserves were too low, as stated herein, Defendants concealed material information, misrepresented certain material facts, and repeatedly assured investors that the Bank's loan loss reserves were "adequate to subsume any actual future losses."   At one point, after the Company reported earnings for its

---

[1] In fact, when unfunded lending commitments are excluded from the calculations, the loan loss provision **decreased** from the first quarter to the second quarter.

third quarter of fiscal 2008, James even told analysts and investors that the Bank's reserves may be too **_high_**, saying that the bank was likely "over-reserved" and that it had "far more reserves than we need."

79.    Defendants deliberately concealed certain information about the Bank's loan portfolio which might have tipped off investors that the reserves were far too low.    Only Defendants had the inside information regarding the mounting risks and nonperformance of RJBank's loan portfolio and, therefore, the ability to gauge whether the Bank's loan loss reserves were in fact accurate.    Without this knowledge, investors had no reason to suspect that Defendants were engaged in an ongoing scheme to deliberately understate the Bank's required loan reserves.

**B.    DEFENDANTS CONCEALED INFORMATION THAT WOULD HAVE SHOWN THE EXTENT OF RISK IN RJBANK'S LOAN PORTFOLIO**

**1.    Defendants Concealed RJBank's Continued Expansive Growth In Risky Areas**

80.    Contrary to the Company's repeated assertions that RJBank's reserve level was adequate, Defendants knew or were extremely reckless in not knowing that RJBank's loan loss reserves were, in fact, inadequate, given the continued expansion of RJBank's lending activities, and particularly its growth in risky commercial real estate loans.    More importantly, however, Defendants were only able to assure investors that RJBank's loan loss reserves were adequate by concealing the fact that, throughout fiscal 2008, RJBank was rapidly increasing its exposure to the riskiest commercial real estate loans, including loans to businesses that own and operate retail space, office buildings, apartment buildings, and warehouses – all of which were steadily losing tenants as rents plummeted (and real estate values fell) throughout 2008, and therefore were at a high risk of default throughout 2008 and early 2009.

81.     This growth was intentionally hidden from investors until RJF released its results for the second quarter of fiscal year 2009, when the Company changed the manner of presenting certain loan data.  As a result, investors and analysts could see for the first time how much of RJBank's commercial loan portfolio was related to real estate, and hence, how much had been at the highest risk during the prior year.

82.     Prior to the second quarter of 2009, in its quarterly earnings releases, RJF reported all of RJBank's commercial lending (*i.e.*, whether or not related to real estate) as one line-item:  Corporate & Real Estate Loans.  In its SEC filings, RJF broke down this category into three parts:  Commercial Loans, Real Estate Construction Loans, and Commercial Real Estate Loans ("CRE").  CRE included loans secured in part or entirely by real estate; thus, it included loans made to borrowers in the real estate industry ("Core CRE") (such as developers or owners of office buildings, retail space, and warehouses) as well as borrowers in industries completely unrelated to real estate, where the borrower's property was collateral for a loan that funded ongoing business operations ("Other Loans Secured By CRE") (such as retailers borrowing to purchase inventory or factories borrowing to purchase raw materials).  While all the CRE loans were at a higher risk of default as the real estate market and overall economy deteriorated, it was the Core CRE loans (as well as Construction Loans) that presented the greatest risk, as those loans were most directly impacted by the general downturn in commercial real estate.  Indeed, the OCC guidance issued in 2006, *see supra* at Section V. B., specifically noted that it was the Core CRE and Real Estate Construction Loans, not the other Loans secured by CRE, that were particularly at risk.  However, until April 2009, outsiders were not given the breakdown to ascertain Core CRE as compared to Other Loans Secured by CRE.

83.     Starting with the April 22, 2009 earnings release (for the second quarter of fiscal year 2009, ending March 31, 2009), RJF changed the breakdown in its disclosure of RJBank's

loans.  The Company began to break down the Corporate & Real Estate Loans into two categories:  Commercial Real Estate Loans (corresponding to Core CRE) and Corporate Loans (corresponding to Other Loans Secured By CRE and the other Commercial Loans).  With the belated disclosure of the Core CRE detail, investors could see that throughout fiscal year 2008 and the first quarter of fiscal year 2009, RJBank was steadily increasing its Core CRE lending, while the rest of the industry was retrenching and while the Bank was slowing down the growth of its loans to other borrowers.  As a result, throughout the rest of 2008, Core CRE loans became an increasingly larger percentage of RJBank's loans, thereby increasing the riskiness of the Bank's overall portfolio.  The chart below shows the growth in Core CRE compared to Other Loans Secured By CRE, and Total CRE.

<div align="center">

**Growth in Core CRE**
**(in millions)** [1]

</div>

| Period | Core CRE Loans | Core CRE Loans Q-on-Q Change % | Other Loans Secured By CRE | Other Loans Secured By CRE Q-on-Q Change % | Total CRE Loans Including Real Estate Construction Loans | Total CRE Loans Q-on-Q Change % |
|---|---|---|---|---|---|---|
| Q2 08 (3/31/08) | $ 920 | | $2,073 | | $3,241 | |
| Q3 08 (6/30/08) | $1,092 | 18.7% | $2,084 | 0.5% | $3,481 | 7.4% |
| Q4 08 (9/30/08) | $1,189 | 8.8% | $2,340 | 12.3% | $3,875 | 11.3% |
| Q1 09 (12/31/08) | $1,402 | 18.0% | $2,459 | 5.1% | $4,244 | 9.5% |
| Q2 09 (3/31/09) | $1,407 | (0.3%) | $2,261 | (8.0%) | $4,042 | (4.8%) |

[1] prior to the quarter ending March 31, 2009, RJF did not disclose this breakdown in its earnings releases

84.    As the chart above indicates, during the period from March 31, 2008 through March 31, 2009, RJBank's Core CRE loans – *i.e.*, those with the highest risk among its

commercial loans – grew from $920 million to $1.4 billion (a 53% increase), while total CRE loans increased from $3.24 billion to $4.04 billion (roughly a 25% increase). Thus, unbeknownst to investors, RJBank was ramping up the lending that was the most vulnerable to the collapse of the commercial real estate market, while slowing down growth in other more conservative (and less risky) lending, and even decreasing the amount of outstanding loans in some sectors. Concealing this growth enabled Defendants to also conceal the increased risks the Bank was assuming. Further, by concealing this increasing risk, Defendants were able to maintain the fiction that the Bank's reserves were adequate throughout fiscal year 2008 and the first quarter of fiscal year 2009. Had investors been able to see the growth in Core CRE as it was occurring, investors would have questioned the Company's low quarterly loan loss provisions and concluded that the Bank needed to significantly increase its loan loss reserve.

85.     Instead, investors were only apprised of RJBank's growth in these risky loans in April 2009, just days after learning that the Company would be forced to record a $75 million provision expense, which included a $28 million charge-off from one of these risky commercial real estate loans.

86.     Throughout fiscal year 2008 and the first quarter of fiscal year 2009, Defendants knew they would continue expansion into commercial real estate loans, particularly Core CRE loans, but deliberately concealed this growth. Thus, Defendants deceived investors as to the extent of likely defaults, and , with it, the adequacy of the Bank's loan loss reserves.

### 2.     Defendants Concealed The Extent Of Loss That One Poorly Performing Loan Could Cause RJBank And The Company

87.     Defendants also concealed the fact that some of the Bank's commercial loans were so large that a default on only one of them would cause significant losses for the Bank and RJF. In fact, SEC Regulation S-K, Item 503c required that RJF disclose its "most significant risk factors" in its 10-K. Yet, in RJF's 2008 10-K, the Company touted to investors that

"RJBank does not have any significant concentration to any one industry or customer."  But as RJF investors would later discover at the end of the Class Period, this risk was significant as the Bank recorded a $28 million charge-off relating to only one commercial loan.  That charge, and the tripling of the Bank's loan loss provisions, sent the Bank's earnings into the red.

88.    In the period between March 31, 2007 and March 31, 2008, the magnitude of potential harm that one default could generate had multiplied.  As RJBank's commercial portfolio grew, the size of its loans grew as well, as evidenced by the total number of borrowers, which did not grow in the same proportion.  In the quarter ending March 31, 2007, the Bank's commercial loan portfolio was worth approximately $1.39 billion, with 146 corporate borrowers, an average of approximately $9.5 million per borrower.  A year later, as reported in the Company's earnings release for the quarter ending March 31, 2008, RJBank's commercial loan portfolio had grown to $3.97 billion, with 222 corporate borrowers, for an average of $17.9 million per loan.  While the size of the portfolio grew by 186% in that year, the number of borrowers grew by only slightly over 50%.  According to CW 1, for a "bank the size of Raymond James [Bank], they were taking, probably, more exposure on a single credit than most institutions would do."  Yet Defendants deliberately concealed the concomitant increase in risk generated by the increase in size of the Bank's loans and concentration among relatively fewer borrowers.

89.    Defendants knew or were extremely reckless in not knowing that such a large dollar amount of loans concentrated among a small population of borrowers created the significant risk that one loan default could have a significant impact on the Company's financial results.  Furthermore, this risk concentration was something the Company and RJBank were *required* to consider in determining the adequacy of RJBank's loan loss reserves and thus, the size of RJBank's quarterly loan loss provision.

90.     Yet Defendants concealed the potential impact of a single loan default, despite specific regulatory requirements that mandated disclosure of this risk.  RJF's public filings should have disclosed the effect that one borrower's default could cause have on the Company's earnings.  Had the Company clearly and fully disclosed to investors that a single commercial or corporate loan default could materially affect the Company's earnings, investors undoubtedly would have questioned RJBank's low reserve level.

> **3.      Defendants Concealed That The LTV Ratios Should Have Been Updated To Reflect Falling Housing Prices**

91.     Defendants further concealed that the outdated LTV ratios could not be considered in determining whether RJBank was likely to suffer material losses through residential mortgage defaults.

92.     Defendants reported what purported to be the LTV ratio of RJBank's average residential loan at the time of the origination of the loans.  An LTV ratio is the amount of a home loan as a percentage of the total appraised value of a home.  For example, if a borrower's home is worth $100,000, and RJBank lends the borrower $80,000, the LTV ratio of the loan will be 80% ($80,000/$100,000).  A *low* LTV ratio indicates a higher quality loan, because it means the borrower has significant equity in his or her home.  Similarly, if the value of the home falls to $90,000, the LTV ratio will rise to approximately 89% (not including any additional equity the borrower may have added in the interim).

93.     Defendants knew that LTV ratios calculated at the time of loan origination become outdated as the value of the property changes.  Defendants also knew (or were extremely reckless in not knowing) that housing prices were falling beginning in 2006, and more rapidly from 2007 through 2009.  Thus, RJBank's average LTV ratio was far higher than reported, based on rapidly declining housing prices.  Because a higher LTV ratio implies a higher risk of default,

the actual average LTV ratio would have revealed an increased risk of losses RJBank was likely to incur through its residential loans.

94.    Defendants did not, however, disclose the fact that the existing LTV ratios were outdated and were far higher than reported.  At a minimum, Defendants should have disclosed that the average LTV ratios they disclosed were of limited utility, or no utility, and that those reported ratios were much lower than the actual ratios, given the collapse of the residential housing market.  By this material omission, Defendants deliberately misled investors as to the strength of the Bank's residential mortgage portfolio.

C.    **DEFENDANTS MISREPRESENTED RISKS IN RJBANK'S LOAN PORTFOLIO AS WELL AS THE COMPANY'S RISK MANAGEMENT AND LOAN UNDERWRITING PRACTICES**

1.    **Defendants Misrepresented The Risks In RJBank's Residential Mortgage Portfolio**

95.    Defendants misled investors regarding the risk associated with RJBank's residential mortgage loans, falsely implying that by avoiding subprime loans RJBank had avoided virtually all risk of mortgage-related losses.  Moreover, in addition to concealing the outdated nature (and thus minimal or non-existent utility) of the LTV ratios, Defendants used the LTV ratios to mislead investors and misrepresent the Bank's risks.

96.    **First**, as discussed above, throughout the Class Period, RJF's quarterly press releases touted low LTV ratios for the majority of the Bank's home loans.  For instance, beginning with RJF's April 22, 2008 Press Release, the Company began reporting average LTV ratios below 70%.  By the quarter ended September 30, 2008, RJF indicated that RJBank's average loan had an LTV ratio of 64%.

97.    But the LTV ratios that RJF was reporting to investors were LTV ratios generated at the time the loans were originated.  Thus, knowing of the declining home value of loans within its portfolio, Defendants knew they were misleading investors into believing that RJBank's home

loans were higher quality and less risky than they in fact were. Indeed, only Defendants had the specific information on the current and true state of RJBank's home loans, which Defendants failed to disclose to investors. Particularly given RJBank's mortgage exposure in California and Florida, two states with the most severe declines in home values, the reported LTV ratios were materially misleading to investors. Investors would only learn that RJBank's home loans were not what Defendants held them out to be, when, in April 2009, the Bank had to double its loan loss reserves on its home loans, in part due to declining home values.

98.    *Second*, although mortgage-related losses were mounting throughout the industry and among both subprime and prime borrowers, Defendants continued to misrepresent the extent to which the Bank's own mortgage portfolio was also vulnerable to these same forces. By understating the risk stemming from its residential loan portfolio, Defendants were able to justify the Bank's lower loan loss reserves in comparison to the industry average.

99.    For example, during RJF's fourth fiscal quarter of 2008, mortgage delinquencies were up 30% across the country, existing home sales had fallen nearly 8% nationally from the previous year, and home prices were also down more than 11%. The picture was particularly grim in California, with home values down nearly 30% from the previous year, and delinquent home mortgages in California up nearly 50% in the same period. Similarly, in Florida, home values were down nearly 20% compared to the previous year, while delinquencies rose more than 40%. Given that 5.5% of RJBank's total assets were home loans in California, and 3.2% of the Bank's assets were home loans in Florida, the Bank had suffered substantial losses from its mortgages in these markets.

100.    Yet at the time, Defendants were publically reassuring investors that any nonperforming loans in RJBank's residential portfolio were insignificant and a "non-factor" that could not possibly have any impact on the Company's performance. Additionally, Defendants

touted the high quality of the borrowers and loans in the Bank's residential loan portfolio, thereby misleadingly suggesting that the Bank's residential loans were not subject to the losses generally accompanying the severe decline in the residential real estate market.  For example, during an April 22, 2008 interview on CNBC, James explained that the Bank had avoided subprime lending "so a lot of the direct losses that have been experienced by the major banks [RJBank hadn't] experienced."  Similarly, during an analyst conference call on July 23, 2008, James noted that the Bank's "[r]esidential loans [were] nominal [sic] way below industry averages" in losses.

### 2.    Defendants Misrepresented The Risks In RJBank's Commercial Loan Portfolio

101.    Defendants similarly misled investors as to the risks associated with the Bank's commercial loans.  In addition to concealing the Bank's growth in risky commercial real estate lending, as discussed above, Defendants trumpeted the superiority of the Bank's loan portfolio compared to the industry average.  Defendants denied that the Bank was experiencing any problems among its corporate borrowers, even as late as September 2008, well into the recession, and touted to investors that the Bank's reserves had put the Company in "a situation where we don't get unexpected surprises."  In April 2009, however, these statements were proven to be untrue, when the Bank had to triple its loan loss provision and its nonperforming loans more than doubled compared to the previous quarter.

102.    Moreover, Defendants did not provide investors with information that would have enabled them to look beyond the claims that all was well and learn that the reserve levels were inadequate.  In its quarterly earnings releases, RJF reported the industry concentration among its corporate loans, listing the top five industry categories measured by dollars outstanding as a percentage of RJBank's total assets.  For example, in the third quarter of fiscal year 2008 (ending June 30, 2008), the Bank's outstanding retail real estate loans were valued at 3.4% of the Bank's

total assets, making this category the fourth largest among its commercial borrowers.  But this information alone would not have enabled an investor to determine the extent of risk within the Bank's portfolio or, from there, the appropriate level of loan loss reserves.  One would have to know where the retail borrowers were located and who their retail tenants were to know how much their business was suffering due to the overall market decline.  Stores in states or cities hit hardest by the recession would have had higher vacancy rates, leading to fewer and/or lower rent payments, and, for RJBank, more loan defaults from borrowers trying to lease those spaces.  Indeed, Raney acknowledged the necessity of considering these details in the July 23, 2008 analyst conference call, noting that the reserves for the Bank's corporate loans are "based on the risk profile of each individual loan."

103.    While such detail is necessary for determining the likelihood of default and the appropriate level of reserves to set aside to cover such likely losses, only RJF and RJBank insiders had such information.  For example, Raney explained during the July 23, 2008 analyst conference call that the Bank based reserves on an analysis of the risk probable for "each individual loan" and James noted that with certain risky commercial real estate loans, the Bank "ha[d] tended to mark them down the instant they there [was] any question about any problems dealing with them."  But RJF did not disclose this level of detail.  Thus, the outside world could only rely on the representations of RJF and the Individual Defendants that the appropriate reserves had been set aside.  As it turns out, investors were deceived, and the risks had been present all along, requiring higher reserves from the second quarter of fiscal year 2008 through the first quarter of fiscal year 2009.

### 3.    Defendants Misrepresented The Adequacy Of RJBank's Risk Management And Loan Underwriting Practices

104.    During the Class Period, Defendants repeatedly asserted that the Company employed highly conservative risk management practices and that, for the Company, "risk

34

management is key." Despite these assurances, RJF's management of RJBank was anything but conservative. RJBank's loan loss provisions showed a knowing and reckless disregard by RJF of industry conditions and regulators' warnings, particularly in light of RJBank's continued explosive loan growth in commercial and residential real estate, at a time when other lenders were decreasing their exposure.

105. If the Bank's risk management practices had been adequate – as stated – the Bank would have made larger loan loss provisions throughout fiscal year 2008 and the first quarter of fiscal year 2009, thereby obviating the large increase in the loan loss provision in the second quarter of fiscal year 2009, which took investors by surprise and caused RJF's stock price to plummet. But worse still, throughout the Class Period, RJF misrepresented the Company's and RJBank's risk management and loan underwriting practices in order to convince investors that the Bank's loan loss reserves and quarterly loan loss provisions were adequate.

### a.    RJF Misrepresented RJBank's Loan Underwriting Practices

106. In fiscal 2008, the Company repeatedly sought to distance itself and RJBank from the purportedly "inadequate underwriting standards and other lax management policies" of other banks that were reporting declining financial results. For instance, during the Class Period, the Company stated that that "[r]egardless of the source, all [commercial and corporate] loans are independently underwritten to RJBank credit policies" and that all of the Bank's corporate and commercial loans "are independently underwritten by RJBank credit personnel."

107. These representations were particularly important, since a large percentage of loans in RJBank's portfolio were purchased on the secondary market, *i.e.*, from banks and other lenders that originally extended the loans. Thus, to assure investors that these loans were high quality, RJF stated that RJBank's practice was to independently examine each loan as if the Bank were originating the loan itself.

108.    However, RJBank did not independently underwrite all of its loans and, as a result, assumed a risk that diligence by third parties would be inadequate.  In April 2009, this risk materialized when RJF reported that the Bank was taking a $28 million charge-off on "one specific loan to a commercial mortgage real estate investment trust." According to CW 2, RJBank had not independently underwritten that loan, but instead relied on the primary bank to perform "due diligence" on the loan.

109.    Had investors known that RJBank relied on other banks to evaluate the quality of RJBank's loans, particularly large commercial real estate loans that could severely impact the Company's bottom-line, investors would have factored this increased risk into their valuation of RJF and its stock, and may have also recognized that RJBank's low loan loss reserve levels were inadequate because RJBank could not be confident that the Bank's borrowers could sustain their payments.

**b.    The Company Knowingly Or Recklessly Devoted Inadequate RJBank Resources To Risk Management**

110.    During the Class Period, Defendant James repeatedly represented to investors that RJF held "risk management" sacrosanct, but this assertion was belied by the Company's staffing of RJBank.  Indeed, from 2006 to 2008, as RJBank's total loans increased by more than 300%, RJBank's full time staff increased only 25%, to a mere 84 total employees.  But these figures alone were not enough to arouse investors' suspicions, particularly in light of James's and RJF's repeated assertions that RJF did not engage in "lax management policies" and considered risk management "key."

111.    As investors would later learn, throughout the Class Period, the Company's and RJBank's focus had been on loan growth as opposed to managing risks in the Bank's portfolio. On May 12, 2009, *after* the Company announced its disappointing second quarter 2009 results, James and Raney stated in an investor presentation that "[t]he focus of the bank ha[d] shifted to

portfolio oversight from loan growth," and that the Company and Bank would now undertake "[a]ggressive credit management," with "more frequent loan reviews, and increased scrutiny of new loans." Thus, James and Raney belatedly acknowledged that their representations concerning the Company's and RJBank's emphasis on risk management had, in fact, been false and materially misleading.

### D. DEFENDANTS DELIBERATELY IGNORED ECONOMIC DATA AND REGULATORS' WARNINGS AND ANALYSIS IN ASSESSING THE ADEQUACY OF RJBANK'S LOAN LOSS RESERVES IN ORDER TO CREATE THE APPEARANCE OF PROFITABILITY

112. Throughout the Class Period, Defendants deliberately and/or recklessly disregarded important information they were required to consider (and which investors assumed Defendants considered), such as external data sources and benchmarks, when determining the appropriate level of loan loss reserves the Bank should hold.

113. As explained in RJF's 2008 10-K, in determining the appropriate level of reserves

[t]he factors taken into consideration . . . include estimates of borrower default probabilities and collateral values; trends in delinquencies; volume and terms; changes in geographic distribution, lending policies, local, regional, and national economic conditions; concentrations of credit risk and past loss history.

114. Thus, Defendants were required to take into account macroeconomic data indicating that the recession's impact had spread throughout the economy, hitting the retail, manufacturing, and services sectors – industries to which RJBank was heavily exposed *vis-à-vis* its corporate borrowers, as well as other information showing that both the commercial and residential real estate markets were continuing on steep declines, putting at risk any lender with loans secured by real estate. Defendants received (or at least had access to) numerous warnings from federal regulators concerning the deterioration of commercial real estate and commercial loans and reports providing industry-wide trends, and were bombarded with other news items, reports and public information that showed material divergences between, among other things, RJBank's loan growth and loan loss provisions compared to those of other banks.

115.    In sum, as CW 2 stated, executives within the Company "certainly knew what they were doing" when assessing loan risks and determining the adequacy of RJBank's reserves. Yet during the Class Period, Defendants deliberately  ignored information that they possessed and were required to consider in determining the appropriate level of loan loss reserves.

116.    By the end of the second quarter of fiscal year 2009, as the Bank was faced with mounting defaults across its portfolio including one particularly large loan in the commercial real estate sector, Defendants could no longer continue their scheme.  The losses were too great, and had built up for too long.  The ongoing scheme to keep reserves artificially low in order to artificially inflate the Bank's (and RJF's) earnings required massive correction.  Defendants announced that the Bank had to triple its loan loss provision, attributing this sudden change of course to, among other things, "deterioration of commercial real estate values during the March quarter" and "declining residential property values."  Significantly RJF did not attribute the tripling of the loan provision to events and conditions confined to the immediate preceding quarter.  Rather, Defendants vaguely told investors that the Bank's "corporate borrowers whose business is highly dependent on consumer spending" had "led to an abnormally high level of provision for loan losses and charge-offs" at the Bank, but did not state that problems at corporate borrowers had occurred only in the March quarter.

117.    Indeed, the commercial and residential real estate and broader economic declines that the Company blamed for its losses had started in 2006, accelerated in 2007 and hit the financial industry and RJF hard in 2008.  The reasons for RJF's huge increased loan loss reserve had existed well prior to the quarter preceding the April 2009 announcement, and were well known within the Company and the financial industry for years.  Defendants simply chose to ignore these facts throughout the Class Period, in order to boost profits at the Company and beat analysts' expectations.

### 1. RJF Knowingly And/Or Recklessly Disregarded Regulatory Warnings And Assessments

118.    Throughout the Class Period, Defendants knowingly and/or recklessly disregarded regulatory and industry warnings regarding the losses that all banks were likely to suffer through their lending activities.  Indeed, according to CW 2, RJBank paid "close attention" to the information provided by regulators and would look to federal regulators for "the most current information on a troubled sector" when making loan loss reserve determinations.

119.    Moreover, industry and regulatory guidance is precisely the type of information that banks, such as RJBank, are required to consider and incorporate into their determination of the appropriate loan loss reserve level and quarterly loan loss provisions.  But Defendants disregarded these warnings in order to set aside inadequate loan reserves, despite public representations to the contrary.

120.    For example, on January 31, 2008, at the beginning of RJBank's second fiscal quarter of 2008, John C. Dugan ("Dugan"), the Comptroller of Currency, gave a speech to the Florida Bankers Association concerning concentrations in commercial real estate.  Defendant Raney sits on the Florida Bankers Association's Board of Directors, and RJBank's Senior Vice President and Chief Compliance Officer, Nancy McCarthy, is a member of the organization.  During this speech, Dugan reaffirmed regulators' concerns about growing concentrations of commercial real estate loans at banks, and delivered the following message to lenders:

> I want to emphasize today, as we see the clear signs of CRE credit quality declining, that we will expect banks with CRE concentrations to make realistic assessments of their portfolio based on current, changed market conditions. That may require you to obtain new appraisals. ***For those of you in stressed markets, it will almost certainly require you to downgrade more of your assets, increase loan loss provisions, and reassess the adequacy of bank capital.***

(emphasis added). Despite this direct instruction to increase loan loss reserves, RJBank's loan loss provision for the quarter ending March 31, 2008 actually *decreased* (excluding the provision for unfunded commitments).

121. Similarly, on October 8, 2008, the federal Agencies released their annual Shared National Credit ("SNC") review, entitled "Shared National Credits Program Reports Large Increase in Credit Volume and **Significant Deterioration in Credit Quality**." (emphasis added) (the "SNC Report"). In the SNC Report, the Agencies classify SNCs, which are syndicated loans of $20 million or more that are shared by three or more national banks, in one of the following four categories, among others: (1) "Substandard," which is a loan "inadequately protected by the current sound worth and paying capacity of the" borrower that has a "well-defined weakness or weaknesses"; (2) "Doubtful," which is defined as a loan that has "all the weaknesses inherent in one classified Substandard, with the added characteristic that the weaknesses make collection . . . highly questionable and improbable"; (3) "Loss," which are loans "considered uncollectible and of such little value that their continuance as bankable assets is not warranted"; and (4) "Special Mention," which are loans that "exhibit potential weakness, which may result in further deterioration if left uncorrected." Furthermore, the Agencies classify SNCs as "Criticized," which are all SNCs that are labeled in one of the four categories above.

122. In the SNC Report, the Agencies reported staggering increases in the industry in all Criticized-loan categories from 2007 to 2008. Substandard loan commitments increased 122%; Doubtful loans increased by 373%; Loss loans increased by 231%; and Special Mention loans skyrocketed 395%. Total Criticized loans increased 227% from the previous year, comprising more than 13.4% of all SNCs, up from 5% in 2007.

123. In 2008, 90% of RJBank's more than $4.5 billion of non-residential loans were SNCs. Thus, the SNC Report, which gauged "emerging risks at large banks, including

underwriting and industry performance trends," signaled that RJBank was likely to incur significant losses through its SNC loans. And CW 2 confirmed that the SNC Report was a standard guide in the industry that provided useful information for RJBank decisions regarding the Bank's loan loss reserves. Accordingly, RJBank was required to consider the information reported by the Agencies. But because increasing the reserves would have harmed the earnings of RJF, Defendants knowingly or recklessly disregarded the regulators' assessment.

124.    In sum, Defendants consciously disregarded regulators' warnings and assessments and caused RJBank to make only paltry additions to its loan loss reserve during the periods in which these reports were issued as well as subsequent periods, even though the Bank's loan portfolio was vulnerable to the same factors cited in these warnings and assessments.

### 2.    Defendants Ignored Severe Declines In Commercial And Residential Real Estate

125.    Throughout the Class Period, Defendants received information indicating that both commercial and residential real estate markets were spiraling downward, indicating that RJBank's commercial and residential real estate loans were at increased risk of default. Indeed, according to CW 2, during his tenure at the Bank, he and Bank personnel relied on numerous sources to monitor real estate prices and trends and that, in particular, the Bank made every effort to stay ahead of information pertaining to the real estate sector.

126.    For instance, the Moody's/REAL Commercial Property Price Index (the "Moody's Index"), which documents prices in completed commercial real estate transactions, showed that commercial real estate values had fallen off a cliff, declining more than 11% during the first through third quarters of RJF's fiscal 2008 alone. According to CW 2, the Moody's Index was both utilized at RJBank and accessible on a daily basis.

127.    In addition, C.B. Richard Ellis Group Inc., the world's largest commercial real estate brokerage, reported that commercial real estate transactions had dropped 40% to 45% from the previous year.

128.    Similarly, trends in the residential real estate market indicated that RJBank was likely to suffer significant rates of default – and losses – through its residential mortgages, yet Defendants chose to ignore these trends.  For instance, in January of 2008, the median home price fell for the sixth straight month, experiencing the largest one-month drop in the 20-year history of the S&P/Case-Shiller index.  CW 2 confirms that Bank personnel monitored this index.  Similarly, by the end of December 2007, more than *one in 50* mortgages was in the foreclosure process, the highest rate ever recorded by the Mortgage Bankers Association.  By June 2008, the Mortgage Bankers Association reported that more than one million homes were in foreclosure, for the first time in history, and the Association predicted that foreclosures would continue to rise.

129.    Worse still, in California, home values fell nearly 30% from the previous year, while delinquent home mortgages rose by nearly 50% in the same period.  Similarly, in Florida, home values were down nearly 20% compared to the previous year, while delinquencies rose more than 40%.  Given that nearly 10% of RJBank's total assets were home loans in California and in Florida, the Bank was vulnerable to substantial losses from its mortgages in these markets.

130.    Ultimately, of course, the declines in commercial and residential real estate that Defendants chose to ignore materialized in non-performance in RJBank's loan portfolio.  In April 2009,  RJBank was finally forced to take a $75 million provision for loan losses related to losses in commercial and residential real estate.

### 3. Defendants Knowingly Disregarded Broader Macroeconomic Indicators That Signaled That Widespread Losses Were Imminent

131. By the first half of 2008, the carnage from the real estate market was spreading to the broader economy, indicating even larger losses were on the horizon. And the situation deteriorated as 2008 progressed. RJF's 2008 10-K states that RJBank reviews "national economic conditions" in performing loan loss determinations, and CW 2 confirms that certain economic indicators were factored in loan loss determinations at RJBank. Yet Defendants, who studied these indicators as part of their loan loss reserve and quarterly provision determinations, chose to ignore these warnings signs entirely.

132. In early 2008, the U.S. Labor Department announced that the national unemployment rate had increased from 4.7% to 5%, and from March through December, the unemployment rate rose every month, eventually topping 7.2% in December 2008. Additionally, as early as March 2008, Federal Reserve Chairman Ben Bernanke predicted that the economy could contract – in other words, that a formal recession was possible. (Later, economists recognized that a full-scale recession had actually begun in December 2007.)

133. In April 2008, the Federal Reserve noted that "household and business spending has been subdued and labor markets have softened further . . . and [that] financial markets remain[ed] under considerable stress."

134. In this environment, it was clear that many industries – not just real estate – were suffering and would experience greater hardship as the recession continued. The Bank's corporate borrowers were concentrated in (1) consumer products and services; (2) industrial manufacturing; (2) telecommunications; (3) healthcare (excluding hospitals); and (4) retail real estate. At any given time during the Class Period, loans to borrowers in these sectors comprised roughly 15% of the Bank's total assets, and more than 30% of the Bank's corporate loans. Because all of these industries were seeing demand fall in light of the "subdued" consumer,

household and business spending, as detailed below, the risk of default among the Bank's corporate borrowers was increasing throughout 2008. Accordingly, RJBank was increasingly likely to suffer losses from its corporate loans.

135. For example, from the beginning of 2008, the retail sector showed worrisome signs. December 2007 holidays sales had been their weakest in half a decade. By mid-2008, there were no longer any doubts. For instance, on October 15, 2008, the Dow dropped 733 points in one day, then its worst percentage drop since October 1987, based on a Commerce Department report that retail sales had fallen 1.2% in September, the worst performance since August 2005. This downturn marked the third consecutive monthly decline, the longest such streak since records began in 1992.

136. Similarly, in mid-November 2008, the Commerce Department reported the **largest ever plunge** for retail sales, a drop of 2.8%, the worst monthly drop since the Commerce Department began using its current measurement standard in 1992. By December, retails sales had fallen precipitously for six straight months.

137. The downturn in retail sales also impacted retail real estate, *i.e.*, shopping malls and other spaces occupied by retailers, since the health of shopping malls directly depends on the success of the retailers who occupy them. As early as January 2008, industry insiders painted a bleak picture for retail real estate. In January, CoStar Group, Inc. ("CoStar") published a report stating that 2008 would be marked by, among other things, "[r]ising vacancy . . . lower retail property sales transaction volume . . . declining customer traffic and lower sales for retailers at shopping centers." CoStar's conclusion: "Unfortunately, little relief is in sight."

138. In June, Real Capital Analytics reported that investment sales of retail real estate properties were down 70% in May 2008 compared to the prior year. In July, ICSC reported similarly grim news, projecting "nearly 144,000 establishments (about 36,000 per quarter) to be

shuttered in 2008, which is up 7% from the prior year and the largest increase in at least 14 years for which these data exist."

139.    The picture in manufacturing was equally bleak.  Beginning in February 2008, and for every successive month in 2008 without exception, the PMI index, which is considered the indicator of manufacturing industry health and performance, was below 50, indicating that the manufacturing industry was performing poorly and in a period of contraction.  In October 2008, the PMI index for September 2008 dropped to 43.5, the lowest number since October 2001.  Lindsey Piegza, an FTN Financial market analyst was quoted saying, "Manufacturing could be on the brink of collapse.  There are no orders, no jobs and there is really no incentive for businesses to invest."

140.    The following month, the PMI index fell to 38.9, the worst reading since September 1982, when the country was near the end of a 16-month recession.  By December 2008, the PMI index fell to 32.9, the worst number ever recorded since the index's inception in 1948.

141.    As with consumer products and services, retail real estate, and industrial manufacturing, the telecommunications and healthcare sectors experienced severe downturns throughout 2008.  As an example of the overall declines in these sectors,  from January 2008 to November 2008, the Dow Jones U.S. Telecommunications Index as well as the Dow Jones U.S. Health Care Index , key indicators of the performance of the telecommunications and healthcare sectors, were down 40% and more than 30%, respectively.

142.    CW 2 confirmed that RJBank monitored the performance of these specific industries.  Yet, despite clear signals indicating that economic problems had crept into the very sectors to which RJBank's borrowers were exposed, Defendants steadfastly disregarded this

obvious deterioration, instead keeping RJBank's loss reserves at inadequate levels in order to boost Company profits.

> **4.      Defendants Ignored The Risks Inherent In RJBank's Growth Which Defied Industry Trends**

143.    In fiscal 2008, while other lenders were drastically slowing down loan growth in the face of a rapidly evaporating real estate markets and a deteriorating economy, RJF pushed RJBank to continue expanding its commercial and residential lending.  But Defendants ignored the discrepancy between RJBank's significant growth and low loan loss provisions, as well as the discrepancy between those figures and those reported for other banks.  Indeed, according to CW 2, information concerning the Bank's competitors was certainly monitored.

144.    For instance, Defendants ignored the disparity between the growth in loans at RJBank as opposed to growth in the industry.  From the first quarter to the second quarter of fiscal 2008, RJBank's commercial and residential loan portfolio grew by 9.5% to exceed $6 billion in total loans, while industry-wide commercial and residential lending was barely up 1.0%.  The following quarter, RJBank's commercial and residential loans increased more than 8%, while the industry saw a 0.2% *decrease* in similar lending.  This vast divergence between RJBank and the industry continued, and by the end of fiscal year 2008, RJBank had increased its commercial and residential portfolio by more than 25%.  At the same time, the industry had contracted during the economic crisis as commercial and residential lending had increased by only 0.5%.

145.    The beginning of fiscal year 2009 was no different.  In the first quarter of fiscal 2009, RJBank increased its commercial and residential loan holdings by 8.5% to $7.8 billion in total loans.  By comparison, the industry *decreased* lending by 0.4%.

146.    Despite the fact that RJBank's loan growth was far above and out of line with the industry, Defendants recklessly ignored these discrepancies and failed to increase the Bank's reserves to accommodate the Bank's rapid growth.

### 5.    Defendants Recklessly Disregarded The Risks That Ongoing Manipulation Of RJBank Would Ultimately Imperil The Company

147.    Throughout 2008 and early 2009, the consequences of the financial meltdown and the recession were causing substantial losses for the banking industry.  Whereas other banks were taking increasingly significant loan loss provisions in the wake of mounting losses, Defendants chose not to make similar adjustments, since doing so would have undone Defendants' scheme. In order to retain the appearance of a profitable Company, Defendants ignored the vast differences between RJBank's quarterly provisions and reserve levels and those of other banks.

### a.    Quarter Ended March 31, 2008

148.    Every quarter the FDIC publishes an industry report on the trends at thrifts and commercial banks.  In the FDIC's report for the quarter ending March 31, 2008 (RJF's second quarter), the FDIC painted a grim picture of the banking sector, including lower profits, significantly higher loan loss provisions, and significantly slower growth in loan volume.

149.    According to the report, "Deteriorating asset quality concentrated in real estate loan portfolios continued to take a toll on the earnings performance of many insured institutions."  Furthermore, "*Higher loss provisions* were the primary reason that industry earnings for the quarter totaled only $19.3 billion, compared to $35.6 billion a year earlier." (emphasis added).  The FDIC similarly reported that "institutions continue[] to build their loan-loss reserves," and increased reserves by 18.1% from 1.30% of all loans to 1.52%, "the highest level since first quarter of 2004."

150.    Yet RJBank's results differed materially from those of other banks as reported by the FDIC.  As a result, RJF's fortunes were boosted and the Company reported significantly higher earnings of $0.50 per share, up 164% from the previous year.  RJBank recorded a *lower* loan loss provision (excluding provisions for unfunded lending commitments), which declined more than 13% from the previous quarter.  In addition, RJBank's loan loss provision gave only a slight bump to its overall reserve, increasing the Bank's reserve ratio by only 0.09% to 1.24%, less than half the average industry increase of 17%.  At the same time, however, RJBank saw a more dramatic increase of nonperforming loans than the industry, with nonperforming loans as a percentage of total loans roughly doubling in that quarter, justifying an *increase* in the loss provision, not the decrease that RJBank had recorded.

### b.    Quarter Ended June 30, 2008

151.    For the quarter ending June 30, 2008, RJF's results again were a study in contrast compared to the industry.  According to the FDIC, "Insured commercial banks and savings institutions reported net income of $5.0 billion for the second quarter of 2008 . . . the second-lowest quarterly total since 1991."  The FDIC also reported that "[h]igher loan-loss provisions were the most significant factor in the earnings decline . . . absorb[ing] almost one-third (31.9 percent) of the industry's net operating revenue (net interest income plus total noninterest income), the highest proportion since the third quarter of 1989."  Additionally, the FDIC reported that over half of all commercial and savings banks reported "year-over-year declines in quarterly net income."  Lastly, the FDIC reported, the ratio of loan loss reserves to total loans "increased from 1.52 percent to 1.80 percent, its highest level since the middle of 1996."

152.    Where the industry showed an earnings decline, RJBank reported an increase in pretax earnings, up 47% from the previous quarter and more than 330% from the previous year. Where the industry saw materially higher loan loss provisions, the Bank's loss provision

increased only slightly. The Bank's loan loss reserve percentage barely inched up, from 1.24% to 1.26%, despite the fact that its percentage of noncurrent loans (compared to total loans) more than doubled for the second consecutive quarter.

153. Defendants ignored the significance of the vast differences between RJBank and the banking industry. Instead, Defendants continued their scheme of manipulating RJBank's results in order to beat analysts' expectations for the Company and report profitable results.

## VII. RJF FALTERS BUT DEFENDANTS CONTINUE TO CONCEAL THE EXTENT OF THE PROBLEMS

### A. RJF ANNOUNCES Q4 EARNINGS THAT FALL SHORT OF ANALYST PROJECTIONS, DESPITE CONTINUED MANIPULATION OF LOAN LOSS RESERVES

154. After the close of markets on October 21, 2008, RJF issued a press release announcing its results for its fourth quarter and fiscal year ended September 30, 2008. The Company reported quarterly net income of $49 million, or $0.41 per share, this time *lower* than analyst estimates of $0.51, and *lower* than the $0.59 per share from the prior quarter. Total nonperforming loans as a percentage of loans increased from the previous quarter from 0.54% to 0.82%. RJF increased its provision for loan losses to $19.8 million, bringing the total amount of reserves for loan loss to $97.3 million.

155. Net income for the year declined a modest 6% to $1.97 per share, which James attributed to "superb results in Raymond James Bank." Indeed, despite these threatening signs, James continued to portray RJF as being in a league above other financial institutions, noting that RJF had "successfully avoided almost all of the carnage suffered by the larger firms in the financial services sector through abstaining from participating in subprime mortgages, credit default swaps and high leverage."

156. In the report for the period ending September 30, 2008, the FDIC reported that "[t]he industry's ratio of reserves to total loans and leases increased from 1.81 percent to 1.95

49

percent, its highest level since the first quarter of 1995." By contrast, RJBank's loan loss reserve increased to 1.35% from 1.26% in the previous quarter. This lower level of reserves would have aroused suspicion if Defendants had not concealed certain information (such as the growth in commercial loans, particularly the Core CRE loans), misrepresented other information (such as the LTV ratios), and disregarded the losses likely to be seen in the Bank's residential portfolio (and the increasing risks in the Bank's commercial portfolio). In light of the risks that were in fact present at that time, RJBank was required to take a larger loss provision. Its failure to do so lulled investors and analysts into believing that RJBank could survive the credit crisis unscathed – a belief that was shattered when the truth was revealed the following April.

### B. RJF ISSUES MISLEADING PRESS RELEASE TO COUNTER QUESTIONS RAISED IN THE MEDIA

#### 1. November 10 *Barron's* Article Questions RJBank's Strength

157.    In the aftermath of the poor results reported in mid-October, investor confidence was shaken further after the publication of a November 10, 2008 article in *Barron's* titled "The Siren Song of Banking," by Sandra Ward. Ward explained that RJBank's growth had come at the height of the lending bubble, and that stresses were starting to show. She pointed to several areas for concern, including a high percentage of adjustable-rate mortgages within its residential portfolio and an uptick in the percentage of nonperforming loans.

158.    Ward also discussed RJBank's corporate loans in the telecommunications, retail property, consumer products and services, industrial manufacturing, and healthcare (excluding hospitals) industries, many of which were SNC loans. Citing the Agencies' October 8, 2008 review showing troubled credits jumping from 5% in 2007 to 13.4%, Ward suggested that RJBank's corporate loans might be similarly troubled. She also noted that in the past, the Company had repurchased its stock when the price declined, but was not doing so at this time, suggesting that within the Company, there were doubts as to the Company's future prospects.

159.    The bottom line, Ward concluded, was that the stock had declined sharply since September, and she concluded that the price could fall another 20% as "more of the bank's business loans and home mortgages go bad.  It holds many risky interest-only mortgages."  The article also mentioned that an analyst from Wachovia Capital Markets had downgraded the shares the prior week and quoted Sy Jacobs of JAM Partners in Manhattan, who expressed skepticism over the core business – retail brokerage – but also explained that "'the misunderstood part is the bank and credit risk at the bank.' It is only a matter of time before more serious loan problems develop, he believe[d]."

### 2.    RJF Issues False And Misleading Press Release In Response

160.    Concerned about fall-out from the November 10 *Barron's* article, RJF issued a press release the next day, allaying investors' concerns over article.

161.    The press release noted that "the article cited performance indicators that require clarification or correction."  RJF dismissed the concern over the increase in nonperforming loans from 0.54% to 0.82%, saying viewing percentage changes from small numbers is less meaningful than evaluating absolute levels.  The press release went on to say:

> Although, as noted in our earnings release, we anticipate higher charge-offs and non-performing loans levels going into fiscal year 2009, ***Raymond James Bank believes it will continue to outperform peer banks with regard to credit quality measures given its stringent underwriting criteria and portfolio monitoring***.  As we have reported in the past, ***we still anticipate that existing reserves are sufficient to encompass future charge-offs*** unless conditions materially worsen in the general economy.

(emphasis added).

162.    Yet as Defendants were telling investors that RJBank's loan loss reserves were more than adequate unless the economy materially worsened, they knew or were extremely reckless in not knowing, that conditions in the economy had already worsened considerably, and, moreover, that the very sectors to which the Bank were exposed were experiencing severe

downturns.  At various times during the Class Period, more than 30% of RJBank's commercial loans were extended to corporate borrowers operating in industries that, by October 2008, had already suffered dramatic declines and were showing no signs of recovery, as detailed above. *See supra* at Section VI. D. 3. The performance of these industries directly impacted RJBank's corporate borrowers' ability to pay back their loans and, in fact, was already impacting RJBank's borrowers.  Thus, the loan loss reserves were not adequate, and Defendants knew it.

## VIII.   RJF APPEARS TO MAKE A REBOUND

163.    On January 21, 2009, RJF announced its results for the first quarter of fiscal year 2009, ending December 31, 2008.  Once again, the Company beat analysts' estimates, reporting net income of $61.1 million or $0.52 per share.

164.    RJBank's performance was particularly impressive compared to the rest of the banking industry.  In its quarterly report, the FDIC found that the industry as a whole posted an aggregate net loss, for the "first time since the fourth quarter of 1990."  "Expenses associated with rising loan losses and declining asset values overwhelmed revenues in the fourth quarter of [calendar] 2008, producing a net loss of $32.1 billion at insured commercial banks and savings institutions."  Despite RJBank's exposure to the same industry risk, RJBank managed to report a 61% *increase* in earnings from its previous quarter and a 262% jump from the first quarter in the previous year, achieved in part by recording an insufficiently low loan loss provision for RJBank's loans.

165.    Furthermore, the FDIC reported that "growth in reserves, coupled with a decline in industry loan balances, caused the industry's ratio of reserves to total loans to increase during the quarter from 1.96 percent to 2.20 percent, a 14-year high."  Again, in sharp contrast to the industry, RJF increased RJBank's reserves to a paltry 1.36% of loans, from 1.23% the prior

quarter.[2]   Moreover, while the industry as a whole saw declining loan balances, RJF had increased its real estate loan portfolio by more than 8%.

166.   As in prior quarters, the Company was able to best its competitors only through the manipulation of RJBank's loan loss reserves.  Within one year, the Bank's nonperforming loans had increased by more than a factor of ten, from $6.2 million to $63.9 million, yet its reserves had only increased from $59 million (or 1.04% of loans) to $106 million (or 1.36% of loans).  Defendants repeatedly reassured the market that its performance was due to its superior loan performance and conservative lending and risk management practices.   However, Defendants knew or were extremely reckless in not knowing that the residential and commercial loans in RJBank's portfolio were not escaping the impacts of the credit crisis and the recession and that the Bank required a material increase in loan loss reserves.

## IX.     THE TRUTH IS REVEALED, AND THE BOTTOM FALLS OUT

167.   Defendants' scheme had worked for several quarters – they were able to cover declining earnings at various non-bank segments of RJF with increasing earnings at RJBank, generated through the manipulation of the Bank's loan loss reserves.  However, as the financial and housing crises continued, and got worse, the disparity between the Bank's actual reserves and the amount required to cover increasing risks, defaults and non-performance in the Bank's loan portfolio grew too big to cover through the fraud.  The Defendants' repeated failure during the Class Period to record appropriate provisions and loan loss reserves had accumulated and required a massive correction.

---

[2]RJF changed its presentation and calculation methodology beginning with the earnings release for the first quarter of fiscal year 2009 (*i.e.*, the quarter ending December 31, 2008).  Prior to the change, the Company had included the Bank's unfunded loan commitments when reporting reserves, the provision expense to increase reserves, and the loan loss reserve as percentage of loans, but beginning with the quarter ending December 31, 2008, the unfunded commitments were not included and the figures for previous quarters were adjusted accordingly.  Thus, in the October 21, 2008 earnings release for the quarter ended September 30, 2008, the loan loss reserve ratio was reported at 1.35%, but after the change in presentation and calculation, that figure was adjusted to 1.23%.

168.    On April 14, 2009, RJF shocked investors when it announced that results for the second fiscal quarter ended March 31, 2009 would be well below the consensus analysts' estimates of $0.37 due to significant losses at RJBank:

> [T]he dramatic deterioration of commercial real estate values during the March quarter, as well as credit exposures related to corporate borrowers whose business is highly dependent on consumer spending, led to an abnormally high level of provision for loan losses and charge-offs at Raymond James Bank ("the Bank"). Further, the Bank added to loan reserves against its residential loan portfolio given an increase in delinquencies and continued declining residential property values.

169.    The allowance for loan losses was expected to reach $142 million, or 1.83% of loans.  Nonperforming assets were expected to be $143 million.  As a result of the foregoing charges, RJBank was expected to incur a loss of $8 million for the quarter.  Moreover, preliminary results indicated a loan loss provision of $75 million, *triple* the loss provision of $25 million in the prior quarter, and more than that recorded during all of 2008, bringing the loan loss reserve to $141 million from $106 million in the prior quarter.  Total charge-offs were reported at $40 million, of which $28 million was a purportedly "unexpected" charge related to a loan to one commercial real estate finance company (which the Company later identified as a "commercial mortgage real estate investment trust").  The $75 million provision also included charges related to its residential portfolio, with approximately $6 million in charge-offs and an $11.5 million charge to increase loan reserves, attributed to an increase in delinquencies and declining residential property values.

170.    Even though RJBank's residential loans comprised approximately 36% of the Bank's total loans, as was the case at the end of the prior quarter, the percentage of RJBank's reserve attributable to its residential loans increased substantially, jumping from 11% of the total reserve in the Bank's first quarter to nearly 17% in the second quarter.  Additionally, the $11.5 million reserve build was roughly one-third of the nearly $35 million increase.

171.    While RJF's press release blamed losses on "the dramatic deterioration of commercial real estate during the March" and "corporate borrowers whose business is highly dependent on consumer spending"[3] as detailed above, *see supra* at Sections VI. D. 1-2, commercial real estate values had been declining for more than a year before RJF's April 2009 announcement, and as early as January 2008, regulators had warned banks they would need to begin writing-down their commercial real estate loans.  Moreover, the economy had been in a recession since the end of 2007, while retail sales and other economic indicators were at their worst levels in decades.  Thus, none of these factors should have surprised RJBank or RJF.  Indeed, RJF's explanation was merely a post-hoc rationalization of Defendants' scheme which had caused RJBank to fail to adequately account for losses that had been foreseeable throughout fiscal 2008.

172.    In response to such an unexpected sharp increase in loan loss provisions, especially given the upbeat outlook on the bank from CEO James, investors sent RJF shares plummeting.  RJF closed at $16.49 per share on April 15, on unusually high volume, down $2.57 per share, or 13.48% from its close the prior day.  Over the next few days, RJF's stock price traded as low as under $15 per share, well below its Class Period highs of over $38 per share.

## X.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

173.    Throughout the Class Period, Defendants made numerous false and misleading statements concerning the value of RJBank's loan portfolio and as well false and misleading statements concerning the adequacy of RJBank's loan loss reserves and of its risk management practices.  Indeed, Defendants repeatedly reassured its investors that its loan loss reserves were sufficient to account for any foreseeable losses associated with its residential and commercial

---

[3] In the Company's April 22, 2009 press release, the Company added a "dramatic decline in values in the office and retail real estate space" as yet another vague and generalized reason for RJBank's losses.

55

real estate loans.  As was eventually revealed in April 2009, however, these reassurances were false and misleading, as explained below.

### A.     SECOND QUARTER ENDING MARCH 31, 2008

#### 1.     April 22, 2008 Press Release

174.    On April 22, 2008, the Company issued a press release entitled "RAYMOND JAMES FINANCIAL, INC. ANNOUNCES SECOND QUARTER RESULTS" (the "April 22, 2008 Press Release") for its fiscal second quarter ended March 31, 2008.  In the April 22, 2008 Press Release, James made the following false and misleading statement:

> Although our results are a pleasant relief from the incessant flurry of write-offs and negative earnings comparisons reported by a number of larger financial services companies, I'm frustrated by the fact that our results and those of many other ***conservatively managed financial institutions*** have been impacted negatively by fallout from inadequate underwriting standards and other lax management policies as well as a lack of regulatory oversight, ill-derived ratings and unregulated mortgage practices.

(emphasis added).

175.    Regarding the planned growth and loan loss reserves for RJBank, James went on to say:

> Of course, Raymond James Bank's reported profits were also dampened by the formulaic additions to reserves in excess of charge offs and before any earnings were generated by the growth in loan balances.  Both of these factors should have less impact in future quarters as overnight rates near a bottom and ***the planned growth rate of Raymond James Bank slows.***  To preempt the inevitable question related to credit quality, while absolute losses will increase somewhat in the near term related to fall-out from the sub-prime crisis and economic slowdown, ***we expect our reserves for losses at 1.24 percent of loan balances to be adequate to subsume any actual future losses*** relating to current market conditions."

(emphasis added).

176.    The April 22, 2008 Press Release included detailed results for RJBank.  The Company reported that for the quarter ending March 31, 2008, the average LTV of RJBank's residential first mortgages at origination was 68%.

2.    **April 22, 2008 CNBC Interview**

177.    On April 22, 2008, James appeared on CNBC's *Closing Bell* with Maria Bartiromo to discuss RJF's financial results for its second quarter 2008.  Bartiromo asked James, "How do you find that you have been able to escape some of the upset in the sector?" James replied, "Well, of course in our bank subsidiary we avoided subprime lending, so, a lot of the direct losses that have been experienced by the major banks we haven't experienced."

178.    Bartiromo later asked, "Do you feel like you're being lumped in with all of the other financial services companies there?" James responded, "I'd express some frustration about that because, you know, we have a very conservative management approach in our business and so we've avoided a lot of the problems, but I don't think we've been recognized for having done that."

3.    **April 23, 2008 Quarterly Analysts Conference Call**

179.    On April 23, 2008, RJF held its Quarterly Analysts Conference Call.  During the call, James made the following false and misleading statement concerning RJBank's performance:

> I would suggest to you that that ought to give you comfort that the earnings growth that you see in the Bank segment is not a harbinger of things that are going to change in the future, on the downside, rather, ***that we actually expect those -growth in those numbers***.

(emphasis added).

180.    James then commented on RJF's purportedly conservative approach to risk management:

> [W]e've always had a very conservative business model here, where risk management is key. And I chair the Compliance and Standards Committee that meets once a month and looks at every problem in the firm, and in the market generally, and tries to devise strategies to avoid systemic problems arising or continuing. And we've always had a very conservative balance sheet in terms of our approach to the business.

181.   Next, Julien made the following false and misleading statement concerning RJBank's residential loans: "[W]ith all of the screenings and scrubs we do on the residential mortgage pools, we have a[n] equally good credit profile there as we do on the commercial side in terms of superior statistics to the industry averages."

182.   James then went one step further and explicitly encouraged purchasing RJF stock:

> And the final thing I'd say is, at least our stock – and I don't normally say this just so you understand – our stock is inexpensive.  It's inexpensive enough that it triggered our own stock purchase mechanisms, it has initiated a lot of purchase activity among our associate employee base, and when I meet with my own associates when the market is – our stock is near highs, you will always hear me tell people, look, don't bet a lot on the company and in a market when things are overpriced. I mean, you have to pay attention to where the market is when you buy stocks.

> Quite the contrary today, ***I recommend that you can purchase our stock***.

(emphasis added).

### 4.    RJF's Statements Made In Relation To Its Q2 2008 Results Were False and Misleading

183.   The foregoing statements were false and materially misleading because Defendants knew or were extremely reckless in not knowing that RJBank's loan loss reserves were not adequate to account for the risks associated with the Bank's commercial and residential loan portfolios and that a substantial increase in reserves would at some point be required. Accordingly, the loan loss provision and total loan loss allowance were deliberately understated, and RJF's income was deliberately overstated.

184.   The foregoing statements were also misleading because Defendants concealed the fact that RJBank's exposure to risky commercial real estate was in fact growing, and that the Bank's home loans would see higher defaults in a deteriorating housing market.  Moreover, RJBank was not conservatively managed.  As RJF would later disclose in a May 2009

presentation, the Bank had actually been focused on loan production, and not risk management. Thus, risk management was *not* "key."

185.    Additionally, the April 22 2008 press release cited average LTV ratios for RJBank's residential borrowers that were misleading, implying to investors that RJBank's residential mortgages were safer and at a lower risk of default than they in fact were.  RJF included similar information regarding the Bank's average LTV ratio in its press releases for the quarters ending June 30, 2008 (issued on July 22, 2008); September 30, 2008 (issued on October 21, 2008); and December 31, 2008 (issued on January 21, 2009).  These press releases were similarly misleading in misrepresenting the quality of the residential loans by relying on LTV ratios calculated at origination.

186.    Further, James's statements during the CNBC interview were false and misleading because, contrary to James's assertions, RJF had not avoided losses experienced by other banks.  In fact, at the time of James's statement, RJBank, was subject to the same risks and losses as other lenders.  But RJF concealed these risks by making artificially low loan loss provisions and keeping RJBank's loan loss reserves at inadequate levels.

187.    Further, James's statements during the analyst call were false and materially misleading because RJBank's purported earnings were **not** expected to grow and were not something in which investors could take "comfort."  At the time of his statements, James knew or was extremely reckless in not knowing that RJBank would eventually have to substantially increase its loan loss reserves through far larger loan loss provisions, which in turn would harm the Company's "earnings growth."

188.    Lastly, James's statements were false and misleading because he explicitly advocated purchasing RJF's stock based on it being "inexpensive," even though James knew or

was reckless in not knowing that the Company's stock price was inflated based on the manipulated earnings of RJBank.

### 5.    RJF's Second Quarter 2008 SEC Form 10-Q

189.    On May 12, 2008, RJF filed its report for the second quarter of fiscal 2008 on SEC Form 10-Q (the "Q2 2008 Form 10-Q").

190.    In the Q2 2008 Form 10-Q, Defendants stated "RJBank provides for both an allowance for losses in accordance with SFAS No. 5 and a reserve for individually impaired loans in accordance with SFAS No. 114."

191.    The foregoing statement was materially false and misleading when made because, as discussed below, *see infra* at Section XI., RJF's Q2 2008 Form 10-Q failed to comply with GAAP.

192.    In addition, Defendants James and Julien certified that the information contained in the Q2 2008 Form 10-Q was accurate by signing a statement that said:

1. I have reviewed this quarterly report on Form 10-Q of Raymond James Financial, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

193.    Defendants James and Julien also certified that the information contained in the

10-Q was accurate by signing statements that read:

In connection with the Quarterly Report of Raymond James Financial, Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2008 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I . . . certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

194.    The Q2 2008 Form 10-Q was also false and materially misleading because (a) contrary to the statements of Defendants James and Julien, the Q2 2008 Form 10-Q *did* contain untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; (b) the financial statements and other information included in the Q2 2008 Form 10-Q did not "fairly present in all material respects the financial condition, results of operations and cash flows" of RJF; (c) as discussed in more detail in Section XI., *infra*, Defendants James and Julien failed to design proper control procedures to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements"; (d) Defendants James and Julien did not disclose "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting"; (e) Defendants James and Julien did not disclose fraud involving "management or other employees who have a significant role in [RJF's] internal control over financial reporting"; (f) the Q2 2008 Form 10-Q did not fully comply with the requirements of Section 13(a) and 15(d) of the Securities Exchange Act of 1934; and (g) the information contained in the Q2 2008 Form 10-Q did *not* "fairly present[], in all material respects, the financial condition and results of operations of the Company."

195.    The Q2 2008 Form 10-Q was also materially false and misleading because (a) Defendants omitted the fact that RJBank's loan loss provisions did not properly reflect the risks associated with its residential and commercial real estate loan portfolios; and (b) Defendants failed to disclose to investors the amount and growth RJBank's Core CRE holdings.

196.    RJF's Form 10-Q filings for the periods ending June 30, 2008 (filed on August 11, 2008); December 31, 2008 (filed on February 9, 2009); and Form 10-K filing for the fiscal year ending September 30, 2008 (filed on November 28, 2008), contained substantially the same

representations as those quoted above from the Q2 2008 Form 10-Q, and were materially false and misleading for the same reasons.

### B.    APRIL 25, 2008 INVESTOR DAY PRESENTATION

197.    On April 25, 2008, RJF gave the Company's annual Investor Day Presentation to analysts and investors.  During the discussion of RJBank, Defendants Raney as well as Moody – RJBank's Senior Vice President and Senior Credit Risk Executive – presented a slide show to the analysts that included the following false and misleading statement: "Loans sourced from agent or syndicate bank are independently underwritten by RJBank credit personnel."

198.    The foregoing statement was false and materially misleading because RJBank did not independently underwrite all of its loans.  Indeed, CW 2 confirmed that the commercial real estate loan that caused RJBank to record a $28 million charge-off in the Company's second quarter of 2009 was not independently underwritten by RJBank.  Instead, RJBank relied on the primary bank to perform due diligence on the loan.

### C.    THIRD QUARTER ENDING JUNE 30, 2008

#### 1.    July 22, 2008 Earnings Press Release

199.    On July 22, 2008, the Company issued a press release entitled "RAYMOND JAMES FINANCIAL, INC. ANNOUNCES RECORD THIRD QUARTER RESULTS," for its third quarter ended June 30, 2008.  The press release stated in part:

> In light of the continuing aftershocks emanating from the "earthquake" in the financial sector engendered by the subprime crisis, the record quarterly net revenues of $742 million and net income of $69.9 million, achieved in our 2008 third fiscal quarter, were gratifying.  Unlike our peers, we managed to slightly exceed the earnings results of last year's third quarter, which was previously our best quarter.

> * * *

> On the other side of the ledger, RJBank experienced excellent profit results, as we managed asset growth at a more sustainable level.  Hence, net revenues grew 174

percent to $62.5 million, generating pre-tax income of $38 million, up 335 percent from the third quarter last year.

* * *

[O]ur results prove the naysayers' forecasts of reduced revenues and profits for industry participants to be ill-founded . . . Corporations and individuals still require reliable sources of debt capital, which RJBank can provide.

200.    The press release further stated that "RJBank was categorized as 'well capitalized' under the bank regulation framework."

201.    The foregoing statements were false and misleading because Defendants knew or were extremely reckless in not knowing that RJBank's profits were the result of their improper manipulation and distortion of RJBank's loan loss reserves and quarterly loan loss provisions. Moreover, Defendants were not growing RJBank at sustainable levels.  In fact, RJBank was increasing its exposure to a deteriorating housing market and, as would only later be revealed, to risky commercial real estate loans.

202.    In addition, the July 22, 2008 press release was false and misleading because it stated that RJBank was well capitalized under the relevant bank regulatory framework.  As explained in more detail in Section XI., *infra*, RJBank was not well capitalized under relevant banking regulations during its third and fourth quarters of fiscal 2008.  All publically filed documents, including the July 22, 2008 press release (which was filed as an exhibit to an RJF SEC Form 8-K), that state that RJBank was well capitalized during either the third and/or fourth quarters of fiscal 2008 are false and materially misleading for this reason.

### 2.    July 22, 2008 CNBC Interview

203.    On July 22, 2008, James went on CNBC's *Closing Bell* with Maria Bartiromo to discuss RJF's results for the third quarter of its fiscal year 2008.  During the program,  James made the following false and misleading statement:

Commissions and fees were up about five percent, asset management was down somewhat due to the decline in assets under management as a result in the market decline in the June quarter, *but the bank did extremely well, as we had a very large increase in both revenues and net profits so it offset some weakness in investment banking.*

(emphasis added).

204.    James's statement was false and misleading because RJBank "offset" weaknesses in RJF's investment banking units through Defendants' knowing and intentional manipulation of RJBank's loan loss reserves and quarterly loan loss provision.  At the time of James's statement, he knew of or was extremely reckless in not knowing of the deterioration in the residential and commercial real estate markets to which RJBank was exposed and which would cause losses at the Bank, and knew or was reckless in not knowing that RJBank had not properly recorded a quarterly loan loss provisions to ensure RJBank's loan loss reserves accounted for those risks.

205.    Later in the program, James said the following:

We actually expect charge offs to go up a little bit on a nominal basis because of the size of the current balance sheet, *but we're still operating well within the reserves and I think we're in very good shape in terms of asset quality*.

(emphasis added).

206.    James's statement was false and materially misleading because James knew or was extremely reckless in not knowing that RJBank was not "well within" its reserves and further knew that the Bank's "asset quality" was deteriorating and not in "very good shape."

**3.    July 23, 2008 Raymond James Financial Analyst Conference Call**

207.    On July 23, 2008, RJF held its quarterly conference call.  During the call, the following exchange occurred between Goldman Sachs analyst, Williams Tanona, and Raney, RJBank's President and CEO:

**<Q - William Tanona>**: Okay, that's helpful. And then I guess on the reserve, I know you're obviously restricted in terms of the reserve build that you can ultimately do but, where do you ultimately think you're going to feel comfortable in terms of reserves to kind of loans? If I look at your reserve and kind of

compare it to a lot of the other banks you guys seem to be at the low end of that range, I'm just wondering whether or not you anticipate kind of building that reserve up as this portfolio continues to grow?

**<A - Steven Raney>**: Bill one thing, that's sometimes hard to compare institutions in terms of the asset mix, we don't have any consumer loans, no credit cards, no auto loans that typically have higher reserves associated with them. Our residential loans have a certain reserve going in that tends to be a more homogeneous product offering in asset. Our corporate loans based on the risk profile of each individual loan when we book it, it varies – it could swing by almost a 100 basis points based on the risk profile of that transaction. ***We actually feel like we have been pretty conservative in the way we've reserved against these certain assets.***

We've also been very proactive in downgrading loans early on in the process and when we're downgrading loans, we are actually taking additional reserves against that particular asset through that process. So, we have seen an increase in reserves over the last five quarters, that's really been a reflection of the credit, some of the credit deterioration. We haven't really changed the methodology. ***We haven't really seen evidence of a need to change the methodology and feel comfortable that we've got really the reserves adequately covered in pretty conservative, that now a little over $85 million in total reserves.***

(emphasis added).

208.    Raney's statements were false and misleading because RJBank had not conservatively reserved against its assets.  RJBank's still growing exposure to deteriorating residential real estate markets coupled with its commercial real estate concentrations required RJBank to keep a far higher loan loss reserve than it had set aside at that time.

209.    Later in the call, James made the following false and misleading statement:

**<A - Thomas James>**: Yeah, just adding color to that. ***Most of the questions from our auditors are still dealing with the fact that our reserves are too high***. So, our outside auditors who should be chastened in their approach to what reserves are necessary in the banking industry at the moment, still are not convinced that we are not over-reserved. So, we'll find out but as Steve pointed out to you and I hope you got a feel of essentially the Residential loans are nominal way below industry averages in terms, and we do have a lot of history with a lot of those loans over a period of time. The A&D loans, he has tended to mark them down the instant that there is any question about any problems dealing with them and we do anticipate that a couple of other of those loans will have some sort of loss exposure. But again they do have good assets. I mean it isn't like they don't have good assets.

So, it's not like we are going to have any fire sales in those areas. So, I am, I feel more than confident that without any problems in the corporate sector that *we have far more reserves than we need.*

(emphasis added).

210.    James's statement was false and misleading because he stated that the Bank had "far more reserves" than needed, and that RJBank's loan loss reserves were probably too *high*, when in fact (and as James knew) RJBank's reserves were inadequate to account for RJBank's then-growing residential and commercial real estate exposures, which were showing increasing losses and would require additional reserves.

211.    Defendants also failed to disclose that because of the increased the size of the Bank's commercial loan portfolio, the likelihood that one defaulting loan would cause a material disruption and loss had increased.

### D.    FOURTH QUARTER ENDING SEPTEMBER 30, 2008

#### 1.    October 21, 2008 Earnings Release

212.    On October 21, 2008, the Company issued a press release entitled "RAYMOND JAMES FINANCIAL, INC. ANNOUNCES FOURTH QUARTER RESULTS."   The Press Release stated in part:

[W]e have successfully avoided almost all of the carnage suffered by the larger firms in the financial services sector through abstaining from participating in subprime mortgages, credit default swaps and high leverage . . .

[S]uperb results in Raymond James Bank, in spite of turbulent conditions, buoyed operations.

#### 2.    October 22, 2008 Quarterly Analysts Conference Call

213.    On October 22, 2008, RJF held its quarterly conference call.  During the call, James stated the following:

[W]e have about 45 or 6 individual real-estate loans that are in non-accrual status. They don't amount to much. It's about $17 million.

\* \* \*

But when you take that number of loans and you relate it to the 6500 individual loans we have, *it's really a non-factor*; and what I had tried to explain to you before was that this very detail due diligence review, loan-by-loan, that we go through on even residential loans has really proven to be a saving grace contrasted to other lenders on the banking front.

(emphasis added).

### 3.    RJF's Statements Made In Relation To Its Q4 2008 Results Were False and Misleading

214.    The foregoing statements were false and misleading because they falsely indicated that RJBank was able to avoid the losses incurred by other lenders when, in fact, RJBank was only reporting impressive numbers due to knowing manipulation and intentional under-recording of quarterly loan loss provisions.  Had RJBank recorded loan loss provisions sufficient to fund a loan loss reserve that accounted for the risks in its loan portfolio, the Bank's results would not have boosted the Company's operations.

215.    In addition, the foregoing statements in the October 22, 2008 conference call were false and materially misleading because James knew or was extremely reckless in not knowing that RJBank's residential loan portfolio, which was already suffering increased delinquencies and declining real estate values, had sustained significant losses.  Moreover, James told investors that the Bank conducted a "loan-by-loan" due diligence and that the Company and RJBank rigorously monitored its loans, when in fact the Bank often relied on third parties to perform the due diligence, and at the time of James' statements, RJBank had inadequate risk management practices and was focused on loan growth instead of "portfolio oversight."

### E.    NOVEMBER 11, 2008 PRESS RELEASE

216.    On November 11, 2008, the Company issued a press release in response to criticism in the November 10, 2008 *Barron's* article.  The press release included the following false and misleading statements:

Raymond James' leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices that helped the firm avert the subprime crisis and post solid operating results in 2007 ***will continue to serve the company well in the coming year***.

* * *

Raymond James Bank believes it will continue to outperform peer banks with regard to credit quality measures given its stringent underwriting criteria and portfolio monitoring. As we have reported in the past, we still anticipate that **existing reserves are sufficient to encompass future charge-offs** unless conditions materially worsen in the general economy.

(emphasis added).

217.    In regards to RJBank's residential loans, three-quarters of which were interest-only mortgages, the press release later stated, "We believe our selective purchase criteria more than offset additional risk from buying interest-only mortgages."

218.    The press release also noted that RJBank's loan portfolio was highly diversified across industries, conveying the impression that RJBank could withstand nonperformance by one customer or industry-wide weaknesses.  Furthermore, the press release stated that "Raymond James' leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices that helped the firm avert the subprime crisis and post solid operating results in 2007 will continue to serve the company well in the coming year."

219.    The foregoing statements were statements were false and misleading for several reasons.  First, Defendants indicated to investors that RJF and RJBank were committed to risk management.  However, as would later be disclosed in May 2009, RJBank was focused on loan growth as opposed to portfolio monitoring at the time of the press release.  Moreover, RJBank was not undergoing a managed growth strategy, but instead was rapidly expanding its exposure to risky commercial real estate loans.

220.    Second, the above press release falsely stated that RJBank utilized stringent underwriting criteria when, in fact, RJBank relied on *other* banks to perform due diligence and to underwrite some of the Bank's loans.

221.    Third, the foregoing statements were false and misleading because Defendants knew or were extremely reckless in not knowing that RJBank's loan loss reserves were insufficient to account for future losses.  Indeed, at the time of the press release, RJBank had been taking inadequate quarterly loan loss provisions and thus Defendants knew or were extremely reckless in not knowing that the Bank would ultimately have to make significant additions to its loan loss reserves.

### F.    FISCAL YEAR 2008 10-K

222.    On November 28, 2008, RJF filed its SEC Form 10-K for fiscal year 2008 (the "2008 Form 10-K").  In the 2008 Form 10-K, RJF stated that "[r]egardless of the source, all loans are independently underwritten to RJBank credit policies."

223.    The foregoing statement was false and materially misleading because RJBank did not independently underwrite all of its loans. CW 2 confirms that the commercial loan that caused RJBank to record a $28 million charge-off in the Company's second quarter of fiscal 2009 was not independently underwritten by RJBank.

224.    Furthermore, the 2008 Form 10-K cited materially misleading average LTV ratios for RJBank's residential borrowers which misled investors into believing that RJBank's home loans were safer and at a lower risk of default than they in fact were.

### G.    FIRST QUARTER ENDING DECEMBER 31, 2008

#### 1.    January 21, 2009 Press Release

225.    On January 21, 2009, the Company issued a press release entitled "RAYMOND JAMES FINANCIAL, INC. ANNOUNCES FIRST QUARTER RESULTS."

226.    The press release included the following false and misleading statements:

Raymond James Bank continues to record much higher profits.  First and foremost, federal market intervention with low rates has dramatically increased spreads.  Secondly, while we continue to make large additions to reserves for loan losses to reflect deteriorating economic conditions and loan growth, both our real estate and corporate loan portfolios continue to perform far better than industry benchmarks and actual charge-offs remain low.

227.    James commended RJBank for its contribution to the results, emphasizing that "the results [were] a result of the outstanding performance by Raymond James Bank, a culmination of the blend of conservative lending practices and managed, albeit high, growth over the last five years."

228.    The foregoing statements were false and misleading because they suggested to investors that RJBank's loans loss reserves would be sufficient to account for RJBank's continuing growth in the deteriorating residential and commercial real estate markets.  But since RJBank had been taking inadequate loss provisions in previous quarters, its total loan loss reserves remained far too low.

229.    The foregoing statements were also false and misleading because they indicated to investors that RJBank was able to record "higher profits" due to RJBank's purportedly conservative lending practices.  In truth, the profits reported by RJBank were only possible through Defendants' manipulation of the Bank's quarterly loan loss reserves, which allowed RJBank to avoid significant charges to its earnings.

### 2.    January 22, 2009 Analyst Conference Call

230.    On January 22, 2009, the RJF held its quarterly analyst conference call.  During the call, James made the following false and misleading statement:

So those of you who are surprised by the level of profitability by the bank, I would tell you that you shouldn't be surprised. If you look at the amount of reserves we set up during the quarter, *they more than comprehend the volume growth,* which was around over 500 million in loans over the quarter. Indeed we are making loans, Mr. President.

71

231.    Also during the call, the following exchange occurred between Steve Stelmach, analyst with FBR Capital Markets, Raney, Julien, and James:

> **<Q – Steve Stelmach>**: That's helpful. And then just turning to credit real quick, I guess no one expects NPAs to be going down any time soon, but what about the your watch list? Is that developing at about the same pace as your non-performers? I mean the stuff that you think, not having gone non-perform yet, but sort of on the watch list for you guys. Is that...how is that developing?
>
> **<A – Steven Raney>**: Well, part of the additional provision expense to the – approaching $25 million for the quarter is related to downgrades in the portfolio, criticized loans are up, watch loans are up, we're being very rigorous with how we are going through the portfolio. And trying to be as forward-looking as we can in terms of what we think may happen to the portfolio really loan-by-loan. So we have seen increases in those criticized loan categories and the provision expense reflects that, so.
>
> **<A – Jeffrey Julien>**: About 70% of the provision expense for the quarter related to credit re-gradings and as opposed to new loan provisions.
>
> **<A – Thomas James>**: But a lot of that re-grading is kind of generated by our own views. What I would say since you don't have as much experience in dealing with the mentality of our General Accounting Principles here, we are an extremely conservative organization with respect to evaluating reserves and *trying to put ourselves in a situation where we don't get unexpected surprises*. And that's always been true of the company and it certainly is reflected in what we do in the loan portfolio at the bank.

(emphasis added).

232.    The foregoing statements were false and materially misleading when made because, contrary to Raney's and James's assertions, RJBank's reserves did not adequately account for the risks associated with RJBank's growing commercial and residential loan portfolios.

233.    Also during the call, Devin Ryan, an analyst with Sandler O'Neill, had the following exchange with James:

> **<Q – Devin Ryan>**: Most of my questions have been answered, but just a few here. So on the provision, it sounds like you are being conservative. But based on what you're seeing today, and I know this is difficult, but is it at least reasonable to expect that the provision level should be increasing from this quarter's level, especially if credit losses are increasing?

72

**<A – Thomas James>**: I actually – I mean that's a very hard question to answer, because it's very sensitive to whatever is going on in the portfolio. If you ask me, I would tell you that while they may stay in the range they're in, with the same logic that we're applying now, if anything, at the rate of growth we're forecasting, which is slightly less than the 500-plus million addition to loans, ***I would think the provision will be lower***.

(emphasis added).

234.    The foregoing statements were false and materially misleading when made because RJBank's loan loss reserve was inadequate to account for the risks in its loan portfolios and, thus, James knew or was reckless in not knowing that RJBank should have recorded a significantly higher loan loss provision.

235.    Additionally, James's and Raney's statements during the quarterly conference call were false and materially misleading because they knew or were reckless in not knowing that RJBank's loan loss reserves were inadequate to account for the Bank's commercial and residential real estate exposures.  Defendants James and Raney knew that they had been failing to properly add to RJBank's loan loss reserve throughout fiscal 2008 and the first quarter of fiscal 2009.  They also knew, but did not disclose, that the Bank was at risk of an "unexpected surprise" because the Bank did not perform due diligence on all its loans (but sometimes relied on third parties), and the increased commercial loan values put the Bank at risk of loss based upon the default of only one loan.

## XI.    RJF'S FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

236.    RJF, in reporting its financial results during the Class Period, made false statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading.  As set forth below, RJF published financial statements and information that violated Generally Accepted Accounting Principles ("GAAP") and SEC regulations prohibiting false and misleading public disclosures.  These financial

statements filed during the Class Period include the audited year-end financial statements included in RJF's 2008 Form 10-K, and the financial information included in RJF's quarterly reports filed with the SEC on Form 10-Q for the periods ending March 31, 2008, June 30, 2008, and December 31, 2008 (collectively, the "SEC Filings").

### A.     OVERVIEW OF GAAP REGULATIONS

237.    GAAP are those principles recognized by the accounting profession and the SEC as the conventions, rules and procedures which define accounting practice at a particular time. GAAP is promulgated by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA. The highest level in the hierarchy, during the Class Period, included Financial Accounting Standards Board Statements of Financial Accounting Standards ("SFAS"), Financial Accounting Standards Board Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP") and SEC Staff Accounting Bulletins ("SAB").   GAAP provides other authoritative pronouncements including Statements of Financial Accounting Concepts ("SFAC") which are standards that form the conceptual framework for financial accounting and reporting. (After September 15, 2009 the FASB Accounting Standards Codification became the single source of authoritative non-governmental GAAP.)

238.    Management is responsible for preparing financial statements that conform to GAAP. As noted by Public Company Accounting Oversight Board (PCAOB) professional standards, AU Section 110, *Responsibilities and Functions of the Independent Auditor*:

> [F]inancial statements are management' responsibility…
>
> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions … consistent with management's assertions embodied in the financial statements. The entity's transactions and the

related assets, liabilities and equity are within the direct knowledge and control of management … Thus, the fair presentation of financial statements in conformity with [G]enerally [A]ccepted [A]ccounting [P]rinciples is an implicit and integral part of management's responsibility.

239.    The SEC requires that public companies such as RJF prepare financial statements in accordance with GAAP.  Pursuant to SEC Regulation S-X, financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures. 17 C.F.R. § 210.4-01(a)(1).  Regulation S-X also requires quarterly financial statements to comply with GAAP, with the exception that quarterly financial statements do not need to include disclosures that would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

240.    RJF repeatedly represented in its SEC Filings that the Company's financial statements were prepared in accordance with GAAP.  These statements were materially false and misleading because Defendants knew, or recklessly ignored, that RJF's improper accounting practices, in violation of GAAP and the SEC's financial reporting requirements, misrepresented the Company's operating results and financial condition throughout the Class Period.

241.    As alleged herein, prior to and throughout the Class Period, Defendants deliberately caused the Company to increase its level of risk by dramatically increasing the Bank's exposure to loans secured by real estate and failing to consider all relevant factors in the development of the Bank's loan loss reserves.  As a result of deferring loan losses, RJF's earnings were materially misstated as reported in its SEC Filings.  Furthermore, throughout the Class Period, the Company failed to maintain effective internal controls and procedures over financial reporting, despite contrary certifications signed by Defendants James and Julien in SEC filings during the Class Period.

242.    RJF's financial statements during the Class Period violated GAAP and SEC regulations, in that the statements failed to (i) disclose facts necessary to present a fair

representation of its financial position and operating results, and (ii) record adequate loan loss reserves, both of which were necessary for investors to evaluate the Company from a financial perspective. Consequently, through the issuance of financial statements purportedly prepared in accordance with GAAP, coupled with KPMG's unqualified audit opinion thereon, Defendants fraudulently created the overall impression of a company that was immune to the collapse of the credit and real estate markets, when in reality Defendants were hiding significant unrecorded losses.

### B.    RJBANK'S MOUNTING LOAN LOSSES WENT UNRECORDED

243.    SFAS 114, *Accounting by Creditors for Impairment of a Loan*, requires a lender to measure loan impairment based on the present value of expected future cash flows or the fair value of the collateral. Under SFAS 114, a loan is impaired and written down when it is probable that the lender will be unable to collect all amounts due according to the contractual terms of the loan agreement.

244.    SFAS 5, *Accounting for Contingencies*, requires a lender to record a loan loss allowance if (1) it is probable that the loan has been impaired and (2) that the amount of loss can be reasonably estimable. Probable is defined in SFAS 5 as a future event that is likely to occur.

245.    Additionally, Bulletin 2006-47, *Interagency Policy Statement on the Allowance for Loan and Lease Losses* (the "Bulletin"), requires banks to implement a methodology for determining allowances for loan losses in accordance with GAAP. The Bulletin focuses on the documentation to be prepared and maintained in support of the allowances for loan losses. The documentation should include a systematic methodology to be employed each period in determining the amount of loan losses to be reported and the rationale supporting each period's determination that the amounts reported were adequate. Furthermore, the guidance for

determining an allowance of loan and lease losses ("ALLL") should incorporate the following

safe and sound banking practices:

- Consistently applying a comprehensive, well-documented analysis of the loan portfolio;

- Ensuring controls are in place to consistently determine the ALLL is in accordance with GAAP;

- Maintaining an effective loan review system and controls (including an effective loan classification or credit grading system) that identify, monitor, and address asset quality problems in an accurate and timely manner;

- Periodically validating the ALLL methodology; and

- The board of directors reviewing and approving the institution's written ALLL policies and procedures.

246.    In addition, the Bulletin states that the following factors should be taken into

consideration in estimating credit losses:

- Changes in lending policies and procedures;

- Changes in … national, regional and local economic and business conditions and developments that affect the collectability of the portfolio, including the condition of various market segments;

- Changes in the nature and volume of the portfolio …;

- Changes in the experience, ability, and depth of lending management and other relevant staff;

- Changes in the volume and severity of past due loans …;

- Changes in the quality of the institution's loan review system;

- Changes in the value of underlying collateral for collateral-dependent loans; and

- The existence and effect of any concentrations of credit, and changes in the level of such concentrations.

247.    According to the Bulletin, an institution's failure to analyze the collectability of

the loan portfolio and maintain and support an appropriate ALLL in accordance with GAAP and

supervisory guidance is generally an unsafe and unsound practice.

248.    Last, under SAB 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, a lender is required to implement a methodology for determining allowances for loan losses in accordance with GAAP.  SAB 102 focuses on the documentation to be prepared and maintained in support of the allowances for loan losses.  The documentation is similar to that required pursuant to bank regulatory guidance.

249.    Up until April 2009, RJBank's loan loss allowance accounting and methodology violated these GAAP, regulatory, and SEC standards by failing to record the probable losses incurred as a result of the deterioration in its lending portfolio.  It was not until the second quarter of 2009 that RJF admitted to the full extent of losses in the Bank's loan portfolio.  Prior to April 2009, when the Bank made the large increase in loan loss reserves, RJF concealed the fact that the Bank's loan portfolio was susceptible to non-payment, although the industry had acknowledged this factor and accordingly began providing for such losses since the middle of 2007.  Although the Bank saw rising delinquency rates and charge-offs, Defendants repeatedly shrugged off these facts, falsely concealing the fact that the Bank was, like the rest of the industry, vulnerable to the real estate and credit crises.

250.    Had RJF complied with GAAP, regulatory, and SEC standards, the Bank would have recorded loan loss reserves against its loan portfolio secured by real estate much earlier than April 2009.  No later than the second quarter of fiscal year 2008, RJBank should have recorded additional reserves, to coincide with the loss in value in light of the sharp declines in real estate values, and the related effects these declining values had on RJF's ability to collect and/or salvage the value of the underlying real estate collateral, as well as the impact of the recession on the Bank's corporate borrowers.

251.    An analysis of the Bank's loan loss allowance in 2007 and 2008 shows that it increased by less than $70 million even though its loans secured by real estate more than tripled,

increasing by more than $4.4 billion. Furthermore, a comparison of RJBank's loan loss metrics with those of the industry, considering the effects of the dual crises of illiquidity and declining real estate values, reveals a company that ignored mounting loan losses in its myopic pursuit of earnings growth. Based on the explosive growth in its loans, particularly in commercial real estate, and the spiraling downward trends in the real estate and credit markets, RJBank was required to increase its reserve for loan losses in a period much earlier than the second quarter of 2009.

252.   The loan loss provision recorded in the second quarter of fiscal 2009 should have been recorded earlier in the Class Period (at some point between the first quarter of 2008 and the first quarter of 2009) to coincide with the decline in loan values. And if RJBank had correctly recorded the loan loss allowance at the time the Bank knew that its loans had suffered severe losses and risks of future losses, such a decision would have had a material effect on the Bank's reported reserves for the second through fourth quarter of fiscal 2008, the full 2008 fiscal year, and the first quarter of 2009. And, as explained below, recording the loan loss provision earlier in the Class Period would have materially impacted the Bank's – and the Company's – earnings.

253.   Throughout 2008, Defendants knew, or were extremely reckless in not knowing, that RJBank should have recorded significantly higher loan loss reserves. Instead of scaling back its lending, particularly its exposure to loans secured by real estate in the face of historic declines in real estate values, RJBank choose to exacerbate already dire circumstances by venturing further into high-risk commercial real estate lending, a strategy that was directly contrary to safe and sound banking practices, and one that was not disclosed until April 2009. Rather than implementing procedures to reflect a prudent and conservative ALLL in accordance with GAAP, SEC and regulatory guidance, Defendants chose to report materially misstated financial statements to hide the Bank's (and RJF's) true financial results.

254.    Additionally, in its attempt to hide increasing loan losses, during the first three quarters in the Class Period, RJF lumped the Bank's estimated losses stemming from unfunded commitments into the disclosed amounts of reserves for loan losses, which in turn impacted the ratio of loan reserves to total loans, as well as the amount of the provision expense.  RJBank was inflating the ratio of the allowance to loans by including estimated losses for unfunded loan commitments in the loan loss allowance (*i.e.*, the numerator) without including the corresponding exposure in the amount of total loans (*i.e.*, the denominator).  With this method, the Bank appeared more conservative and able to withstand future loan defaults than it really was.  As the following chart shows, RJBank's loan loss reserves and the related metrics were higher as reported for the second, third and fourth quarters of fiscal year 2008 than they would have been without the unfunded loan commitments.   For instance, in the fourth quarter of fiscal year 2008, RJF inflated the allowance for loan losses by more than $9 million, increasing the ratio to 1.35%, whereas the ratio calculated without the unfunded loan commitments was only 1.23%.

**Comparison of Loan Loss Provision, Allowance, and Ratio Pre- and Post-Adjustment**

| | Q2 2008 | Q3 2008 | Q4 2008 | Q1 2009 |
|---|---|---|---|---|
| | | | | |
| Loan loss provision with unfunded commitments | $12,558 | $12,732 | $19,822 | N/A |
| Loan loss provision with out unfunded commitments | $11,113 | $12,366 | $18,450 | $24,870 |
| | | | | |
| Total allowance with unfunded commitments | $77,644 | $85,373 | $97,318 | N/A |
| Total allowance without unfunded commitments | $70,219 | $77,582 | $88,155 | $106,140 |
| | | | | |
| Reserves as % loans with unfunded commitments | 1.24% | 1.26% | 1.35% | N/A |
| Reserves as % loans without unfunded commitments | 1.12% | 1.15% | 1.23% | 1.36% |

255.    RJF repeatedly materially understated its loss reserve, including in the Company's SEC Filings, in violation of SFAS 5 and SFAS 114 and SEC Regulations.  And had the Bank taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risk

inherent in its loan portfolio during the Class Period, the Company's earnings would have suffered proportionately.

### C.    RJF INTENTIONALLY MISSTATED ITS FINANCIAL STATEMENTS

256.    Accounting Principles Board Opinion #22, *Disclosure of Accounting Policies*, states that the accounting policies adopted by a company can affect significantly the presentation of its financial position and results of operations.   Accordingly, the usefulness of financial statements for purposes of making investment decisions depends considerably upon the investor's understanding of the accounting policies followed by the company.

257.    RJF discussed in its financial statements filed with the SEC RJBank's loan loss allowance policies and methodology in sections referred to as "Significant Accounting Policies" and "Critical Accounting Policies."   RJF explicitly stated that it provides an allowance for loans in accordance with SFAS 5 and SFAS 114, even detailing the relevant factors.   In the Company's 2008 10-K, for example, RJF stated that:

> [t]he factors taken into consideration . . . include estimates of borrower default probabilities and collateral value; trends in delinquencies; volume and terms; changes in geographic distributions, lending policies, local, regional, and national economic conditions; concentrations of credit risk and past loss history.

258.    RJF repeatedly stated in its SEC Filings that the Bank's accounting policies regarding allowance for loan losses complied with GAAP.   However, Defendants did not follow GAAP or their own policies.   Had RJBank actually implemented the policies disclosed in RJF's financial statements, the Bank would have increased the level of the loan provision significantly in 2008 to take into consideration the risks associated with its ballooning loan portfolio, particularly for its loans secured by real estate, where the underlying collateral values were declining dramatically.   In contrast, the industry was well aware of the consequences of the real estate market crisis and took steps to scale back real estate exposure and provide significant and increasing reserves for probable losses.

81

259.    In PCAOB auditing standards, AU Section 316, *Fraud in a Financial Statement Audit*, financial reporting fraud is defined as either:

- The misrepresentation in or omission from, the financial statements of events, transactions or other significant information; or

- The intentional misapplication of accounting principles relating to amounts, classification, manner of presentation or disclosure.

260.    Defendants knew, or were extremely reckless in not knowing, that the Bank's loan portfolio was deteriorating as a result of industry events and macroeconomic conditions and the portfolio's increased concentration in commercial real estate. Thus, Defendants knew, or were extremely reckless in not knowing, that additional loan provisions were required throughout fiscal year 2008 and in the first quarter of fiscal 2009, rather than deferring loan losses until the second quarter of fiscal 2009. However, Defendants misrepresented the appropriate level of loan loss reserves and deliberately misapplied the Bank's disclosed accounting policies. As a result, RJF's SEC Filings were materially false and misleading and were, in fact, fraudulent.

### D.    RJF DID NOT HAVE ADEQUATE INTERNAL CONTROLS

261.    Internal control over financial reporting is defined in PCAOB Auditing Standard No. 5 *An Audit of Internal Control Over Financial Reporting That is Integrated with An Audit of Financial Statements* ("AS 5") as follows:

- A process designed by, or under the supervision of, the company's principal executive and principal financial officers … to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

    o    Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

    o    Provide reasonable assurance that transactions are recorded as

necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

o    Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

262.    This definition is the same one used by the SEC, requiring management to report on internal controls over financial reporting.  The SEC requires a company's principal executive officer and principal financial officer to annually certify the effectiveness, or deficiencies in the effectiveness, of the company's disclosure controls and procedures and internal controls over financial reporting.

263.    The report is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective.

264.    During the Class Period, RJF misled investors regarding the effectiveness of the Company's and RJBank's internal controls.  Throughout the Class Period, RJF and RJBank failed to maintain effective internal controls and procedures over the Bank's allowance for loan losses, despite contrary certifications signed by Defendants.  Additionally, RJF and RJBank failed to implement suitable credit risk management procedures, with less than 100 employees saddled with monitoring a burgeoning portfolio of loans experiencing declining collateral values. Material weaknesses in internal controls and procedures were contributing factors enabling RJF to issue fraudulent financial statements during 2008.

265.    As a result of the Company's failure to maintain effective internal controls and procedures over RJBank's allowance for loan losses, Defendants were able to perpetrate their

fraud throughout the Class Period.  The Company's true financial condition and results of operations were further masked with false assurances that the Company had effective internal controls and procedures, in violation of SEC regulations.

### E.    DEFENDANTS VIOLATED MD&A DISCLOSURE REQUIREMENTS

266.    The SEC requires, in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of every Form 10-K and 10-Q filing, that the issuer furnish material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future.  The MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company.  Management is required to discuss the dynamics of the business and to analyze the financial statements.  It is management's responsibility to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the company.

267.    In discussing results of operations, the SEC requires the company to describe any known trends or uncertainties that have had or that will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  The discussion and analysis must focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.

268.    Despite the SEC requirement that the MD&A discuss significant aspects of the Company's operating results and financial condition, Defendants altogether failed to disclose that RJBank was amassing a multi-billion-dollar, over-valued loan portfolio during 2007 and 2008, while accumulating losses including $75 million that went unrecorded until April 2009.

Additionally, though it had a duty to describe unusual and/or significant transactions that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, the Company failed to inform investors during 2008 and into 2009 that the credit crisis and downward spiraling real estate values would decimate its future earnings. In addition, Defendants failed to disclose the negative impact that one borrower's loan default could have on the Company's earnings.

269.    Thus, the MD&A section in each of the Company's SEC Filings during the Class Period failed to comply with SEC Regulations.

### F.    RJF'S FINANCIAL STATEMENTS SHOULD HAVE BEEN RESTATED

270.    Both in SFAS 154, *Accounting Changes and Error Corrections* and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, GAAP and SEC standards are clear that material financial statement errors, defined as mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts, which existed at the time the financial statements were prepared and which are discovered subsequent to the issuance of the financial statements, should be reported as adjustments by restating the prior period's financial statements. In addition to restating the financial statements, the company is required to disclose:

- the description and nature of the error; and

- the effect of the correction on each financial statement line item and per share amounts.

271.    A major feature of a correction of an error is that the financial statements of the affected prior period, when originally issued, should have reflected the adjustment.

272.    In applying SFAS 154 and SAB 108, financial statements are only to be restated for error corrections that are considered material. Materiality is defined in SFAC 2, *Qualitative Characteristics of Accounting Information*, as the magnitude of an omission or misstatement of

accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

273.    During 2008 and the first quarter of fiscal year 2009, RJF led investors to believe that its earnings outpaced those of its competitors.  RJF consistently reported quarterly earnings within the range of analyst estimates, and in three of the four quarters during the Class Period the Company reported earnings well above that range.  However, these operating results were achieved by intentionally misapplying GAAP standards, which rendered the 2008 annual audited financial statements and quarterly financial statements materially misstated, in light of the materiality of the required loan loss corrections.

274.    Defendants willfully or recklessly disregarded facts existing at the time the 2008 financial statements were prepared.  Had RJF complied with GAAP and recorded loan losses for RJBank in the proper quarterly periods rather than deferring the amounts to subsequent periods, the earnings in the 2008 annual and quarterly financial statements as well as during the first quarter of 2009 would have been drastically reduced.  For instance, if the nearly $75 million loan loss provision (recorded in the second quarter of fiscal 2009) had been recorded in the second quarter of fiscal 2008, RJF's reported earnings of $59.8 million in the second quarter of fiscal 2008 would have been only $20.8 million.  Similarly, had the nearly $75 million provision been recorded in the third quarter of fiscal 2008, RJF's earnings for that period would have been reduced by more than half, from $69.9 million to $31.9 million.

275.    Furthermore, instead of reporting record earnings at RJB, which artificially buoyed the Company's stock price, the proper loan loss provisions would have dropped RJF's earnings below consensus estimates for the second quarter of fiscal 2008 through the first quarter of fiscal 2009.  For instance, had the nearly $75 million provision been recorded in the second

quarter of fiscal 2008, RJF's earnings for that quarter would have dropped from $0.50 per share to a mere $0.17, far below the consensus analyst estimate of $0.45.  Likewise, recording the $75 million loan loss provision in the third quarter of fiscal 2008, would have sunk RJF's reported earnings per share figure of $0.59 down to $0.27, again well below the consensus analyst estimate of $0.57 per share.

276.    However, RJF failed to restate its financial statements in violation of GAAP and SEC Regulations.

## G.    RJF MISSTATED RJBANK'S "WELL CAPITALIZED" STATUS

277.    In addition to the material effect the understated loan losses had on RJF's reported earnings, RJBank's capital would have been equally decimated to the point that in the third quarter of 2008, capital would have fallen below the threshold required for the Bank to be designated as "well capitalized" by federal bank regulators.  While RJBank operated with capital barely above the well-capitalized requirement, if RJBank had recorded the required GAAP adjustments for loan losses, it would have depleted its capital base, making it subject to Prompt Correction Action ("PCA") under FDIC guidelines.[4]    In circumstances where a bank is reclassified by a Federal banking agency from well capitalized to adequately capitalized, the agency can require the bank to comply with PCA provisions as if the bank were undercapitalized.  Such provisions include:

- Capital distribution and management fee payment restrictions;

- Ongoing monitoring of capital restoration;

---

[4] In fact, RJBank operated so close to the well capitalized threshold that during the Company's fourth fiscal quarter of 2008, RJBank fell below the 10% Total Capital ratio required for well capitalized status.  According to the Company, RJBank "misinterpreted an instruction related to the calculation of RJBank's risk weighted capital ratio" causing the Bank to temporarily be only "adequately capitalized." Following the discovery of the alleged calculation error, and as yet another example of RJF's efforts to maintain RJBank's appearance as a healthy and financially sound institution, RJF made a $30 million capital contribution to RJBank that allowed it to reclaim its well-capitalized status.

- Asset growth restrictions;

- Prior approval required for acquisitions, branching and new lines of business;

- Restricting transactions with affiliates;

- Restricting interest rates paid; and

- Improving management.

278.    Given regulators' preference for higher capital ratios, it would have been likely that one or several of the above restrictions would have been placed on RJBank had RJF not manipulated the Bank's results, but instead had prepared financial statements in compliance with GAAP.

279.    As a result of not recording loan losses in accordance with GAAP, RJF was reporting inflated levels of capital for the Bank in attempt to ward off closer examination by federal banking agencies.  Had RJF complied with GAAP, the Bank's capital levels would have shrunk below well-capitalized levels, leading to PCA restrictions.  Having such restrictions imposed on the Bank would have given investors a more accurate picture of the Bank's underlying operating risks and restated operating results.  However, RJF's SEC Filings misrepresented and fraudulently overstated the Bank's well-capitalized status.

## XII.    SCIENTER

### A.    GENERAL ALLEGATIONS OF SCIENTER

280.    The Defendants acted with scienter in that they knew or were extremely reckless in not knowing that the public documents and statements issued by RJF were materially false and misleading; knew or were extremely reckless in not knowing that such statements would be disseminated amongst the investing public; and knowingly and substantially participated in the issuance and dissemination of the public documents and statements. In addition, the Defendants acted with scienter by intentionally failing to disclose and inform the market in a timely manner

of material information.   Defendants were active, culpable, and primary participants in the

fraudulent scheme and in the issuance of material misrepresentations and omissions of other

material information as alleged herein.   As set forth in detail below, the Defendants' intent to

deceive and/or their reckless disregard for the truth is demonstrated by direct evidence as well as

circumstantial evidence supporting a strong inference of scienter.

B.    CIRCUMSTANCES SURROUNDING RJBANK'S LOSS PROVISIONS STRONGLY
      INDICATE THAT DEFENDANTS DELIBERATELY MANIPULATED RJBANK'S
      RESERVES IN ORDER TO BEAT EARNINGS EXPECTATIONS AND MAINTAIN THE
      APPEARANCE OF PROFITABILITY

281.    Defendants' repeated and ongoing failure during the Class Period to make

significant provisions for loan losses and, thus, increase RJBank's loan loss reserves to adequate

levels, coupled with RJF's continued ability report earnings in excess of analysts' estimates,

creates a strong inference of scienter.

282.    Indeed, RJBank's quarterly loan loss provision is the single largest recurring

charge to its earnings, and the adequacy of the Bank's loan loss reserve is one of the most

important ongoing evaluations the Bank has to make.  As confirmed by CW 1, the quarterly loss

provision and overall reserve determination are such "integral part[s]" of RJBank's operations

that they are discussed extensively and routinely at the highest levels of both Company and Bank

management.  As a result, during the Class Period, Defendants were presented with, among other

things:  (1) regulatory warnings concerning the Bank's commercial and residential loans; (2)

economic indicators that signaled current and continuing devastation in the real estate sector and

other industries directly affecting the Bank's borrowers; and (3) internal reports revealing

information about RJBank's loans known only by Company insiders, including the Bank's

concentration risks associated with the recently expanded portfolio of corporate and commercial

borrowers.  At the same time, however, Defendants made only minimal additions to RJBank's

loan loss reserves, while the Company continued to beat analysts' expectations and excel while other banks were failing.

283.    But at the end of the RJF's second fiscal quarter of 2009, when the Company was forced to triple the Bank's loan loss provision from the previous quarter, RJF could not point to any new development in the Company's second fiscal quarter that caused it to add to the Bank's loan loss reserve so significantly.  Instead, RJF's inability to attribute the drastic increase to any event that occurred in the preceding quarter allows one to draw the conclusion that RJBank's $75 million provision was the result of Defendants' conscious and deliberate failure to set aside adequate loan loss reserves throughout the Class Period.

### C.  ECONOMIC REPORTS ISSUED BY RJA CREATE A STRONG INFERENCE OF SCIENTER

284.    In addition to the reports and warnings from federal regulators that Defendants were required to consider in assessing the adequacy of RJBank's loan loss reserves, RJF's own subsidiary – RJA – issued similar reports that gave dire forecasts for the real estate industry and the broader economy.  Throughout the Class Period, while RJF was representing to its investors that its loan portfolios were immune to the carnage affecting other banks and that its loan loss reserves were at sufficient levels to account for future losses, RJA's own analysis indicated that *no* lenders could be immune to the collapsing financial markets and overall U.S. economy.

285.    For instance, during RJF's second quarter of fiscal 2008, as the Company was *decreasing* its loan loss provision from the prior quarter, RJA and its Senior Vice President and Chief Economist, Scott J. Brown ("Brown"), issued a monthly economic outlook warning that "[f]urther declines in home prices could amplify," which Brown said could extend the housing downturn.  According to Brown, declining home prices were likely to lead to increased foreclosures which, in turn, would lead to even lower home prices:

> Declining home prices have become a more serious threat to the overall economic
> outlook (much more than adjustable-rate resets) . . . [F]urther declines in home
> prices will turn an increasing share of recent homebuyers (those who bought
> within the last few years) upside down (owing more than the home is worth).
> Increased foreclosures will then add to the volume of unsold homes and put
> further downward pressure on home prices.

286.    For RJF, this risk was particularly acute, since RJBank's residential loans were heavily concentrated in Florida and California, two states experiencing the worst declines in home prices and a majority of its residential loans were interest-only loans. Yet, at the end of the quarter, James represented to investors that its paltry increase to its loan loss reserve was "adequate to subsume any actual future losses relating to current market conditions."

287.    Similarly, at the beginning of RJF's third fiscal quarter 2008, RJA issued a similar forecast wherein Brown said that the economy had likely entered a recession. Brown re-issued warnings concerning residential real estate, and also cautioned that consumer spending would experience further decline – an event that would directly impact RJBank's corporate borrowers. According to Brown, "[l]ower home prices will prolong and deepen the housing correction and dampen consumer spending." Brown continued that the "downside risks . . . are considerable." But at the end of the quarter, as RJBank's loan loss reserves continued to lag far behind industry benchmarks, James told investors that RJBank had "far more reserves than we need."

288.    The fact that RJF's own subsidiary was issuing dire forecasts throughout the Class Period concerning the economy and specific sectors to which RJBank was heavily exposed (residential real estate and consumer spending) creates a strong inference that Defendants knew or was extremely reckless in not knowing that RJBank's loan loss reserves were too low.

### D. POOR PERFORMANCE AT RJF'S NON-BANK DIVISIONS PROVIDED MOTIVE FOR DEFENDANTS TO COMMIT FRAUD

289.    RJF's primary non-bank divisions – Private Client Group, Asset Management, and Capital Markets – historically provided the lion's share of RJF's quarterly earnings.  But in fiscal year 2008, those primary earnings drivers began to post flat or declining results.

290.    In the first quarter of fiscal 2008, the three divisions' combined pretax income fell by more than 10% from the previous quarter.  Throughout fiscal 2008 and into fiscal 2009, this trend continued.  For instance, in the fourth quarter of fiscal 2008, Private Client Group contributed $34 million to the Company's pretax earnings, down 41% from the same quarter in the previous year. Similarly, Capital Markets generated only $8.4 million in the fourth quarter, a decrease of nearly 50% from the prior year.

291.    As a result, RJF needed to report increasingly positive results at RJBank in order to offset the poor performance of its other divisions.  The failing performance of the Company's non-bank divisions provided motive for Defendants to manipulate RJBank's earnings.

### E. RJF'S AUCTION RATE SECURITIES LIABILITY PROVIDED MOTIVE FOR RJF TO ARTIFICIALLY BOOST RJF'S AND RJBANK'S INCOME

292.    At the beginning of the Class Period, RJF faced nearly $2 billion in potential liability in connection with assets that the Company's broker-dealer subsidiaries, RJA and RJFS, fraudulently marketed and sold to their clients.  Knowing of this looming problem, Defendants had motive to prop up the Company's results to offset this potential, multi-billion-dollar liability.

293.    Specifically, on April 22, 2008, in the Company's quarterly earnings release, RJF disclosed that the Company's clients were holding $1.9 billion worth of auction rates securities ("ARS") "almost all of which [were] illiquid."  ARS are bonds that RJA and RJFS (as well as scores of other brokerage houses) underwrote and marketed to clients as short-term, cash-equivalent investments that provided safe alternatives to savings accounts and money market

funds.  Investors believed that ARS were particularly attractive investments since they had historically paid steady rates of interest and were purportedly highly liquid due to holders' ability to sell the securities at periodic auctions (typically held weekly, biweekly or monthly).

294.    But ARS were not the safe, cash-alternatives that RJA, RJFS and other brokers held them out to be.  Indeed, ARS auctions are subject to "auction failure," which occurs when the number of ARS sellers exceeds the number of buyers at auction.  When a failure occurs, all ARS sellers are forced to hold their bonds until the next successful auction.  But if auction failures continue, investors are forced to hold their ARS indefinitely.

295.    Moreover, unbeknownst to investors, for years, ARS underwriters had routinely been intervening in ARS auctions by placing "support bids" and purchasing ARS on their on accounts to prevent auction failures.  Indeed, according to a federal securities class action filed in the United States District Court for the Southern District of New York against RJF, RJA, and RJFS (the "ARS Complaint"), between April 2003 and February 2008, RJA, which was the underwriter for numerous ARS offerings, intervened in numerous auctions to prevent failures while other underwriters supported hundreds of thousands of auctions during the same period. Worse still, while RJA and RJFS knew that, but for financial institutions' continued intervention, auctions were subject to high risk of failure, RJA and RJFS pressured their financial advisers to market ARS to their clients as safe, short-term investments.  Indeed, according to the ARS Complaint, RJA and RJFS distributed materials to their financial advisers that touted the purportedly safe cash-equivalent profile of ARS and their suitability for clients in need of short-term investments that paid higher rates of interest than money market funds.  Additionally, according to the ARS Complaint, RJA and RJFS told their brokers that auction failures occurred in less than .0004% of all auctions, but never informed their brokers that RJA and other financial

institutions routinely intervened to prevent failures.[5]   Furthermore, according to the ARS Complaint, RJA and RJFS incentivized their financial advisers to push ARS investments by awarding high commissions on ARS sales and often 0.0% commissions on money market account sales.

296.    By the summer of 2007, with the impact of the financial crisis spreading, auctions began to fail when underwriters such as RJA no longer had the financial capacity to intervene in auctions.  Nevertheless, knowing of the increased rate of failure, RJA and RJFS continued to tout the purported safety of ARS to their financial advisers.  According to the ARS Complaint, as rumors of auction failures began to emerge in September 2007, RJFS financial advisers were told that the ARS they were selling were "rock-solid" investments and different from the ARS in auctions that had been failing.  Accordingly, RJFS and RJA financial advisers continued selling ARS to their clients.

297.    Ultimately, however, in early 2008, the ARS markets collapsed, when virtually all auctions failed.  Holders of ARS, such as RJA's and RJFS's clients, were left holding the bag. Floods of customer complaints were filed, and multiple regulatory agencies launched investigations.  At the same time, regulatory authorities began to pressure ARS brokers and underwriters to repurchase the illiquid ARS that they had sold to their clients.

298.    Through RJA and RJFS, RJF sold nearly $2 billion in ARS as of February 2009. Thus, RJF faced the potential of being forced to repurchase the illiquid investments.  Indeed, in November 2008, the Company disclosed that RJA and RJFS were being investigated by regulatory authorities but that the Company did not have "sufficient regulatory capital and cash or borrowing power" to repurchase its clients' ARS.

---

[5] In fact, according to the ARS Complaint,  RJA's and RJFS's financial advisers were never even informed of RJA's participation in the ARS auctions.

299.    This nearly $2 billion liability provided motive for RJF to pad the Company's balance sheet by manipulating RJBank's earnings in order to offset potential losses that Defendants knew were coming from their ARS sales.

**F.    THE NEED TO KEEP RJBANK WELL CAPITALIZED PROVIDED MOTIVE FOR DEFENDANTS TO COMMIT FRAUD**

300.    Defendants knew that recording loan loss provisions large enough to provide RJBank an adequate loan loss reserve would reduce RJBank's Total Capital ratio to levels that could prompt regulatory scrutiny and investor alarm.  Thus, Defendants concealed the risks of the Bank's loan portfolio and took artificially low loan loss provisions in order to keep the Bank's Total Capital ratio at sufficient levels.

301.    RJBank's Total Capital ratio provides investors and regulators essential information regarding the Company's overall financial strength, and is a measure of the Bank's ability to withstand substantial losses.  A Total Capital ratio of 10% or greater is considered "well capitalized."  Falling below that 10% threshold triggers regulatory scrutiny and raises a red flag to investors.  RJBank operated perilously close to dropping below the 10% ratio throughout the Class Period and, in fact, **did** briefly fall below the required 10% Total Capital ratio during the Company's fourth fiscal quarter of 2008.[6]

302.    Defendants knew that it was essential to maintain RJBank's well-capitalized status, and repeatedly represented in public statements that the Bank maintained a well-capitalized position.  Thus, it was important to Defendants that RJBank's Total Capital ratio stay above the crucial 10% mark.

---

[6] As explained in Section XI. G., *supra*, RJBank allegedly "misinterpreted an instruction" related to calculation of its Total Capital Ratio, which caused the Bank to lose its well capitalized status.

303.    Throughout the Class Period, by failing to take proper quarterly loan loss provisions and increase RJBank's loan loss reserves to adequate levels, Defendants were able to maintain RJBank's Total Capital ratio above 10%.

304.    The Defendants' motivation to keep RJBank's Total Capital Ratio above 10% supports a strong inference of scienter.

### G.    RJF DEVIATED FROM ITS HISTORY OF STOCK REPURCHASES

305.    Prior to the Class Period, RJF had a history of committing capital for stock repurchases, and then buying back the Company's stock as sign of confidence in the future performance of the Company.    For instance, in May of 2004, RJF's Board of Directors authorized the Company to purchase up to $75 million of its shares.    Throughout February and March of 2008, the Company bought over 2.5 million shares of its common stock at an average price of $22.66, and in March of 2008, disclosed that it had exhausted its stock repurchases under the May 2004 authorization.

306.    On March 11, 2008, RJF announced that its Board of Directors authorized an additional $75 million for stock repurchases.    One month later, on April 23, 2008, after reporting earnings well above analysts' estimates, James publically touted the supposed value of RJF stock to investors and explicitly encouraged investors to buy Company stock.

307.    Despite James's rhetoric, from April 2008 through June 30, 2008, RJF purchased only 397 shares of Company stock.    RJF purchased no shares in July, and only 868 shares in August.    Finally in September of 2008, RJF purchased roughly $500,000 of Company stock. According to RJF's SEC Form 10-Q, filed August 10, 2009, RJF purchased no Company stock for the remainder of the Class Period.    This failure to continue RJF's past program of stock repurchases provides further evidence of inside knowledge of serious financial problems at RJBank and RJF, as well as Defendants' knowledge of, and participation, in the fraud.

**H.    HIGHLY SUSPICIOUS STOCK SALES BY JULIEN AND OTHER INSIDERS AT RJF CREATE A STRONG INFERENCE OF SCIENTER**

308.    During the Class Period, insiders at RJF sold their Company stock in patterns and circumstances that were suspicious in scope and timing.  These sales create a strong inference of scienter.

### 1.    RJTrust

309.    RJTrust, a subsidiary of RJF, provides personal trust services primarily to existing clients of RJF's broker-dealer subsidiaries, such as RJA and RJFS.  Julien, who is the CFO of RJF and Chairman of the Board of RJBank, serves as Chairman of The Board of RJTrust.  In addition, Raney, who is the President and CEO of RJBank, is also an RJTrust board member.

310.    According to public filings, RJTrust sold more than 98% of its RJF stock during the Class Period.  Specifically,  from 2002 through at least June of 2008, RJTrust held more than 8 million shares of RJF.  Then, during the last six months of 2008, RJTrust unloaded more than 7.9 million shares of RJF stock, dropping its holdings significantly to just under 89,000 shares. In other words, during the Class Period and at the specific time when Defendants were assuring investors that RJF was the outlier in the financial services industry based on the purportedly strong performance of RJBank, and when they were authorizing (but not following through on) share repurchases, RJTrust sold substantially all of its RJF holdings.

### 2.    Jeffrey P. Julien

311.    Julien is the CFO and Senior Vice President of Finance at RJF.  In addition, he is the Chairman of the Board of RJBank.  During the Class Period, Julien sold RJF stock for proceeds of $344,200, which was nearly double Julien's $186,000 base annual salary in 2008. But Julien's Class Period sales were particularly suspicious in light of his pre-Class Period purchases and sales.  Specifically, prior to the Class Period, Julien purchased 10,000 shares of RJF stock on November 19, 2007 at price of $29.84 per share.  Additionally, Julien purchased

97

another 10,000 shares of RJF common stock on January 29, 2008 at $27.18 per share. However, during the Class Period, Julien *sold* 10,000 shares of RJF stock $15.34 per share, and another 10,000 shares at $19.08 per share. It is highly suspicious for Julien, the top financial officer of RJF with insight into the financial picture of the Company, to purchase shares at particular prices ($29.84 and $27.18), and then turn around months later and sell shares at far lower prices ($15.34 and $19.08). Indeed, Julien knew RJF's stock price was artificially inflated during the Class Period and would ultimately decline, as RJBank's loan loss reserves would ultimately need to be increased significantly to account for past failures to take appropriate loss provisions and to account for foreseeable future losses in the Bank's loan portfolio. Moreover, Julien had not sold any RJF shares prior to the Class Period since at least June of 2004.

### 3. Dennis Zank

312.    Dennis Zank ("Zank") is the President of Raymond James & Associates ("RJA"), one of RJF's broker-dealer subsidiaries, and serves on RJF's Operating Committee, which meets with the RJF Board of Directors at all board meetings. During the Class Period, Zank sold 53,013 shares on September 2, 2008 at slightly over $31 per share for proceeds of $1,653,599. From the time of Zank's sale to the day after the end of the Class Period, RJF's stock price decreased nearly 50%. Moreover, prior to the Class Period, Zank had not sold any RJF shares since at least January of 2005.

### I. RJF'S BONUS COMPENSATION STRUCTURE PROVIDED MOTIVE FOR THE JAMES AND JULIEN TO DEFRAUD SHAREHOLDERS

313.    RJF's bonus structure incentivized top Company executives to do everything in their power to ensure that RJF reported solid financial results. Company executives are awarded bonuses "based upon contributions to the pre-tax profits of the Company." According to RJF's proxy filed on January 12, 2009, "The emphasis on profit-based compensation serves two functions: *it encourages executives to be conscious of the 'bottom line' and it aligns the*

*Company's total compensation structure with profitability, which is advantageous to the firm*." (emphasis added). As explained above, quarterly loan loss provisions are recorded as expenses on RJBank's income statement, so lower loss provisions result in higher profits at the Bank. Thus, artificially low loan loss provisions, in turn, boost RJF's bottom line.

314.   A second aspect of RJF's bonus structure is similarly revealing. Specifically, up to half of an executive's bonus compensation is "based upon the Chief Executive Officer's subjective evaluation of achievement of performance objectives set by him." Tellingly, in 2008, Julien's achievement objectives were, among other things, "earning a reasonable return on equity *at RJBank and Raymond James Trust*." (emphasis added). As explained above, not only did RJBank report stellar results in 2008, but RJTrust liquidated its holdings in the Company.

315.   Indeed, insiders at RJF, including James and Julien were awarded handsomely in 2008, earning more than $11 million dollars in bonuses. James, whose 2008 bonus was set at "1.0% of total Company pre-tax profits" earned a $2.3 million cash bonus, while Julien reaped more than a $750,000 cash bonus, which is more than four times his annual salary of $186,000.

### J.    RJF's NUMEROUS VIOLATIONS OF GAAP AND SEC VIOLATIONS IN ITS FINANCIAL REPORTS CREATE A STRONG INFERENCE OF SCIENTER

316.   Defendants RJF, James, and Julien violated numerous provisions of GAAP, as well as SEC and banking regulations, in RJF's financial reporting during the Class. As a result, RJF's financial statements failed to accurately portray the Company's financial position and results of operations.

317.   Defendants James and Julien certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements. Additionally, Defendants James and Julien signed each of the Company's Form 10-K and Form 10-Q filings during the Class Period. However, the nature and extent of RJF's accounting violations, in conjunction with the statements of Defendants James and Julien, suggest

that as senior executives with oversight of the Company's financial reporting, James and Julien

knew or were extremely reckless in not knowing that RJF was perpetrating a fraud by concealing

mounting losses.

## XIII.  FRAUD ON THE MARKET

318.    At all relevant times, the market for RJF's common stock was efficient for the

following reasons, among others:

      a.      RJF common stock met the requirements for listing, and was listed and actively traded on the NYSE (symbol RJF), a highly efficient and automated market;

      b.      As a regulated issuer, RJF filed regular reports with the SEC;

      c.      RJF regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

      d.      RJF was regularly followed by numerous securities analysts employed by major brokerage firms headquartered in the United States and overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

      e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of RJF's securities; and

      f.      Without knowledge of the misrepresented or omitted facts, Lead Plaintiff purchased or otherwise acquired RJF common stock between the time that the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of RJF common stock was artificially inflated by the Defendants' misrepresentations and omissions.

319.    As a result of the foregoing, the market for RJF common stock promptly reacted

to current information regarding RJF from publicly available sources and reflected such

information in the trading price of RJF common stock.   Under these circumstances, a

presumption of reliance applies.

## XIV.  NO SAFE HARBOR

320.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  Many of the statements pleaded herein were not identified as "forward-looking" statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

321.    Alternatively, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, Defendants are liable for such false forward-looking statements because at the time each such statement was made, the particular speaker knew and/or recklessly disregarded the fact that forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of RJF who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

## XV.  LOSS CAUSATION

322.    Throughout the Class Period, Defendants' false and misleading statements and omissions concerning RJF's financial performance and projected earnings caused RJF's stock price to be inflated.  But for Defendants' misrepresentations and omissions, which concealed the inadequacy of RJBank's loan loss reserves and the Bank's risk of future losses, Lead Plaintiff and the members of the Class would not have purchased RJF's stock, or would not have purchased it at artificially inflated prices.

323.    As a direct result of Defendants' scheme, misrepresentations and omissions material omissions, RJF's common stock was artificially inflated during the Class Period, trading

between $20 per share and $30 per share for most of the Class Period, reaching a Class Period high of $38.25 on September 19, 2008.

324.    Lead Plaintiff and the other members of the Class were damaged as a direct result of Defendants' fraudulent conduct described in this Complaint.  Specifically, as a result of Defendants' fraudulent conduct, Lead Plaintiff and members of the Class purchased RJF stock at artificially inflated prices.  When the truth of Defendants' conduct and the true financial condition of RJF were revealed to the investing public, the price of RJF common stock declined significantly.

325.    On October 21, 2008, RJF announced its results for the fourth fiscal quarter ending September 30, 2008, which results missed analysts' expectations.  While RJBank's disappointing earnings were largely due to lower revenues in the Company's non-bank divisions, particularly Capital Markets, whose pretax income declined an astounding 69% from the previous quarter, RJBank's net income did experience its first quarter-over-quarter drop in fiscal 2008. Moreover, the Company reported that RJBank's nonperforming loans as a percentage of total loans had increased from 0.54% to 0.82% and that the Bank had taken a larger loan loss provision than in previous quarters.

326.    While RJF's stock price dropped $2.35 per share from $23.18 per share on October 21, 2008 to $20.83 per share on October 22, 2008, a one-day drop of over 10%, Defendants were able to stem investor concerns and larger declines in stock prices by reassuring investors that RJBank and the Company still stood in marked contrast to other financial firms, telling investors that RJBank's results "buoyed" operations and that RJBank and the Company "successfully avoided almost all of the carnage suffered by" other financial services firms.  As a result of Defendants' reassurances, investors continued to be misled as to the condition of RJBank.

327.    Three weeks after the Company's disappointing earnings announcement, on November 10, 2008, an article in *Barron's* questioned the long-term stability of RJBank. Among other things, the *Barron's* article raised the prospect that RJBank's loan growth and significant exposures to commercial and residential loans could cause the Company to suffer significant losses, and highlighted RJBank's higher loan loss provision and the increase in nonperforming loans reported by the Company in the prior quarter.  In response, RJF's share price fell to $18.06 on November 10, down from $19.62 the day before, decreasing nearly 8%.

328.    RJF, however, immediately and aggressively responded by issuing a press release the following day in an attempt to refute the points raised in the *Barron's* article.  Among other things, the Company continued to misrepresent the Bank's purported commitment to risk management, stringent underwriting, and portfolio monitoring, and assured investors that the Bank would "continue to serve the company well in the coming year."

329.    Two months later, on January 21, 2009, RJF finally succeeded in putting any investor doubts or concerns to rest when it announced results for the first quarter of the 2009 fiscal year.  Specifically, the Company reported earnings of $0.52 per share (far in excess of analysts' estimates of $0.35 per share), and an increase in earnings to $61.1 million, telling investors that "Raymond James Bank continues to record much higher profits." In reaction to this good news, RJF's stock price increased from $16.17 to $16.56, a 2.5% jump.  RJF's share price continued to rise the following day, closing at $17.55 on January 23, an 8.5% gain over those two days.

330.    But Defendants could only hide the truth from investors for so long.  On April 14, 2009, RJF announced that results for the second fiscal quarter ended March 31, 2009 would be far below the analysts' estimates of $0.37 per share due to significant losses at RJBank.  Indeed, RJBank was forced to record a $75 million loan loss provision, ***triple*** the $25 million loss

provision in the prior quarter, and charge-offs of $40 million based on, among other things, deteriorating commercial real estate markets, delinquencies and declining residential loan values. With RJF's second quarter announcement, the market was finally aware that Defendants had been deferring losses at RJBank by failing to adequately fund the Bank's loan loss reserves throughout the Class Period.

331.    In response to this news, investors sent RJF shares plummeting.  RJF closed down $2.57 per share, or 13.48%, to close at $16.49 per share on April 15, on unusually high volume. Over the next few days, RJF's stock price traded as low as under $15 per share, well below its Class Period highs of over $38 per share.

332.    After manipulating RJBank's results for more than a year, and faced with mounting loan losses and inadequate loss reserves, RJF could no longer mislead investors into believing that the Company's performance was the outlier in the industry.  The following chart shows the relative performance of RJF throughout the Class Period compared to the Standard and Poor's Midcap 400 Index, a measure of the performance of mid-cap publically-traded companies (such as RJF), and the Standard and Poor's Midcap Financial Index, an index of the performance of all mid-cap financial services companies (such as RJF):



333.    During the first portion of the Class Period, while the Company was understating the loan loss reserves in order to boost its earnings, the Company's stock price was inflated, and traded above the relevant indices.  In November, when the *Barron's* article spooked investors, the stock price came down, falling in line with its peers.  Then, in January 2009, when RJF again reported earnings above analysts' expectations – once again through manipulation of the Bank's reserves to boost earnings – the stock price moved back above the relevant indices.  In mid-April 2009, however, with the truth finally revealed, RJF's stock performance finally fell in line with the market from which RJF had fraudulently attempted to distance itself.

334.    Because Lead Plaintiff and other putative Class members purchased RJF shares at inflated prices based on Defendants' fraud and still held shares after the truth was revealed on April 14, 2009, Lead Plaintiff's and the Class's losses were directly caused by Defendants' fraud.

## XVI.   CLASS ACTION ALLEGATIONS

335.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired

RJF publicly traded securities during the Class Period, April 22, 2008 through and including April 14, 2009 (the "Class").  Excluded from the Class are (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person or entity who is a partner, executive officer, director or controlling person of RJF (including any of its subsidiaries or affiliates) or any other Defendant; (e) any entity in which any Defendants have a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representative, heirs, successors and assigns of any such excluded party.

336.    The members of the Class are so numerous that joinder of all members is impracticable.  RJF has over 123 million shares of common stock outstanding, owned by thousands of persons, with an average daily trading volume in excess of 100 million shares during the Class Period.  While Lead Plaintiff does do not know the exact number of Class members, Lead Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased RJF common stock during the Class Period.

337.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affect individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the Exchange Act was violated by Defendants;

b.    whether Defendants omitted and/or misrepresented material facts;

c.    whether Defendants' statements omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading;

d.    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

    e.     whether the prices of RJF's publicly traded securities were artificially inflated; and

    f.     the extent of damage sustained by Class members and the appropriate measure of damages;

338.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

339.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

340.    A class action is superior to other available methods for the fair and efficient adjudication of this case.

## COUNT ONE
### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) PROMULGATED THEREUNDER)

341.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all of the Defendants.

342.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

343.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period. Defendants herein are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

344. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

345. The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew or were reckless in not knowing that the statements set forth in Section X., *supra*, were materially false and misleading for the reasons set forth herein.

346. In addition to having actual knowledge, and/or with extreme reckless disregard for the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive to engage in the fraudulent scheme set forth herein.

347. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of RJF's securities were artificially inflated throughout the Class Period. Unaware that the market price of RJF's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which RJF's securities traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the

Defendants but not disclosed in their public statements, Lead Plaintiff purchased or acquired RJF's securities at artificially inflated prices.

348.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases and sales of RJF securities when the inflation in the price of RJF's securities was gradually corrected as the truth regarding Defendants' conduct was revealed.

## COUNT TWO
## (VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT)

349.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Individual Defendants.

350.    During the Class Period, the Individual Defendants, by virtue of their senior executive positions in RJF, were privy to confidential and proprietary information concerning RJF, its operations, finances, financial condition and present and future business prospects. Because of their positions within RJF, the Individual Defendants had access to non-public information about its business, finances, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or were reckless in not knowing that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

351.    The Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the

Individual Defendants were able to and did, directly or indirectly, control the conduct of RJF's and RJBank's business.

352.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports, press releases, advertisements and marketing materials alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

353.    As senior executives and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to RJF's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of RJF's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

354.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of RJF's common stock by disseminating materially false and misleading statements and/or concealing the risks associated with RJBank's loan portfolio.

355.    As set forth above, the Individual Defendants and RJF each violated Section 10(b) and Rule 10b-5 by their acts and omissions.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

356.    As a direct and proximate result of Defendants wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of  Lead Plaintiff and the Class for all losses and damages suffered as a result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Lead Plaintiff's attorneys and experts; and

D.    Awarding Lead Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Lead Plaintiff demands a trial by jury as to all issues so triable.


Dated:  November 23, 2009


Respectfully submitted,


**GRANT & EISENHOFER P.A.**

By: _Keith Fleischman_

Jay W. Eisenhofer
Keith M. Fleischman
John C. Kairis
Shelly L. Friedland
Ned C. Weinberger
485 Lexington Avenue
New York, NY 10017
Tel.: 646-722-8500
Fax: 646-722-8501
*Attorneys for Lead Plaintiff Louisiana School*
*Employees' Retirement System*

Mark C. Gardy
**GARDY & NOTIS, LLP**
440 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: 201-567-7377
Fax: 201-567-7337


*Additional Plaintiffs' Counsel*

112

## CERTIFICATE OF SERVICE

I hereby certify that I filed the attached **Amended Class Action Complaint** with the Clerk of the

Court on November 23, 2009. I hereby certify that notice of this filing will be sent via electronic

mail to:

Melissa E. Byroade, Esq.
John M. Callagy, Esq.
Joel A. Hankin, Esq.
Nicholas J. Panarella, Esq.
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178

***Counsel for Defendants Raymond James
Financial, Inc., Thomas A. James, Jeffrey P.
Julian***

Keith M. Fleischman