# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN WOODARD, individuals and on behalf of all others similarly situated,

        Plaintiff,

        v.

RAYMOND JAMES FINANCIAL, INC.,
THOMAS A. JAMES, JEFFREY P. JULIEN,
STEVEN RANEY, and MARK MOODY,

        Defendants.

Civil Action No. 09-cv-05347 (RPP)

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178
212-808-7800

*Attorneys for Defendants*
*Raymond James Financial, Inc.,*
*Thomas A. James, Jeffrey P. Julien,*
*Steven Raney, and Mark Moody*

Dated:  New York, New York
       January 22, 2010

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

FACTS AS ALLEGED IN THE COMPLAINT ........................................ 5

    Raymond James ........................................................................................ 5

    The Decline of the Real Estate Market and Economic Recession .................... 6

    RJF's Loan Loss Reserves And Quarterly Earnings Reports ........................... 6

    RJF's Stock Prices During the Alleged Class Period ...................................... 9

    Plainitffs' Allegations .............................................................................. 10

ARGUMENT ........................................................................................ 10

I.    The Section 10(b) and Rule 10b-5 Claims Must Be Dismissed ...................... 12

    A.    The Alleged Statements Are Not Material Misrepresentations .................... 12

        1.    Plaintiffs Fail To State A Claim With Respect To Loan Loss Reserve Statements ........................................................ 13

            a.    Allegations Regarding The Inadequacy Of Loan Loss Reserves Are Not Actionable Under Section 10(b) .................... 13

            b.    The Loan Loss Reserves Statements Are Protected Under the PSLRA And The "Bespeaks Caution" Doctrine ................... 16

        2.    Allegations As to Loan Portfolio Statements Fail To State A Claim ...... 22

            a.    Statements Regarding LTV Ratios Do Not State A Claim .......... 22

            b.    Loan Concentration Statements Are Not Actionable ................. 23

            c.    Statements Regarding Due Diligence Do Not State A Claim ...... 27

        3.    Plaintiffs Fail to Sufficiently Allege Falsity or Materiality of the Management Style Statements .............................................. 28

            a.    The Statements Are Non-Actionable Puffery ............................. 29

            b.    The Statements Are Protected Under the PSLRA And The "Bespeaks Caution" Doctrine ................................... 30

        4.    Plaintiffs' Allegations About GAAP Are Irrelevant ............................... 31

    B.    Plaintiffs Do Not Adequately Allege Scienter .................................... 32

        1.    Plaintiffs Cannot Plead Scienter By Alleging "Fraud By Hindsight" ............................................................... 33

        2.    Plaintiffs Fail to Allege Scienter Based On Motive and Opportunity ............................................................... 35

            a.    Plaintiffs' Allegations Regarding Corporate Profits and Liabilities Do Not Show Motive and Opportunity ..................... 37

b.    The Stock Repurchases Do Not Show Motive and Opportunity ................................................................. 38

c.    The Individual Stock Sales Do Not Show Motive and Opportunity ................................................................. 39

d.    Allegations Regarding Executive Compensation Do Not Show Motive and Opportunity ..................................... 40

e.    Plaintiffs' Allegations Regarding Accounting Violations Do Not Show Fraudulent Intent Of The Individual Defendants .......................................................................... 41

3.    Plaintiffs Do Not Sufficiently Plead Recklessness ................. 42

C.    Plaintiffs Fail to Adequately Plead Loss Causation............................................. 45

II.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS ..................................... 48

CONCLUSION.......................................................................................................... 50

TABLE OF AUTHORITIES

# CASES

*Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292 (S.D.N.Y. 2009) ...........................................................................................33

*In re Aegon N.V. Securities Litigation*, No. 03 Civ. 0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004)..........................................................5, 14, 15, 16

*AIG Global Securities Lending Corp. v. Banc of America Securities LLC*, 254 F. Supp. 2d 373 (S.D.N.Y. 2003)........................................................16

*In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005)............48, 49

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .................................................2, 10, 11

*ATSI Communic'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)..............5, 11, 32 45, 48

*In re Australia and New Zealand Banking Group Ltd. Secs. Litig.*, No. 08 Civ. 11278 (DCL), 2009 WL 4823923  (S.D.N.Y. Dec. 14, 2009)............................ *passim*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................2, 10, 11

*In re Bristol-Meyers Squibb Secs. Litig.*, 312 F. Supp. 2d at 549,557 (S.D.N.Y. 2004) ..................................................................................... *passim*

*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270-71 (2d Cir.1996) ...............................31, 37, 38

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991) *aff'd* 956 F. 2d 1161 (2d Cir. 1992) ................................................................................. 13-14, 15

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992)................................................48

*Cortec Industrial, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ........................40

*Courtenay Comm's Corp. v. Hall*, 334 F.3d 210 (2d Cir. 2003)........................................40

*In re Cross Media Marketing Corp. Securities Litigation*, 314 F. Supp. 2d 256 (S.D.N.Y. 2004) ................................................................................17, 19, 21

*Denny v. Barber*, 576 F.2d 654 (2d Cir. 1978) ...............................................................34

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)....................................................34

*DiVittorio v. Equidyne Extractive Industrial, Inc.*, 822 F.2d 1242 (2d Cir. 1987)............33

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ...................................................12, 45

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)...................................................................... *passim*

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994).....................45

*Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F. Supp. 2d at 1221 (M.D. Fla. 2008) ..........................................................................................19

*Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759 (S.D.N.Y. 2006).............................................42

*Grossman v. Texas Commerce Bancshares, Inc.*, No. 87 Civ. 6295, 1995 WL. 552744 (S.D.N.Y. Sept. 15, 1995)..............................................................35

*Higginbotham v. Baxter Int'l, Inc..*, 495 F.3d 753 (7th Cir. 2007)...................................28

*In re Health Management System, Inc. Securities Litigation*, No. 09 CIV 1865 (HB), 1998 WL. 283286 (S.D.N.Y. June 1, 1998) .......................................42

*Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392 (S.D.N.Y. 2007) .........................................48

*Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931, 2009 Wl 928279 (S.D.N.Y. March 30, 2009) ......................................................................................................49

*In re Kindred Healthcare Inc. Securities Litigation*, 299 F. Supp. 2d 724 (W.D.Ky. 2004) ................................................................................... *passim*

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ...............................................40

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................49

*Lasker v. N.Y. State Electric & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996)............................29

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)...................................45

*Medina v. Bauer*, No. 02 Civ. 8837, 2004 WL. 136636 (S.D.N.Y. Jan. 27, 2004)....14, 15, 16, 32

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003)........................................................... *passim*

*In re MSC Industrial Direct Co.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003) .........................16

*In re Nokia Corp. Securities Litigation*, No. 96 CIV. 3752 (DC), 1998 WL.
150963 (S.D.N.Y. April 1, 1998)..................................................................28

*In re Novagold Resources Inc. Securities Litigation*, 629 F. Supp. 2d 272
(S.D.N.Y. 2009) ..........................................................................12, 26, 28

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000) ...............................28, 33, 36, 42

*In re Pfizer, Inc. Secs. Litig*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008)..........................44

*Primavera Familienstiftung v. Askin*, 173 F.R.D. 115 (S.D.N.Y. 1997) ..........................41

*In re PXRE Group, Ltd., Sec. Litigation*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009)
*aff'd* 2009 WL 4893719 (2d Cir. 2009) .............................................. *passim*

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..........................11, 17, 30, 48

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)......................................5, 36, 49

*In re Salomon Analyst Winstar Litigation*, No. 02 Civ. 6171, 2006 WL. 510526
(S.D.N.Y. Feb. 28, 2006) .............................................................................21

*In re Sierra Wireless, Inc. Sec. Litigation*, 482 F. Supp. 2d 365 (S.D.N.Y. 2007)............28

*Santa Fe Industrial Inc. v. Green*, 430 U.S. 462 (1977)....................................14

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..........................35, 36, 41

*In re Sotheby's Holdings, Inc. Secs. Litig.*, No. 00 Civ. 1041 (DCL), 2000 WL
1234601 (S.D.N.Y. Aug 31, 2000) ...............................................................42

*Steinberg v. Ericsson LM Telegraph Co.*, No. 07 CV. 9615, 2008 WL. 5170640
(S.D.N.Y. Dec. 10, 2008)...............................................................................44

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital In*c., 531
F.3d 190 (2d Cir. 2008).........................................................................32, 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .............................11, 45

*Virtual Countries, Inc. v. Republic of South Africa*, 148 F. Supp. 2d 256
(S.D.N.Y. 2001) aff'd 300 F.3d 230 (2d Cir. 2002)....................................46

*Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473 (S.D.N.Y. 2009).................................25

**STATUTES**

15 U.S.C. §78p(a) ............................................................40

15 U.S.C. § 78u-4(b)(2) ..............................................4, 11,
32, 45

15 U.S.C. § 78u-5(c)(1) .................................................16

15 U.S.C. § 78u-5(e) .......................................................17

17 C.F.R. §240.16a-2, 16a-3 ...........................................40

**MISCELLANEOUS**

5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327, at 489 & n. 15 ...........40

Defendants Raymond James Financial, Inc., ("RJF"), Thomas A. James ("Mr. James"), Jeffrey P. Julien ("Mr. Julien"), Steven Raney ("Mr. Raney"), and Mark Moody ("Mr. Moody", together with Messrs. James, Julien and Raney the "Individual Defendants", collectively with RJF, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss, pursuant to Fed. R. Civ. P. 8(a), 9(b), and 12(b)(6), all claims asserted by Plaintiffs Louisiana School Employees' Retirement System and John Woodard on behalf of themselves and purportedly on behalf of a putative class ("Plaintiffs") in the Amended Class Action Complaint dated November 23, 2009 (the "Amended Complaint").

## PRELIMINARY STATEMENT

In a prolix 356 paragraph, 112 page Amended Complaint, Plaintiffs seek to recover the loss in the value of their stockholdings in RJF during a time period that coincides with one of the greatest collapses in the financial markets in the last one hundred years.  Indeed, during the putative Class Period, between April 22, 2008 and April 14, 2009, the financial markets lost approximately 40% of their value.  Despite the length of the Amended Complaint, however, Plaintiffs' allegations are this: in the midst of a recession in which "the financial industry in general was reeling from the credit crisis," RJF allegedly manipulated loan loss reserve levels at Raymond James Bank ("RJBank") to "offset losses incurred by its non-bank divisions" and to artificially inflate revenues at RJF.  (Am. Compl. ¶¶ 1-3).  Plaintiffs admit that RJBank increased loan loss reserves throughout (and even prior to) the putative Class Period – but complain by not enough in light of market conditions.  Plaintiffs further claim that Defendants "implemented" their scheme to understate reserves by misleading investors as to the strength of RJBank's loan portfolios and falsely touting the bank's conservative management approach.

The problem with Plaintiffs' fanciful theory, however, is their failure to identify any actual fraudulent statement or omission, made with the requisite intent.  Instead, Plaintiffs

allege, in sum and substance, nothing more than their subjective belief that the loan loss reserves at RJBank should have been larger.  Under the standards announced by the Supreme Court in *Iqbal* and *Twombly*, that is patently insufficient to state a securities fraud claim.  As set forth below, the Amended Complaint should be dismissed for a number of independent reasons.

First, Plaintiffs' core theory – that RJF intentionally set aside inadequate loan loss reserves in light of market conditions – does not state a claim for relief under Section 10(b) and Rule 10b-5.  Plaintiffs concede that the loan loss reserve calculation is an estimation of capital that RJBank sets aside to account for potential loan losses and thereby necessitates RJBank's evaluation of several risk factors, such as estimates of borrower defaults, delinquency trends and economic conditions.  Calculating loan reserves based on these risk factors is, therefore, an inherently uncertain exercise.  Thus, akin to a claim that Defendants failed to exercise proper business judgment, courts repeatedly dismiss securities fraud claims that are based on a failure to maintain proper reserves.  *See* § I.A.1.a, *infra*.

Further, statements regarding the loan loss reserve levels are protected by the PSLRA's "safe-harbor" doctrine and the judicially established "bespeaks caution doctrine."  Such statements are inherently forward-looking predictions of the performance of the bank's loan portfolio, and thus are not actionable.  Moreover, some of the very language alleged by the Plaintiffs to be misrepresentations contained cautionary language.  Further, the documents upon which Plaintiffs rely contain repeated warnings by RJF that the economy was in turmoil and that additional losses could occur.  The existence of such cautionary language mandates dismissal.  *See* § I.A.1.b, *infra*.

In addition, like a house of cards, the failure of the Amended Complaint to state a claim with respect to loan loss reserves, mandates dismissal of the Amended Complaint in its entirety – including the allegations as to ways in which the Defendants allegedly "implemented"

this purported scheme. (Am. Compl. ¶¶ 4-8). But even if that were not the case, allegations regarding the "implementation" of the alleged scheme are themselves deficient.

For instance, Plaintiffs allege that Defendants misled investors in reporting the loans' average loan-to-value ("LTV") ratio at the time of origination, rather than at the time of the report. Of course, Plaintiffs do not (and cannot) allege that the reported LTV ratio is itself false. (Am. Compl. ¶ 6). Moreover, the documents upon which Plaintiffs rely expressly state that the LTV ratio is reported as of the time of loan origination. *See* § I.A.2.a, *infra*. Next, Plaintiffs allege that Defendants made misstatements and omissions regarding various characteristics of the RJBank loan portfolio. That claim also independently fails because again Plaintiffs do not – and cannot – allege actual falsity of any statement. At most, Plaintiffs complain merely that they would have appreciated more *detailed* information about the loan portfolio, but do not adequately allege any obligation requiring Defendants to actually provide such detail. Moreover, Plaintiffs' chief complaint – that Defendants did not disclose loans to borrowers in the commercial real estate sector – is belied by the documents upon which Plaintiffs rely. In any event, the alleged corrective disclosure of such information occurred outside the putative Class Period. Finally, many of the statements are either forward looking and/or are also non-actionable puffery. *See* § I.A.2.b, *infra*.

Plaintiffs also rely on alleged statements regarding the Defendants' due diligence in underwriting RJBank's loan portfolio. Plaintiffs say that such statements were proven false when a single loan defaulted in April 2009 resulting in a $28 million loss. Again, there was nothing false about RJF's statements as to its due diligence efforts. Nor can Plaintiffs adequately plead how that one default at RJBank materially affected the stock price of RJF with a loan portfolio of over $7 billion, and total assets of over $18 billion. *See* § I.A.2.c, *infra*.

Likewise, Plaintiffs' reliance on statements that RJF and RJBank were "conservatively managed" (Am. Compl. ¶ 58) are not actionable. Such statements, *i.e.*

expressions of corporate optimism or vague statements of opinion, are non-actionable puffery and protected as forward-looking. *See* § I.A.3, *infra*. Finally, Plaintiffs' allegations regarding certain accounting violations are insufficient to form the basis for a claim under Section 10(b). Letters from auditors confirmed the accuracy of the public filings, and the Amended Complaint has no non-conclusory allegations that such a conclusion was false. *See* § I.A.4, *infra*.

       Second, Plaintiffs' claims must be dismissed because they fail to sufficiently allege scienter, which requires a complaint to state with particularity "facts giving rise to a *strong* inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). Plaintiffs do nothing more than say that RJF should have more accurately predicted loan loss provisions. That is classic – and inactionable – "fraud by hindsight." *See* § I.B.1, *infra*. Plaintiffs' attempts to plead "motive" fare no better. All of the examples relied upon by Plaintiffs – a desire to increase corporate profits, certain stock sales, the executives' motives to increase compensation, and alleged accounting violations – are insufficient as a matter of law to plead scienter. S*ee* § I.B.2, *infra*. Finally, Plaintiffs' last ditch attempt to plead scienter through reckless conduct is similarly dead on arrival, as the Amended Complaint does not allege knowledge of facts contradicting Defendants' public statements, or that Defendants failed to review information that they were obligated to review. *See* § I.B.3, *infra.*

       Third, the Amended Complaint must be dismissed because Plaintiffs fail to sufficiently plead loss causation. Indeed, Plaintiffs admit that the loss about which they complain occurred simultaneously with the global recession. Plaintiffs are unable to demonstrate with any non-conclusory allegations that their alleged losses are attributable to the alleged misstatements and/or omissions and *not* other factors. *See* § I.C, *infra.*

Finally, Plaintiffs' claim under Section 20(a) must be dismissed because Plaintiffs cannot state a claim under Section 10(b) and Rule 10b-5 and cannot adequately plead that any of the Individual Defendants "culpably participated" in the alleged fraud.  *See* § II, *infra*.

## **FACTS AS ALLEGED IN THE COMPLAINT**[1]

**Raymond James**

According to the Amended Complaint, RJF and its affiliates offer financial services including financial planning, asset management, and investment research.  (Am. Compl., ¶ 32). RJF consists of several major divisions, including:  Private Clients (the largest by far of all divisions), Capital Markets, Asset Management, and RJBank.  (Am. Compl., ¶ 36; Panarella Decl., Ex. 34 at p. 2).  According to Plaintiffs, RJBank's loan portfolio grew from less than $700 million in 2005 to $7.5 billion in outstanding loans by April 2009.  (Am. Compl., ¶ 37).  RJBank's outstanding loans included both residential loans and commercial loans.  (Am. Compl., ¶¶ 38, 44). RJF provided detailed statements on a quarterly basis breaking down the financial performance of its divisions.  It also provided detailed information on RJBank, including, *inter alia*: total assets, total loans and total deposits, a description and breakdown of its corporate and residential loan portfolios, total non-performing assets, percentage of residential loans overdue, geographic concentration of residential loans, number of corporate borrowers, industry concentration of corporate borrowers, allowance for loan losses and allowance for loan losses as a percentage of all

---

[1]      In ruling on this motion, the Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Communic'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)); *see also In re Aegon N.V. Secs. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at *5 (S.D.N.Y.  June 23, 2004) (citation omitted) ("The truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted.").  Documents incorporated by reference or relied upon by Plaintiffs in the Amended Complaint and cited herein are attached to the Declaration of Nicholas J. Panarella, dated January 22, 2010 (the "Panarella Decl.").

loans.[2]  Indeed, RJF took a conservative lending approach, as it abstained from participating in "subprime mortgages, credit defaults swaps and high leverage" (Am. Compl. ¶ 155) and also abstained from originating or purchasing "option ARM loans with negative amortization, payment options, reverse mortgages, or other types of exotic loan products." (*See, e.g,* Panarella Decl., Ex. 13 at p. 8; Ex. 18 at p. 8; Ex. 26 at p. 8).

**The Decline of the Real Estate Market and Economic Recession**

Numerous sources cited in the Amended Complaint detail the real estate crisis in 2007 and 2008, including falling housing prices, increased foreclosures, and declines in commercial real estate.  (Am. Compl., ¶¶ 49-50, 125, 127, 128, 133, 137-38).  These factors ultimately led to broader economic decline, with financial institutions reporting enormous losses. (*Id.*, ¶ 51).  RJBank's borrowers in various industries, including consumer products, retail real estate, industrial manufacturing, telecommunications, media, and healthcare, were all impacted by fallout from the broader credit crisis.  (*Id.*, ¶ 52).  RJBank was not immune to the coming recession.  Indeed, RJF repeatedly acknowledged the market's impact on RJBank, and the potential for future losses attributable to industry-wide phenomena.  *See* § I.A.1.b, *infra*.

**RJF's Loan Loss Reserves And Quarterly Earnings Reports**

RJBank records a reserve for loan losses which is set aside to account for potential losses in the loan portfolio.  The loan loss reserve reflects the company's evaluation of: (1) economic conditions that could impact borrowers' ability to pay; (2) regulatory and industry guidance; (3) default and foreclosure rates on similar loans; and (4) collateral values.  (Am. Compl., ¶ 53).  RJBank also must take into account growth and risk concentration in the loan

---

[2]      *See* Panarella Decl., Exs. 1, 4, 8, 12-13, 16, 18, 22, 26, 28 and 33-34.

portfolio.  (*Id.*)  RJF explained in its 2008 form 10-K report that factors taken into consideration include:

> [E]stimates of borrower default probabilities and collateral values; trends in delinquencies; volume and terms; changes in geographic distribution, lending policies, local, regional and national economic conditions; concentrations of credit risk and past loss history.

(*Id.*, ¶ 113).  Each fiscal quarter, RJBank makes a provision for loan losses which is added to RJBank's total reserves as needed.  These provisions are recorded as an expense on RJF's income statement.  (*Id.*, ¶ 54).  RJF also reports RJBank's loan loss reserves as a percentage of RJBank's total loan holdings.  (*Id.*, ¶ 55).

Beginning at least as early as fiscal year 2007, RJBank began building up its loan loss reserves.  For example, just before the beginning of the putative Class Period, in the fourth quarter of 2007, RJBank increased its reserves by $19.1 million, bringing its total loan loss reserves to $53.8 million.  (Am. Compl., ¶ 56).  RJBank continued to increase its loan loss reserves throughout the putative Class Period.[3]

RJF's increases in its loan loss reserves were consistently accompanied by cautionary statements about the economy.  On January 23, 2008, before the putative Class Period even began, Mr. James stated:  "[i]f investor perception worsens and/or actual corporate earnings results manifests that reality, results in the financial services sector will continue to disappoint."  (Am. Compl., ¶ 59).  RJF and Mr. James continued to issue cautionary statements throughout the putative Class Period.  For example:

- On July 22, 2008, Mr. James stated that there were "continuing aftershocks emanating from the 'earthquake' in the financial sector" and that RJF was still

---

[3]    Indeed, contrary to the implications in Plaintiffs' Amended Complaint, the rate at which RJBank increased reserves also accelerated.  Between the first quarter of fiscal year 2008 and the first quarter of fiscal year 2009, RJF nearly doubled its loan loss provisions (from $12.8 million to $24.9 million) and its total reserves (from $59.2 million to $106.1 million).  (Panarella Decl., Ex. 26 at p.9).

"susceptible to the vicissitudes of the economy and stock market in the short term."
(Panarella Decl., Ex. 13 at p. 2).

- On October 21, 2008, Mr. James stated that while RJF had "successfully avoided almost all of the carnage suffered by the larger firms … through abstaining from participating in subprime mortgages, credit defaults swaps and high leverage, the fallout has definitely affected us."  (Am. Compl., ¶ 155; Panarella Decl., Ex. 18 at p. 1).  Mr. James also recognized that "the general economy and the financial markets could experience weakness for the next six to 12 months."  (Panarella Decl., Ex. 18 at p. 2).

- On November 11, 2008, RJF stated that it "anticipate[d] higher charge-offs and non-performing loans levels going into fiscal year 2009."  (Am. Compl., ¶ 161; Panarella Decl., Ex. 20 at p. 1).

- On January 21, 2009, Mr. James noted that during that quarter "a growing recession impacted the global economy" and "U.S. banks experienced burgeoning problems in their consumer and corporate loan portfolios in addition to the damage already manifested in their mortgage portfolios."  (Panarella Decl., Ex. 26 at p. 1).  Mr. James added that "we continue to make large additions to reserves for loan losses to reflect deteriorating economic conditions" and noted that "spreads could decline and charge-offs increase as the economic malaise spreads through the economy."  (*Id.* at p. 3)

On April 14, 2009, in advance of reporting its quarterly results for the second fiscal quarter of 2009, RJF issued a press release stating that it would raise RJBank loan loss reserves to approximately $143 million, or 1.83% of total loans.  RJF explained that this increase was caused by several factors, including the "deterioration of commercial real estate values during the March quarter;" "declining residential property values;" "corporate borrowers whose business is highly dependent on consumer spending;" and "an increase in delinquencies [in the residential loan portfolio] and continued declining residential property values."  (Panarella Decl., Ex. 29 at p. 1).

On April 22, 2009, after the putative Class Period, RJF announced its results for the second fiscal quarter of 2009.  Mr. James stated:

> As we have been forecasting for some time, the malaise in the financial sector, which has migrated to the general economy, has manifested itself in [RJBank's] loan portfolio. For the past several quarters, we have been increasing the rate of additions to the

provision for loan losses to reflect increasingly difficult conditions
in both the real estate and corporate sectors.

(Panarella Decl., Ex. 30 at p. 1).  RJF noted that the now $141 million in loan loss reserves

"reflect[ed] both the dramatic decline in values in the office and retail real estate space", a single

$28 million charge-off and other smaller charge-offs, and specific additions to reserves.  (*Id.*)

**RJF's Stock Prices During the Putative Class Period**

On April 22, 2008, the first day of the putative Class Period, RJF stock closed at

$22.96 per share and on April 14, 2009, the last day of the putative Class Period, RJF stock closed

at $19.06 per share.  (Panarella Decl., Ex. 35).  Thus, RJF's stock price declined 17% during this

period.  An examination of RJF's stock prices tells a fuller story.  Over the course of the putative

Class Period, RJF's stock price initially rose to a (one day) high of $38 on September 19.  It fell

approximately $8 the next trading day and then gradually declined from September 2008

throughout the rest of the putative Class Period – coinciding, of course, with the collapse of the

financial markets.  (*Id.*) Indeed, RJF's stock price reached a low of $11.48 on March 6, 2009 (or

almost $5 below the price at the end of the putative Class Period when Plaintiffs allege RJF made

a corrective disclosure).  Notably, during the putative Class Period, the Dow Jones Industrial

Average (DJI) lost 38% of its value, the S&P 500 Index (SPX) declined 39%, and the S&P Bank

Index (BIX) and KBW Bank Index (BKX) fell 62% and 58%, respectively.  (Panarella Decl., Ex.

37).

In fact, between 2006 and 2008, shares of RJF stock traded between $20 and $30

per share.  (Am. Compl., ¶ 323), and as of January 21, 2010, shares were again trading at

approximately $26.72.  (Panarella Decl., Ex. 36).

**Plaintiffs' Allegations**

Plaintiffs allege, in sum, that between April 22, 2008 and April 14, 2009 Defendants kept loan loss reserves at RJBank artificially low in order to inflate RJF's revenues and stock price.  (Am. Compl., ¶¶ 1-4).  Plaintiffs claim that RJF made its purported "corrective" disclosure on April 14, 2009 when it increased loan loss reserves to $143 million.  (Am. Compl., ¶¶ 167-172).  Section X of the Amended Complaint  (Am. Compl. ¶¶ 173-235) identifies the alleged misstatements or omissions made by Defendants about loan loss reserves during the putative Class Period.  Those alleged misstatements are primarily found in RJF press releases, regulatory reports, analyst calls and interviews.  (*Id.*)  Because these documents each contain the same types of alleged misstatements or omissions, this memorandum categorizes them into four groups:

- Allegations related to the adequacy of RJF's loan loss reserves (Am. Compl., ¶¶ 175, 201, 207-210, 214, 215, 216, 221, 226, 228-29, 231, 233-35, 237-269; the "Loan Loss Reserve Statements");

- Allegations related to the RJF loan portfolio (the loan-to-value ratios, loan concentrations, and due diligence) (Am. Compl., ¶¶ 176-77, 181, 185, 197-98, 201, 207-13, 215-20, 222-24, 230-35; the "Loan Portfolio Statements");

- Allegations related to the management style and/or future of RJF (Am. Compl., ¶¶ 174-175, 178-180, 182, 184, 186-188, 199-210, 212, 216-219, 227; the "Management Style Statements"); and

- Allegations related to Securities and Exchange Commission ("SEC") filings and Generally Accepted Accounting Principles ("GAAP") (Am. Compl., ¶¶ 190-196, 202; the "GAAP Statements").

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs cannot survive a motion to dismiss merely by stating a "formulaic recitation of the

elements of a cause of action." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

Rather, a claim is "plausible" only when "the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

(citing *Twombly*, 550 U.S. at 556). The plaintiff must show "more than a sheer possibility that a

defendant has acted unlawfully." *Id.* Thus, a complaint that pleads facts that are "merely

consistent with [liability] stops short of the line between possibility and plausibility of 'entitlement

to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, under the new standard ushered in by

*Twombly* and *Iqbal*, determining the "plausibility" of a claim requires a context-specific inquiry in

which federal judges should draw on their "judicial experience and common sense." *Id*. at 1950.

Complaints alleging securities fraud must also satisfy the heightened pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities

Litigation Reform Act (the "PSLRA") "by stating with particularity the circumstances constituting

fraud." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d

187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007)

and *ATSI Commc'ns*, 413 F.3d at 99). To comply with Rule 9(b), a plaintiff must:

> (1) specify the statements that the plaintiff contends were fraudulent,
> (2) identify the speaker, (3) state where and when the statements
> were made, and (4) explain why the statements were fraudulent.

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted); *see also ATSI*

*Commc'ns.*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions

are insufficient." *ATSI Commc'ns.*, 493 F.3d at 99 (citation omitted). Under Rule 9(b), "plaintiffs

cannot rest on their say-so that these statements are fraudulent; they must explain why."

*Rombach,* 355 F.3d at 175. Similarly, under the PSLRA, plaintiff must:

> specify each statement alleged to have been misleading, the reason
> or reasons why the statement is misleading, and, if an allegation
> regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which
that belief is formed.

15 U.S.C. § 78u-4(b)(1); *see also In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510,

524 (S.D.N.Y. 2009) aff'd 2009 WL 4893719 (2d Cir. 2009).  Plaintiffs repeatedly fail to meet

their burden.

## I.    THE SECTION 10(B) AND RULE 10B-5 CLAIMS MUST BE DISMISSED

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must adequately

allege: (1) a material misrepresentation or omission; (2) made with scienter, *i.e.* an intent to

deceive or defraud; (3) in connection with the purchase or sale of a security; (4) reliance; (5)

economic loss; and (6) loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42

(2005).  Section 10(b) claims are not intended to compensate investors in a down market with the

benefit of 20-20 hindsight.  *See, e.g., In re Merrill Lynch & Co., Inc. Research Reports Secs.

Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003).

### A.    The Alleged Statements Are Not Material Misrepresentations

Only materially false (or misleading) statements or omissions give rise to liability

under Section 10(b).  Plaintiffs "must establish both the existence of a false statement or omission

and the materiality of that false statement or omission."  *In re Australia and New Zealand Banking

Group Ltd. Secs. Litig.*, No. 08 Civ. 11278 (DCL), 2009 WL 4823923, at *8 (S.D.N.Y. Dec. 14,

2009) (citing *ECA*, 553 F.3d at 197).  A statement or omission is material only if there is a

"'substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available.'"

*In re Novagold Res. Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 291-92 (S.D.N.Y. 2009) (quotation

omitted).  As described below, all of the statements and omissions relied upon by Plaintiffs are not

actionable.

1.    **Plaintiffs Fail To State A Claim With
     Respect To Loan Loss Reserve Statements**

The essence of Plaintiffs' Amended Complaint is that RJF set aside inadequate loan loss reserves in order to increase earnings and artificially inflate RJF's stock price.  (Am. Compl., ¶¶ 2-3).  As described below, all of Plaintiffs' other allegations flow from this core allegation. Plaintiffs' allegations regarding the adequacy of loan loss reserves are based on statements in press releases (Am. Compl., ¶¶ 175, 201, 221, 226, 228-29); on analyst calls discussing quarterly results (Am. Compl., ¶¶ 207-210, 214, 215, 231, 233-35); and on alleged violations of GAAP and other regulatory requirements (Am. Compl., ¶¶ 237-269).  Plaintiffs' claim fails for several reasons.

a.    **Allegations Regarding The Inadequacy Of Loan
     Loss Reserves Are Not Actionable Under Section 10(b)**

Plaintiffs allege that various statements made by RJF regarding loan loss reserves and quarterly loan loss provisions were misleading.  For example:

- "[We] feel comfortable that we've got really the reserves adequately covered in pretty conservative, that [it is] now a little over $85 million in total reserves" (Am. Compl., ¶ 207);

- "I feel more than confident that without any problems in the corporate sector that we have far more reserves than we need" (Am. Compl., ¶ 209); and

- "As we have reported in the past, we still anticipate that existing reserves are sufficient to encompass future charge-offs unless conditions materially worsen in the general economy" (Am. Compl., ¶ 216).

These types of allegations do not state a claim under Section 10(b).  For example, in *Ciresi v. Citicorp*, 782 F. Supp. 819, 821-22 (S.D.N.Y. 1991) *aff'd* 956 F. 2d 1161 (2d Cir. 1992), as here, the plaintiffs alleged that the defendants failed to set adequate loan loss reserves while taking on high-risk loans, and consequently defendants' public statements that the reserves

were adequate were materially misleading.[4]  In dismissing the complaint, the district court held the

"claim that the defendants did not plan their loan reserves properly is essentially a claim that

defendants mismanaged the company." *Id.* at 821.   The district court reasoned that an inquiry into

the adequacy of reserves "would require the court to evaluate [defendant's] business judgment to

determine whether [defendant] did indeed engage in imprudent banking practices." *Id* at 822.

This is improper because the Securities Act imposes liability for false statements made with

fraudulent intent, not corporate mismanagement.  *See Santa Fe Indus. Inc. v. Green,* 430 U.S. 462

at 479-80 (1977) (allegations of mismanagement are not actionable under Section 10(b))).  *See

also Australia and New Zealand Banking Grou*, 2009 WL 4823923, at *7 (same).

        Similarly, in *In re Aegon N.V. Secs. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973),

the plaintiffs alleged Aegon's reserve for bond defaults was "'inadequate given the significant

deterioration in the credit markets' and the composition of Aegon's bond portfolio."  2004 WL

1415973, at *6.  Specifically, the *Aegon* plaintiffs alleged that defendants "falsely represented that

Aegon was on track to achieve earnings growth of 10% to 15%." *Id.* at *2.  Plaintiffs alleged that

the defendants, realizing that this growth could not be obtained because of economic conditions

and increased defaults, took several accounting measures, including "understat[ing] its liabilities

for minimum benefit guarantees and provisions for bond defaults." *Id.*  Such measures, said

plaintiffs, "result[ed] in [Aegon] materially overstating its reported net income and earnings per

share throughout the Class Period." *Id.*

---

[4]     Indeed, Plaintiffs' allegations here mirror those in *Ciresi*, where it was alleged that "defendants have engaged consciously in a course of conduct of disseminating misleading statements to the public regarding the financial condition of Citicorp and [Citibank], specifically the condition of the loan portfolio and the allowance for possible loan losses … of Citicorp and the Bank. The effect of such a craftily conceived and carried out process was to create and maintain the image that Citicorp … has been able to avoid the massive problems generated by years of imprudent lending."  782 F. Supp. at 821 n.3.

The district court found that while plaintiffs alleged that reserves were "materially understated" and were "unreasonable in light of the then current economic conditions," they did not "claim that [Aegon] misrepresented its data." *Id.* at *6, 8. The district court found that such a claim "does not support an action for violation of the securities laws." *Id.* at *8 (citation omitted). It reasoned:

> Juxtaposing Aegon's future earning projections during the Class Period, on the one hand, with its subsequent announcement that it would be … bolstering its reserves for bond defaults …, on the other hand, does not in itself establish the inference that Aegon's reserves must have been inadequate throughout the entire Class Period, that the Defendants' economic assumptions must have been unjustified throughout the entire Class Period and that the Defendants purposefully concealed this information from the public in order to defraud investors.

*Id.* at *7. *See also In re Kindred Healthcare Inc. Secs. Litig.*, 299 F. Supp. 2d 724, 729 n. 3 (W.D.Ky. 2004).

Here, Plaintiffs ask this Court to draw the same inferences rejected in *Ciresi* and *Aegon, i.e.,* that the size of the reserve announced by RJF on April 14, 2009 indicates that reserves were purposefully kept low during the entire putative Class Period. As in *Aegon*, while Plaintiffs repeatedly allege that the RJF loan loss reserves were *inadequate*, they do not – and cannot – allege that any number was *misrepresented*. (Am. Compl. ¶¶ 175, 190, 205, 207, 209, 226-228, 230-235). Rather, Plaintiffs only allege in conclusory fashion that the statements were false and misleading because, for example, "the Defendants knew or were extremely reckless in not knowing that RJBank's loan loss reserves were insufficient to account for future losses" (*Id.*, ¶ 221); or "RJBank's reserves did not adequately account for the risks associated with RJBank's growing commercial and residential loan portfolios." (*Id.*, ¶ 232). Such allegations simply do not state a claim for relief.

Moreover, Plaintiffs allege no "specific facts" from which this Court can infer that the loan loss reserves were improperly calculated or otherwise inadequate. Nor is that the Court's proper role in a securities fraud case. *See Ciresi*, 782 F. Supp. at 822. *See also AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) (Rule 9(b) not met where "[a]lthough the plaintiffs have claimed in conclusory terms that the loss figures were materially false, they have provided no indication of the amount by which the figures were supposedly under or overstated"); *In re MSC Indus. Direct Co.*, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (citation omitted) (plaintiffs failed to "allege what the inventory reserve for Enco or any other acquired company should have been").[5]

### b. The Loan Loss Reserves Statements Are Protected Under the PSLRA And The "Bespeaks Caution" Doctrine

Even if allegations of inadequate reserves were actionable – which they are not – the statements alleged by Plaintiffs to be misleading are protected by: (i) the statutory PSLRA "safe harbor" doctrine; and/or (ii) the judicially created "bespeaks caution" doctrine. Both doctrines render a forward-looking statement not actionable when the statement at issue is accompanied by cautionary language. The PSLRA provides that an issuer of securities:

> shall not be liable with respect to any forward-looking statement ... if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial.

15 U.S.C. § 78u-5(c)(1). Simply, the PSLRA "creates a 'safe harbor' for forward-looking statements, even those that, with the benefit of hindsight, turn out to be untrue." *Aegon*, 2004 WL

---

[5]     Plaintiffs' allegations as to loan loss reserves also fail under Rule 9(b) because they do not attempt to allege exactly how much higher RJF's loan loss reserves should have been during the putative Class Period. *See Aegon*, 2004 WL 1415973, at *8.

1415973, at *6 (citing 15 U.S.C. §78u-5(c)(1)).  Moreover, the statutory definition of "forward-looking statement" includes, among other things,

> a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, … or other financial items"; "a statement of the plans and objectives of management for future operations"; and "a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations.

15 U.S.C. § 78u-5(i)(1).

Further, in considering this motion, the court must examine "any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e); *see also In re Cross Media Mktg Corp. Secs. Litig.*, 314 F. Supp. 2d 256, 267 (S.D.N.Y. 2004).

Similarly, the "bespeaks caution" doctrine "removes liability for statements accompanied by sufficiently cautionary language" so that "the existence of cautionary language effectively negates the materiality of an alleged misstatement or omission."  *Australia and New Zealand Banking Grp.*, 2009 WL 4823923, at *13 (citing *Rombach*, 355 F.3d at 173).  This doctrine requires courts to consider the alleged disclosure "in its entirety to determine whether a reasonable investor would have been misled."  *Id.*  For instance, in *Australia and New Zealand Banking Group*, the court found that statements about revenue growth and potential losses were non-actionable under the bespeaks caution doctrine because they contained cautionary language, including, *inter alia*, the phrases "we expect", that revenue was "on track", and that material losses were "unlikely".  *Id.*  The Loan Loss Reserve Statements are protected by these doctrines for four independent reasons.

First, a loan loss reserve is an inherently forward-looking projection, the "accuracy" of which cannot be determined, if at all, until future loss is incurred, and are therefore

clearly within the scope of the PSLRA safe harbor provisions. For instance, in *Kindred Healthcare*, investors brought a securities fraud action against a healthcare company and its officers, claiming that the defendants misstated the reserves intended to cover professional liability claims in order to boost earnings and the stock price. 299 F.Supp.2d at 727. Plaintiffs claimed that the defendants' statements that reserves were adequate proved false when the company was forced to significantly increase reserves, due to a single $55 million charge, which led to a 40% decline in the company's stock price. *Id.* at 726. The court held that statements as to the adequacy of reserve levels did not state a claim:

> Assertions about the adequacy of Kindred's reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.

*In re Kindred Healthcare, Inc. Secs. Litig.* 299 F. Supp. 2d at 724, 738 (W.D. Ky. 2004).

Similarly, here, Plaintiffs admit that the loan loss reserves are "to account for *potential* losses stemming from the Bank's loans." (Am. Compl., ¶ 53) (emphasis added). As RJF explained in its 2008 form 10-K report, the level of the reserves depended upon:

> [E]*stimates of borrower default probabilities* and collateral values; *trends* in delinquencies; volume and terms; changes in geographic distribution, lending policies, local, regional and national economic conditions; concentrations of credit risk and past loss history.

(Am. Compl., ¶ 113; Panarella Decl., Ex. 22 at p. 52) (emphasis added). The loan loss reserve levels, therefore, necessarily reflect RJF's estimation and business judgment of: (1) economic conditions that could impact borrowers' ability to pay; (2) regulatory and industry guidance; (3) default and foreclosure rates on similar loans; and (4) collateral values. (Am. Compl., ¶ 53). Accordingly, as in *Kindred*, RJF's alleged statements regarding the adequacy of loan loss reserves

"are inherently forward-looking statements under the PSLRA" because they are "predicated on projections of future events." *Kindred Healthcare,* 299 F. Supp. 2d 724 at 738-39.

Second, many of the Loan Loss Reserve Statements were made in RJF press releases (*see* Am. Compl., ¶¶ 175, 201, 221, 226, 228-29). Each and every one of these press releases contained meaningful cautionary language. For example, the April 22, 2008, press release states:

> To the extent that Raymond James makes or publishes forward-looking statements (regarding economic conditions, management expectations, strategic objectives, business prospects, anticipated expense savings, loan reserves/losses, financial results, anticipated results of litigation and regulatory proceedings, and other similar matters), a variety of factors, many of which are beyond Raymond James' control, could cause actual results and experiences to differ materially from the expectations and objectives expressed in these statements. These factors are described in Raymond James' 2007 annual report on Form 10-K, which is available on raymondjames.com and sec.gov.

(*See* Panarella Decl., Ex. 8 at p. 4).[6] Moreover, this cautionary language expressly incorporates RJF's SEC filings, which in turn contain additional cautionary language.[7] Such a disclaimer protects these statements as a matter of law. *See Cross Media*, 314 F. Supp. 2d at 268 ("In the light of all of these cautions ... [in] Cross Media's 10-K and 10-Q reports ... [t]he reasonable investor would not have been misled by []representations of expected earnings").

---

[6]    The July 22, 2008, October 21, 2008, November 11, 2008, and January 21, 2009 press releases contain similar if not identical language and likewise refer to applicable SEC filings. (Panarella Decl., Ex. 13, at p. 3; Ex. 18 at p. 3; Ex. 26 at p. 4). The November 11, 2008 press release also stated: "The data provided above is for informational purposes only and is not a solicitation to buy or sell Raymond James Financial stock." (Panarella Decl., Ex. 20, at p. 3)

[7]    "[T]he Company cautions readers that a variety of factors could cause the Company's actual results to differ materially from the anticipated results or other expectations expressed in the Company's forward-looking statements… The Company's operations and financial results are subject to various risks and uncertainties … that could adversely affect its business, financial condition, results of operations, cash flows, and the trading price of its common stock." (*See* Panarella Decl., Ex. 22, p. 15). Incorporating cautionary language is appropriate in this circumstance. *See Goodman Life Income Trust v. Jabil Circuit, Inc.*, 560 F.Supp.2d at 1221, 1237 (M.D. Fla. 2008) (quotation omitted). ("Congress was explicit in stating that meaningful cautionary language could incorporate by reference information contained in documents filed with the SEC") (citation omitted).

Moreover, certain of the Loan Loss Reserve Statements were made during analyst conference calls discussing those same quarterly results contained in the press releases.  (*See* Am. Compl., ¶¶ 179-82, 207-11, 230-35).  The date, time, and dial-in information for each call were announced in the corresponding press release regarding quarterly results, each of which explicitly stated that "[t]he subjects to be covered [on the call] may also include forward-looking information."  (*See* Panarella Decl., Ex. 1 at p. 2; Ex. 8 at p. 3; Ex. 13 at p. 2; Ex. 18 at p. 2).

Third, many of the statements specifically identified by Plaintiffs as false and misleading are themselves expressly limited by cautionary language and are therefore protected. For example, Plaintiffs rely on the following, despite the fact that they contain forward-looking and/or cautionary language (all emphasis below added):

- "[W]hile absolute losses *will increase* somewhat in the near term related to the fall out from the *sub-prime crisis and economic slowdown, we expect* our reserves for losses at 1.24 percent of loan balances to be adequate to subsume any *actual future losses* related to *current market conditions.*" (*See* Am. Compl., ¶ 175 [April 22, 2008 Press Release]; Panarella Decl., Ex. 8 at p. 2).

- "We actually *expect charge offs to go up* a little bit on a nominal basis because of the size of the current balance sheet, but we're still operating well within the reserves and I *think* we're in good shape in terms of asset quality."  (*See* Am. Compl., ¶ 205 [July 22, 2008 appearance on CNBC's *Closing Bell*]; Panarella Decl., Ex. 14).

- "The A&D loans, he has tended to mark them down the instant that there is any question about any problems dealing with them *and we do anticipate that a couple of other of these loans will have some sort of loss exposure.*" (*See* Am. Compl., ¶ 209 [July 23, 2008 Analyst Call]; Panarella Decl., Ex. 15 at p. 14).

- "we still *anticipate* that existing reserves are sufficient to encompass future charge-offs *unless conditions materially worsen in the general economy.*" (*See* Am. Compl., ¶ 216 [November 11, 2008 Press Release]; Panarella Decl., Ex. 20 at p. 1).[8]

---

[8]    *See also*, Am. Compl., ¶ 231, Panarella Decl., Ex. 27  [January 22, 2009 Analyst Call] at p. 11 ("[We are] *trying* to put ourselves in a situation where we don't get *unexpected surprises.*"); Am. Compl., ¶ 233, Panarella Decl., Ex. 27 ("I *would think* the provision will be lower."); Am. Compl., ¶ 207, Panarella Decl., Ex. 15 [July 23, 2008 Analyst Call] at p. 14; ("Our corporate loans based on the risk profile of each individual loan when we book it, it

- 20 -

Fourth, throughout the Class Period, RJF specifically and repeatedly (i) warned of potential losses in RJBank's loan portfolio due to worsening economic conditions, and (ii) explained the nature of RJF's loan loss reserves and provisions, and the factors that went into a determination of those reserves. For example (all emphasis below added):

- "[The nature of bank accounting is that] it tends to spread out the losses on these whole loans over a long period of time. So, there are still more losses to be taken in those bank securities." (*See* Panarella Decl., Ex. 10 [April 23, 2008 Analyst Call] at p. 3). "Needless to say, the decline in real estate prices is continuing and the risk of recession is still present." (*See* Panarella Decl., Ex. 13 [July 22, 2008 Press Release] at p. 2).

- "[W]e anticipate *higher charge-offs and non-performing loan levels* going into fiscal year 2009." (*See* Panarella Decl., Ex. 20 [November 11, 2008 Press Release] at p. 1).

- "Unfortunately, one can't annualize the first quarter because economic conditions are still worsening. The outlook for the revenue side of the securities business looks anemic for the balance of 2009." (*See* Panarella Decl., Ex. 26 [January 21, 2009 Press Release] at p. 3).[9]

Plaintiffs cannot rely on cherry-picked phrases from within the larger alleged statements made by RJF. *See In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526, at *11 (S.D.N.Y. Feb. 28, 2006) (plaintiff failed to state a claim for securities fraud where defendant warned of the losses at issue and disclosed basis for challenged statement regarding funding); *Cross Media*, 314 F. Supp. 2d at 268 (considering total mix of information available to investors and dismissing claims). Rather, RJF gave more than adequate warning of the very losses which forms the basis of Plaintiffs' entire theory of securities fraud. *See Salomon Analyst Winstar*

---

varies – *it could swing by almost 100 basis points based on the risk profile of the transaction*."); Am. Compl., ¶ 209, Panarella Decl., Ex. 15 [July 23, 2008 Analyst Call] at p. 14; ("I feel more than confident that *without any problems in the corporate sector* that we have far more reserves than we need.").

[9]    *See also*, Panarella Decl., Ex. 10 [April 23, 2008 Analyst Call] at p. 3 ("Some of these financial results are going to continue to trickle in negatively, especially in the bank sector."); Panarella Decl., Ex. 13 [July 22, 2008 Press Release] at p. 2 ("Raymond James and the financial services industry are susceptible to the vicissitudes of the economy and stock market in the short term…."); Panarella Decl., Ex. 26 [January 21, 2009 Press Release] at p. 3 ("[S]preads could decline and *charge-offs increase* as the economic malaise spreads through the economy.").

*Litig.*, 2006 WL 510526, at *11.  These repeated warnings preclude Plaintiffs' claims as a matter of law.  *See, e.g., Australia and New Zealand Banking Group*, 2009 WL 4823923, at *13.

### 2.    Allegations As To Loan Portfolio Statements Fail To State A Claim

Plaintiffs also rely on several statements made regarding RJF's loan portfolio. These allegations are, however, merely attempts by Plaintiffs to provide *reasons* why the loan loss reserves were set too low by RJF, and are not independent theories of liability.  Because Plaintiffs fail to adequately state a claim with respect to the loan loss reserves, derivative allegations as to the Loan Portfolio Statements must be dismissed as well.

Nevertheless, to the extent that Plaintiffs contend that these misrepresentations are independent of the Loan Loss Reserve Statements, all three subsets of the Loan Portfolio Statements, namely (i) the loan-to-value ratios ("LTV" ratios) of RJF loans; (ii) loan concentrations; and (iii) due diligence, fail to sufficiently state a claim for relief.

### a.    Statements Regarding LTV Ratios Do Not State A Claim

According to the Amended Complaint, "[a]n LTV ratio is the amount of a home loan as a percentage of the total appraised value of a home."  (Am. Compl., ¶ 92).  Plaintiffs allege that "Defendants knew that the LTV ratios calculated at the time of loan origination become outdated as the value of the property changes."  (*Id*).  According to Plaintiffs, "Defendants should have disclosed that the average LTV ratios they disclosed were of limited utility."  (Am. Compl., ¶ 94).  Plaintiffs further allege that the LTV (loan-to-value) ratios were "misleading, implying to investors that RJBank's residential mortgages were safer and at a lower risk of default than they in fact were."  (Am. Compl., ¶185; *see also* Am. Compl. ¶¶ 176, 224).  Plaintiffs' contentions are misplaced and not actionable.

First, as with the Loan Loss Reserve Statements, Plaintiffs do not – and cannot – allege that the publicly reported LTV ratios were *misrepresented*.  Instead, Plaintiffs allege only

that they were misleading because such ratios were calculated "at origination."  As Plaintiffs

concede, the publicly available RJF documents relied on by Plaintiffs *specifically disclose that the*

*LTV ratios were calculated at loan origination*.  (Panarella Decl., Ex. 8 at p. 13; Ex. 13 at p. 10;

Ex. 18 at p. 10; Ex. 26 at p. 10).  The statements are not false and therefore any reliance upon them

is insufficient to state a claim as a matter of law.  *See*, § I.A.1.a, *supra*.

Second, to the extent that Plaintiffs allege that Defendants omitted providing

updated LTV ratios, their claim must likewise fail.  Plaintiffs fail to cite to any obligation on the

part of RJF to provide updated LTV ratios.  Absent such an obligation, the alleged omission

cannot form the basis for a Section 10(b) claim.  *See Kindred Healthcare*, 299 F. Supp. 2d at 732.

### b.     Loan Concentration Statements Are Not Actionable

Plaintiffs also allege that Defendants made misstatements and omissions regarding

various characteristics of the RJBank loan portfolio, including statements about loan

concentration[10] and exposure to allegedly risky commercial real estate loans, including "Core

CRE" loans,[11] overall credit quality,[12] and RJBank's lack of exposure to subprime loans.[13]  Like

---

[10]     *See, e.g.,* Am. Compl., ¶¶ 87-90 ("Defendants concealed the potential impact of a single loan default, despite specific regulatory requirements that mandated disclosure"), ¶ 211 (RJF "failed to disclose … the likelihood that one defaulting loan would cause a material disruption"), ¶ 217 (RJF misrepresented that its "selective purchase criteria more than offset additional risk from buying interest-only mortgages"), ¶ 235 (RJF failed to disclose that "increased commercial loan values put the Bank at risk of loss based upon the default of only one loan").

[11]     According to Plaintiffs, "Core CRE" loans are loans "secured in part or entirely by real estate" which are "made to borrowers in the real estate industry" such as developers or owners of office buildings, retail space and warehouses. (Am. Compl., ¶ 82).  Plaintiffs allege that, prior to the second quarter of 2009, Plaintiffs should have revealed the amount of Core CRE in the loan portfolio.  *See, e.g,* Am. Compl., ¶¶ 80-83, 84 ("[B]y concealing this increasing risk, Defendants were able to maintain the fiction that the Bank's reserves were adequate"), ¶¶ 85-86, 201 (certain statements were misleading because "RJBank was increasing its exposure to … risky commercial real estate loans"), ¶ 208 ("commercial real estate concentrations required RJBank to keep a far higher loan loss reserve"), ¶¶ 210, 219, 228, 232, 235.

[12]     *See, e.g.*, Am. Compl., ¶¶ 181 ("[W]e have an equally good credit profile [in residential] as we do on the commercial side in terms of superior statistics to the industry averages"), 205 ("I think we're in very good shape in terms of asset quality"), ¶¶ 206-07 (It's "sometimes hard to compare institutions in terms of the asset mix, we don't have any consumer loans, no credit cards, no auto loans that typically have higher reserves."), ¶ 209 ("[T]he Residential loans are nominal way below industry averages in terms" and the "A&D loans" "do have good assets"), ¶ 216 ("[RJBank] believes it will continue to outperform peer banks with regard to credit quality measures").

the allegations regarding LTV ratios, all of these allegations are offered as explanations of why RJF's loan loss reserves were inadequate, and are therefore derivative of Plaintiffs' core allegations. Accordingly, they must be dismissed for the reasons stated above. *See* § I.A.1, *supra*. Moreover, these allegations also fail for several, independent reasons.

First, Plaintiffs fail to allege that these statements were *misrepresentations*. Plaintiffs do not allege, for example, that RJF's statements regarding loan concentration or exposure based on subprime loans were in any way false, or that statistics regarding RJBank's credit quality as compared to peer banks were misstated.

Second, Plaintiffs' allegation with respect to the so-called "Core CRE" loans fails for several, independent reasons. Plaintiffs allege that RJF failed to adequately disclose exposure to such loans in its loan portfolio prior to April 22, 2009. (*See* Am. Compl., ¶ 84-86). Specifically, Plaintiffs claim that Defendants violated Section 10(b) by failing to subdivide its accounting of "Corporate & Real Estate Loans" into "Corporate Loans" and "Commercial Real Estate Loans" prior to April 22, 2009. (Am. Compl. ¶ 82-83; Panarella Dec., Ex. 26, p. 9, *compare with,* Panarella Decl., Ex. 30, p. 10). Plaintiffs allege that RJF disclosed its exposure to loans to borrowers in the real estate industry for the first time in its "April 22, 2009 earnings release." (Am. Compl. ¶ 82-83). This allegation is meritless. Initially, the allegedly omitted fact was first disclosed *after* the putative Class Period ended (*i.e.*, April 14, 2009). Thus, by Plaintiffs' own admission, the revelation of this allegedly omitted fact did not negatively affect RJF's stock price. Indeed, on the day the Core CRE loans were allegedly disclosed (*i.e.*, April 22, 2009), there

---

[13]    *See, e.g.,* Am. Compl., ¶¶ 177 ("[W]e avoided subprime lending, so a lot of the direct losses that have been experienced by the major banks we haven't experienced"), ¶ 212 ("[W]e have successfully avoided almost all of the carnage suffered by the larger firms … through abstaining from participating in subprime mortgages."), ¶ 216 ("[T]he managed growth strategy, commitment to risk management and conservative lending practices that helped the firm avert the subprime crisis").

was no material change in RJF's stock price and in fact, the price rose on April 23, 2009 when

RJF discussed its quarterly report with analysts.  (Panarella Decl., Ex. 35).

Moreover, the documents relied upon by Plaintiffs readily demonstrate that

investors had an abundance of information regarding the amount of RJF's loans that were secured

by real estate.  For instance, in every 10Q report, RJF disclosed the dollar amounts of "Real Estate

Construction Loans," "Commercial Real Estate Loans," and "Residential Mortgage Loans".

(Panarella Decl., Ex. 4 at p. 10-11; Ex. 12 at p. 11-12; Ex. 16 at p. 11-12; Ex. 28 at p. 17-18; Ex.

33 at p. 24-25).  These reports also told the public that "Commercial Real Estate Loans" were

loans "wholly or partially secured by real estate."   And they revealed the percentages of the total

loan portfolio each of the loan categories represented.  *Id.*  That is not all.  In every quarterly

earnings report (upon which Plaintiffs also rely), RJF specifically disclosed that the item

"Corporate & Real Estate Loans" included "Commercial, Real Estate Construction, and

Commercial Real Estate Loans" (Panarella Decl., Ex. 8 at n.2; Ex. 13 at n. 4; Ex. 18 at n. 4; Ex. 26

at n. 4); and the press releases accompanying those earnings reports stated that the Corporate

Loans include loans "secured by mortgages on specific real estate" and included "project finance

real estate loans and commercial lines of credit and term loans."  *Id.*  Any reasonable investor,

therefore, was on notice that the loan portfolio included such loans to "borrowers in the real estate

industry."  (Am. Compl. ¶ 82).

In sum, Plaintiffs do nothing more than allege that certain information that *was*

provided was not provided in sufficient detail.  This is insufficient to state a claim as a matter of

law.  A corporation "is not required to disclose a fact merely because a reasonable investor would

very much like to know that fact."  *Vladimir v. Bioenvision Inc.*, 606 F.Supp.2d 473, 484

(S.D.N.Y. 2009).  An alleged omission is actionable "only when the corporation is subject to a

duty to disclose the omitted facts."  *Id.* at 484-85*; see also Kindred*, 299 F.Supp.2d at 732

(quotations omitted).  Plaintiffs do not – and cannot – point to anything that requires RJF to provide the additional detail it chose to provide in the April 2009 report, and RJF cannot (and should not) be liable for voluntarily providing an additional level of detail to its loan portfolio.

Moreover, even if Plaintiffs had successfully alleged such an omission by the Defendants, they do not (and cannot) plausibly allege that such additional detail would have altered the "total mix" of available information.  *See Novagold*, 629 F. Supp. 2d at 291-92.  This is particularly true where Plaintiffs already knew that RJBank had outstanding real estate loans, RJBank's total loan portfolio exceeded $7.5 billion, and RJF's total assets exceeded $18.1 billion in April 2009.  (Panarella Decl., Ex. 30).[14]

Third, many of the challenged statements were forward-looking under the PSLRA or otherwise protected under the bespeaks caution doctrine.  *See*, n. 5, 7, 9 and § I.A.1.b, *supra*.

Finally, many of the challenged statements regarding the superior asset quality of RJBank's loan portfolio are nothing more than general statements of corporate optimism that do not give rise to securities frauds claims.  *See, e.g.,* Am. Compl., ¶ 181 (RJF has an "equally good credit profile [in residential] as we do on the commercial side in terms of superior statistics to the industry averages"); ¶ 205 ("I think we're in very good shape in terms of asset quality.")  Such statements are non-actionable puffery.  *See* § I.A.3.a, *infra*.

---

[14]    Plaintiffs make a similar untenable argument with respect to an alleged change in reporting the reserves for loan loss and unfunded commitments.  (Am. Compl. ¶¶ 77 n. 1, 165 n. 2, 254).  Reliance on this reporting change fails as well.  First, RJBank fully disclosed that its loan loss reserves included "unfunded commitments."  Each of the earnings reports explicitly reported reserves as "Reserve for Loan Loss & Unfunded Lending Commitments."  In its January 2009 earnings report, RJF simply subdivided that category into "Reserves for Loan Loss" and "Reserves for Unfunded Lending Commitments." (Panarella Dec., Ex. 17, p. 9, *compare with,* Panarella Decl., Ex. 26, p. 9).  Any reasonable investor was therefore on notice that prior to the change in reporting, the reserves included unfunded commitments.  Second, the change occurred, by Plaintiffs' own admission on December 31, 2008.  (Am. Compl. ¶ 165 n. 2)  Plaintiffs, however, allege no casual link between this reporting change and their alleged losses in April 2009 – months after the change.  Finally, as with the so-called "Core CRE" loans, Plaintiffs do not (and cannot) plausibly allege that such additional detail would have altered the "total mix" of available information.  *See Novagold*, 629 F. Supp. 2d at 291-92

c.    <u>Statements Regarding Due Diligence Do Not State A Claim</u>

Plaintiffs also allege that certain statements made by RJF concerning due diligence and loan defaults were fraudulent.  Specifically:

- "Loans sourced from agent or syndicate bank are independently underwritten by RJBank credit personnel."  *See* Am. Compl., ¶ 197 [April 25, 2008 Investor Day Presentation]; Panarella Decl., Ex. 11 at p. 37).

- "this very detail due diligence review, loan-by-loan, that we go through on even residential loans has really proven to be a saving grace contrasted to other lenders on the banking front."  *See* Am. Compl., ¶ 213 [October 22, 2008 Analyst Conference Call]; Panarella Decl., Ex. 19 at p. 4).

- "Raymond James Bank believes it will continue to outperform peer banks with regard to credit quality measures given its stringent underwriting criteria."  *See* Am. Compl., ¶ 216 [November 11, 2008 Press Release]; Panarella Decl., Ex. 20 at p. 1).

None of these statements are actionable.  First, these statements are not false. Plaintiffs' sole support for their claim of falsity is their self-serving characterization (not even a quote) of an alleged statement from a confidential witness ("CW2") who allegedly confirmed *only* that one particular loan that led to a $28 million charge-off in the second quarter of 2009 "was not independently underwritten by RJBank" and that the bank "relied on the primary bank to perform due diligence on the loan."  (Am. Compl., ¶ 198).  On its face, CW2's alleged statement does not contradict the statements referenced above.[15]

Moreover, Plaintiffs' reliance on a confidential witness who was Senior Vice President at RJBank from February 2008 to July 2009 is inadequate, as Plaintiffs do not allege how CW2 has knowledge of this particular loan.  Plaintiffs fail to describe CW1 and CW2 "with sufficient particularity to support the probability that a person in the position occupied by the

---

[15]    Plaintiffs make a number of other conclusory allegations of falsity, none of which are inconsistent with the language in the quarterly reports or SEC filings.  *See, e.g.,* Am. Compl. ¶¶ 198, 223 ("did not independently underwrite all of its loans"); Am. Compl. ¶ 215 ("often relied on third parties to perform the due diligence"); Am. Compl. ¶ 220 ("relied on other banks to perform due diligence and to underwrite some of the Bank's loans").

source would possess the information alleged." *In re PXRE Group, Ltd., Sec. Litig.*, 600 F.Supp.2d 510, 526 (S.D.N.Y. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000)); *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.Supp.2d 365, 376 (S.D.N.Y. 2007). This reliance on confidential witnesses is dubious following the Supreme Court's ruling in *Tellabs*. *See, e.g., PXRE*, 600 F.Supp.2d at 526 n.18 (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir.2007)).

Second, Plaintiffs fail to plead facts showing that this $28 million charge-off was a material factor to RJBank's financial results, much less to RJF's share price. As shown by the quarterly reports, as of March 31, 2009, RJBank had $7.55 billion in total loans outstanding. (Panarella Decl., Ex. 30, at p. 10). Moreover, for the prior quarter, RJF had existing reserves of more than $100 million. *Id.* Plaintiffs do not – and cannot – dispute these facts, yet fail to plead in any nonconclusory manner how additional information regarding the diligence done on this one loan would have "significantly altered the 'total-mix' of information made available." *Novagold*, 629 F. Supp. 2d at 291-92 (citation omitted).[16]

### 3.    Plaintiffs Fail To Sufficiently Allege Falsity Or Materiality Of The Management Style Statements

Plaintiffs also allege that Defendants' statements regarding, *inter alia*, RJF's "conservative management approach" were materially misleading because of the alleged inadequacy of the loan loss reserves. For example:

- "I'm frustrated by the fact that our results and those of many other conservatively managed financial institutions have been impacted negatively by fallout from inadequate underwriting standards ... ". (Am. Compl., ¶ 174 [April 22, 2008 Press Release]; Panarella Decl., Ex. 8 at p.2).

---

[16]    Notably, RJF released information regarding the $28 million charge-off 8 days *prior* to the due date of its quarterly results. (*See* Panarella Decl., Ex 29). The early release of negative information "undercuts the allegation that defendants were acting recklessly." *In re Nokia Corp. Secs. Litig.*, No. 96 CIV. 3752 (DC), 1998 WL 150963, at *13 (S.D.N.Y. April 1, 1998).

- "I'd express some frustration about that because, you know, we have a very conservative management approach in our business and so we've avoided a lot of problems." (Am. Compl., ¶ 178 [April 22, 2008 *CNBC* Interview]; Panarella Decl., Ex. 9).[17]

Here too, the failure to adequately state a claim with respect to Loan Loss Reserve Statements (*see* § I.A.1, *supra*) is fatal to Plaintiffs' claims based on the Management Style Statements. In any event, allegations regarding the Management Style Statements fail for several independent reasons.

### a.    The Statements Are Non-Actionable Puffery

Plaintiffs' Management Style Statements are non-actionable puffery. "It is well-settled that a complaint alleging violations of the securities laws may not rely upon statements that are true, or constitute puffery or ordinary expressions of corporate optimism." *In re Bristol-Meyers Squibb Secs. Litig.*, 312 F. Supp. 2d at 549,557 (S.D.N.Y. 2004); *see also ECA*, 553 F.3d at 206; *Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir. 1996). According to the Second Circuit, statements of, for example, "highly disciplined risk management":

> are too general to cause a reasonable investor to rely upon them…
> [T]hese statements did not, and could not, amount to a guarantee
> that [JPMC's] choices would prevent failures in its risk management
> practices…. JPMC's statements were merely generalizations
> regarding JPMC's business practices. Such generalizations are
> "precisely the type of 'puffery' that this and other circuits have
> consistently held to be inactionable."

---

[17]       *See also* Am. Compl., ¶ 180 ("[W]e've always had a very conservative business model here, where risk management is key. . . .  And we've always had a very conservative balance sheet in terms of our approach to the business" [April 23, 2008 Analyst Call]; Panarella Decl., Ex. 10 at p. 6); ¶ 199 ("On the other side of the ledger, RJBank experienced excellent profit results, as we managed asset growth at a more sustainable level" [July 22, 2008 Press Release]; Panarella Decl., Ex. 13 at p. 1); ¶ 207 ("Our corporate loans based on the risk profile of each individual loan when we book it, it varies … We actually feel we have been pretty conservative in the way that we've reserved against these certain assets" [July 23, 2008 Analyst Call]; Panarella Decl., Ex. 15 at p. 14); ¶ 200 ("RJBank was categorized as 'well capitalized' under the bank regulation framework" [July 22, 2008 Press Release]; Panarella Decl., Ex. 13 at p. 8); ¶ 216 ("Raymond James' leadership believes that the managed growth strategy, commitment to risk management and conservative lending practices that helped the firm avert the subprime crisis and post solid operating results in 2007 will continue to serve the company well in the coming year" [November 11, 2008 Press Release]; Panarella Decl., Ex. 20 at p. 1).

*ECA*, 553 F.3d at 206 (quoting *Lasker,* 85 F.3d at 59).

As with the statements at issue in *ECA*, RJF's statements regarding its conservative business practices are so general that "[n]o investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank makes these statements." *Id.* A finding that such statements are actionable "would bring within the sweep of federal securities laws many routine representations made by investment institutions." *Id.*[18] Plaintiffs' allegations based on the Management Style Statements therefore should be dismissed.

### b. The Statements Are Protected Under the PSLRA And The "Bespeaks Caution" Doctrine

Plaintiffs' allegations regarding the Management Style Statements are also inactionable because these statements are either "forward looking" under the PSLRA, or protected under the judicially-created counterpart called the "bespeaks caution" doctrine. *See* § I.A.1.b, *supra*.

First, with two exceptions, the Management Style Statements were made in RJF press releases (*see* Am. Compl., ¶¶ 174, 175, 199, 200, 216), each of which contained cautionary language and expressly incorporated RJF's SEC filings, which in turn contained additional cautionary language, or during analyst conference calls discussing those same quarterly results contained in the press releases. *See* § I.A.1.b, *supra*.

---

[18] Plaintiffs do not (and cannot) allege, with any specificity, the falsity of the Management Style Statements. Instead, Plaintiffs do nothing more than make the repeated conclusory allegations that "RJBank was not conservatively managed" because it was "focused on loan production, and not risk management." *See* Am. Compl. 184; *see also* Am. Compl. ¶ 219 ("RJBank was focused on loan growth as opposed to portfolio monitoring"). Even if these statements were not classified as puffery or forward-looking, there are no non-conclusory allegations to dispute their truth. To state a claim, "plaintiffs 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Australia and New Zealand Banking Group,* 2009 WL 4823923, at *7 (quoting *Rombach*, 355 F.3d at 174). Plaintiffs do not satisfy this heightened pleading standard.

Second, as before, notwithstanding the general cautionary language incorporated into the releases and conference calls, many of the statements identified by Plaintiffs are cherry-picked out of a large number statements expressly limited by certain cautionary and forward-looking language within the statement itself.  *See* § I.A.1.b, *supra*.  Indeed, even the two Management Style Statements made outside the context of a press release – those made by Mr. James on CNBC's Closing Bell television program (*see* Am. Compl., ¶¶ 177, 203) – were couched in cautionary terms.[19]

### 4.     Plaintiffs' Allegations About GAAP Are Irrelevant

Plaintiffs spend a significant amount of time accusing RJF of various accounting violations, purportedly in an attempt to state a claim under Section 10(b).  (*See* Am. Compl., ¶¶ 190-196, 202).  First, these allegations are again derivative of Plaintiffs' allegations related to the loan loss reserves.  (*See* Am. Compl. ¶ 241 ("As a result of deferring loan losses, RJF's earnings were materially misstated as reported in SEC filings"); *see also* ¶¶ 242, 250, 255, 260, 265).  Because the underlying allegations related to the Loan Loss Statements fail (*see* § I.A.1, *supra*), these do as well.

Second, the Second Circuit has held that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *ECA*, 553 F.3d at 200; *see also Bristol-Myers*, 312 F. Supp. 2d at 565 (citing *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270-71 (2d Cir.1996)).  The auditor letters from KPMG in RJF's filings with the SEC confirm that RJF received an unqualified audit opinion for its 2008 and 2009 financial statements and "maintained, in all material respects, effective internal control over financial reporting as of

---

[19]     *See* Panarella Decl., Ex. 9 [April 22, 2008 appearance on CNBC's *Closing Bell*] ("there will be more losses related to not only to subprime lending but to other lending"); Panarella Decl., Ex. 14 [July 22, 2008 appearance on CNBC's *Closing Bell*] ("it could be that the consumer is further hurt and that we indeed slip into a real recession").

September 30, 2008." (Panarella Decl., Ex. 22 at 120, Ex. 34 at 71, 138). Plaintiffs

fundamentally fail to allege in any non-conclusory manner that such a conclusion was false.[20]

     **B.**       **Plaintiffs Do Not Adequately Allege Scienter**

       Plaintiffs' Section 10(b) and Rule 10b-5 claims also fail to sufficiently allege

scienter. The PSLRA provides that, to survive a motion to dismiss, Plaintiffs must "state with

particularity facts giving rise to a *strong* inference that the defendant[s] acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also ECA*, 553 F.3d at 196 (while

this Court would "'normally draw reasonable inferences in the non-movant's favor on a motion to

dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter'")

(citation omitted). Plaintiffs must show the requisite state of mind on the Defendants' part, which

is either: (i) an intent to deceive, manipulate, or defraud; or (ii) recklessness. *ECA*, 553 F.3d at

198 (quotations omitted).

       For an inference regarding Defendants' state of mind to be "strong", it must be

"more than merely plausible or reasonable – it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent." *Id.* (citations omitted); *see also ATSI Commc'ns,* 493

F.3d at 99; *Australia and New Zealand Banking Group*, 2009 WL 4823923, at *7. Where, as here,

a defendant is a corporation, "this means that the pleaded facts must create a strong inference that

someone whose intent could be imputed to the corporation acted with the requisite scienter."

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.

2008).[21] A "strong inference" can be established:

---

[20]      Allegations regarding accounting violations "might" be sufficient "[o]nly where [they] are coupled with evidence of corresponding fraudulent intent." *ECA*, 553 F.3d at 200. Plaintiffs fail to adequately allege that any of the Defendants acted with scienter. *See* § I.B, *infra*.

[21]      Throughout the Amended Complaint, including in their scienter allegations, Plaintiffs improperly rely on group pleading in violation of Rule 8(a) and 9(b). Indeed, the "lumping of defendants is frowned upon particularly to

by alleging facts to show either (1) that defendants had the motive
and opportunity to commit fraud, or (2) strong circumstantial
evidence of conscious misbehavior or recklessness.

*ECA*, 553 F. 3d at 198 (citation omitted).

Recklessness means "'at the least, … an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (citing *Novak*, 216 F.3d at 308). Additionally, the Court "must consider … any competing inferences rationally drawn from all the facts alleged" and ask, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter *at least as strong as* any opposing inference?" *ECA*, 553 F. 3d at 198 (emphasis added); *see also PXRE*, 600 F. Supp. 2d at 528.

## 1.    Plaintiffs Cannot Plead Scienter By Alleging "Fraud By Hindsight"

Plaintiffs allege, essentially, that RJF should have more accurately predicted loan losses, or at least increased the reserves earlier than they did. As an initial matter, this claim, taken as a whole, is a classic "fraud by hindsight" allegation which does not give rise to 10(b) liability. *See, Merrill*, 289 F. Supp. 2d at 428.

In *Merrill Lynch*, plaintiffs alleged that defendants published misleading information about future stock performance and failed to disclose certain conflicts of interests. The court dismissed allegations regarding the defendants' predictions regarding the percentage by

---

meet the higher standards of pleading under Rule 9(b)." *Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 315 (S.D.N.Y. 2009) (reconsideration granted in part 2009 WL 1676077 (S.D.N.Y. May 6, 2009)). Where courts allow group pleading, it is a "limited exception" applied "where defendants have collaborated on or approved a document together and the document is the basis for the liability." *Id.*; *see also DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1249 (2d Cir. 1987) (plaintiffs must allege either that defendants are insiders or affiliates, or that they are otherwise linked "in [a] specific way to any fraudulent misrepresentation or omission"). Fair notice is not satisfied by "lumping all the defendants together and failing to distinguish their conduct." *Medina v. Bauer*, No. 02 Civ. 8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004). Where, as here, "multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio*, 822 F.2d at 1247. Plaintiffs' fail to meet this standard. (*See, e.g.,* Am. Compl., ¶¶ 26-31, 342 ("Defendants disseminated or approved" statements); 343 ("Defendants [] employed devices, schemes, and artifices to defraud"), 354 ("The Individual Defendants are liable as participants in a fraudulent scheme").

which stock price would increase in the following year. *Id.* at 428. Noting that the "[p]laintiffs

here do not dispute the accuracy of the factual materials contained in the reports" but only took

issue with the predictions themselves, the court held that:

> The fact that the market turned sour causing these particular
> plaintiffs to lose money, as opposed to the multitude of individuals
> who made large fortunes while the bubble lasted, is a classic
> allegation of fraud by hindsight. Imposing a new duty after the fact
> on what disclosures are required does not support a cognizable
> securities fraud claim.

*Id.*

Similarly, in *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990) (cert.

denied 498 U.S. 941 (1990)), plaintiffs sued a bank's accounting firm and alleged that the bank

"did not increase its reserves fast enough" despite facing "ever-larger volumes of nonperforming

loans and established reserves." *Id.* at 626. Like Plaintiffs here, the *DiLeo* plaintiffs failed to

"distinguish their situation from that of many others who are adversely affected by business

reverses" and therefore failed to make the necessary showing under Rule 10b-5. *Id.* at 627. The

court noted that the complaint told a story "familiar in securities litigation":

> At one time the firm bathes itself in a favorable light. Later the firm
> discloses that things are less rosy. The plaintiff contends that the
> difference must be attributable to fraud. "Must be" is the critical
> phrase, for the complaint offers no information other than the
> differences between the two statements of the firm's condition.
> Because only a fraction of financial deteriorations reflects fraud,
> plaintiffs may not proffer the different financial statements and rest.
> Investors must point to some facts suggesting that the difference is
> attributable to fraud.

*Id.* at 627-28 (citations omitted). Because the *DiLeo* plaintiffs failed to supply such facts "that

might separate fraud from the benefit of hindsight," Rule 9(b) required dismissal. *Id.* at 628

(citing *Denny v. Barber*, 576 F.2d 654 (2d Cir. 1978)).

The Second Circuit's decision in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994)) is also instructive.  In that case, Plaintiffs alleged that statements "expressing confidence in the adequacy of [defendants'] reserve for bad loans," and "failing to disclose the hazards of" a certain type of loan were fraudulent under Section 10(b) and Rule 10b-5.  *Id.* at 1128-29.  The Court of Appeals held that Shields' allegations that Citytrust "knew or should have known" that its reserves would have to be substantially increased failed because they did not say "that the company's disclosures were inconsistent with current data."  *Id.* at 1129*; see also Grossman v. Texas Commerce Bancshares, Inc.*, No. 87 Civ. 6295, 1995 WL 552744,  at *12 (S.D.N.Y. Sept. 15, 1995) (dismissing claims based on loan loss reserves where Plaintiff did not allege that "Defendants disseminated figures different from those in [the company's] books and records).  Importantly, the *Shields* court noted that:

> People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage.

*Id.* at 1129-30.  *See also Grossman*, 1995 WL 552744, at *12 (holding that the "allegation that a company's optimism or forecast of the future was misplaced does not alone support an inference of fraud").

Here, Plaintiffs' allegations fail for the same reasons.  Not only are the allegations classic fraud by hindsight, but, as in *Shields* and *Grossman*, they do not allege any inconsistent information as to RJF's reserve levels in Defendants' possession at the time the challenged statements were made.  Thus, the Amended Complaint must be dismissed.

## 2.    Plaintiffs Fail to Allege Scienter Based On Motive and Opportunity

To raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs "must allege that [Defendants] 'benefitted in some concrete and personal way from the

purported fraud.'" *ECA*, 553 F.3d at 198 (citing *Novak*, 216 F.3d at 307-308). "Opportunity"

requires allegations "showing that defendants had 'the means and likely prospect of achieving

concrete benefits by the means alleged." *Merrill Lynch*, 289 F. Supp. 2d at 428. The Second

Circuit has stated that what is required to plead facts supporting scienter through "motive and

opportunity":

> is not a bare invocation of 'magic words such as 'motive and
> opportunity' ' but an allegation of facts showing the type of
> particular circumstances that our case law has recognized will render
> motive and opportunity probative of a strong inference of scienter.

*PXRE*, 600 F. Supp. 2d at 531 (quoting *Rothman*, 220 F.3d at 90).

The Second Circuit has given several examples of motives that are *insufficient*

because they are "generally possessed by most corporate directors and officers":

> (1) the desire to maintain a high corporate bond or credit rating; (2)
> "the motive to maintain the appearance of corporate profitability, or
> of the success of an investment"; (3) the desire to maintain a high
> stock price in order to increase executive compensation; and (4) the
> desire to prolong the benefits of holding corporate office.

*PXRE*, 600 F. Supp. 2d at 530 (internal citations omitted).

For example, in *Shields*, the court found implausible plaintiffs' theory of motive

and opportunity to commit fraud with respect to statements as to the adequacy of loan loss

reserves and risks in the Citytrust's loan portfolio. Specifically, the court held:

> In looking for a sufficient allegation of motive, we assume that the
> defendant is acting in his or her informed economic self-interest …
> It is hard to see what benefits accrue from a short respite from an
> inevitable day of reckoning … For related reasons, the Complaint
> fails to allege a sufficient opportunity to derive a benefit from the
> alleged misstatements and nondisclosures: the ordinary course of
> bank business would lead to the review of loan portfolios, as it did.

*Shields*, 25 F.3d at 1130 (internal citation omitted).

a.     **Plaintiffs' Allegations Regarding Corporate Profits
And Liabilities Do Not Show Motive And Opportunity**

Plaintiffs make speculative and conclusory claims that:

- "RJF needed to report increasingly positive results at RJBank in order to offset the poor performance of its other divisions." (*See* Am. Compl., ¶¶ 289-291).

- Potential liability of RJF subsidiaries for auction rate securities caused RJF to intentionally understate reserves. (*See* Am. Compl., ¶¶ 292-299).[22]

- The alleged need to "maintain RJBank's well-capitalized status" and to keep the Total Capital ratio above 10% led to inadequate reserve levels. (*See* Am. Compl., ¶¶ 300-304).

These allegations fail as a matter of law because they plainly do not "state with particularity facts giving rise" to *any* inference that the Defendants acted with scienter, much less a strong inference. There can be no question that such general allegations of a desire to maintain corporate profitability are not sufficient to show scienter. Indeed:

> although maintaining the appearance of corporate profitability, or of the success of an investment, will involve benefit to a corporation, allegations that defendants were motivated by those desires in connection with making allegedly false statements are not sufficient to support an inference of scienter.

*Bristol-Myers*, 312 F. Supp. 2d 549, 560 (citing *Chill*, 101 F.3d at 267-68). Like RJF, "every publicly-held corporation desires its stock to be priced highly by the market and to hold allegations to that effect were sufficient motive would be to render the motive requirement meaningless." *Id.*; *see also Teamsters Local*, 531 F.3d at 196 (citing *Chill*, 101 F.3 at 268) ("Teamsters' proffered motive is the same desire to maintain the appearance of profitability that we have consistently rejected as insufficient in securities fraud pleading.")

---

[22]     The first amended complaint in that case was dismissed on September 17, 2009. *See Defer LP v. Raymond James Financial, Inc., et al.*, 08-CV-03449 (S.D.N.Y.) (LAK).

For example, in *Bristol-Myers Squibb*, the plaintiffs alleged that defendants'
actions were motivated by, *inter alia*, the desire to "make it appear that the future of the Company
was more promising," to "maintain a facade of future potential," and to "address potential
concerns about patent expirations the Company faced on certain of its products."  312 F. Supp, 2d
at 560.  The court held that:

> These "motives" are nothing more than ordinary and prudent
> corporate desires.  Plaintiffs allege no "concrete benefits" that would
> accrue to the Defendants as a result of the misstatements alleged,
> beyond those enjoyed by any corporate executive.  Such general
> allegations are insufficient to establish motive under § 10(b).

*Id.* at 561 (citing *Chill*, 101 F.3 at 268 n. 5).  As in *Bristol-Myers*, Plaintiffs' allegations that RJF
was motivated by a desire to stay profitable and well-capitalized "amount to nothing more than a
pejorative characterization of these ordinary corporate desires."  *Id.* at 560.

### b.    The Stock Repurchases Do Not Show Motive And Opportunity

Plaintiffs also attempt to allege scienter based on RJF's purported "failure to
continue [its] past program of stock repurchases" which, according to Plaintiffs, "provides further
evidence of inside knowledge of serious financial problems."  (Am. Compl., ¶¶ 305-307).  This
allegation likewise fails because it does not provide any facts sufficient to infer that any change in
practice was a result of scienter.  Moreover, in the November 11, 2008 press release, one of the
documents relied on by Plaintiffs (*see* Am. Compl., ¶¶ 216-21), RJF responds to a statement about
its plans to repurchase stock by saying:

> While we believe that the stock represents a compelling value at the
> current price, there is concern over the lack of credit availability in
> the market.  Accordingly, *the firm is not purchasing shares
> currently in favor of conserving cash as a prudent business decision,*
> as discussed on its October 22, 2008, quarterly analyst conference
> call.

(Panarella Decl., Ex. 20 at 2) (emphasis added).  This public explanation for RJF's stock repurchase pattern – unlike Plaintiffs' conclusory allegation of scienter – is "rationally drawn from all the facts alleged" and is unquestionably the stronger inference.  *ECA*, 553 F.3d at 198.

### c.     The Individual Stock Sales Do Not Show Motive and Opportunity

Plaintiffs also attempt to allege scienter on the part of the Individual Defendants by stating that "insiders at RJF sold their Company stock in patterns and circumstances that were suspicious in scope and timing."  (Am. Compl., ¶¶ 309-312).  These allegations all fail.

First, allegations of "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."  *Bristol-Myers*, 312 F. Supp. 2d at 561 (citations omitted).

Second, Plaintiffs' allegations are insufficient to create any inference – much less a strong inference – that these sales were made with anything nearing scienter.  The stock sales by a Dennis Zank (*see* Am. Compl., ¶ 312)  are patently irrelevant.  Mr. Zank is not a defendant, and Plaintiffs do not allege any causal link between Mr. Zank's alleged stock sales and the alleged misstatements.  Moreover, the suggestion that RJF perpetrated a massive fraud so that Mr. Zank could make one stock sale for $1,653,599 is absurd on its face.

Equally nonsensical is Plaintiffs' allegation that sales by Mr. Julien evidence fraudulent intent.  Motive with respect to stock sales can be "met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *ECA*, 553 F.3d at 198 (citing *Novak*, 216 F.3d at 308).  As Plaintiffs concede, Mr. Julien *suffered a loss* on his sale.  (Am. Compl. ¶ 311).  Moreover, Plaintiffs allege no connection between Mr. Julien's alleged misstatements and his stock sales.  In addition, Mr. Julien's stock sales occurred in November and December 2008 (Panarella Decl., Exs. 21, 23) – well before the allegedly corrective disclosures in

April 2009.  The timing of such sales undercuts any inference of fraudulent intent.  *See, e.g.,* *Kindred Healthcare*, 299 F.Supp.2d at 741.

    Finally, Plaintiffs allege that RJTrust, a subsidiary of RJF, sold more than 98% of its RJF during the Class Period.  (*See* Am. Compl. ¶¶ 309-10).  This allegation simply misrepresents the facts.  The shares in question – which are personally held for the benefit of certain members of the James family – were not sold at all, but rather transferred from RJTrust to Mr. James, as a successor trustee.  As shown by the SEC Form 4, Mr. James "became the successor trustee to Raymond James Trust … on December 22, 2008".  (*See* Panarella Decl., Ex. 24 at n. 1, 3, 4).[23]  Moreover, as trustee for these shares being held for the benefit of others, Mr. James expressly "disclaims beneficial ownership of these securities."  (*Id.*)  Plaintiffs' allegations in this regard are therefore not only conclusory, but are fundamentally incorrect.

### d. Allegations Regarding Executive Compensation Do Not Show Motive And Opportunity

    Plaintiffs next attempt to plead the requisite intent by allegations that "RJF's bonus structure incentivized top Company executives to do everything in their power to ensure that RJF reported solid financial results."  (Am. Compl., ¶¶ 313-315).  Neither this specific allegation, nor Plaintiffs' general allegations about RJF's bonus compensation, create any inference of scienter.

---

[23] The Court may consider this document for several reasons.  First, this SEC Form 4 is necessarily relied upon in the Amended Complaint and is are therefore properly subject to consideration by the Court on a motion to dismiss without the necessity of taking judicial notice under Federal Rule of Evidence 201.  *See Courtenay Comm's Corp. v. Hall,* 334 F.3d 210, 215 (2d Cir. 2003) (the court may refer to "documents necessarily relied upon by plaintiff's complaint"); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327, at 489 & n. 15 (when "plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading."  Second, judicial notice under Federal Rule of Evidence 201 is proper because this is a document filed with the SEC and its authenticity is not questioned. The SEC requires certain corporate insiders to file Form 4s. 15 U.S.C. §78p(a); 17 C.F.R. §240.16a-2, 16a-3. Courts routinely take judicial notice of SEC filings not specifically cited in the complaint. *See, e.g., Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (court may take judicial notice of SEC filings not referenced in complaint); *Cortec*, 949 F.2d at 47 (court "may review and consider public disclosure documents required by law to be [filed] and which actually have been filed with the SEC").

For example, in *ECA*, plaintiffs similarly alleged that individual defendants "had the requisite motive because they received bonuses based on corporate earnings and higher stock prices." 553 F.3d at 201 (citation omitted). The Second Circuit found that those allegations "[did] not strengthen the inference of fraudulent intent." *Id.* (citation omitted). The *ECA* court recognized that:

> If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.

*Id.* (internal quotations omitted); *see also Shields*, 25 F.3d at 1130; *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 124 (S.D.N.Y. 1997) ("allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)") (citations omitted).

Likewise, in *Bristol-Myers*, the court noted that "performance-based compensation" is not "evidence of motive sufficient to support a strong inference of scienter." 312 F. Supp. 2d at 561. The plaintiffs in *Bristol-Myers*, like the Plaintiffs here, merely alleged the facts of certain individuals' compensation plans. The court held that "to allege motive successfully, plaintiffs must 'do more than merely charge that executives aim to prolong the benefits of the positions they hold.'" *Id.* at 562 (quoting *Shields,* 25 F.3d at 1130).

### e. Plaintiffs' Allegations Regarding Accounting Violations Do Not Show Fraudulent Intent Of The Individual Defendants

Plaintiffs allege that RJF violated "numerous provisions of GAAP, as well as SEC and banking regulations, in RJF's financial reporting" during the Class Period and that such violations, coupled with Messrs. James and Julien's certification of RJF's financial statements:

> suggest that, as senior executives with oversight of the Company's financial reporting, James and Julien knew or were extremely reckless in not knowing that RJF was perpetrating a fraud by concealing mounting losses.

(Am. Compl., ¶¶ 316-17). These "boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their … executive positions are insufficient" to satisfy Rule 9(b). *PXRE*, 600 F. Supp. 2d at 545 (quoting *In re Sotheby's Holdings, Inc. Secs. Litig.*, No. 00 Civ. 1041 (DCL), 2000 WL 1234601, at *7 (S.D.N.Y. Aug 31, 2000)). Indeed, "courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership … they had access to information concerning the company's adverse financial outlook.*" In re Health Mgmt Sys., Inc. Secs. Litig.*, No. 09 CIV 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) (citing, *Goplen v. 51job, Inc.*, 453 F.Supp.2d 759, 773 (S.D.N.Y. 2006)). Moreover, allegations that Messrs. James and Julien signed SEC filings "without specific allegations of reasonably available facts that should have put [them] on notice that the reported financial results were false" are not sufficient to establish scienter. *Goplen*, 453 F. Supp. 2d at 775.

### 3.   Plaintiffs Do Not Sufficiently Plead Recklessness

"Reckless conduct" means "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *PXRE*, 600 F. Supp. 2d at 535 (citing *Novak,* 216 F.3d at 308). In the scienter context, recklessness "cannot be merely enhanced negligence." *Id.* (quoting *In re JP Morgan Chase Secs. Litig.,* 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005)). It is not enough to allege that a defendant "ought to have known" of the danger *Id.* (citations omitted). Where, as here, plaintiffs have failed

to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *Id.* (citations omitted).

Recklessness exists where plaintiffs specifically allege (i) "defendants' knowledge of facts or access to information contradicting their public statements;" or (ii) "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *PXRE*, 600 F. Supp. 2d at 536, 536 n. 28 (quoting *Novak,* 216 F.3d at 308). Under the first prong, "Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *Id.* at 536 (citations omitted, emphasis in original).

Plaintiffs allege that Defendants had access to numerous public reports showing decline in real estate values and the general economic downturn during the putative Class Period, yet knowingly or recklessly disregarded such warnings. (*See* Am. Compl., ¶¶ 49-52, 70-71, 118-142). This type of allegation fails to make the "particularized showing" of facts giving rise to scienter.

For example, in *PXRE*, the plaintiff alleged that the defendants made various misrepresentations regarding reinsurance loss estimates following Hurricane Katrina. Plaintiff alleged that the defendants had access to information that contradicted their public statements, including, *inter alia*, peer companies' decisions to increase loss estimates before the defendants, the "widespread publicity surrounding the commercial flooding losses in New Orleans," and the magnitude of the defendants' understatement of its losses. 600 F. Supp. 2d at 536. The *PXRE* court found that the plaintiff failed to sufficiently allege recklessness because it failed to allege "that Defendants had access to information that *specifically* informed them of the alleged flaws" in the loss estimation process. *Id.* at 536, 546. Regarding the publicity cited by the plaintiff, the

court noted that "[t]o state the obvious, these articles only would have alerted PXRE to the fact

that the costs incurred" by the hurricane would be extraordinary, and "offered no insight

whatsoever with respect to the specific alleged problems with PXRE's loss estimation process."

*Id.* at 543. *See also*, *Steinberg v. Ericsson LM Tel. Co.,* No. 07 CV. 9615, 2008 WL 5170640, at

*13 (S.D.N.Y. Dec. 10, 2008) (holding that plaintiffs "fail[ed] to identify any reports Defendants

…saw, or any conversations in which they were provided information, that was inconsistent in any

way with their public statements").

   Plaintiffs here suffer the same fate. They refer to a laundry list of public reports

detailing the housing crisis and increasing economic decline during the alleged Class Period and

allege that such reports put Defendants on notice that the loan loss reserves were too low. (*See*

Am. Compl., ¶¶ 49-51, 112-141). But these reports fail to establish scienter for the same reason

that the *PXRE* court rejected the publicity regarding Hurricane Katrina – *i.e.*, they say nothing

about the methodology used *by RJF* to determine loan loss reserves, report financials, or any other

nonpublic information about RJF, and therefore, they cannot possibly have contradicted *any* of the

alleged misrepresentations. Absent that causal link, they cannot form a basis for scienter.

   Indeed, the very fact that these reports were public *weakens* allegations of scienter.

For example in *In re Pfizer, Inc. Secs. Litig.*, the court held:

> Numerous courts have suggested or assumed that the contradictory
> information must have been non-public in order to raise a strong
> inference of intent. That the information was publicly available
> when the allegedly misleading statements were made weakens any
> inference that defendants intended to defraud the market.

538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008).

   Finally, this Court must consider non-fraudulent inferences that can be drawn from

Defendants' alleged conduct. Where, as here, the Plaintiffs fail to allege "motive and

opportunity," it follows that "competing, non-fraudulent inferences [are] more 'compelling' for

purposes of the *Tellabs* analysis." *PXRE*, 600 F. Supp. 2d at 529 n.21, 534. Likewise, if any

inference can be drawn from the decline in RJF's stock price, the stronger inference is that RJF

was faced with an unprecedented economic downturn, which affected RJF – and the entire

economy – *despite* RJF's conservative management and continual increase in loan loss reserves

throughout the putative Class Period.

      **C.**      **Plaintiffs Fail To Adequately Plead Loss Causation**

      Plaintiffs' claims must also be dismissed for the additional reason that they do not

sufficiently plead loss causation. Like proximate cause, "[t]he loss causation requirement is

intended to fix a legal limit on a person's responsibilities, even for wrongful acts." *Merrill Lynch*,

289 F. Supp. 2d at 419 (citation omitted). The plain language of the PSLRA requires Plaintiffs to

prove "that the act or omission of the defendant … caused the loss for which the plaintiff seeks to

recover damages." 15 U.S.C. § 78u-4(b)(4). Plaintiffs must plead "that the loss was foreseeable

and caused by the materialization of the risk concealed by the fraudulent statement." *ATSI*

*Commc'ns,* 493 F.3d at 107 (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.

2005)). Thus, loss causation requires a showing that RJF shares declined as a result of the 'truth'

regarding the alleged misrepresentations being revealed. *See Dura Pharms.*, 544 U.S. at 346-47.

In other words, Plaintiffs must plead facts showing that the Defendants "misstated or omitted risks

that did lead to the loss." *Lentell,* 396 F.3d at 175. It is not enough for a plaintiff to plead that

"had he known the truth he would not have acted." *Dura Pharms.*, 544 U.S. at 342-44. Further,

Plaintiffs' efforts to link specific statements to specific price declines are legally insufficient. *See*

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (cert. denied 513

U.S. 1079 (1995)) (citation omitted) ("when the plaintiff's loss coincides with a marketwide

phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was

caused by the fraud decreases.").

For example, in *Merrill Lynch*, the court took "judicial notice of the burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims." 289 F. Supp. 2d at 419.  Accordingly, the court dismissed the complaint with prejudice, holding that "[t]he burst of the bubble and the attendant market chaos are not chargeable to the defendants and represent intervening causes for which defendants are not responsible in the sequence of responsible causation."  *Id.*; *see also Virtual Countries, Inc. v. Republic of South Africa,* 148 F. Supp. 2d 256, 267 n. 12 (S.D.N.Y. 2001) *aff'd* 300 F.3d 230 (2d Cir. 2002) (taking judicial notice of "the financial hardship experienced by Internet-based businesses operating in the electronic commerce industry, or 'dot-coms,' following the decline of the technology-laden NASDAQ stock market in mid-2000").

Here, the Amended Complaint should be dismissed for similar reasons.  As an initial matter, the movement of the price of RJF stock, and of the larger market, belies any suggestion that the alleged losses were the result of the alleged fraud.  Indeed, Plaintiffs admit as much.  On the date of, and following, the alleged "corrective disclosure" the stock fell from $19.06 on April 14, 2009 to $16.49 on April 15, 2009 – a 13% decline.  But while the alleged "corrective disclosure" about the reserves levels came on April 14, 2008, Plaintiffs also admit that in October 2008 RJF stock experienced a "one-day drop of over 10%" due to reported results missing analysts expectations, and that there was another 8% drop in November 2008 after a *Barron's* article (Am. Compl. ¶¶ 325-27).  These allegations alone undercut Plaintiffs' loss causation theory.  But these admissions by Plaintiffs tell only half the story.  On April 22, 2008, the first day of the Alleged Class Period, RJF stock closed at $22.96.  The stock experienced a gradual increase to the (one-day) high during the alleged Class Period of $38.25 on September 19, 2008.  (*See* Am. Compl. ¶ 323).  After reaching this high, on the very next trading day, September

22, 2008, the stock closed at $30.8 – an almost 20% decline.  After this temporary class-high valuation, RJF stock experienced a gradual fall to the low price during the alleged Class Period of $11.48 on March 6, 2009.  Five weeks later, on the last day of the alleged Class Period, April 14, 2009, RJF stock closed at $19.06.  (*See* Panarella Decl., Ex. 35).[24]  Plaintiffs suggestion that there was a "corrective disclosure" on April 14, 2009 simply does not correspond to the movement of the RJF stock.

Second, on April 15, 2009, RJF closed at $16.49, meaning that the market had evaluated the alleged new information and determined the stock price.  Yet, on twenty-six (26) days during the alleged Class Period, RJF stock closed *below* $16.49.  (*See* Panarella Decl., Ex. 35).  Thus, even *without* this information, RJF stock had routinely traded below the new valuation.  This invalidates Plaintiffs' theory of loss causation.

Finally, the various declines experienced by RJF stock, were not experienced in a vacuum.  During the alleged Class Period, the Dow Jones Industrial Average (DJI) was down 38%, the S&P 500 Index (SPX) was down 39%, the S&P Bank Index (BIX) was down 62% and the KBW Bank Index (BKX) was down 58%. (*See* Panarella Decl., Ex. 37).  Indeed, the Amended Complaint itself references the more plausible cause of any decline in RJF's share price during the Class Period – the housing market crash and broader economic decline.  (*See* Am. Compl., ¶¶ 117, 125-29, 132-41).  This "market chaos" is not chargeable to Defendants and represents an

---

[24]    During the alleged Class Period, RJF stock had a number of additional days with significant gains/losses. For example: April 22-23, 2008 (+20%); June 25-26, 2008 (-6%); July 7-8, 2008 (+11%); July 8-9, 2008 (-6%); September 18-19, 2008 (+25%); September 26-29, 2008 (-11%); September 2-3, 2008 (-10%); October 10-13, 2008 (+23%); October 14-15, 2008 (-12%); October 21-22, 2008 (-10%), November 4-5, 2008 (-15%); November 28-December 1, 2008 (-23%); January 20-21 (+12%); February 23-24 (+11%); March 10-11 (+18%); March 20-23 (+15%).  (Panarella Decl., Ex. 35).

intervening cause in the sequence of causation – which mandates dismissal. *Merrill Lynch*, 289 F. Supp. 2d at 419; *see also, Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1496 (2d Cir. 1992).[25]

## II.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL PERSON LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS

The Amended Complaint also fails to adequately allege a claim against the Individual Defendants under Section 20(a).  To adequately allege liability under Section 20(a), Plaintiffs must plead: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns*, 493 F.3d at 108 (citation omitted); *see also Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007).  "Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (internal quotations omitted).  Control person liability requires a showing of "actual control" rather than mere ability to influence the primary violator.  *Id.*  Additionally, the defendant "must not only have actual control over the primary violator, but have actual control over the *transaction* in question."  *Id.* at 487 (internal quotations and citations omitted).  Plaintiffs fail to plead a Section 20(a) claim for several reasons.

First, because Plaintiffs fail to establish a primary violation against the Defendants under Section 10(b), Plaintiffs' claims under Section 20(a) must likewise fail.  *See, e.g.*, *ECA*, 553 F.3d at 207; *ATSI Commc'ns*, 493 F.3d at 108; *Rombach*, 355 F.3d at 178.

---

[25]    Nor do Plaintiffs explain any causal link between RJF's stock price and the alleged misrepresentations and omissions alleged in the Amended Complaint such as RJF's reporting of LTV ratios, "Core CRE" loans, unfunded commitments, Management Style Statements and descriptions of its due diligence efforts with respect to underwriting loans.  To the extent Plaintiffs claim that any of these allegations are independent from the Loan Loss Reserve Statements, they must be dismissed because they fail to meet loss causation requirements.

Second, Plaintiffs fail to allege that the Individual Defendants culpably participated in the fraud.  Plaintiffs bear the burden of pleading "culpable participation" with "the same particularity as scienter under section 10(b)." *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 246 (S.D.N.Y. 2006); *see also Kalin v. Xanboo, Inc.,* No. 04 Civ 5931 (RJS), 2009 WL 928279, at *12 (S.D.N.Y. March 30, 2009).  This requires "at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." *Lapin*, 506 F.Supp. 2d at 246 (citing Alstrom, 406 F. Supp. 2d at 490).  Recklessness can be shown by alleging "an extreme departure from the standards of ordinary care," *Rothman*, 220 F. 3d at 90, or by alleging that defendants had "access to information contracting their public statements." *Alstom*, 406 F. Supp. 2d at 491 (citing *Novak*, 216 F.3d at 308).

Here, Plaintiffs make only conclusory assertions that the Individual Defendants, based on "their senior executive positions in RJF," had access to "non-public" information, and knew or should of known that "adverse facts specified herein" had not been disclosed.  (Am. Compl., ¶ 350).  Such allegations fall woefully short of pleading with the requisite particularity that the Individual Defendants "culpably participated" in a primary violation.  As noted above, nowhere do Plaintiffs allege, with any specificity, that the Individual Defendants had any information as to RJF's loss loan reserve levels that contradicted the amount of loan loss reserve levels set by RJF.  *See* § I.A.1, *supra*.   Nor do Plaintiffs allege with any specificity that the Individual Defendants, individually or collectively, had a role in determining the loan loss reserve levels.  At most, Plaintiffs allege that an unidentified group at RJBank "discussed [] loan loss reserve determinations with certain Individual Defendants."  (Am. Compl., ¶ 64).  Finally, Plaintiffs do not (and cannot) sufficiently allege that the Individual Defendants' actions constituted an extreme departure from the standards of ordinary care.  Nor could they since RJF's

loan loss reserves increased substantially over the relevant time period (*see* Panarella Decl., Ex. 26 at p. 9).

Finally, Plaintiffs do not allege in any non-conclusory way that any of the Individual Defendants actually "controlled" RJF.  Indeed, Messrs. Raney and Moody were employed at RJBank, not RJF.  (*See* Am. Compl. ¶¶ 23-24).

<u>**CONCLUSION**</u>

For all of the reasons herein, Defendants Raymond James Financial, Inc., Thomas A. James, Jeffrey P. Julien, Steven Raney, and Mark Moody, respectfully request that this Court dismiss the Amended Complaint in its entirety.

Dated:        New York, New York
              January 22, 2010


                                      KELLEY DRYE & WARREN LLP

                                      By: _____
                                            John M. Callagy
                                            Nicholas J. Panarella
                                            Joel A. Hankin
                                            Melissa E. Byroade
                                      101 Park Avenue
                                      New York, NY  10178
                                      212-808-7800

                                      *Attorneys for Defendants Raymond James*
                                      *Financial, Inc., Thomas A. James, Jeffrey P.*
                                      *Julien, Steven Raney, and Mark Moody*

1394526

- 50 -