**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN WOODARD, individually and on behalf of all others similarly situated,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>RAYMOND JAMES FINANCIAL, INC.,<br>THOMAS A. JAMES, JEFFREY P. JULIEN,<br>STEVEN RANEY, and MARK MOODY,<br>　　　　　Defendants. | Civil Action No. 09-5347 (RPP)<br><br>ECF CASE |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS</u>

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................iii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................4

    A.    RJF Expands RJBank Into A Major Component Of RJF's Business .................... 4

    B.    As The Financial Crisis Affects RJF'S Investment Divisions, Defendants Design A Scheme To Offset Losses Through Illusory Profits At RJBank ......................... 6

    C.    Defendants Concealed The Risks In RJBank's Loan Portfolio To Assure Investors Of Continued Profitability ................................................................... 7

        1.    Defendants Concealed RJBank's Growth In Its Risky Commercial Real Estate Portfolio............................................................................ 7

        2.    Defendants Concealed The Risk Of Loss From One Loan Default........... 8

        3.    Defendants Concealed The True Loan-To-Value Ratios Of RJBank's Residential Loans ..................................................................... 9

    D.    Defendants Misrepresented The Risks In RJBank's Commercial And Residential Loans As Well As The Company's Risk Management And Loan Underwriting Practices ............................................................................................ 9

        1.    Defendants Misrepresented The Risks In RJBank's Residential And Commercial Loan Portfolios....................................................... 9

        2.    Defendants Misrepresented RJBank's Risk Management and Loan Underwriting Practices.............................................................. 10

    E.    Defendants Ignored Numerous Reports, Warnings And Data Demonstrating That RJBank's Loan Loss Reserves Were Inadequate................................................. 11

    F.    Defendants Continue To Mislead Investors Until The Truth Is Revealed And The Company Is Forced To Report Devastating Losses.............................................. 13

ARGUMENT ............................................................................................ 14

I.    APPLICABLE LEGAL STANDARDS ON A MOTION TO DISMISS ........................ 14

II.    THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................... 15

i

A.    Applicable Legal Standard .................................................................. 15

B.    The Complaint Adequately Alleges Material And Actionable Misstatements
      Regarding Loan Loss Reserves .......................................................... 16

      1.    The Complaint Alleges Fraudulent Misstatements – Not Mere
            Mismanagement ...................................................................... 17

      2.    The Loan Loss Reserve Misstatements Are Not Protected Under the
            PSLRA or the "Bespeaks Caution" Doctrine ........................... 20

C.    Misstatements Regarding LTV Ratios ................................................ 22

D.    Misstatements Regarding Loan Growth And Loan Concentration ...... 23

E.    Misstatements Regarding Due Diligence ............................................ 27

F.    Misstatements Regarding Conservative Lending Practices ................. 29

G.    Misstatements Regarding GAAP Compliance ..................................... 30

III.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ..................................... 31

A.    Applicable Legal Standard .................................................................. 31

B.    The Facts, Taken As A Whole, Support An Inference Of Scienter ...... 32

      1.    The Complaint Adequately Alleges, At a Minimum, Recklessness ........ 33

      2.    The Complaint Adequately Alleges Motive and Opportunity .................. 37

C.    This Is Not A Case of Mere Mismanagement or Fraud By Hindsight ................. 41

IV.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ......................... 42

V.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON
      LIABILITY ........................................................................................... 47

CONCLUSION ......................................................................................... 50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Recovery Trust v. Bank of America,*
    624 F. Supp. 2d 292 (S.D.N.Y. 2009)....................................................................33

*In re Aegon N.V. Sec. Litig.,*
    No. 03-cv-0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ............................18

*AIG Global Sec. Lending Corp. v. Banc of America Sec. LLC,*
    254 F. Supp. 2d 373 (S.D.N.Y. 2003)....................................................................20

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002)..............................................................................34, 37

*In re Alliance Pharm. Corp. Sec. Litig.,*
    279 F. Supp. 2d 171 (S.D.N.Y. 2003)..............................................................21, 30

*In re Alstom, S.A., Sec. Litig.,*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................................................................33

*In re American Bank Note Holographics, Inc.,*
    93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................................................36

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................35, 36

*Atlas v. Accredited Home Lenders Holding Co.,*
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)............................................................20, 29

*ATSI Commc'ns., Inc. v. Shaar Fund Ltd.,*
    493 F.3d 87 (2d Cir. 2007)......................................................................................49

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)................................................................................................15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................15

*In re BISYS Sec. Litig.,*
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)....................................................................33

*In re Campbell Soup Co. Sec. Litig.,*
    145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................36

*In re Cardinal Health Inc. Sec. Litig.,*
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ...........................................................24, 40

*Ciresi v. Citicorp,*
    782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) .........................17, 18

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l,*
    423 F. Supp. 2d 348 (S.D.N.Y. 2006)......................................................................36

*Coronel v. Quanta Capital Holdings Ltd.,*
    No. 07-cv-1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009*)* .................................49

*In re Cross Media Mktg. Corp. Sec. Litig.,*
    314 F. Supp. 2d 256 (S.D.N.Y. 2004).....................................................................33

*DeMarco v. Robertson Stephens Inc.,*
    318 F. Supp. 2d 110 (S.D.N.Y. 2004)..........................................................43, 44, 47

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ................................................................................41

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
    822 F.2d 1242 (2d Cir. 1987).................................................................................33

*In re Dothill Sys. Corp. Sec. Litig.,*
    No. 06-cv-228, 2009 WL 734296 (S.D. Cal. Mar. 18, 2009) .................................27

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005).............................................................................................42

*In re Dynex Capital, Inc. Sec. Litig.,*
    No. 05-cv-1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006), *vacated in part*, 531
    F.3d 190 (2d Cir. 2008).......................................................................................20

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)..................................................................................29

*Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)..........................................................................43, 44, 45

*Feiner v. SS & C Techs.,*
    11 F. Supp. 2d 204 (D. Conn. 1998)......................................................................37

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994)....................................................................................43

*Florida State Bd. of Admin. v. Green Tree,*
    270 F.3d 645 (8th Cir. 2001) ..........................................................................34, 42

*In re Globalstar Sec. Litig.*,
    No. 01-cv-1748, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ......................................21, 30

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ...................................................................................................16

*Grossman v. Texas Commerce Bancshares, Inc.*,
    No. 87-cv-6295, 1995 WL 552744 (S.D.N.Y. Sept. 15, 1995) .................................................41

*Huberman v. Tag-It Pacific, Inc.*,
    No. 07-cv-55648, 2009 WL 485053 (9th Cir. Feb. 11, 2009) ..................................................36

*In re Kidder Peabody Sec. Litig.*,
    10 F. Supp. 2d 398 (S.D.N.Y. 1998) ........................................................................................15

*In re Kindred Healthcare Inc. Sec. Litig.*,
    299 F. Supp. 2d 724 (W.D. Ky. 2004) ......................................................................................19

*Lazzarro v. Manber*,
    701 F. Supp. 353 (E.D.N.Y. 1988) ...........................................................................................16

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d. 1230 (N.D. Cal. 2008) ...................................................................................31

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005) .................................14, 43, 45

*Lewin v. Lipper Convertibles, L.P.*,
    03-cv-1117, 2004 WL 1077930 (S.D.N.Y. May 13, 2004) ......................................................36

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
    173 F. Supp. 2d 129 (S.D.N.Y. 2001) ......................................................................................14

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ...................................................................................................26

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................................31

*In re Marsh & McClennan Co., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................................24

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................................................38

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990), *aff'd in part, rev'd in part*, 65 F.3d 1044 (2d Cir. 1995) ..........22

*Medina v. Bauer*,
    No. 02-cv-8837, 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) .................................................34

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)...................................................................43, 44, 45, 46

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 161 (2008)........................................22

*In re Mobilemedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ..........................................................................................42

*In re Moneygram Int'l, Inc. Sec. Litig.*,
    626 F. Supp. 2d 947 (D. Minn. 2009)......................................................................................42

*In re Moody's Corp. Sec. Litig.*,
    612 F. Supp. 2d 397 (S.D.N.Y. 2009)......................................................................................42

*In re MSC Industrial Direct Co.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) .....................................................................................20

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .......................................................................20, 26, 29

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...........................................................................................39, 41

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000)................................... passim

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007).......................................................................................47

*In re Oxford Health Plans, Inc., Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ..............................................................................................21

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990).....................................................................................16, 23

*In re Par Pharm. Sec. Litig.*,
    No. 06-cv-3226, 2009 WL 3234273 (D.N.J. Sept. 30, 2009).................................................40

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005).......................................................................................24

*In re Parmalat Sec. Litig.*,
    497 F. Supp. 2d 526 (S.D.N.Y. 2007).......................................................................................49

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009)......................................................................48

*Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)......................................................................43

*In re Prudential Sec. Inc. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996).............................................................................22

*In re PXRE Group, Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group*, No.
    09-cv-1370, 2009 WL 4893719 (2d Cir. Dec. 21, 2009)..........................................27

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999)................................................................... 30-31

*In re RAIT Fin. Trust Sec. Litig.*,
    No. 07-cv-3148, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)..................................29

*In re Refco Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................33

*In re Reliance Sec. Litig.*,
    135 F. Supp. 2d 480 (D. Del. 2001).........................................................................19

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000)...................................................................... 20-21

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    185 F. Supp. 2d 389 (S.D.N.Y. 2002)......................................................................16

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)......................................................................................37

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)..................................................................................49

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)................................................................32, 37

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. 2007)......................................................................38

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................................37, 40

*In re Sears, Roebuck & Co. Sec. Litig.*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) ......................................................................36

vii

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)...................................................................19

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994).................................................38, 39, 41

*Steinberg v. Ericsson LM Telephone Co.*,
    No. 07-cv-9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)...........................49

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................47

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)...............................................................37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007).......................................................27, 32, 33, 37

*In re Tommy Hilfiger Sec. Litig.*,
    No. 04-cv-7678, 2007 WL 5581705 (S.D.N.Y. July 20, 2007).......................36

*TSC Indus., Inc. v. Northaway, Inc.*,
    426 U.S. 438 (1976).........................................................................16

*Virtual Countries, Inc. v. Republic of South Africa*,
    148 F. Supp. 2d 256 (S.D.N.Y. 2001), *aff'd*, 300 F.3d 230 (2d Cir. 2002).............45

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................21, 39

*In re Wells Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993), *cert. denied*, 513 U.S. 917 (1994).........................19

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003)..............................................37

*In re WorldCom Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)............................................47, 48, 49

## RULES AND STATUTES

15 U.S.C. § 78u-4(b)(2) ..............................................................14, 31-32

17 C.F.R. § 210.4-01(a)(1)................................................................30

17 C.F.R. § 211 .........................................................................15

17 C.F.R. § 240.12b-2....................................................................48

Fed. R. Civ. P. 9(b) ...........................................................................................14, 15, 33

## OTHER AUTHORITIES

SEC Staff Accounting Bulletin No. 99 ..........................................................................15

Lead Plaintiff the Louisiana School Employees' Retirement System, individually and on behalf of all other persons (collectively "Plaintiffs"), who purchased or otherwise acquired securities issued by Raymond James Financial, Inc. ("RJF" or the "Company") between April 22, 2008 and April 14, 2009 (the "Class Period"), submit this memorandum of law in opposition to Defendants' Motion to Dismiss[1] the Amended Class Action Complaint (the "Complaint").

## PRELIMINARY STATEMENT

This litigation presents the classic case of securities fraud.  During the Class Period, as business losses threatened to undermine their success and growth, Defendants resorted to fraud to generate profits to offset those losses.  The fraud involved Defendants' intentional recording of artificially low loan loss reserves, despite an avalanche of internal and external data and regulatory warnings requiring much higher reserves, while at the same time falsely assuring investors that the Company's reserves were adequate and that, unlike RJF's peers, the Company was not suffering from risky loans or defaults nor affected by the general economic malaise causing widespread losses in the financial and banking industry.  When the truth was revealed, causing the stock price to decline, shareholders collectively lost hundreds of millions of dollars.

The precursor to this fraud began in 2007, when RJF recorded increasingly larger provisions for loan losses each quarter to set aside capital to mitigate the risks of borrowers defaulting on their loans.  During that time, Defendants demonstrated their ability to assess all relevant data and set the appropriate levels of loss provisions.  Then beginning in 2008 and into 2009, RJF's primary non-bank divisions began to suffer, and Defendants sought to offset those losses.  During this time period, Defendants designed and perpetrated their fraud.  In order to generate the illusion of profits, as the overall economy and the financial industry in particular

---

[1]  Citations to Defendants' supporting brief are to "DB at ___."

(including RJF) began to falter, Defendants improperly manipulated the results of RJF's banking subsidiary, Raymond James Bank ("RJBank" or the "Bank").  Defendants used RJBank as the instrumentality of their fraud by using it to record loan loss reserves which they knew were far from adequate in order to increase the Bank's – and the Company's – profits.  This fraud, in turn, artificially inflated RJF's stock price, resulting in personal benefits to the Individual Defendants in the form of lucrative bonuses that were based on RJF's profits and insider sales of stock.

The Individual Defendants served on or met with RJBank's Operating Committee which was involved in setting the loan loss provisions.  To further implement their fraud, Defendants made related misrepresentations that kept investors from questioning the rosy calculations that were far out of line with the much larger provisions being taken by other banks.  For example, Defendants masked the severe deficiency in RJBank's reserves by concealing the fact that the Bank was ramping up its lending in the riskiest segment of commercial loans and by overstating the quality of the Bank's underwriting.  Furthermore, Defendants repeatedly distinguished RJBank from its peers by emphasizing how the Bank's purportedly conservative management approach immunized the Company from the turmoil shaking the rest of the financial sector.  According to Defendants' Class Period statements, unlike other firms in the financial sector which were bleeding red ink and therefore scaling back lending and significantly increasing their reserves, RJBank was growing and prospering.  Analysts and investors were persuaded by these statements and optimistic that RJF would emerge unscathed from the twin forces of the financial industry's collapse and the recession that followed.  For a period of time, RJF's stock price thrived as a result – particularly in contrast to the stocks of other firms in the financial sector.  However, once the deficiencies in the reserves grew to unmanageable proportions, Defendants had no choice but to "catch up" – in one fell swoop they tripled the Bank's loan loss reserves, recording a huge $75 million loss provision, shocking investors, causing a 13.48% one-day

plunge in the Company's stock price, and causing shareholders to suffer hundreds of millions of dollars of losses as a result of Defendants' fraud.

Now, in the face of this fraud, RJF wants to tell a different story – one where RJF was no different than its competitors. RJF complains that it is a victim of the same forces that brought down other banks and that its rapid decline in earnings – and stock price – is due to nothing more than the forces dragging down the U.S. economy in general and the financial sector in particular. Now Defendants claim that RJBank is just like other banks, and therefore was bound to falter, given the economic climate.

Defendants cannot have it both ways. RJBank's sudden and unexplained tripling of its loan loss reserves – and RJF's accompanying dramatic drop in earnings – cannot be explained away by reference to broader economic forces. If RJF was truly different – as Defendants repeatedly claimed – the Company would have continued to outperform other financial institutions, just as it had during the Class Period when its stock price was artificially inflated. Its failure to do so validates Plaintiffs' position – the Company's prior representations were false and misleading which artificially inflated its stock price. Defendants' misrepresentations, not the general state of the economy, caused the sudden and dramatic stock decline when the truth finally emerged.

Defendants' material misstatements and omissions of material facts concerned RJBank's growth in its risky commercial real estate portfolio, the risk of loss from any one loan default, the true loan-to-value ratios of its residential loans, the risks in the Bank's residential and commercial loan portfolios, and the Bank's risk management and loan underwriting practices. These misstatements were instrumental to Defendants' scheme and are alleged with specificity in the Complaint.

Defendants' contention that Plaintiffs failed to adequately allege scienter is belied by the avalanche of facts and regulatory warnings which the Defendants monitored and were required to consider. As detailed in the Complaint, these warnings and the totality of facts prove that Defendants' public statements were false – and that their provisions for loan losses were wholly deficient. This is not a case of simple mismanagement or mere failure to accurately calculate or properly predict future losses – Defendants deliberately or recklessly ignored specific information from numerous sources that they knew required RJBank to record much larger loan loss reserves. Allegations explaining how Defendants violated generally accepted accounting principles ("GAAP") and how they personally profited from their scheme further demonstrate their motive, opportunity and scienter. Plaintiffs have also adequately alleged how Defendants' fraud caused Plaintiffs' losses, and have further adequately alleged control person claims against the Individual Defendants.

Defendants pejoratively, and erroneously, characterize Plaintiffs' theory as "fanciful." Defendants are wrong. The Complaint sets forth a detailed fraud supported by specific facts and meets all applicable pleading requirements. This case should be allowed to proceed to discovery and Defendants' Motion to Dismiss should be denied.

## STATEMENT OF FACTS

### A.    RJF EXPANDS RJBANK INTO A MAJOR COMPONENT OF RJF'S BUSINESS

In 2005, with the real estate market soaring, RJF sought to take advantage of profit opportunities by expanding its banking operation. ¶ 37.[2] RJBank, a subsidiary that represented a mere 4% of RJF's pretax earnings at the end of fiscal year 2004, began a period of rapid expansion, more than doubling its total loans outstanding to surpass $2.3 billion by the end of

---

[2] Citations in the form "¶ ___" are to the Complaint.

fiscal year 2006.  The Bank continued on this course by deviating from its original practice of primarily lending to individuals (i.e., homebuyers and consumers) and expanding into commercial lending, including commercial real estate loans and loans to businesses.  ¶¶ 38-39.[3] As a result, RJBank exceeded $7.2 billion in total loans by the end of fiscal 2008.  ¶ 38.

RJBank's rapid expansion in both commercial and individual loans carried serious risks. While four federal banking regulators in December 2006 warned banks about excessive commercial real estate lending and increased risk exposures, RJBank had increased its commercial loans secured by real estate by nearly *five times* from the previous year.  ¶¶  41-43. Similarly, throughout 2007, while the U.S. housing market began experiencing sharp declines, RJBank's risks were magnified because 10% of its total assets were loans to residential borrowers in California  and Florida – two states that experienced the most severe housing downturns.  ¶¶ 45-48.[4]

In fiscal 2007, in light of increasing risks in its loan portfolio, RJBank took steps to account for foreseeable losses.  Like all banks, RJBank keeps a reserve or allowance for loan losses, which is capital the Bank sets aside to mitigate the risks of borrowers failing to meet their loan payment obligations.  ¶ 53.[5]  To ensure that its reserves are at the appropriate levels, RJBank makes a "provision for loan losses" each quarter, which is money added to the total

---

[3] In fact, in 2007, RJBank applied to the Office of Thrift Supervision (the "OTS") for a waiver allowing it to hold twice the amount of commercial loans normally permitted for savings banks such as RJBank.  ¶¶ 38-39.  The OTS granted RJBank the waiver, and in an effort to increase the Bank's commercial lending even further, RJF subsequently announced plans to transform RJBank into a full-scale commercial bank.  ¶ 40.

[4] RJBank's corporate and commercial loans placed RJF and the Bank at risk as well, as numerous economic indicators, including retail sales, factory orders, and unemployment, fell to their worst levels in years beginning in late 2007. ¶¶ 51-52.

[5] A bank's loan loss reserve should reflect its evaluation of *all* relevant risks factors in its portfolio, including: (1) economic conditions that may impact borrowers' ability to repay their loans; (2) regulatory and industry guidance; (3) default and foreclosure rates on similar loans; (4) collateral values, *e.g.,* declines or increases in real estate values; (5) total loan growth; and (6) loan concentration or exposure to significant numbers of similar loans (*e.g.,* loans in the same industry, geographic location, etc.).  ¶ 53.

reserve.  Every provision is recorded as an expense on RJF's income statement; thus, the higher the quarterly provision, the lower the quarterly profit.  ¶ 54.[6]

In fiscal 2007, RJBank recorded increasingly large loan loss provisions.  For instance,  in the fourth quarter of fiscal 2007, as RJBank's total loans increased from $3.5 billion to $4.7 billion, the Bank increased its loan loss provisions as well, recording a $19.1 million loan loss provision, compared to a $6.2 million provision in the prior quarter, and increasing its total loan loss reserves from $35.6 million to $53.8 million.  ¶ 56.  However, as explained in more detail below, in fiscal 2008, as RJF began experiencing severe contraction in other divisions, Defendants caused RJBank to begin recording inadequate loan loss provisions in an effort to offset those declines.

### B.    AS THE FINANCIAL CRISIS AFFECTS RJF'S INVESTMENT DIVISIONS, DEFENDANTS DESIGN A SCHEME TO OFFSET LOSSES THROUGH ILLUSORY PROFITS AT RJBANK

In the first quarter of fiscal 2008, as the financial crisis worsened, RJF's primary non-bank divisions began to suffer.  ¶¶ 58-61.  Compared to the prior quarter, these divisions' combined pretax income fell in excess of $88 million.  ¶ 59. For the following fifteen months, the Company's non-bank divisions generally continued their steep downward trends.  ¶ 61.

In response to the Company's declining earnings, Defendants desperately sought a way to retain the appearance of profitability, and to distinguish RJF from the legion of other banks and financial institutions that were suffering.  Accordingly, Defendants turned to RJBank, whose profits could be fraudulently enhanced simply by taking artificially low quarterly loan loss provisions.  ¶¶ 62-63, 65.  Defendants knew that RJBank's loan loss reserve and quarterly loan loss provisions were vitally important figures on which investors focused, and thus Defendants

---

[6] Additionally, RJF reports RJBank's loan loss reserve as a percentage of the Bank's total loans.  ¶ 55.

knew they needed to justify RJBank's relatively minimal loan loss provisions. To distinguish RJBank from its peers, Defendants fraudulently conveyed to investors and analysts that the Bank was not vulnerable to broader economic forces that were devastating other financial institutions. ¶¶ 65, 174-75, 177-82, 199, 205, 207, 209, 212-13, 216-18, 226-27, 230-31, 233.

To implement their scheme, Defendants issued materially false and misleading statements concerning RJBank's loan portfolio, loan loss reserves, and risk management practices, and intentionally concealed material facts known only to the Company that would have enabled investors to determine that RJBank's loan loss reserves were, in fact, inadequate. ¶¶ 66, 174-75, 177-82, 199, 205, 207, 209, 212-13, 216-18, 226-27, 230-31, 233. As a result of their fraudulent scheme, from the Company's second quarter of fiscal 2008 through the first quarter of fiscal 2009, RJF reported generally impressive financial results based on the purportedly stellar performance of RJBank, and RJF beat analysts' earnings expectations, while recording low quarterly loan loss provisions. ¶¶ 72-77, 149-50, 152, 154-56, 163-66.

### C. DEFENDANTS CONCEALED THE RISKS IN RJBANK'S LOAN PORTFOLIO TO ASSURE INVESTORS OF CONTINUED PROFITABILITY

#### 1. Defendants Concealed RJBank's Growth In Its Risky Commercial Real Estate Portfolio

Throughout fiscal 2008, Defendants intentionally hid from investors the fact that RJBank was rapidly expanding its exposure to the riskiest commercial real estate loans, which were at an extremely high risk of default throughout 2008 and early 2009. ¶¶ 67, 80. To conceal this increasing risk, in reporting RJF's earnings, Defendants intentionally lumped together the Bank's Commercial Loans, Real Estate Construction Loans, and Commercial Real Estate Loans ("CRE"). CRE included loans secured in whole or in part by real estate, including loans made to commercial borrowers in the real estate industry ("Core CRE") (such as developers or owners of office buildings and retail space) and loans made to borrowers in industries completely unrelated

to real estate, but where the borrower's property was merely collateral for a loan that funded ongoing business operations. ¶ 82.  While all CRE loans were at a higher risk of default, Core CRE loans were the most directly impacted by the downturn in commercial real estate.  *Id.* Unbeknownst to investors, from March 31, 2008 through March 31, 2009, RJBank's Core CRE loans grew by 53%, while the Bank's total CRE portfolio increased by only 25% .  ¶¶ 83-84. Thus,  investors had been led to believe that RJBank's commercial real estate exposure had only increased by 25%, while the Bank's exposure had grown at more than twice that rate.  Had investors been aware of this growth, they would have immediately concluded that the Bank needed to significantly increase its loan loss reserve levels.  ¶ 84.[7]  But it was not until April 2009, after the Company had been forced to record a $75 million loan loss provision, including a $28 million charge-off related to one Core CRE loan, that investors learned of RJBank's reckless commercial real estate loan growth.  ¶¶ 80-85.

### 2.    Defendants Concealed The Risk Of Loss From One Loan Default

While SEC regulations required RJF to disclose its "most significant risk factors," Defendants intentionally ignored this obligation, and instead touted to investors that "RJBank does not have any significant concentration to any one industry or customer." ¶ 87.  In reality, as RJBank was vastly increasing its commercial loan portfolio, it was not increasing its number of borrowers at anywhere near the same pace.  ¶¶ 87-88.[8]  Defendants deliberately concealed this concentration risk, which ultimately caused RJBank to record, among other things, a $28 million charge-off on *one* commercial real estate loan in the second quarter of fiscal 2009.

---

[7] RJF's other SEC filings, such as the Company's 10-Ks and 10-Qs, presented RJBank's CRE and Core CRE holdings in similarly misleading fashion. ¶¶ 82, 195-96.

[8] Indeed, as one former Vice President in RJBank's commercial real estate department confirmed, for a "bank the size of Raymond James [Bank], they were taking, probably, more exposure on a single credit than most institutions would do." ¶ 88.

### 3. Defendants Concealed The True Loan-To-Value Ratios Of RJBank's Residential Loans

Throughout the Class Period, Defendants reported outdated loan-to-value ("LTV") ratios[9] for RJBank's residential loans, and failed to disclose to investors that the reported ratios were useless in assessing the quality of RJBank's home loans. ¶¶ 91-94, 96-97, 176, 185.

As home prices fell rapidly from 2006 through the beginning of 2009, Defendants touted purportedly low average LTV ratios on the Bank's home loans, which were meaningless because they were based on home values at the time of loan origination. ¶¶ 93-94, 176, 185. Defendants did not, however, disclose that these LTV ratios were outdated, not based on greatly reduced housing prices, and thus of limited or no utility to investors in evaluating the risks inherent in RJBank's residential loans. ¶¶ 93-94. By concealing these facts, Defendants concealed that the actual average LTV ratios were much higher, and that the risk of imminent losses to RJBank was much higher as well. ¶ 94.

### D. DEFENDANTS MISREPRESENTED THE RISKS IN RJBANK'S COMMERCIAL AND RESIDENTIAL LOANS AS WELL AS THE COMPANY'S RISK MANAGEMENT AND LOAN UNDERWRITING PRACTICES

### 1. Defendants Misrepresented The Risks In RJBank's Residential And Commercial Loan Portfolios

Defendants misled investors concerning the risks associated with RJBank's residential and commercial loans portfolios and, instead, touted the supposed superiority of RJBank's loans compared to other financial institutions.

*First*, in addition to concealing the uselessness of the Bank's reported LTV ratios, Defendants affirmatively touted the Bank's purportedly low and ***decreasing*** home LTV ratios,

---

[9] An LTV ratio is the amount of a home loan expressed as a percentage of the total appraised value of a home. A low LTV ratio indicates a higher quality loan, as it means the borrower owes significantly less than the home's actual value. ¶ 92.

despite the fact that home values were sinking and, thus, these ratios were *increasing*.  ¶¶ 96-97, 176, 186.[10]

*Second*, Defendants continually misrepresented to investors that RJBank's home loan portfolio was immune to the mortgage-related losses that were decimating the industry, and publically reassured investors that any nonperforming residential loans were a "non-factor," despite the Bank's heavy exposure to California and Florida.  ¶¶ 98-100.  Defendant James specifically and falsely stated that RJ Bank had not experienced "a lot of the direct losses that have been experienced by the major banks" because RJ Bank's "residential loans [were] nominal [sic] way below industry average" in losses.  ¶ 100.

*Third,* Defendants misrepresented the risks in RJBank's commercial loan portfolio by touting to investors that the Bank's reserves for its corporate loans were "based on the risk profile of each individual loan" and that the Bank's reserves had put the Company "in a situation where we don't get unexpected surprises."  ¶¶ 101-03, 207, 231.   Defendants possessed, but did not disclose, the information that would have enabled investors to determine that the Bank's reserves were far from adequate. ¶¶ 102-03.

### 2.    Defendants Misrepresented RJBank's Risk Management and Loan Underwriting Practices

During the Class Period, Defendants criticized and openly sought to distance themselves from "inadequate underwriting standards and other lax management policies" of banks that were reporting dismal financial results. ¶¶ 106, 174.  Defendants expressly stated that "[r]egardless of the source, all [commercial and corporate] loans are independently underwritten to RJBank credit policies" and that all of the Bank's corporate and commercial loans "are independently

---

[10] Given that nearly 10% of RJBank's total assets consisted of home loans in California and Florida – two states that experienced the most severe declines in home values – RJBank's reported LTV ratios were particularly misleading to investors.  ¶ 97.

underwritten by RJBank credit personnel." ¶¶ 106, 197, 222. Since a large percentage of RJBank's loans were purchased from banks that originally extended the loans, these representations were vital to investors. RJBank did not, however, independently underwrite all of its loans. As a former Senior Vice President at RJBank confirmed, the very commercial real estate loan that caused RJBank to record a $28 million charge-off in April 2009 was never independently underwritten. ¶ 108.

Similarly, while Defendants repeatedly touted RJF's purported devotion to "risk management," Defendants had, instead, been focused on loan growth throughout the Class Period. Only after the Company announced its devastating numbers for the second quarter of fiscal 2009 did investors learn that that RJBank's focus would only then be "shift[ing] to portfolio oversight from loan growth" and that the Company would begin to undertake "[a]ggressive credit management," with "more frequent loan reviews, and increased scrutiny of new loans." ¶¶ 110-11.

### E.    DEFENDANTS IGNORED NUMEROUS REPORTS, WARNINGS AND DATA DEMONSTRATING THAT RJBANK'S LOAN LOSS RESERVES WERE INADEQUATE

Throughout the Class Period, Defendants were flooded with information, including economic data and regulators' warnings and assessments, that demonstrated the need for far greater loan loss reserves. Defendants were required to, and in fact did, consider this information, but chose to deliberately and/or recklessly ignore it to maintain the Company's false appearance of profitability. ¶¶ 112, 114-53, 246. Indeed, a former Senior Vice President at RJBank, who worked at the Bank prior to and throughout the Class Period, confirmed the Defendants paid "close attention" to this and other information that made clear to Defendants that RJBank's loan loss reserves were dangerously and improperly low. ¶¶ 118, 123, 125-26, 128, 131, 142-43. Nevertheless, Defendants touted to investors the Bank's reserves were adequate and, remarkably, that its reserve levels could be *too high*. ¶¶ 175, 207, 209, 216.

11

*First*, Defendants intentionally and/or recklessly disregarded regulators' warnings and reports that warned of likely losses concerning commercial loans. During RJF's second quarter of fiscal 2008, the Comptroller of Currency gave a speech to the Florida Banker's Association – of which RJBank's CEO and Senior Vice President *and* its Chief Compliance Officer are Directors – where he expressly warned banks of the "clear signs of CRE credit quality declining" that "***will almost certainly require you to downgrade more of your assets  [and] increase loan loss provisions***." ¶ 120. Federal banking regulators later issued a report detailing the "Significant Deterioration in Credit Quality" of certain large syndicated loans called Shared National Credits ("SNC"s). At the time of the report, 90% of RJBank's more than $4.5 billion in non-residential loans were SNCs. ¶¶ 121-23

*Second*, Defendants ignored the plethora of reports of severe declines in commercial and residential real estate and numerous macroeconomic indicators that evidenced devastation for RJBank's commercial borrowers. ¶¶ 126-41. Likewise, the main industries in which RJBank's corporate borrowers operated[11] were at their worst historical levels. ¶¶ 134-42.

*Third*, Defendants consciously and/or recklessly ignored that RJBank's loan growth and meager loan loss provisions were in extreme divergence from the rest of the banking industry. ¶¶ 144-45, 148-52. Throughout the Class Period, as banks were retrenching their lending, RJBank expanded its lending in both the commercial and residential sectors. Indeed, in fiscal 2008, RJBank's commercial and residential loans increased by more than 25%, compared to an industry increase of a mere 0.5%. ¶ 144. Unbelievably, RJBank's quarterly loan loss provision *decreased* in one quarter in the Class Period, and experienced only minor increases in other quarters, compared to peers that were taking *record* loan loss provisions. ¶¶ 148-52, 156.

---

[11] RJBank's corporate borrowers were primarily concentrated in the consumer products and services, industrial manufacturing, telecommunications, healthcare (excluding hospitals), and retail real estate industries. ¶ 134.

F.    **DEFENDANTS CONTINUE TO MISLEAD INVESTORS UNTIL THE TRUTH IS REVEALED AND THE COMPANY IS FORCED TO REPORT DEVASTATING LOSSES**

In the fourth quarter of fiscal 2008, RJF missed analysts' earnings estimates and reported significant increases in RJBank's nonperforming loans. Weeks later, *Barron's* published an article suggesting that RJBank's growth carried serious risks, and that many of RJBank's "loans and home mortgages [could] go bad." ¶¶ 157-59.

To counteract any potential fall-out from the article, the following day, RJF issued a press release that, among other things, reassured investors that RJBank's loan loss reserves were "sufficient to encompass" any future losses and touted the Bank's purportedly "stringent underwriting criteria" as justifying its current reserve levels. ¶ 161. Defendants further reassured investors in announcing RJF's earnings for first quarter of fiscal 2009, which once again beat analysts' estimates. RJBank's results were in sharp contrast to its peers – increasing earnings as other banks reported losses, and growing its loan loss reserves only slightly as other financial institutions' loss reserves as a percentage of total loans reached "a 14-year high." ¶¶ 163-65.

Defendants' scheme, however, could only work for so long, as the disparity between the Bank's reserves and the amount required to cover the Bank's increasing risks and looming losses grew too large. On April 14, 2009, RJF shocked investors when it released preliminarily results for its second fiscal quarter that were well below analysts' estimates. ¶ 168. The Company stated that the Bank would record a $75 million loan loss provision, *triple* the $25 million provision from the prior quarter, and larger than all 2008 quarterly provisions combined. ¶ 169. The Company also reported $40 million in total charge-offs, including a $28 million charge-off on one loan to a commercial real estate finance company, as well as losses related to the Bank's residential mortgage portfolio. *Id.*

Defendants attempted to blame the Bank's stunning reversal on "deterioration of commercial real estate values," "corporate borrowers whose business is highly dependent on

13

consumer spending" and "declining residential property values." ¶ 168.  But as early as January 2008, regulators had warned banks of the need to begin writing-down commercial real estate loans, and residential property values had been declining since 2007.  ¶¶ 49, 120, 128-29, 171. Likewise, the problems facing the Bank's corporate borrowers had been present in the economy and well-known to Defendants since the end of 2007.  ¶¶135, 171.  In other words, none of these factors should have surprised Defendants.   Significantly, Defendants did not attribute the need to record the huge loss provision and charge-offs on events that had occurred in the preceding quarter.

RJF's announcement sent the Company's shares plummeting, and on April 15, RJF's stock closed at $16.49 per share, down $2.57 per share, or 13.48% from its close the prior day, causing investors hundreds of millions of dollars of losses on their RJF investments.  ¶ 172.

## ARGUMENT

## I.    APPLICABLE LEGAL STANDARDS ON A MOTION TO DISMISS

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a misstatement or omission of a material fact in connection with the purchase or sale of a security; (2) defendant's scienter; (3) plaintiff's reliance on the misrepresentation; and (4) damage to plaintiff resulting from the misrepresentation.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005).  While the Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), "courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) (citation omitted).  Similarly, while Rule 9(b)

14

requires a complaint to specify the false statements and the associated "who, where, when, and why," a plaintiff is *not* required to "plead with particularity every single fact upon which [its] beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000). For those allegations not subject to the heightened pleading standards of Rule 9(b) and/or the PSLRA, to survive a motion to dismiss, the facts alleged need only "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As set forth below, the Complaint sufficiently pleads all elements of each claim and the Court should deny Defendants' motion to dismiss.

## II. THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. APPLICABLE LEGAL STANDARD

False or misleading statements and omissions are material if their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Materiality requires both a qualitative and quantitative assessment. *See In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410-11 (S.D.N.Y. 1998) (rejecting defendants' argument that alleged misrepresentations were immaterial because they affected earnings by no "more than 2.54%" and stating "that materiality of the misstatements must be considered in light of their impact on [defendant's] reputation, wholly apart from their statistical impact on [defendant's] reported earnings."); *see also* SEC Staff Accounting Bulletin No. 99 ("quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations…. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."); 17 C.F.R. § 211.

In light of the nature of the required inquiry, it is well-settled that materiality issues are rarely appropriate for resolution on a motion to dismiss. *In re Par Pharm., Inc. Sec. Litig.,* 733 F. Supp. 668, 677 (S.D.N.Y. 1990); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 400 (S.D.N.Y. 2002); *Lazzarro v. Manber*, 701 F. Supp. 353, 364 (E.D.N.Y. 1988) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). "The determination [of materiality] requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact." *RMED Int'l, Inc.*, 185 F. Supp. 2d. at 400 (quoting *TSC Indus., Inc. v. Northaway, Inc.*, 426 U.S. 438, 450 (1976)). Furthermore, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman*, 754 F.2d at 1067.

Despite the general rule against deciding materiality on a motion to dismiss, Defendants persist in arguing that many of their misstatements are immaterial and/or otherwise non-actionable. Defendants' arguments are misplaced, as Plaintiffs have adequately alleged multiple materially false and misleading statements.

### B.    THE COMPLAINT ADEQUATELY ALLEGES MATERIAL AND ACTIONABLE MISSTATEMENTS REGARDING LOAN LOSS RESERVES

Defendants contend that Plaintiffs have failed to identify any material misstatements regarding RJBank's loan loss reserves. They argue that: (1) Plaintiffs' allegations constitute, at most, claims of mismanagement and not securities fraud; and (2) Defendants' statements are protected "forward looking statements" under the PSLRA and/or covered by the "bespeaks caution" doctrine. DB at 13-22. Both arguments fail.

### 1.  The Complaint Alleges Fraudulent Misstatements – Not Mere Mismanagement

Defendants characterize Plaintiffs' allegations regarding deliberately understated loan loss reserves as allegations of mere "mismanagement."  DB at 14-15.  This tactic fails, as rather than simply alleging that Defendants innocently or negligently miscalculated their loan loss reserves, Plaintiffs allege that Defendants deliberately (or at least recklessly) ignored specific information that they knew required much larger loan loss reserves.

The very cases cited by Defendants demonstrate the importance of this distinction.  In *Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991), for example, the court stated that misrepresentations concerning the adequacy of loan loss reserves, while not actionable in that case, could be "actionable if the speaker 'disseminated the forecasts knowing that they were false or that the method of preparation was so egregious as to render their dissemination reckless.'" *Id.* at 822 (internal citations omitted), *aff'd*, 956 F.2d 1161 (2d Cir. 1992)  In *Ciresi*, the statements at issue were not actionable because Plaintiff "fail[ed] to aver any facts which would give rise to an inference that defendants were aware of where their decisions were leading."  *Id.*

In stark contrast, the Complaint here alleges that Defendants "deliberately and/or recklessly disregarded important information that they were required to consider . . . such as external data sources and benchmarks, when determining the appropriate level of loan loss reserves the Bank should hold."  ¶ 112.  Among other things, the Complaint alleges that Defendants knowingly and/or recklessly disregarded:  (1) regulatory warnings and assessments concerning the appropriate levels of loan loss reserves (¶¶ 118-24); (2) severe declines in commercial and residential real estate that Defendants were monitoring (¶¶ 125-30); (3) broader macroeconomic indicators that signaled that widespread losses were imminent – again, indicators the Complaint alleges Defendants studied, yet ignored (¶¶ 131-42); and (4) the discrepancies between RJBank's loan loss reserves and those Defendants were monitoring at competitor banks

17

(¶¶ 143-53).    The Complaint also alleges that loan loss reserves were an "integral part of operating" RJBank and that top Company executives were directly involved in determining the appropriate loan loss provisions.  ¶ 64.  The Complaint here, unlike the one in *Ciresi*, thus clearly alleges facts supporting (in the words of the *Ciresi* court) "an inference that defendants were aware of where their decisions were leading" – in other words, material misrepresentations and actionable securities fraud.  782 F. Supp. at 822.

Similarly, the court in *In re Aegon N.V. Securities Litigation*, No. 03-cv-0603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004), citing *Ciresi*, found the complaint there lacking for its failure to "plead particular facts supporting [plaintiffs'] theory that the Defendants' failure to take the accounting charges earlier was due to something nefarious, rather than simply imperfect economic forecasting."  *Id*. at *8.  Here, however, the Complaint alleges numerous particular facts showing that Defendants' failure to sufficiently increase loan loss reserves *was* due to something nefarious.  Among other facts, the Complaint specifically alleges that in 2007, ***prior*** to the Class Period and when RJF's non-bank segments were still prospering, RJBank appropriately calculated its loan loss reserves based on increased risks (¶ 56), but that starting in 2008, when RJF's non-bank segments started to post declining results, Defendants ignored and misrepresented those same (and ever-increasing) risks and deliberately maintained severely deficient loan loss reserves in order to offset the shrinking earnings in RJF's non-banking segments (¶¶ 58-65)  In other words, the Complaint alleges far more than that the Defendants eventually figured out how to properly calculate loan loss reserves – the sort of "fraud in hindsight" or "failure of clairvoyance" allegations found wanting in *Ciresi* and *Aegon*.  The Complaint here alleges that the Defendants knew the proper calculations all along – and in fact properly performed them prior to the Class Period – but deliberately manipulated those

18

calculations during the Class Period in order to prop up the disappointing results from RJF's other business segments.[12]

Arguments similar to those raised by Defendants have been rejected by other courts in situations analogous to those presented here.  For example, in *In re Wells Fargo Securities Litigation*, 12 F.3d 922, 926-28 (9th Cir. 1993), Wells Fargo argued, as Defendants do here, that plaintiffs' allegations amounted to non-actionable corporate mismanagement because "the calculation of reserves is an uncertain, 'dynamic' process, and necessarily is based in large part on the judgment and discretion of corporate management."  12 F.3d at 927, *cert. denied*, 513 U.S. 917 (1994) (citing *Santa Fe Indus. v. Green*, 430 U.S. 462 (1977)).  The Ninth Circuit rejected this argument and held that plaintiffs had alleged securities fraud because plaintiffs "allege that Wells Fargo knew of certain 'contingencies' which rendered its loan loss reserves 'inadequate,' and failed to disclose this information to purchasers of its stock."  *In re Wells Fargo,* 12 F.3d at 927.  Similarly, the Third Circuit has explained that "[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) (reversing lower court's dismissal of action based on misrepresentations concerning loan loss reserves and "conservative" and "cautious" management practices).  *See also In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 509-10 (D. Del. 2001) (denying motions for summary judgment and rejecting various theories that statements regarding

---

[12] *In re Kindred Healthcare Inc. Securities Litigation*, 299 F. Supp. 2d 724, 729 n.3 (W.D. Ky. 2004), is equally distinguishable.  That case does not involve loan loss reserves; it concerns setting litigation reserves for medical malpractice claims (and the uncertainty involved in this process).  As the court in *In re Kindred Healthcare* noted, litigation reserves are adjusted as cases develop and cannot be estimated precisely based only on the claimants' filing a notice of claim, *i.e.*, at the outset of the case.  The process of determining adequate litigation reserves is not analogous to setting a bank's loan loss reserves.

loan loss reserves are not actionable).  Other courts have also found the deliberate misstatement

of reserves to be actionable (*see* cases cited *infra* at II.B.2).[13]

2.    **The Loan Loss Reserve Misstatements Are Not Protected Under the PSLRA or the "Bespeaks Caution" Doctrine**

Defendants further assert that their misstatements concerning their reserves are protected

by the statutory PSLRA "safe harbor" and/or the judicially created "bespeaks caution" doctrine.

DB at 18-19.  Once again, Defendants' arguments miss the mark.

As an initial matter, deliberate understatements of loan loss reserves are actionable and

not protected as forward-looking.  *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1226-27

(C.D. Cal. 2008) (misstatements regarding adequacy of loss reserves were actionable); *Atlas v.

Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149-52 (S.D. Cal. 2008)

(misstatements regarding various types of reserves).  That the development of loan loss reserves

involves some predictive elements does not allow one to ignore and misrepresent contradictory

information regarding present circumstances with impunity.  *See, e.g., In re Dynex Capital, Inc.

Sec. Litig.*, No. 05-cv-1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006), *vacated in part*,

531 F.3d 190 (2d Cir. 2008) (statements regarding loss reserves were actionable because they

misrepresented present facts by failing to include provision for collateral impaired at the time);

*New Century*, 588 F. Supp. 2d at 1226-27 (misstatements regarding loan loss reserves involved

analysis of facts that could be characterized as present or historical, not only future affairs); *In re*

---

[13]  Equally unconvincing is Defendants' argument that Plaintiffs' claims must fail because Plaintiffs purportedly did not specify in the Complaint the amount by which the loan loss reserves were understated.  DB at 16.  Unlike the plaintiffs in *In re MSC Industrial Direct Co.*, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003), who did *not* specify what the proper reserves should have been, Plaintiffs here adequately allege that the correct loss reserve numbers were those revealed by the Company in its April 14, 2009 corrective disclosure, and the Defendants here further explained the impact of the properly recorded reserves on RFJ's financials.  ¶¶ 168-69.  Defendants also cite *AIG Global Securities Lending Corp. v. Banc of America Securities LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003), but that case is inapposite.  There, the allegedly misleading statements were about a retailer's loss and delinquency rates for installment contracts *compared to* other retailers' rates for similar contracts.  As the court noted, "at oral argument it became clear that the plaintiffs did not even allege that the figures themselves were incorrect, but rather that the comparison to the figures for other retailers was misleading."  254 F. Supp. 2d at 385 n.4.

20

*Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) (representations regarding adequacy of loss reserves were "directed to the then-present state of the Company's financial condition.").

Additionally, boilerplate disclosures of potential risks are insufficient to offset the false and misleading nature of Defendants' statements. *See*, *e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) (generic, boilerplate warnings accompanying other disclosures were insufficient to place defendants' statements within the PSLRA's safe harbor); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("adding boiler plate language . . . does not mitigate a failure to disclose"). Thus, Defendants' vague, generic statements cautioning that results could differ from expectations and objectives described in RJF's press releases and SEC filings or that such documents contained forward-looking statements are wholly inadequate to apprise investors of the true extent of risk associated with RJBank's loan portfolio.

Moreover, even Defendants' statements directly addressing the adequacy of the Bank's loan loss reserves, *see* DB at 20-21, are not protected by the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine if Defendants knew the statements were false when made. *In re Globalstar Sec. Litig.*, No. 01-cv-1748, 2003 WL 22953163, at *9 (S.D.N.Y. Dec. 15, 2003) (safe harbor and bespeaks caution doctrine inapplicable where plaintiffs sufficiently alleged that defendants knew misrepresentations were false when made); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) (same). Plaintiffs allege that Defendants knew, throughout the Class Period, that RJBank was at that time exposed to much greater risk than they disclosed, and that RJBank's reserves were wholly inadequate given the huge losses they knew the Bank would inevitably suffer, just like its peers. Further, Defendants' warnings vastly understated the nature and extent of pending risk. For example, in his July 22, 2008 appearance on CNBC's *Closing Bell*, Defendant James knew, but did not disclose, that the

Bank had significantly expanded lending in the riskiest sector, and thus that the likelihood of losses had also increased significantly, but he merely noted that the Bank expected charge offs to "go up a little bit" as the Bank was in "good shape in terms of asset quality." ¶ 205. "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). While Defendants knew that RJBank, like its peers, had fallen into the proverbial Grand Canyon, they repeatedly told investors that the Bank was prospering on a mountaintop.

## C.    MISSTATEMENTS REGARDING LTV RATIOS

Defendants assert that their statements concerning the average LTV ratio of RJBank's home loans are not actionable because (1) Defendants' statements were factually true, and (2) Plaintiffs have not pointed to "any obligation on the part of RJF to provide updated LTV ratios." DB at 22-23. Both arguments fail.

First, even *factually* true statements are actionable if presented in a manner that misleads investors. *See, e.g., McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), *aff'd in part, rev'd in part*, 65 F.3d 1044 (2d Cir. 1995) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 161 (2008) ("We have recognized that statements literally true on their face may nonetheless be misleading."). Here, Defendants repeatedly touted the low average LTV ratio of RJBank's home loans in an effort to assure investors that RJBank's home loans were safe, at low risk of default, and therefore unlikely to cause RJBank to sustain any significant losses. ¶¶ 93-97, 185, 224. While Defendants disclosed that LTV ratios were based on home values at origination, the

disclosures misled investors into believing that RJBank's home loans were of particularly high quality and placed the Bank at a low risk of loss.  ¶¶ 93-97, 176, 185, 224.  A simple disclosure that the LTV ratios were outdated and not indicative of current home values was required.

Second, Plaintiffs have *not* alleged that Defendants "omitted providing updated LTV ratios" (DB at 23) nor have Plaintiffs asserted that Defendants were obligated to do so.  Rather, Plaintiffs alleged that Defendants should have disclosed that the reported LTV ratios were outdated, unreliable, and/or in no way indicative of the quality of RJBank's home loans.  *See In re Par Pharm.,* 733 F. Supp. at 675 (implicitly accepting plaintiffs' position that "once corporate officers undertake to make statements, they are obligated to . . . make such additional disclosures as are necessary to avoid rendering the statements made misleading.").  As Plaintiffs explained in the Complaint, the manner in which Defendants reported outdated LTV ratios was materially misleading because it indicated to investors that RJBank's residential loans were higher quality and less risky than they in fact were.  ¶¶ 91-94, 97.

### D.    MISSTATEMENTS REGARDING LOAN GROWTH AND LOAN CONCENTRATION

Defendants put forth a laundry list of reasons why their misrepresentations and omissions concerning RJBank's loan portfolio – specifically concerning the Bank's loan growth, loan concentration, and asset quality – are purportedly immaterial and non-actionable.  Each of Defendants' arguments is unavailing.

Defendants largely focus on their alleged material omissions, arguing that their undisputed failures to disclose RJBank's growth in risky commercial real estate loans or Core CRE are non-actionable because investors had "an abundance of information regarding" RJBank's loans and any "reasonable investor" was on notice that RJBank's loans included loans to "'borrowers in the real estate industry.'"  DB at 25.  Defendants miss the point.

Plaintiffs do not dispute that RJF apprised investors of *certain* information concerning the Bank's loans, nor do Plaintiffs contend that Company shareholders were unaware that the Bank's loans included loans to borrowers in the real estate industry. Instead, Plaintiffs have alleged (and Defendants do not dispute) that throughout the Class Period, Defendants intentionally hid RJBank's explosive growth in the ***single highest risk*** category of loans: Core CRE. ¶¶ 42-43, 81-85. Indeed, RJF's press releases indicated to shareholders that, among other things, RJBank's commercial real estate holdings had grown by roughly 25% from the second quarter of fiscal 2008 through the second fiscal 2009, while in reality, RJBank had grown its Core CRE holdings at more than twice that rate. ¶¶ 83-84.

Defendants conclusorily contend that RJBank was under no duty to disclose its Core CRE holdings (DB at 25-26), but they apparently thought otherwise when they attempted to correct their prior failures by disclosing Core CRE after the end of the Class Period.[14] Furthermore, when defendants undertake to make statements on a particular subject they have a duty to make such additional disclosures as are necessary to avoid making those statements misleading" *In re Marsh & McClennan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a corporation does make a disclosure-whether it be voluntary or required-there is a duty to make it complete and accurate.") (citation omitted). As Defendants purported to inform

---

[14] Defendants' argument that disclosure of the Bank's Core CRE growth occurred after the Class Period, and therefore, did not cause Plaintiff's loss, is similarly unavailing. DB at 24-25. Courts routinely hold that loss causation is adequately alleged where part of a Defendants' fraud is disclosed during the class period, and additional details emerge after the class period that expose the full extent of, or greater detailing concerning, the fraud. *See, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) ("That the true extent the fraud [sic] was not revealed to the public until . . . after the close of the Class Period is immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder . . . value."); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 707-08, 759-61 (S.D. Ohio 2006) (loss causation alleged where there were additional fraudulent practices revealed after the class period). In this case, shareholders learned of RJF's fraud when, on April 14, 2009, RJF announced that it was more than tripling its loan loss provision from the previous quarter and reported it would record a $28 million charge-off on one Core CRE loan. ¶¶ 168-69. A few days later, after the Class Period, investors learned that RJF had partially concealed this risk of loss by, among other things, intentionally disguising the Company's Core CRE growth. ¶¶ 83, 85. That this additional disclosure came after the Class Period is immaterial. *In re Parmalat*, 375 F. Supp. 2d at 307.

shareholders of RJBank's commercial real estate holdings and related risks, they were obliged to tell the rest of the story – that RJBank's riskiest loan holdings were growing at faster pace and becoming a greater percentage of the Bank's overall portfolio than apparent in Defendants' misleading and incomplete disclosures.  ¶¶ 83-84.

Defendants also argue that separately disclosing RJBank's Core CRE holdings would not have altered the "'total mix'" of information  (DB at 26), but this assertion is plainly undercut by Defendants' decision to disclose *precisely* this information beginning with RJF's April 22, 2009 earnings release.  ¶ 83.  Moreover, Plaintiffs have adequately alleged the significance of this information to shareholders: prior to and during the Class Period, Core CRE loans were *the* most at-risk bank loans; federal regulators issued warnings specifically addressing the risks faced by banks with high Core CRE concentrations; and while Defendants repeatedly sought to distance themselves from other financial institutions that were reporting massive losses due in part to faltering real estate markets, at the same time, and unbeknownst to investors, the Bank was rapidly growing its riskiest loan holdings and placing RJF at even greater risk of loss.  ¶¶ 42, 120, 126-27  Thus, any reasonable investor would find it significant that, during this period, RJBank grew its Core CRE loans by more than 50%.  ¶¶ 83-84

Defendants also contend that they made no misrepresentations because Plaintiffs have not shown that the challenged statements "were in any way false" or "misstated." DB at 24. Defendants are plainly wrong, as Plaintiffs have alleged multiple misrepresentations concerning "characteristics" of RJBank's loan portfolio.  *See, e.g.,* ¶¶ 175, 184 (James' statement that RJBank's growth rate was "slow[ing]" was false because the Bank's risky commercial real estate portfolio "was in fact growing");  ¶¶ 205-06 (James' representation that RJBank was "in very good shape in terms of asset quality" was false because the Bank's asset quality was

deteriorating); ¶¶ 213, 215 (James' statement that RJBank's non-performing loans were "really a non-factor" was false because the Bank's home loans had experienced significant losses).

Defendants broadly assert, in conclusory fashion, that "many of the challenged statements were forward-looking" or "protected under the bespeaks caution doctrine" (DB at 26), but they do not point to any specific statement that they deem forward-looking or protected by the "bespeaks caution doctrine" and provide no basis for their contentions. Accordingly, this argument fails. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) ("Dismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'") (citations omitted). [15]

Defendants also assert that "many of the challenged statements regarding the superior asset quality of RJBank's loan portfolio" are non-actionable puffery. DB at 26. Here again, Defendants fail to provide any analysis of *why* these statements are supposedly "puffery" and cite no supporting case law. *Id*. Regardless, Defendants' misrepresentations do not constitute "puffery" and are, therefore, actionable. *See generally In re New Century*, 588 F. Supp. 2d. at 1226 ("[t]he Court . . . finds that the alleged statements cannot be chalked up to 'mere puffery'" where bank's representations concerning "strong credit quality" were demonstrably false).

---

[15] Moreover, Defendants' misrepresentations were neither forward-looking nor protected by the bespeaks caution doctrine since they related to RJBank's then-current loan growth and asset quality. *See In re New Century*, 588 F. Supp. 2d at 1226 (finding statements neither forward-looking nor protected by the bespeaks caution doctrine where, among other things, statements concerned "then-current loan . . . performance").

### E.    MISSTATEMENTS REGARDING DUE DILIGENCE

Defendants argue that RJF's statements regarding the Bank's due diligence are not actionable.  But Defendants base their arguments on issues that must be resolved on the merits, not on a motion to dismiss.

Defendants do not dispute the accuracy of CW2's statements that the Bank did not independently underwrite the loan that led to the $28 million charge-off in the second quarter of 2009.  Instead, Defendants claim that Plaintiffs must provide – at the pleading stage – multiple examples of loans that were not independently underwritten before the Court can give these allegations any weight.  Not surprisingly, Defendants cite no case to support such a requirement.

Defendants also argue that Plaintiffs did not provide sufficient information on CW2 to determine the accuracy of the information this individual supplied.  But as of 2008, RJBank had only 84 employees in total and CW2 was a Senior Vice President.  Thus, it is "probab[le] that a person in the position occupied by the [CW2] would possess the information alleged," *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 526 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group*, No. 09-cv-1370, 2009 WL 4893719 (2d Cir. Dec. 21, 2009)[16] regarding RJBank's independent underwriting of this significant commercial loan.[17]

Defendants also claim that Plaintiffs do not plead facts showing that the $28 million charge-off was material to the Bank's results or the Company's share price.  But RJF's own press release – specifically citing the $28 million charge as an explanation for the tripling of the

---

[16] Defendants cite *In re PXRE* for the proposition that any use of confidential witnesses is now dubious, following the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), but the court in *In re PXRE* explicitly "decline[d] to follow this approach absent guidance from the Second Circuit" and noted that other courts in the Southern District of New York have "proceeded similarly."  600 F. Supp. 2d at 526 n.18.

[17] If the Court does not have enough information to assess whether CW2 was in a position to know the relevant facts, Plaintiffs seek leave to amend their complaint so they can provide additional details regarding this individual. *See In re Dothill Sys. Corp. Sec. Litig.*, No. 06-cv-228, 2009 WL 734296, at *14 (S.D. Cal. Mar. 18, 2009) (granting leave to amend a second time to add detail regarding confidential witnesses).

loan provision compared to the previous quarter – belies Defendants' assertion. Moreover, the $28 million charge is almost three-quarters of the total charge of $40 million, one-third of the total loan loss provision for that quarter, more than the $25 million total provision for all loans in the prior quarter, and more than one-fourth of the prior quarter's total reserves, which had stood at $100 million. A comparison of the $28 million charge-off to the Bank's entire loan portfolio is not relevant, as investors (and bank regulators) expect total loan loss provisions to be small compared to the total loan balance. For example, for the quarter ending December 31, 2008, the FDIC noted that the average reserve as a percentage of outstanding loans was 2.20%, a 14-year high, whereas RJBank's reserve percentage was 1.36%. ¶ 165. It is sudden large increases in the provisions that are material, as illustrated by the fact that the tripling of loan loss reserves caused the RJF's stock price to plummet.[18]

Plaintiffs further explain that the Bank took on an additional risk, *i.e.*, that third parties' due diligence would be inadequate, which was not disclosed. ¶ 108. Plaintiffs then allege that "[h]ad investors known that RJBank relied on other banks to evaluate the quality of RJBank's loans. . . investors would have factored this increased risk into their valuation of RJF and its stock, and may have also recognized that RJBank's low loan loss reserve levels were inadequate because RJBank could not be confident that the Bank's borrowers could sustain their payments." ¶ 109. Further, when the November 10, 2008 *Barron's* article questioned the strength of the Bank's loan portfolio, RJF specifically pointed to its "stringent underwriting criteria" in its efforts to persuade the public that large problems were *not* looming. ¶ 161. Thus, RJBank's underwriting criteria are part of the "mix of information" that is material to investors.[19]

---

[18] Defendants point out that the Company's early release of this information suggests Defendants were not reckless. But the issue here is the materiality of Defendants' statements.

[19] As Defendants have not shown that their "alleged misstatements or omissions 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,'" at a minimum the

### F.    MISSTATEMENTS REGARDING CONSERVATIVE LENDING PRACTICES

Defendants assert that their statements regarding their "conservative management approach" are inactionable because Plaintiffs have not adequately alleged materiality or falsity and the statements are protected under the PSLRA and the bespeaks caution doctrine. Defendants are wrong on all counts.

Again, materiality is generally a question of fact not proper for resolution on a motion to dismiss.  Moreover, statements that are virtually identical to those at issue here, where lenders described underwriting practices as "conservative" and credit quality as "strong," have been found to be actionable and not to constitute "mere" puffery.  *See*, *e.g.*, *In re RAIT Fin. Trust Sec. Litig.*, No. 07-cv-3148, 2008 WL 5378164, at **5-6 (E.D. Pa. Dec. 22, 2008) (statement that "credit underwriting involves an extensive due diligence process" was not puffery); *In re New Century,* 588 F. Supp. 2d at 1215, 1225 ("public statements regarding the company's 'strong,' 'excellent,' 'very high' credit quality, and that the credit quality was 'better' than in the past because the company used 'strict,' 'improved,' and 'strong' underwriting guidelines" were actionable); *Atlas,* 556 F. Supp. 2d 1142 (representations that underwriting procedures were more conservative than those of other subprime lenders were actionable where those procedures were consistently disregarded).[20]

Here, the Complaint details multiple instances where Defendants described RJBank's management and, in particular, its risk management as "conservative" and distinct from other

---

issue of materiality is a mixed question of law and fact which should be decided at trial.  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

[20]  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) found that JP Morgan's statements concerning, among other things, its integrity and risk management processes, were non-actionable "for the simple fact that almost every investment bank makes these statements."  *Id*. at 206.  RJF's statements concerning its risk management and conservative lending practices, in contrast, were particularly *not* the same as those made by every bank, but were designed to make RJF seem unique and not subject to the risks facing other banks during the Class Period.

lending institutions. *See*, *e.g.*, ¶¶ 174, 178, 180. Significantly, Defendants made these statements to counteract concerns that RJF would be affected by the economic downturn, which was already causing staggering losses at RJF's competitors. Plaintiffs adequately alleged that Defendants' statements were false when made because, among other things, RJBank's loan loss reserves were inadequate, its exposure to risky commercial real estate was growing, the Bank had been focused on loan production rather than risk management, and Defendants knew at the time that RJBank was subject to the same risks and losses as other lenders. ¶¶ 183-86.

Finally, Defendants' arguments that their statements concerning their underwriting practices are protected as forward-looking statements or under the "bespeaks caution" doctrine are unpersuasive. Their statements concerning their existing management style, practices and procedures were false when made, were not in any way "forward-looking," and do not fall within the ambit of either "safe harbor" provision. *See*, *e.g.*, *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *9 (safe harbor and bespeaks caution doctrine inapplicable in face of allegations that defendants knew misrepresentations were false when made); *see also In re Alliance Pharm. Corp.*, 279 F. Supp. 2d at 192.

### G.    MISSTATEMENTS REGARDING GAAP COMPLIANCE

Defendants assert, rather tersely, that Plaintiffs' GAAP allegations are "irrelevant" because RJF received unqualified audit opinions for 2008 and 2009 and Plaintiffs have not shown that any of the Defendants acted with scienter. These arguments fail to address the *substance* of any of Plaintiffs' GAAP allegations and should be rejected.

It is well-established that GAAP violations, when coupled with allegations of scienter, can constitute false and misleading statements necessary to establish securities fraud.[21] *See In re*

---

[21] Furthermore, financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. 17 C.F.R. § 210.4-01(a)(1).

*Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999) ("if the Complaint alleges additional evidence of [scienter], a violation of GAAP [can] be the basis of a § 10(b) claim"). Plaintiffs' Complaint alleges pervasive GAAP violations by Defendants, which include, but are not limited to:

- failure to follow required loan loss allowance and accounting methodologies by intentionally and/or recklessly failing to record probable losses incurred on RJBank's home and commercial loans, ¶¶ 243-53, 256-58;

- failure to implement and maintain effective internal controls over RJBank's allowance for loan losses, including a failure to implement and maintain required credit risk management procedures, ¶¶ 262-65;

- violation of Management's Discussion and Analysis of Financial and Results of Operations ("MD&A") disclosure requirements, ¶¶ 267-69;

- failure to restate the Company's quarterly and full-year earnings for fiscal year 2008 and the Company's quarterly earnings for the first fiscal quarter of 2009 to reflect realized losses. ¶¶ 273-76; and

- misstatement of RJBank's well capitalized status. ¶¶ 277-79.

It is immaterial that Defendants received "clean" audit opinions for their Class Period financial statements. *See, e.g., Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996) ("The fact that [Defendant's] independent auditor may have approved the accounting methods will not shield [Defendants] from liability for deception such methods may have caused.").[22]

## III.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

### A.    APPLICABLE LEGAL STANDARD

To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

---

[22] *See also In re LDK Solar Sec. Litig.,* 584 F. Supp. 2d. 1230, 1245-46 (N.D. Cal. 2008) ("[T]he lack of a restatement did not mean that [defendant] only engaged in legitimate conduct . . .[and] KPMG's unqualified audit opinion did not necessarily exonerate [defendant]").

78u-4(b)(2).   As explained by the United States Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007), the inference of scienter drawn from the allegations of a complaint "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but need only be "at least as compelling as any [plausible] opposing inference."   Furthermore, in assessing the adequacy of a plaintiff's allegations, a court should not "scrutinize each allegation in isolation" but rather, review the complaint "in its entirety" and "holistically" with the allegations "taken collectively."   *Id.* at 2509-16.

In the Second Circuit, the requisite strong inference of scienter can be established by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."   *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 527 (S.D.N.Y. 2009) (citations omitted).   Plaintiffs' allegations, taken collectively, adequately allege both that Defendants had the motive and opportunity to commit fraud ***and*** strong circumstantial evidence of their conscious misbehavior and/or recklessness.

### B.    THE FACTS, TAKEN AS A WHOLE, SUPPORT AN INFERENCE OF SCIENTER

Ignoring the holistic approach mandated by the Supreme Court, Defendants adopt a divide-and-conquer approach to Plaintiffs' scienter allegations, arguing that each fact or subset of facts, standing alone, does not support a "strong inference" as mandated by the PSLRA.   DB at 37-41.   When the allegations of the Complaint are considered in their entirety, as *Tellabs* requires, the Complaint amply establishes scienter through a combination of the following allegations:  (1) Defendants willfully ignored an avalanche of facts presented to them from within and without the Company that were contrary to their public statements; (2) the information and misstatements concerned core aspects of the Company's business; (3) the Company *tripled* its loan loss reserves once the truth was revealed, demonstrating the magnitude

of the deception; (4) the Company repeatedly violated GAAP, contravening external accounting standards and internal policy; and (5) Defendants had the motive and opportunity to make the misstatements in order to cover up deficiencies in RJF's failing non-Bank sectors and to line their own pockets.  Taken together, as *Tellabs* demands, these allegations create a cogent and compelling inference of Defendants' scienter.

### 1.     The Complaint Adequately Alleges, At a Minimum, Recklessness

This is a classic case of "conscious disregard and recklessness" as Defendants knew or had access to facts showing that their statements[23] were false or misleadingly incomplete.  *See,*

---

[23]  Plaintiffs have alleged false and misleading statements made directly by each of the Individual Defendants such that resort to the group-pleading doctrine is not required in order to find liability for each of them.  *See, e.g.*, ¶¶ 177, 203, 209, 213, 230 (James); ¶ 181 (Julien); ¶ 192 (James and Julien); ¶ 197 (Raney and Moody); ¶ 207 (Raney); and ¶ 231 (Raney, Julien, and James).  Additionally, Plaintiffs have adequately alleged *all* of the Individual Defendants' participation in setting RJBank's loan loss reserves, either through their membership on RJF's Operating Committee, or through their discussions with the committee, ¶ 64, and *all* of the Individual Defendants' conscious or reckless disregard of, among other things, regulatory warnings and assessments, sharp declines in commercial and residential real, and the vast disparities between RJBank's and other banks' loan loss reserves.  ¶¶ 118-24, 125-30, 143-53.  Although not necessary in order to find the Individual Defendants liable, application of the "group-pleading" doctrine is also appropriate here.  The group-pleading doctrine, which enables a plaintiff to satisfy the PSLRA and Rule 9(b) by "rely[ing] on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company," has been accepted by the majority of the courts in the Southern District of New York.  *See, e.g.*, *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (citation and internal quotations omitted); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) ("The group pleading doctrine ... recognizes ... that some corporate documents, including SEC filings and the like, generally are not created by a single author, but by a group of corporate insiders"); *In re Alstom, S.A., Sec. Litig.*, 406 F. Supp. 2d 433, 448-49 (S.D.N.Y. 2005) ("The group pleading doctrine arose out of recognition that plaintiffs charging fraud with respect to corporate utterances seldom have access, prior to the commencement of discovery, to information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question.") (internal quotations omitted).  *Adelphia Recovery Trust v. Bank of America*, cited by Defendants, also supports the appropriateness of group pleading here.  624 F. Supp. 2d 292, 315-16 (S.D.N.Y. 2009) (**permitting** group pleading and stating that "[a]lthough the lumping of defendants is frowned upon particularly to meet the higher standards of pleading under Rule 9(b) . . . [t]he group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint.") (internal quotations omitted).  Unlike *In re Cross Media Marketing Corporation Securities Litigation*, 314 F. Supp. 2d. 256, 262-66 (S.D.N.Y. 2004), where this Court rejected group pleading allegations because, among other things, plaintiffs (a) failed to allege the individual defendants' participation in the challenge actions or even attribute misleading statements to the majority of the individual defendants and (b) failed to allege that the individual defendants consciously ignored or recklessly disregarded information indicating the falsity of the alleged misstatements, the Complaint here specifically links the Individual Defendants to the misstatements and to knowledge from which their scienter is established.  The Complaint alleges much more than Defendants' footnote 21 suggests, as it properly and adequately alleges the Individual Defendants' positions and direct involvement in the everyday business of the Company.  ¶¶ 21–29.  Defendants' citation to *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987), is unavailing.  There, plaintiffs failed to allege that the individual defendants were in any way connected to the false statements at issue or even that the individual defendants were

*e.g.*, *Novak*, 216 F.3d at 308 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *Florida State Bd. of Admin. v. Green Tree*, 270 F.3d 645, 665 (8th Cir. 2001) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter").

Each of the Defendants knew, or had access to, information indicating that the Company was grossly understating its loan loss reserves. The Complaint alleges how Defendants were required to, and in fact did, consider information that mandated reporting higher loan loss reserves, but they chose to deliberately and/or recklessly ignore that information in order to maintain the Company's false appearance of profitability. ¶¶ 112, 114-53, 246. Defendants knowingly and/or recklessly disregarded: (1) regulatory warnings and assessments concerning the appropriate levels of loan loss reserves (¶¶ 118-24); (2) severe declines in commercial and residential real estate that Defendants were monitoring (¶¶ 125-30); (3) broader macroeconomic indicators that signaled that widespread losses were imminent – again, indicators the Complaint alleges Defendants studied, yet ignored (¶¶ 131-42); (4) the discrepancies between the Company's own loan loss reserves and those it was monitoring at competitor banks (¶¶ 143-53); (5) internal reports revealing information about RJBank's loans known only by Company

---

officers or directors of the defendant company. *Id.* at 1248-49 Defendants' citation to *Medina v. Bauer* is simply inapposite. No. 02-cv-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) (dismissing breach of contract claim against individual defendants for failure to satisfy rule 8(a) where plaintiffs failed to allege any involvement by defendants in the subject contract).

insiders, including the Bank's concentration risks associated with the recently expanded portfolio of corporate and commercial borrowers (¶ 282); and (6) economic reports issued by RJF's own subsidiary indicating that *no* lenders would be immune to the collapsing financial markets and overall U.S. economy (¶¶ 284-88). Defendants' repeated and ongoing failures to make significant provisions for loan losses despite being armed with this information, particularly where RJBank *had* properly provided for loan losses prior to the Class Period, combined with RJF's continued ability (as a result of the knowingly inadequate loss provisions) to report earnings in excess of analysts' estimates,[24] creates a strong inference of scienter.[25]

The fact that these statements concerned the core operations of the Company further supports the inference that Defendants knew or should have known the statements were false when made. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004), citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989). Loan loss reserves were not some obscure calculation that Defendants could easily have overlooked. The Complaint alleges that RJBank's quarterly loan loss provision was the single largest recurring charge to its earnings and that the adequacy of the Bank's loan loss reserve was one of the most important ongoing evaluations the Bank had to make. ¶ 282. The Complaint further alleges that the quarterly loss provision and overall reserve determinations were discussed extensively and routinely at the highest levels of Company and Bank management. *Id.* The critical nature of the

---

[24] Defendants' false statements concerning RJBank's LTV ratios, loan growth and loan concentration, due diligence, and conservative lending practices all stemmed from the necessity to conceal from investors the fact that RJBank's loan loss reserves were inadequate. ¶¶ 80, 81, 89, 90, 94, 98,101, 102, 105, 109. As those false statements were made in furtherance of the same scheme, they further support an inference of scienter.

[25] It is also notable that, at the end of the Class Period, when the Company finally *tripled* its loan loss provision, it could not point to any new development causing it to make that sudden and significant change. ¶ 283.

misstatements thus further supports the inference that Defendants made the false statements knowingly and/or recklessly.[26]

The magnitude of the correction, which *tripled* the loan loss provisions, ¶ 93, further supports an inference of scienter. *See Novak*, 216 F.3d at 309 (quoting *Chill v. Gen. Elec.*, 101 F.3d 263, 270 (2d Cir. 1996)); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006); *In re Atlas Air*, 324 F. Supp. 2d at 489 (holding that "the mere fact that the company had to make a large correction is some evidence of scienter").

Defendants' GAAP violations, discussed *infra* at II.F, also support an inference of scienter. *See Lewin v. Lipper Convertibles, L.P.*, 03-cv-1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (repeated and pervasive GAAP violations could provide strong circumstantial evidence of recklessness); *In re Tommy Hilfiger Sec. Litig.*, No. 04-cv-7678, 2007 WL 5581705, at *4 (S.D.N.Y. July 20, 2007) (finding that allegations of GAAP violations, coupled with evidence of corresponding fraudulent intent, are sufficient to plead scienter) (internal citation omitted); *see also In re American Bank Note Holographics, Inc.*, 93 F. Supp. 2d 424, 447 (S.D.N.Y. 2000) (holding that the magnitude of accounting violations and length of time over which they occurred were sufficient to plead conscious misbehavior or recklessness); *Huberman v. Tag-It Pacific, Inc.*, No. 07-cv-55648, 2009 WL 485053, at *1 (9th Cir. Feb. 11, 2009) ("[s]cienter can be established by direct or circumstantial evidence and, while negligent

---

[26] *See also In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business"); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'") (citation omitted).

accounting or misapplication of accounting principles will not establish scienter, egregious deficiencies in accounting practices may.") (citations omitted).[27]

RJF's own policies required the Company to comply with GAAP, creating an inference that Defendants acted recklessly.  *See In re Sadia,* 643 F. Supp. 2d at 531-32 ("there is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness.") (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); ¶ 240.

Taken together, as *Tellabs* dictates they must, these factors more than adequately support an inference of Defendants' scienter.[28]

## 2.    The Complaint Adequately Alleges Motive and Opportunity

As Plaintiffs are not *required* to plead motive and opportunity in order to adequately allege scienter, the allegations of motive and opportunity are both an alternative means of alleging scienter and a means of further strengthening the inference.  *See Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000) (finding it unnecessary to decide whether, standing alone, the motive to artificially inflate stock price to fund acquisition was sufficient to support scienter, as

---

[27]  As discussed *supra* at II.G, that RJF received clean audit opinions provide no cover for deliberate misstatements. Neither does the fact that the Company did not issue a restatement.  *See, e.g., Aldridge*, 284 F.3d at 83 ("[T]he fact that the financial statements … were not restated does not end [plaintiff's] case . . . . To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."); *Feiner v. SS & C Techs.,* 11 F. Supp. 2d 204, 209 (D. Conn. 1998) ("the fact that [the company] has not elected to restate or reverse its earnings or revenue figures … does not indicate, much less prove, the accuracy of those figures"); *In re Williams Sec. Litig.,* 339 F. Supp. 2d 1206, 1222 (N.D. Okla. 2003) (lack of restatement did not render statements not actionable, noting that because the company filed for bankruptcy, its financial results were not subject to additional audits which may have mandated a restatement).

[28] Defendants cite *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008) to suggest that Plaintiffs cannot establish the requisite corporate scienter for RJF.  At the pleading stage, however, all that is required is that the "pleaded facts . . . create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.  In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Id.* at 195.  Plaintiffs' allegations amply support scienter on the part of the Individual Defendants, any one of whose scienter can be imputed to the Company.  Even absent such allegations, however, "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id.*

the alleged motive "in combination with the other allegations of the Complaint, reenforces the adequacy of the complaint's allegation of scienter"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) ("[P]laintiffs are not required to show that the defendants had any special motive to commit fraud"); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000) ("[a] motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general") (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

Defendants do not seriously dispute that the Individual Defendants had the requisite "opportunity." The Individual Defendants were among the highest-ranking operational officers of the Company. *See* ¶¶ 21-24. Moreover, the Complaint specifically alleges the Individual Defendants' access to, and monitoring of, facts, regulatory warnings and reports demonstrating the severe deficiency in RJBank's loan loss reserves, the Defendants' role in setting the reserves, and their concealment of material facts known only to the Defendants that would have enabled investors to determine that RJBank's loan loss reserves were, in fact, wholly inadequate. ¶¶ 64, 66, 118, 123, 125-26, 128, 131, 142-43.

Motive may be alleged by facts showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir. 1994*); Novak*, 216 F.3d 300 (same). The Complaint adequately alleges Defendants' motive: when times started to get tough in RJF's non-banking divisions, Defendants needed to take artificially low quarterly loan loss provisions in order to offset other business losses and enable RJF to beat analysts' earnings expectations. ¶¶ 58-65, 73-77, 149-50, 152, 154-56, 163-66, 289-91. Defendants were motivated to keep RJBank "well capitalized" under the applicable banking requirements so as not to raise red flags with regulators and/or investors, ¶¶ 300-04, and by the desire to "meet [the] numbers" each quarter. ¶ 299. The

Auction Rate Securities litigation pending against RJF during the Class Period also provided Defendants with an additional motive to maximize revenue, in order to fund a potential settlement in that action.[29]  ¶¶ 292-99.

A corporate officer's receipt of increased compensation based on inflated financial performance can contribute to an inference of motive.  *See, e.g., In re Vivendi Universal*, 381 F. Supp. 2d at 185 ($3 million bonus supported an inference of scienter).  Here, the Individual Defendants had additional incentives to boost earnings because RJF's compensation scheme incentivized short term earnings at the expense of long-term soundness.  ¶¶ 313-15.  Specifically, bonuses were awarded based upon the Company's pre-tax profits.  Defendant Julien's bonus was based not just on the results of the Company as a whole, but had a particular emphasis on results at RJBank.  ¶ 314.  James and Julien were amply rewarded in 2008, earning a combined total of more than $11 million in bonuses.  ¶ 315.  They therefore had an even greater motive for inflating the appearance of RJF's financial performance, from which they derived a specific "concrete benefit[ ]" by virtue of "the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields*, 25 F.3d at 1130); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (inference of scienter found based on totality of allegations, including fact that "eligibility for stock options and executive bonuses were based principally on the company's financial

---

[29] Defendants argue that the Auction Rate Securities litigation does not provide motive for Defendants' alleged fraud because the case was dismissed in September 2009.  DB at 37 n.22.  This argument is both factually inaccurate and illogical.  As a factual matter, the court in the ARS class action against Raymond James, *Defer LP v. Raymond James Financial, Inc., et al.*, 08-cv-3449 (LAK) (S.D.N.Y. 2008), gave the plaintiffs leave to file an amended complaint.  On October 16, 2009, the plaintiffs in that action filed a Second Amended Class Action Complaint that provides comprehensive details, including statements by numerous confidential witnesses involved in RJF's sale of ARS, regarding how the Company misled investors (and in some cases, its own sales force) as to the nature of ARS and the risks inherent in purchasing them.  Thus, the Company is still potentially liable for the losses alleged in that action stemming from RJF's sale of over $2.3 billion in ARS.  Even if the ARS case had been dismissed in the fall of 2009, the status of the case after the Class Period would have nothing to do with Defendants' perception of RJF's ARS liability throughout the Class Period, *i.e.*, when the threatened liability was relevant.

performance"). The incentives the Individual Defendants had here are not the typical incentives possessed by nearly all corporate insiders. DB at 36. Rather, there are "specific facts tying the Individual Defendants' compensation to company performance." *In re Cardinal Health*, 426 F. Supp. 2d at 737.

Furthermore, "[u]nusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of … scienter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74 (citation and internal quotations omitted). Here, Plaintiffs allege that Julien – the CFO of RJF and Chairman of the Board of RJBank – sold RJF stock during the Class Period for proceeds nearly twice his 2008 salary. ¶ 311. Moreover, Plaintiffs allege that Julien's stock sales were exceedingly unusual because he sold his shares at prices far lower than he had purchased *those same shares* prior to the Class Period. In other words, knowing that RJF's share price was artificially inflated throughout Defendants' scheme, Julien sought to dump his holdings before the Company's internally-foreseeable downfall. *Id.* Sales by insider Dennis Zank ("Zank"), which exceeded $1.6 million in total proceeds, are similarly suspicious. ¶ 312.[30] Defendants argue that there is no "causal link between Mr. Zank's alleged stock sales and the alleged misstatements" (DB at 39), apparently ignoring that he served along with Individual Defendants James, Julien and Raney on RJF's Operating Committee, which was instrumentally involved in RJBank's loan loss determinations. ¶¶ 64, 312. Not only did Zank's sales occur prior to a nearly 50% decline in RJF's stock, but Zank had not sold any shares since at least

---

[30]    That Plaintiffs did not sue Zank is irrelevant as Section 10(b) claims for misstatements can be alleged only against those who made or are otherwise responsible for the misstatements. *See generally In re Par Pharm. Sec. Litig.*, No. 06-cv-3226, 2009 WL 3234273, at **2, 10 (D.N.J. Sept. 30, 2009) (accepting allegations of suspicious stock sales by non-defendants and finding scienter adequately alleged against the defendant company).

January 2005. ¶ 312. These Company insiders' highly unusual and suspicious stock sales support a strong inference of scienter.[31]

In sum, Plaintiffs' allegations sufficiently support an inference that RJF and the Individual Defendants had one or more motives to promulgate the fraudulent scheme. At the very least, the allegations further support the already compelling allegations of recklessness.

## C.    THIS IS NOT A CASE OF MERE MISMANAGEMENT OR FRAUD BY HINDSIGHT

Unlike the defendants in the "fraud by hindsight" and "mismanagement" cases peppered throughout Defendants' brief (*e.g.*, *DiLeo, Shields,* and *Grossman*),[32] Defendants here cannot hide behind the argument that they made their corrective disclosures as soon as they learned, along with the rest of the market, that things were worse than they thought. First and foremost, unlike any of those cases, one distinguishing fact alleged here is that Defendants appropriately recorded loan loss provisions *prior* to the Class Period and only started manipulating those reserves once their non-banking businesses began to falter and such manipulation enabled RJF to meet analysts' earnings expectations. *See*, *e.g.*, ¶ 63.

Additionally, as discussed in Section II.B.1 above, Defendants in fact possessed or at least had access to the very information needed in order to determine the appropriate loan loss

---

[31] Were this Court to find RJF's insiders' sales insufficiently unusual or suspicious, the absence of unusual stock sales by insiders does not defeat a finding of motive or scienter. *See, e.g., Am. West Holding Corp.,* 320 F.3d at 944 ("the lack of stock sales by a defendant is not dispositive as to scienter").

[32] *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) is not persuasive. While plaintiffs there claimed that an auditor failed to discover that a company had not increased its loan loss reserves quickly enough, plaintiffs failed to plead any facts "to distinguish their situation from that of many others who are adversely affected by business reverses." 901 F.2d at 627. Here, Plaintiffs have made precisely such a distinction, alleging that Defendants understood the business climate in which they were dealing (evidenced in part by their recording proper reserves prior to the Class Period), but recklessly or knowingly ignored that information during the Class Period. In *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), the class representative (who held less than one share of the corporation) made vague allegations about inadequate loan loss reserves, but did not allege that the reserves were "inconsistent with current data." *Grossman v. Texas Commerce Bancshares, Inc.*, No. 87-cv-6295, 1995 WL 552744 (S.D.N.Y. Sept. 15, 1995) is similarly distinguishable in that plaintiffs there also failed to allege any "current data" with which defendants' representations were inconsistent. Here, in contrast, Plaintiffs have alleged multiple sources of "current data" that conflicted with the loan loss reserves taken during the Class Period. *See infra* Section II.B.1.

reserves, but consciously or recklessly disregarded that information *at the time they made the misstatements,* taking this case squarely *out* of the "fraud by hindsight" category. *See*, *e.g., In re Mobilemedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (finding actionable false and misleading statements where complaint contained allegations of existing problems at the time statements were made); *In re Moneygram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 974, 980 (D. Minn. 2009) (rejecting "fraud by hindsight" argument where "complaint does not merely assert that later disclosures should have been made earlier or that later-determined facts show that earlier statements were false," but instead pled "why the challenged statements may have been false at the time they were made and why the asserted omissions should have been made earlier in light of the allegedly then-existing facts"); *Green Tree*, 270 F.3d at 649-50, 666 (relying on the complaint's well-pled allegations that *the defendants had access to facts that arguably contradicted their public pronouncements* concerning valuation of subprime assets and stating "whether the decisions amounted to recklessness will surely be the focus of any trial of this case. We will not prejudge that issue. *But neither the district court, nor we, can conduct a battle of experts on a motion to dismiss. Rather, we must assume the truth of the allegations pleaded with particularity in the complaint.* The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.") (emphasis added).

Accordingly, Defendants' familiar refrain of "fraud by hindsight" is unavailing and Plaintiffs adequately allege scienter.

## IV.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Defendants argue that Plaintiffs do not sufficiently plead loss causation. They are wrong.

Plaintiffs' burden in alleging loss causation is low. Plaintiffs need to satisfy only Rule 8(a) standards for pleading loss causation, not 9(b). *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *see also In re Moody's Corp. Sec. Litig.*, 612 F. Supp. 2d 397, 399 (S.D.N.Y. 2009).

In addition, loss causation is an issue generally reserved for trial.  *See Lentell*, 396 F.3d at 174 (loss causation is fact-based inquiry).  At the pleading stage, Plaintiffs must allege facts sufficient to show the causal connection between the misrepresentation and the loss.  Plaintiffs satisfy this standard if they allege that "Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, contributed to the loss."  *Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 231 (S.D.N.Y. 2009) (internal citations omitted).

While an exception is sometimes made if the loss at issue occurs amidst a broader market or industry downturn, *Lentell*, 396 F.3d at 174, the defendant cannot simply point to broader market forces to prevail on a motion to dismiss.  *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 125 (S.D.N.Y. 2004) (the Second Circuit did not "'suggest that in all cases a fraud plaintiff will be unable to plead proximate causation when the claim follows a market collapse.'") (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)); *see also Gelt Funding*, 27 F.3d at 772 ("[I]t is the cumulative effect of the considerations discussed above, rather than any single factor, that compels our decision.").  Instead, in the wake of a market-wide decline, "the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  *Gelt Funding*, 27 F.3d at 772.  If the plaintiff alleges facts that would establish a causal link, if proven true, the task of "determining . . . which of two possible causes was in fact the proximate cause 'is a matter of proof at trial' and thus 'not to be decided on a Rule 12(b)(6) motion to dismiss.'"  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 422 (S.D.N.Y. 2003) (quoting *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003)); *see also DeMarco*, 318 F. Supp. 2d at 125 (role of intervening event in stock price decline to be addressed after discovery).

Here, the Complaint easily meets this standard. Plaintiffs allege that in October 2008, with the first suggestion that RJBank was not as strong as RJF had represented, the Company's share price fell more than 10%, and 8% more in November, when a *Barron's* article questioned whether RJBank could avoid substantial losses. ¶¶ 325-27. RJF's stock price then recovered when Defendants issued a press release refuting the points raised in the *Barron's* article and when the Company was able to again surpass earnings expectations by failing to take an adequate charge for loan loss reserves. ¶¶ 328-29. Ultimately, however, in April 2009, the truth was revealed regarding the significant weaknesses in RJBank's portfolio. The Bank significantly increased its loan loss provision, causing the Company to fall short of its earnings forecast, and sending its share price down over 13%. ¶¶ 330-31. Plaintiffs clearly allege facts tying the subject of the alleged misrepresentations – the adequacy of RJBank's loan loss reserves and the health of the Bank's loan portfolio – to the disclosures that caused RJF's stock price to fall.

Additionally, Plaintiffs allege that Defendants' misrepresentations enabled RJF to beat the market at a time when the financial sector, as well as the stock market overall, were falling. As long as Defendants were fooling the market, RJF's stock was trading well above the relevant indexes; it was only with each hint that the Company's performance was unsustainable that the stock price fell back in line with the market's overall performance. And at the end of the Class Period, when the truth was fully revealed, the Company's stock again returned to levels comparable to those of its peers. ¶¶ 332-33.

Defendants cite *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003), as an example of a case that was dismissed due to market-

wide declines.[33]  But in *Merrill Lynch*, the plaintiffs had not established *any* causal link between

the alleged misrepresentation and the plaintiffs' loss.  There, the information allegedly revealed –

that the defendant stock analysts' recommendations were biased and therefore unreliable – did

not cause the companies' stock prices to fall.  Instead, it was the industry-wide collapse, which

harmed those companies and indirectly also harmed their stock prices, that caused the plaintiffs'

losses.  *Id*. at 420-21.[34]  The *Merrill Lynch* court explained when a market-wide decline is

dispositive:

> In contrast [to *Emergent Capital*, 343 F.3d 189, 197 (2d Cir. 2003), where the
> Second Circuit found that the plaintiff *had* adequately alleged loss causation,
> notwithstanding the burst of the internet bubble], plaintiffs here have pled *no*
> second reason [other than the market collapse] why their investments turned out
> to be losing ones.  Plaintiffs . . . failed to plead a cause which could have
> accounted for their losses, and **only the intervening cause, the burst of the
> internet bubble, accounts therefor**.  As such, in contrast to *Emergent*, this Court
> is not faced with two possible causes to explain the losses of the plaintiffs.  Where
> there is no proximate cause for the loss sustained other than the direct intervention
> of a market collapse, that collapse will govern on a Rule 12(b)(6) motion to
> dismiss.

*Id*. at 422 (second emphasis added).  Here, where Plaintiffs have pled specifically how

Defendants' misrepresentations and the disclosure of the truth caused Plaintiffs' injury, it is

*Emergent Capital* that governs.  While Defendants suggest that their explanation is "more

---

[33] Defendants also cite *Virtual Countries, Inc. v. Republic of South Africa*, 148 F. Supp. 2d 256 (S.D.N.Y. 2001), *aff'd*, 300 F.3d 230 (2d Cir. 2002), for the uncontroversial proposition that a court can take judicial notice of market conditions.  The case is otherwise irrelevant as it has nothing to do with securities fraud.  That case addressed whether the given conduct satisfied the requirement of commercial activity that had "direct effect in the United States," which would allow the plaintiff to sue the Republic of South Africa under an exception to the Foreign Sovereign Immunities Act.

[34] The rationale underlying this decision is expanded upon in a Second Circuit opinion reviewing a motion to dismiss in a related proceeding against Merrill Lynch, which was part of the same multi-district litigation and was based on the same theory of liability.  In *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005), the Second Circuit explained that the plaintiffs had not alleged that the market reacted negatively to "a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations" and had not alleged facts showing that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.  *Id*. at 175. Plaintiff's Complaint here does not suffer from those deficiencies.

plausible," the allegations of loss causation are not weighed against each other on a motion to dismiss. *Merrill Lynch*, 289 F.3d at 422.

Additionally, given Plaintiffs' theory of the case – that Defendants characterized RJBank and RJF as *better than* other financial institutions and that Defendants' misrepresentations regarding the Bank's health caused the Company's stock price to be inflated – it is impossible to separate the merits of the case from the question of whether the downturn in RJF stock was due to the broader market collapse.

Defendants also rely on various data points to boost their argument, to no avail. First, Defendants cite various other stock indexes that declined during the Class Period as evidence that RJF's share price plummeted as a result of the housing market crash and broader economic decline. But this argument, which looks at only the beginning and end of the Class Period, is too simplistic and ignores the movement of RJF's stock price in relation to various indices throughout the Class Period. RJF's stock price *rose* approximately 60% from April to September 2008, during a period when the market overall was relatively flat. And in that period, RJF's stock never fell below its April 22, 2008 price, whereas from April to September, the financial indexes were well below the April 22 levels, and the KBW banking index (cited by Defendants) in particular was down as much as 40%. Further, as Plaintiffs allege, ¶¶ 332-33, the graph of RJF's stock price compared to the relevant indexes shows that RJF's stock consistently traded above other comparable companies in each period when the Company successfully convinced the market that RJF was somehow different (and better) than other financial institutions, and that its price dropped down, closer in line with stock indexes, each time the market showed concern about RJF's vulnerability.[35]

---

[35] It is unclear that the banking index upon which Defendants rely, the KBW Bank Index, provides the appropriate point of comparison, since the companies comprising that index are banks, whereas RJF is a multi-faceted financial

To refute Plaintiffs' theory of causation, Defendants also note that during the Class Period, RJF's stock traded below the price at the end of the Class Period, $16.49. Notably, however, Defendants cite no case for the extraordinary proposition that if a company's stock price dips below the price prevailing at the end of the class period, plaintiffs cannot establish causation – a rule that would foreclose countless meritorious suits.[36]

## V.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Defendants assert that Plaintiffs have failed to allege a Section 20(a) claim against the Individual Defendants. Defendants are wrong.

To establish a *prima facie* case of control person liability under Section 20(a), a plaintiff must allege a (1) a primary violation by the controlled person, and (2) control of the primary violator by the Section 20(a) defendant. *In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003). Plaintiffs have adequately established both of these prongs.

First, as demonstrated above, the Complaint adequately alleges that Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act by issuing false and misleading statements concerning, among other things, the sufficiency of RJBank's loan loss reserves, the composition

---

institution, with the Bank as only one component, and the KBW index includes the country's largest banks, such as Citigroup, JPMorganChase and Wells Fargo. Plaintiffs appropriately compared RJF's stock to the Standard & Poor's Midcap Financial index, which includes a broader range of financial institutions and is limited to companies of RJF's size – and includes RJF itself. But looking at the KBW index, as Defendants suggest, it is even more clear that RJF's performance did not mirror that of other banks. For example, the KBW Bank Index fell steadily from late September 2008 through early March 2009, bottoming out with an almost 80% drop from its April 2008 level, *i.e.*, at the beginning of the Class Period. In contrast, RJF's price was relatively stable during that time, in the range of 20% lower than the April 2008 price.

[36] The fact that RJF's stock price fluctuated throughout the Class Period (DB at 47 n.24) does not in itself break the requisite causal nexus. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) (fact that stock price hit class period low in middle of class period did not preclude finding loss causation for disclosure made subsequently, after price had bounced back, and did not impact showing of loss causation for disclosures made prior to class period low); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289-90 (S.D.N.Y. 2008) ("because the rapid recovery of Take-Two's share price from declines that it suffered [during the class period] may have resulted from factors unrelated to the company's options backdating, it is premature to preclude a showing of loss causation on that ground"); *DeMarco*, 318 F. Supp. 2d at 124 n.6 ("a factfinder might also conclude that decline was a normal fluctuation, or consistent with the general trend of decline in [the issuer's] share prices during that period, or caused by some other event. . . . These are all matters for the factfinder on a fully-developed record").

of the Bank's loan portfolio, and RJBank's loan underwriting practices.    Additionally, the Complaint adequately alleges "control" of the Company by the Individual Defendants.

Specifically, "control"  is "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise," 17 C.F.R. § 240.12b-2.   Control allegations are governed by Rule 8(a)'s notice pleading standard and, accordingly, a plaintiff need only provide "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person." *WorldCom*, 294 F. Supp. 2d at 415-16.

Here, Plaintiffs have alleged that James and Julien – RJF's CEO and CFO, respectively, and the Company's two highest-ranking officers – had the power to dictate RJBank's loan loss reserve determinations, and in fact did.  *See, e.g.,* ¶ 64.   Similarly, the Complaint alleges that Raney – RJBank's President and CEO – was involved in specific discussions concerning the Bank's loan loss reserve determinations, and that top level RJBank executives, which would include Moody, were involved as well.  *Id*.   Accordingly, Plaintiffs have provided Defendants "fair notice" of the control person claims.  *Worldcom*, 294 F. Supp. 2d at 415-16.

Defendants argue that in addition to pleading control, a plaintiff must also plead "culpable participation" by a defendant before liability under Section 20(a) may attach. DB at 49-50.  The Second Circuit has not ruled that culpable participation is an element of a Section 20(a) claim.  *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009) ("a plaintiff relying on Section 20(a) is not obliged to allege or prove a controlling person's culpable participation in the violation."); *WorldCom*, 294 F. Supp. 2d at 415 ("[I]t does not appear that

there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation."). [37]

But even if culpable participation were an element of a Section 20(a) claim, Plaintiffs have adequately pleaded culpable participation by the Individual Defendants. Specifically, Plaintiffs have alleged that RJBank's Operating Committee, of which Defendants James, Julien, and Raney were members, affirmatively participated in setting RJBank's quarterly loan loss provisions and overall loan loss reserve determinations. ¶ 64. Plaintiffs have also alleged that these determinations were discussed "extensively" among the highest levels of the Company and RJBank, which would include *all* of the Individual Defendants. *Id.* Additionally, Plaintiffs have sufficiently alleged the Individual Defendants' "conscious misbehavior or recklessness" (DB at 49), by pleading, among other things, that the Individual Defendants consciously and/or recklessly ignored numerous regulators' warnings, analysis, economic data, and even reports issued by RJF's own subsidiary, that demonstrated to the Individual Defendants that RJBank's loan loss reserves were perilously and improperly low. ¶¶ 112-53, 284-88.

Since Plaintiffs have adequately alleged (a) that the Individual Defendants committed primary violations of the Exchange Act, (b) that the Individual Defendants were control persons, and (c) that the Individual Defendants were culpable participants in the fraud, Plaintiffs have met their burden for pleading liability under Section 20(a).

---

[37] While, admittedly, some courts in the Second Circuit (including, on occasion, this one) have required a plaintiff to allege culpable participation, *see, e.g., Coronel v. Quanta Capital Holdings Ltd.*, No. 07-cv-1405, 2009 WL 174656, at *24 (S.D.N.Y. Jan. 26, 2009*); Steinberg v. Ericsson LM Telephone Co.*, No. 07-cv-9615, 2008 WL 5170640, at *3 (S.D.N.Y. Dec. 10, 2008), Defendants wrongly imply that *ATSI Communications, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87 (2d Cir. 2007), affirmatively resolved whether a plaintiff must plead culpable participation in this Circuit. DB at 48. Indeed, the *ATSI* court only mentioned culpable participation in *dicta*, as it held that plaintiffs did not state a primary violation under Section 10(b), so no control person allegations would have sufficed. 493 F.3d at 108; *see In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007) (respectfully declining to follow the Second Circuit's statements on culpable participation in both *ATSI* and *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), both of which were non-controlling *dicta* and "at odds with the language of Section 20(a) of the Exchange Act.").

## CONCLUSION

For all of the above reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

Dated:  March 8, 2010                                        Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By: /s/ Keith M. Fleischman
    Jay W. Eisenhofer
    Keith M. Fleischman
    John C. Kairis
    Shelly L. Friedland
    485 Lexington Avenue
    New York, NY 10017
    Tel.: 646-722-8500
    Fax: 646-722-8501

       - and –

    Mary S. Thomas
    Ned C. Weinberger
    1201 N. Market St.
    Wilmington, DE 19801
    Tel.: 302-622-7000
    Fax: 302-622-7100

    *Attorneys for Lead Plaintiff Louisiana*
    *School Employees' Retirement System*

Mark C. Gardy
**GARDY & NOTIS, LLP**
440 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: 201-567-7377
Fax: 201-567-7337

*Additional Plaintiffs' Counsel*