**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JOHN WOODARD, individuals and on behalf of
all others similarly situated,

        Plaintiff,

        v.

RAYMOND JAMES FINANCIAL, INC.,
THOMAS A. JAMES, JEFFREY P. JULIEN,
STEVEN RANEY, and MARK MOODY,

        Defendants.

Civil Action No. 09-cv-05347 (RPP)

**REPLY MEMORANDUM IN FURTHER**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY  10178
212-808-7800

*Attorneys for Defendants*
*Raymond James Financial, Inc., Thomas*
*A. James, Jeffrey P. Julien, Steven*
*Raney, and Mark Moody*

Dated:  New York, New York
      April 19, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

I.  THE SECTION 10(B) AND RULE 10B-5 CLAIMS MUST BE DISMISSED ...................... 2

   A.  Plaintiffs Do Not Allege Any Material Misrepresentations With Respect To
       Statements Regarding Loan Loss Reserves ............................................................ 2

   B.  The Loan Loss Reserve Statements Are Protected Under the Bespeaks Caution
       Doctrine And The PSLRA ....................................................................................... 8

   C.  Plaintiffs Do Not Adequately Allege Scienter .................................................... 10

       1.  The Complaint Alleges Non-Actionable "Fraud-By-Hindsight" .................... 10

       2.  Plaintiffs Fail to Plead Motive and Opportunity ........................................ 12

       3.  Plaintiffs Fail to Plead Recklessness ......................................................... 15

       4.  Defendants' Competing Inference Is More Compelling ................................. 16

II.  PLAINTIFFS' DERIVATIVE ALLEGATIONS FAIL TO STATE A CLAIM ..................... 18

   A.  Statements Regarding LTV Ratios Do Not State A Claim ..................................... 18

   B.  Statements Regarding Loan Concentration Do Not State A Claim ......................... 19

   C.  Statements Regarding Due Diligence Do Not State A Claim .................................. 20

   D.  Statements Regarding Conservative Lending Do Not State A Claim ...................... 21

   E.  Plaintiffs' Unsupported Allegations Regarding GAAP Do Not State A Claim .......... 22

III.  PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION .............................. 22

IV.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE A SECTION 20A CLAIM .................. 24

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ..................................................... 11, 14

*In re Adelphia Communications*, No. 03 MD 1529, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ........................................................................................................................... 24

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................... 25

*In re American Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ................................................................................................ 16, 21

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..................................................................................... 2, 8

*Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...... 10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................................................................................... 16

*ATSI Communic'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............................... 23

*In re Australia and New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ..................................................................... 10

*In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............. 19

*Bogdan v. New York City Transit Authority*, No. 02 Civ. 09587, 2005 WL 1161812 (S.D.N.Y. May 17, 2005) ..................................................................................................... 15

*In re Bristol-Meyers Squibb Securities Litig.*, 312 F. Supp. 2d at 549 (S.D.N.Y. 2004) ... 21-22

*In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006) .................. 13, 20

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ................................................................. 12

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd* 956 F.2d 1161 (2d Cir. 1992) ..................................................................................................................................... 3, 8

*In re CIT Group, Inc. Sec Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) .................................... 3

*Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992) ....................................................... 23

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................... 20-21

*In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009) ........................ 16

*Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)..............................................................*passim*

*In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256 (S.D.N.Y. 2004) ................10

*DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004) ........................23

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................23

*In re Dynex Capital, Inc. Sec. Litig.*, No. 05-civ-1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)..........................................................................10, 12

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ..................................................................*passim*

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ..........................................................................23

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994)............................23

*Florida State Bd. of Admin. V. Green Tree*, 270 F.3d 645 (8th Cir. 2001)..............................11

*In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261 (S.D.N.Y. 2009) ......... 6, 14, 17

*Hershfang v. Citicorp*, 767 F. Supp. 1251 (S.D.N.Y. 1991)....................................................4-5

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007)..............................................14

*Hinerfeld v. United Auto Grp.*, No. 97 CIV. 3533, 1998 WL 397852 (S.D.N.Y. July 15, 1998) .............................................................................................................1, 3

*Kalin v. Xanboo*, Inc., No. 04 Civ 5931, 2009 WL 928279 (S.D.N.Y. March 30, 2009) .......24

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ..........................................................................18

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .......................................................13

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................24, 25

*Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir. 1996) ...................................22

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)....................................................22

*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576 (2d Cir. 1990)...............18

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416
(S.D.N.Y. 2003) .................................................................................................23

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2004) ......................................5

*Miller v. Thane International, Inc.*, 519 F.3d 879 (9th Cir. 2006) ............................18

*In re Mobilemedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998) ............................11

*In re Moneygram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947 (D. Minn. 2009)........11

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008)........................................7

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding
Corp.*, 320 F.3d 920 (9th Cir. 2003) ...................................................................13

*Nolte v. Capital One Finance Corp.*, 390 F.3d 311 (4th Cir. 2004)..........................19

*In re Novagold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009) .................19

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000)....................................................4, 14

*In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999)...........................10

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) ...........................20

*In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621 (S.D.N.Y. 2008)..................15-16

*Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*, No. 08
Civ. 8143, 2010 WL 961596 (S.D.N.Y. March 17, 2010)........................... *passim*

*In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................... *passim*

*In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706 (D. Del. 2000) ....................................7

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ................................14

*Shapiro v. UJB Finance Corp.*, 964 F.2d 272 (3d Cir. 1992)......................................7

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir. 1994) .........................7, 13

*South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009).......... *passim*

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d
190 (2d Cir. 2008)............................................................................................4, 6

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ...............10, 13

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993) (Opp. at 19).....................................7

**STATUTE**

15 U.S.C. § 78u-5(c)(1)...............................................................................................................8

## PRELIMINARY STATEMENT

At its core, this case concerns RJBank's prediction of the appropriate level of its loan loss reserves, rather than RJBank's statements about their adequacy.  Opp. at 35, n. 24.[1]  Tellingly, Plaintiffs do not discuss the documents that form the basis of – but are conveniently not attached to – the Amended Complaint.  This is not surprising because those documents conclusively demonstrate that RJF: (i) did not make any misstatements of material fact with respect to any subject, including loan loss reserves; (ii) repeatedly warned of potential losses due to market volatility; (iii) monitored the economic downturn; (iv) fully and properly disclosed its investment strategy and portfolio risks; and (v) *increased loan loss reserves* over the putative Class Period.  Plaintiffs also do not distinguish this conduct from 2007 when Plaintiffs concede Defendants appropriately set loan loss reserves during the same economic crisis.  Opp. at 1.

Given the inherent business judgment necessary in calculating a reserve, courts (including this one) repeatedly dismiss securities fraud claims based on an allegation that a defendant set an inadequate loan loss reserve.  *See e.g.*, *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405, 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) (Patterson, J); *Hinerfeld v. United Auto Group,* No. 97 CIV. 3533, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (Patterson, J.) ("the failure to anticipate the necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws").  Plaintiffs try to skirt around this authority by alleging that Defendants "deliberately" or "recklessly" set artificially low reserves to prop up other alleged non-performing parts of RJF; but Plaintiffs improperly rely on forecasts of the overall housing market and economy to buttress their point.  *See* Opp. at 17-18; Am. Compl., ¶¶ 112-53.  None of Plaintiffs' allegations have anything to do with RJF, or more specifically, RJBank's calculation of its loan loss reserves.  Plaintiffs fail to identify

---

[1]     References to "Opp. at __" are to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. 23). References to "Motion at __" are to the Memorandum of Law in Support of Defendants' Motion to Dismiss (Dkt. 20, the "Motion").  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

any specific facts – either, for instance, from an internal report or confidential witness – contradicting Defendants' belief as to the adequacy of RJBank's loan loss reserve levels. These failures mandate dismissal. *See, e.g.*, *Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143, 2010 WL 961596 (S.D.N.Y. March 17, 2010).

In essence, Plaintiffs' claim is that given the worsening economy, RJBank should have increased reserves earlier, and its decision to do so in April 2009 implies something nefarious. This is a classic "fraud by hindsight" allegation that has long been rejected. *See* Motion § I.B.1. Looking back on what became the greatest financial collapse since the Great Depression, judgments regarding the adequacy of a company's loan loss reserve might differ. But disagreements with management's judgment in setting reserves at a certain level during a severe economic crisis does not state a securities fraud claim. Plaintiffs' Amended Complaint should be dismissed.

## ARGUMENT

Plaintiffs cannot merely offer "naked assertion[s] devoid of further factual enhancement. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A claim to relief is plausible only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations omitted).

## I.    THE SECTION 10(B) AND RULE 10B-5 CLAIMS MUST BE DISMISSED

### A.    Plaintiffs Do Not Allege Any Material Misrepresentations With Respect To Statements Regarding Loan Loss Reserves

Plaintiffs do not dispute that RJ Bank's determination of its loan loss reserves requires a calculation of *potential* losses in RJBank's loan portfolio. *See* Am. Compl., ¶¶ 53, 113. Plaintiffs admit that RJBank's calculation of loan loss reserves reflects its evaluation of:

> [E]stimates of borrower default probabilities and collateral values; trends in delinquencies; volume and terms; changes in geographic distribution, lending policies, local, regional and national economic conditions; concentrations of credit risk and past loss history.

2

Am. Compl., ¶ 113.  *See, e.g.,* Panarella Decl., Ex. 22 [2008 10-K] at p. 52, Ex. 12 [May 12, 2008 10-Q] at pp. 49-50, Ex. 16 [Aug. 11, 2008 10-Q] at pp. 51-52.[2]  This calculation, therefore, inherently requires a business judgment of several risk factors that change over time.  Indeed, the December 13, 2006 OCC Bulletin relied upon Plaintiffs themselves recognizes that "[a]rriving at an appropriate [loan loss] allowance involves a high degree of management judgment and results in a range of estimated losses." Am. Compl., ¶ 245.[3]  And, as this Court recently recognized, under Statement of Accounting Standards No. 5 ("SFAS No. 5"), upon which Plaintiffs themselves rely (Am. Compl., ¶ 244):

> Companies may book a liability for a loss event *only* when they have enough information to determine that the loss is both "probable" and "can be reasonably estimated" quantitatively.

*Coronel*, 2009 WL 174656 at *3 (emphasis added).[4]

Thus, given the inherent discretion and business judgment involved in determining loan loss reserves, courts (including this one) consistently dismiss securities fraud claims based on allegations that defendants misstated reserves.  *See, e.g., Coronel*, 2009 WL 174656 at *21; *Ciresi v. Citicorp*, 782 F.Supp. 819, 821 (S.D.N.Y. 1991) ("the claim that defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company"); *Hinerfeld*, 1998 WL 397852 at *7; *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 283 (3d Cir. 1992) ("it is not a violation of securities laws to simply fail to provide adequate loan loss reserves"); *In re CIT Group, Inc. Sec Litig.,* 349 F.Supp.2d 685, 691 (S.D.N.Y. 2004) (Section 11 and 12(a)(2) claims dismissed where defendants increased loss reserves after an initial public offering).  *See also* Motion at § I.A.1.

Faced with this overwhelming authority undermining their claim, Plaintiffs throw a

---

[2]     References to "Panarella Decl." refer to the Declaration of Nicholas J. Panarella filed on January 22, 2010 annexing exhibits 1 through 37 (Dkt. 21), and the supplemental Declaration of Nicholas J. Panarella annexing exhibits 38 through 40 attached thereto, filed together with this Reply Memorandum.

[3]     OCC Bulletin 2006-47, *Allowance for Loan and Lease Losses (ALLL)*, available at http://www.occ.treas.gov/ftp/bulletin/2006-47.html.

[4]     SFAS No. 5, *Accounting for Contingencies*, available at http://www.fasb.org/pdf/fas5.pdf.

Hail Mary: they allege, without any factual support, that Defendants "disseminated the forecasts knowing that they were false" or prepared them "so egregious[ly] as to render their dissemination reckless." Opp. at 17. In conclusory fashion, Plaintiffs say that Defendants disregarded:

> (1) regulatory warnings and assessments concerning the appropriate levels of loan loss reserves (¶¶118-24); (2) severe declines in commercial and residential real estate that Defendants were monitoring (¶¶125-30); (3) broader macroeconomic indicators that signaled that widespread losses were imminent - again, indicators the Complaint alleges Defendants studied, yet ignored (¶¶131-42); and (4) the discrepancies between RJBank's loan loss reserves and those Defendants were monitoring at competitor banks (¶¶143-53).

Opp. at 17-18. These allegations do not state a claim as a matter of law because none of this information even relates specifically to RJF, let alone concerns RJBank's loan loss reserve calculation. Further, there are no factual allegations that Defendants did not consider these sources.

To allege a 10(b) violation, a complaint "'must specifically identify the reports or statements' that are contradictory to the statements made." *Plumbers*, 2010 WL 961596 at *9 (citing *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). *See also Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008). For instance, in *Plumbers*, plaintiffs claimed that CIBC misstated the firm's exposure to mortgage backed securities in the midst of a U.S. mortgage crisis. 2010 WL 961596 at *2. Plaintiffs relied chiefly upon outside sources such as newspaper and magazine articles to buttress their claims. *Id.* at *10. The Court dismissed these allegations as insufficient:

> Notably, the Complaint makes no reference to internal CIBC documents or confidential sources discrediting Defendants' assertions that they were only adapting to a 'rapidly changing economic landscape' during a 'once-in-a-century credit tsunami.' … Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations.

*Id.* at *9 (internal citations omitted). *See also id.* at *10 ("knowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate or defraud"); *Hershfang v. Citicorp*, 767

F.Supp. 1251, 1259 (S.D.N.Y. 1991) (rejecting plaintiffs' attempt to "stitch[] together a patchwork of newspaper clippings and proclaim[] the result a tale of securities fraud").

      Similarly, in *Coronel*, 2009 WL 174656, plaintiffs alleged that the defendant insurance company made misrepresentations with regard to loss estimates following Hurricanes Katrina and Rita. In dismissing the plaintiffs' 10b-5 claims, this Court held that:

> Simply put, because the Complaint alleges no specific facts demonstrating that Defendants possessed-at the time they made the allegedly false statements concerning the reserve amounts-information contradicting their statements, fraud has not been shown.

*Id.* at \*27.  Importantly, this Court also found that because the complaint did "little more than note that the later announcements about reserve losses differed from earlier ones," the plaintiffs had "not shown with any particularity that the Company's reserve estimates were false and that Defendants knew that they were false." *Id.* at \*29; *see also In re PXRE Group, Ltd., Sec. Litigation*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("Plaintiff fails to allege that Defendants had access to information that *specifically* informed them of the alleged flaws in the preparation of PXRE's loss estimate reports"); *Miller v. Lazard, Ltd.*, 473 F.Supp.2d 571, 586 (S.D.N.Y. 2004) (stating that "the news articles cited still must indicate particularized facts *about a defendant's conduct*") (emphasis added).

      Plaintiffs' Complaint should be dismissed for the same reasons.  None of Plaintiffs' allegations have anything to do with RJF's business calculation of its loan loss reserves.  Instead, Plaintiffs allege that Defendants knew or should have known the loan loss reserves statements were false because of general, publicly available warnings about looming real estate market crisis and worsening economy such as:

- "industry and regulatory guidance" (Am. Compl., ¶ 118-19);

- a January 31, 2008 speech by John Dugan, the Comptroller of Currency to the Florida Bankers Association which reaffirmed the "regulators concerns about the growing concentration of real estate loans at banks . . ." (*Id.*, ¶ 120);

- An "SNC Report" which classified syndicated loans of $20 million or more shared by three of more banks. (*Id.*, ¶¶ 121-23);

- A Moody's/REAL Commercial Property Price Index, "which documents prices in completed commercial real estate transactions . . . ." and other general real estate statistics. (*Id.*, ¶¶ 126-30);

- Statistics regarding the national unemployment rate, retail sector, and manufacturing (*Id.*, ¶¶ 131, 134, 136-37, 139, 140);

- Statistics regarding lending at other institutions (*Id.*, ¶¶ 143-45)[5];

- FDIC reports noting "deteriorating asset quality concentrated in real estate loan portfolios" and that "institutions continue[] to build their loan loss reserves." (*Id.*, ¶¶ 148-49; *see also id.*, ¶¶ 151-53); and

- Two public documents issued by RJF's subsidiary, Raymond James & Associates, Inc., which allegedly "gave dire forecasts for the real estate industry and the broader economy" but which have nothing to do with RJBank's loan loss calculation. (*Id.*, ¶¶ 284-288).

The only non-public documents advanced by Plaintiffs are alleged "internal reports revealing information about RJBank's loans." Opp. at 35. Yet, Plaintiffs only allege that such reports reveal "information about . . . concentration risks associated with the recently expanded portfolio of corporate and commercial borrowers." Am. Compl. ¶ 282. Plaintiffs do not allege what such reports said, when and by whom they were issued, or how they factored into setting quarterly loan loss provisions. They therefore cannot form the basis of a 10b claim. *See Plumbers*, 2010 WL 961596 at *9 ("'broad reference to raw data' is not sufficient") (quoting *Teamsters*, 531 F.3d at 196); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.Supp.2d 261 (S.D.N.Y. 2009) (reference to "internal modeling" was inadequate because Plaintiffs did not allege facts to suggest what effect the models might have had on financial results); *Coronel*, 2009 WL 174656 at *27. Further, the fact that Defendants allegedly

---

[5]    The allegations pertaining to loan loss reserve levels at other financial institutions are irrelevant because they have nothing whatsoever to do with loans made by RJBank. The accounting guidelines relied on by Plaintiffs prove the point. *See, e.g.,* Dec. 13, 2006 OCC Bulletin (Am. Compl., ¶ 245) (stating that loan allowances should be "at a level that is appropriate to cover estimated credit losses on individually evaluated loans determined to be impaired as well as estimated credit losses on inherent in the remainder of the loan and lease portfolio"). Plaintiffs do not dispute that unlike some other

reviewed internal reports regarding loan concentrations, without more, does not remotely give rise to any inference that Defendants intended to misstate reserves.[6]

Thus, despite the length of the Amended Complaint, Plaintiffs do not – and cannot – allege a single fact (either a document or from a confidential witness) suggesting that Defendants "knew" that their loan loss reserve estimates were false, were otherwise inadequate or deliberately understated the reserve.[7] Nothing, for instance, in these lengthy but conclusory allegations ever suggests that Defendants believed that a loss from a specific loan made by RJBank was "probable" or could be "reasonably estimated" (*see* SFAS No. 5), yet Defendants deliberately chose not to include it in the loss loan reserve estimate. Because Plaintiffs' allegations have nothing to do with RJF, they are plainly insufficient to state a claim. *See Plumbers*, 2010 WL 961596; *Coronel*, 2009 WL 174656.

Worse (for Plaintiffs), there are not even any factual allegations to suggest that RJBank did *not* incorporate these and other factors into its reserve calculations. Indeed, in a spasm of candor, Plaintiffs admit that their second "confidential witness" stated that RJF "certainly knew what they were

---

financial institutions, RJF did not engage in subprime, consumer and credit card loans. *See, e.g.*, Am. Compl. ¶¶ 155, 177, 207, 212. Thus, RJBank's loan loss reserve levels would obviously differ from other financial institutions.

[6]      The cases cited by Plaintiffs from outside this Circuit are distinguishable. *In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993) (Opp. at 19), was superseded by the PSLRA with regard to motive and opportunity, did not apply Rule 9(b), and has been criticized by the Second Circuit. *See Shields v. Citytrust Bancorp., Inc.* 25 F.3d 1124, 1132 (2d Cir. 1994) (declining to adopt the reasoning in *Wells Fargo* and noting that "the dissent . . . in *Wells Fargo* [is] more consonant with case law in this Circuit"). Further, unlike here, the plaintiffs specifically identified "a representative selection of . . . bad loans which, in their view, Wells Fargo should have recognized by adjusting its reserves" and specifically alleged that reserves were understated by at least $350 million. *Wells Fargo*, 12 F.3d at 926. In *In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 720 (D. Del. 2000), the plaintiffs had shown that the defendants used an improper methodology to calculate reserves, and therefore made an inaccurate statement of the company's present condition. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir. 1992) does not help Plaintiffs. There, the Third Circuit recognized that "it is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or loan management practices." *Id.* at 283.

[7]      Indeed, highlighting why Plaintiffs do not allege a material misrepresentation, Plaintiffs do not – and cannot – allege what the correct level of RJBank's loan loss reserves should have been during the putative Class Period. Although Plaintiffs state that "the correct loss reserve numbers were those revealed by RJF in its April 14, 2009 corrective disclosure," (Opp. at 20, n.13) the Amended Complaint is actually devoid of any allegation as to what the "properly recorded reserves" would have been. Am. Compl., ¶¶ 168-69. To the extent Plaintiffs argue that RJBank's reserves should have matched either in amount or percentage the numbers contained in the April 14, 2009 press release throughout the putative Class Period (*see id.*, ¶¶ 252, 274), this argument defies logic. Loss reserves are not static calculations and setting the reserves at an arbitrary number defies all of the accounting guidelines relied on by Plaintiffs themselves. *Id.*, ¶¶ 243-247.

doing when assessing loan risks and determining the adequacy of RJBank's reserves."  Am Compl., ¶

115.  *See also* Am. Compl. ¶ 131 ("CW 2 confirms that certain economic indicators were factored in

loan loss determinations"), ¶ 142 ("CW 2 confirmed that RJBank monitored the performance of these

specific industries").  The allegations that RJBank "recklessly disregarded" such material, therefore, is

nothing but a "legal conclusion couched as a factual allegation" which this Court should not accept as

true. *Iqbal* 129 S.Ct. at 1950.  In sum, Plaintiffs' allegations boil down to disagreement with

Defendants' (and their own confidential witness') judgment as to the adequacy of RJBank's loan loss

reserve level during a once in a lifetime financial tsunami.  Such "'allegations of garden-variety

mismanagement' are not actionable under section 10(b)." *Ciresi*, 782 F.Supp. at 821 (citation

omitted).

### B.    The Loan Loss Reserve Statements Are Protected Under the Bespeaks Caution Doctrine And The PSLRA

As set forth in the Motion, Defendants' allegedly misleading statements are not

actionable because they are protected under the "bespeaks caution" doctrine or the PSLRA's safe

harbor provision.  Motion at §§ I.A.1.b; I.A.3.b; *see* 15 U.S.C. § 78u-5(c)(1).  Plaintiffs decline to

engage in any analysis whatsoever of the actual alleged misrepresentations.  *See* Opp. at 20-22.

Instead, Plaintiffs contend that the safe harbor and the bespeaks caution doctrine do not apply because:

(i) Defendants' alleged understatement of loan loss reserves was deliberate; and (ii) the warnings were

"boilerplate."  Opp. at 20-21.  Both conclusory allegations fail.

First, as demonstrated above, Plaintiffs do not sufficiently allege that the Defendants

deliberately understated loan loss reserves.  *See* Point I.A, *supra*.  Second, as demonstrated in

Defendants' Motion, the cautionary statements were far from "boilerplate."  Motion at § I.A.1.b.  For

example, in its 10-Q reports during the putative Class Period, RJF discussed in detail certain "critical

accounting policies" that "involved judgment based on available information," and warned that "actual

results or amounts could differ from estimates."  Panarella Decl., Ex. 12 [May 12, 2008 10-Q] at p. 47.

RJF identified loan loss reserves as one of these specific areas, and explained that:

> The Company recognizes liabilities . . . when there is an exposure that, when fully analyzed, indicates it is both probable that a liability has been incurred and the amount of loss can be reasonably estimated. . . .  The calculation of the SFAS 5 allowance is subjective as management segregates the loan portfolio into different homogeneous classes and assigns each class an allowance percentage based on the perceived risk associated with that class of loans. . . .

*Id.* at 49-50.  RJF also disclosed the factors considered in setting the loan loss reserves, including, *inter alia*, "estimates of borrower default probabilities and collateral values."  *Id.* at 50.

RJF also warned of the precise risk of increasing nonperforming loans and charge-offs which form the basis of Plaintiffs' claims.  For example (all emphasis below added):

- "The A&D loans, [we have] tended to mark them down the instant that there is any question about any problems dealing with them *and we do anticipate that a couple of other of these loans will have some sort of loss exposure.*"  (*See* Am. Compl., ¶ 209; Panarella Decl., Ex. 15 [July 23, 2008 Analyst Call] at p. 14).

- "Due to the growth in RJBank's loan portfolio, credit risk at RJBank has become more significant.  Continued declines in the housing market or a sustained economic downturn may cause the Company *to have to write-down the value of some of the loans in RJBank's portfolio.*"  (*See* Panarella Decl., Ex. 22 [2008 10-K] at p. 17).

- "[W]e anticipate *higher charge-offs and non-performing loan levels* going into fiscal year 2009."  (*See* Panarella Decl., Ex. 20 [November 11, 2008 Press Release] at p. 1).

- "[S]preads could decline and *charge-offs increase* as the economic malaise spreads through the economy."  (*See* Panarella Decl., Ex. 26 [January 21, 2009 Press Release] at p. 3).

- "Continued declines in the housing market or a sustained economic downturn may cause the Company to have to write-down the value of some of the loans in RJBank's portfolio."  (*See* Panarella Decl., Ex. 22 [2008 10-K] at p. 17).

RJF also explicitly noted that:

The market price of the Company's common stock has been, and is likely to continue to be more volatile than in prior years and subject to fluctuations. Stocks of financial institutions have experienced significant downward pressure in connection with the current economic downturn and may continue to experience such pressures in the future.  Significant declines in

> the market price of the Company's common stock or failure of the market
> price to increase could . . . harm the Company's business or financial
> condition.

*Id.* These specific warnings render any alleged misstatements not actionable. *See In re Australia and New Zealand Banking Group Ltd. Secs. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) ("the existence of cautionary language effectively negates the materiality of an alleged misstatement or omission"); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 268 (S.D.N.Y. 2004) ("In the light of all of these cautions ... [in] Cross Media's 10-K and 10-Q reports ... [t]he reasonable investor would not have been misled by []representations of expected earnings").[8]

### C. Plaintiffs Do Not Adequately Allege Scienter

#### 1. The Complaint Alleges Non-Actionable "Fraud-By-Hindsight"

Buried in the back of their opposition is Plaintiffs' half-hearted attempt to address the fact that their allegations are nothing more than "fraud by hindsight." (Opp. at 41-42). As noted herein and in the Motion, the Complaint is bereft of any factual allegations, made with requisite particularity, that Defendants knowingly or recklessly set an inadequate loan loss reserve. *See* Point I.A., *supra* Instead, Plaintiffs chiefly rely on the fact that RJBank set a higher reserve in April 2009 as proof that reserves during the putative Class Period were artificially too low. *See* Opp. at 2-3; Am. Compl., ¶¶ 330-34. This classic "fraud by hindsight" allegation has been repeatedly rejected by the courts within

---

[8]    Plaintiffs improperly rely on cases where, unlike here, there were substantial factual allegations suggesting deliberate misstatements. Opp. at 20-21. For example, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) stands for the inapposite proposition that "adding boiler plate language to the effect that estimates can never be one hundred percent accurate does not mitigate a failure to disclose the severity of the computer problem." *See also In re New Century*, 588 F.Supp.2d 1206, 1225 (C.D. Cal. 2008) (complaint contained multiple witness statements and corroborating data regarding rising delinquency rates and high-risk loans, and company had restated financials, admitting material weaknesses in internal controls); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142, 1149-1152 (S.D. Cal. 2008) (alleging several specific violations of accounting rules and regulations in company's financial statements led to $630 million overstatement of income); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05-civ-1897, 2006 WL 314524, at *12 (S.D.N.Y. Feb. 10, 2006) (plaintiffs alleged that "the reserve understatement concealed present facts concerning the impaired nature of the bond collateral" because of the company's accounting methodology); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 183 (S.D.N.Y. 2003) (statements including those relating to "financial results" and "cash situation" either were not forward-looking, or not protected because the cautionary language was merely "a generic warning 'that actual results may differ.'").

the Second Circuit. *See* Motion at § I.B.1.

Most recently, in *Plumbers*, the plaintiffs alleged that the defendants were reckless in not taking write-downs earlier than they did. The court rejected this argument, stating:

> Because the securities laws do not allow fraud by hindsight claims, after-the-fact "allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."

*Id.* at *12 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)); *see also Coronel*, 2009 WL 174656 at *27 (allegations regarding unprecedented losses attributable to hurricanes alleged fraud by hindsight).

Plaintiffs' cases, again from outside this Circuit, are inapposite. *See* Opp. at 34, 42. In those cases, the plaintiffs pled particularized facts suggesting that the alleged misrepresentations were inconsistent with current internal data at the time they were made. For example, in *Florida State Bd. of Admin. v. Green Tree*, 270 F.3d 645 (8th Cir. 2001), plaintiffs specifically alleged that certain assumptions regarding loan prepayment, on which defendants accounting method was based, differed greatly from the actual rates of prepayment, and that defendant's financial statements "did not take account of the disparity between the assumptions and actual experience." *Id.* at 665. Likewise, in *In re Moneygram Int'l, Inc. Sec. Litig.*, 626 F.Supp.2d 947 (D. Minn. 2009), the plaintiffs connected "the external market 'red flags' with defendants' internal recognition of the effect of those red flags on the Portfolio's securities throughout the class period." *Id.* at 980. Plaintiffs also alleged that defendants violated a particular internal control, concealed "specific information related to the Portfolio's subprime exposure," "MoneyGram's use of credit ratings" and "a change in the Portfolio's investment strategy." *Id.* at 978.[9] In *In re Mobilemedia Sec. Litig.*, 28 F.Supp.2d 901 (D.N.J. 1998), the complaint alleged that defendant, at the time the statement was made, "was experiencing technical problems,

---

[9]    Notably, the *Moneygram* court noted that allegations supported only by "external market indicators" do not permit an inference of scienter and indeed "resemble the very essence of pleading fraud by hindsight [that] the [PSLRA] is designed to prevent." *Id.* at 974 (internal quotations omitted).

billing problems, an increased churn rate, increased personnel expenses, and problems complying with FCC rules and regulations." *Id.* at 926. Plaintiffs make no such particularized factual allegations here.

### 2.    Plaintiffs Fail to Plead Motive and Opportunity

Plaintiffs' arguments on motive and opportunity to commit fraud all fail as a matter of law. *See* Opp. at 37-41. Initially, Plaintiffs allege that Defendants committed fraud because:

> Defendants needed to take artificially low quarterly loan loss provisions in order to offset other business losses and enable RJF to beat analysts' earnings expectations. Defendants were motivated to keep RJBank "well capitalized under applicable banking requirements so as not to raise red flags with regulators and/or investors, and by the desire to "meet [the] numbers" each quarter.

Opp. at 38-39 (citations to Am. Compl. omitted).

These allegations plainly fail to allege scienter because, on their face, they state "goals that are 'possessed by virtually all corporate insiders.'" *Plumbers*, 2010 WL 961596 at *8 (citation omitted); *see also South Cherry Street, LLC v. Hennessy Group LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009); *Dynex Capital*, 531 F.3d at 196 (the "desire to maintain the appearance of profitability" has been "consistently rejected as insufficient in securities fraud pleading"). As the Second Circuit has recognized, imposing liability for such motives would mean that "virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).[10]

Next, Plaintiffs argue that the Individual Defendants had motive to defraud because of "increased compensation" in the form of "bonuses" based upon "pre-tax profits." Opp. at 39; Am.

---

[10]    Plaintiffs' allegation regarding the Auction Rate Securities litigation (Opp. at 39 n.29) is meritless. Plaintiffs fail to explain how a speculative liability, where no judgment has been entered, provided the Defendants with a motive, let alone one unique to the Individual Defendants, to understate loan loss reserves. Moreover, RJF specifically disclosed and accounted for this litigation in its financials, stating that "[i]n the opinion of the Company's management, based on currently available information, review with outside legal counsel, *and consideration of amounts provided for in the accompanying consolidated financial statements with regard to these matters*, ultimate resolution of these matters will not have a material adverse impact on the Company's financial position or results of operations." Panarella Decl., Ex. 22 [2008 10-K] at 22 (emphasis added).

Compl., ¶ 314.  This argument is without merit for several reasons.  First, the Second Circuit, in *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), rejected the same argument.  Specifically, the *ECA* court declined to find that the defendants "had the requisite motive because they received bonuses based on corporate earnings and higher stock prices." 553 F.3d at 201 (citation omitted).  The Second Circuit found that such "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."  *Id.*; *see also Shields*, 25 F.3d at 1130 (same).[11]  Moreover, like many of Plaintiffs' allegations, the documents belie the claim.  RJF's publicly available proxy statement dated December 31, 2009 discusses the compensation-setting process for fiscal year 2009 and notes that: (i) Messrs. James and Julien's base salary remained unchanged from 2008 to 2009, along with salaries of other executive officers, "as a result of the impact of the downturn in the financial markets on our clients and shareholders, as well as to preserve liquidity in the face of the then unfavorable business outlook"; and (ii) Messrs. James and Julien's bonus and total compensation *have decreased each year since fiscal year 2007*, and throughout the putative Class Period.  *See* Panarella Decl., Ex. 38 [Dec. 31, 2009 Proxy Statement] at 11, 18.[12]

Finally, Plaintiffs' allegations regarding individual stock sales do not suffice, as a matter of law, to allege motive.  Plaintiffs concede that Mr. Julien sold his stock at a significant loss in November and December 2008, several months before the end of the putative Class Period.  *See* Motion at § I.B.2.c.  Plaintiffs do not, and cannot, dispute that stock sales may be relevant only where

---

[11]     Plaintiffs' cases on this point are inapposite.  *See* Opp. at 39-40.  In *Vivendi*, 381 F.Supp.2d at 185, the court found scienter based on the motive to "inflate company stock prices as a means to effectuate a *specific* acquisition that would not be possible without fraudulently inflating stock prices."  Plaintiffs allege no such motive here.  Likewise, *In re Cardinal Health Inc. Sec. Litig.*, 426 F.Supp.2d 688 (S.D. Ohio 2006) involved extensive allegations of insider trading, in addition to allegations regarding compensation.  *Id.* at 727-736.  In *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), yet another case relied upon by Plaintiffs from outside this Circuit, compensation was one of several motives recognized by the court, and the court focused on allegations that (i) individual defendants received stock options where they had not the previous year, and (ii) the majority of the members of the compensation committee were chosen by co-defendants.  *Id.* at 944.

"corporate insiders [a]re alleged to have misrepresented to the public material facts . . . in order to keep the stock price artificially high while they sold their own shares *at a profit*." *South Cherry Street*, 573 F.3d at 108-09 (quoting *Novak*, 216 F.3d at 308) (emphasis added); *see also Gildan*, 636 F.Supp.2d 261, 270 (Plaintiffs must establish sales were "unusual", *i.e.*, made "at times calculated to maximize personal benefit from undisclosed information") (citations omitted). Plaintiffs do not cite any authority for the novel contention that sales made at a *loss* can give rise to an inference of scienter. Further, Mr. Julien's sales occurred several months before the end of the putative Class Period which defeats any finding of motive. *See, e.g., Plumbers*, 2010 WL 961596 at *9 ("Defendants did not sell their stock just prior to a price drop – a fact suggesting the absence of any nefarious motives"). Nor do Plaintiffs attempt to connect Mr. Julien's stock sales with the alleged misstatements.[13]

The only decision cited by Plaintiffs, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001), does not help them. In that case, the officer, who was "represented to stock analysts to be a key spokesperson," was alleged to have "sold 80 percent of his holdings within a matter of days" for $1.25 million, "after having sold no Scholastic stock since 1995." *Id.* at 74-75. Plaintiffs allege nothing of the sort here. Indeed, here, Mr. Julien retained 107,405 shares as of December 24, 2008. (Panarella Decl., Ex. 40 [Jan. 5, 2009 Proxy Statement]). Likewise, Mr. James held over 14 million shares as of December 24, 2008. *Id.; see Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (where those "who would have been in the know" do not sell their stock, it "implies that nothing was thought to be out of the ordinary"). Indeed, the precipitous drop in the value of several

---

[12]    This Court may take judicial notice of SEC filings not specifically cited in the complaint. *See, e.g., Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Moreover, Plaintiffs rely on RJF's proxy statement for the prior year, which was the most recent filing at the time the Amended Complaint was filed. *See* Am. Compl., ¶ 313.

[13]    Nor do allegations regarding Dennis Zank's sales indicate scienter. First, like Mr. Julien, the sales were well before the price drop (September 2008) on which Plaintiffs base their allegations. Second, Mr. Zank sold 53,013 shares but retained 467,502 shares. *See* Panarella Decl., Ex. 39 [Sept. 3, 2008 Form 4]. This sale of roughly 11% of holdings does not provide a motive. *Gildan*, 636 F.Supp.2d at 270 ("total sales amounting to a relatively low percentage . . . of stock holdings militate against an inference of scienter"); *see also Acito*, 47 F.3d at 54 (holding that a sale of 11% of an individual

14

Individual Defendants' stockholdings over the putative Class Period highlight why Plaintiffs cannot show motive. *See, e.g., Plumbers*, 2010 WL 961695 at *9 ("It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings and executive compensation").[14]

### 3.    Plaintiffs Fail To Plead Recklessness

"Recklessness" requires "conscious recklessness – *i.e.*, a state of mind *approximating actual intent* and *not merely a heightened form of negligence*." *South Cherry*, 573 F.3d at 109 (emphasis in original). Where, as here, Plaintiffs have failed to allege motive and opportunity, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *PXRE*, 600 F. Supp. 2d at 535. Under the law of this Circuit, Plaintiffs must "specifically identify the reports or statements that are contradictory to the statements made." *Plumbers*, 2010 WL 961595, at *9 (internal quotations omitted); *see also PXRE*, 600 F. Supp. 2d at 536 (Second Circuit cases uniformly require "specific contradictory information"); *Coronel*, 2009 WL 174656 at *27 (dismissal where complaint alleged "no specific facts" showing that defendants possessed contradictory information concerning reserve amounts").

As described above, the Amended Complaint is devoid of particularized facts alleging that Defendants had access to contrary information at the time their loan loss reserve statements were made. *See* § I.A., *supra*. Instead, Plaintiffs rely on publicly available, macroeconomic forecasts, which say nothing about RJF, let alone RJBank's calculation of loan loss reserves. *Id*. Plaintiffs, therefore, cannot show recklessness. *See In re Pfizer, Inc. Secs. Litig.* 538 F. Supp. 2d 621,

---

defendant's holdings was not "unusual"). Finally, there is no allegation connecting these sales with RJBank's determination of loan loss reserves. Indeed, Plaintiffs do not allege that Mr. Zank was even involved in such a calculation.

[14]      Notably, Plaintiffs do not address Defendants' arguments that RJTrust stock sales and RJF's purchase of company stock do not show motive and opportunity. *See* Motion at 38, 40. Plaintiffs, therefore, concede Defendants' arguments. *See Bogdan v. New York City Transit Authority*, No. 02 Civ. 09587, 2005 WL 1161812, at *3 (S.D.N.Y. May 17, 2005) ("Plaintiff fails to respond to defendant's arguments, and has thus abandoned her claim.")

637 (S.D.N.Y. 2008) ("That the information was publicly available . . .weakens any inference that

defendants intended to defraud the market").

        Moreover, Plaintiffs utterly fail to plead recklessness on the part of the Individual

Defendants.  Indeed, there are no particularized allegations involving the Individual Defendants' state

of mind at all.  Plaintiffs only allege that some of the Individual Defendants were members of RJF's

Operating Committee and that they must have been aware of "regulatory warnings" and "disparities

between RJBank's and other banks loan loss reserves."  Opp. at 33, n. 23.  This is insufficient.  *See In

re American Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL 4501928, at *5 (S.D.N.Y. Sept. 26,

2008) ("It is well established that boilerplate allegations that defendants knew or should have known of

fraudulent conduct based solely on their board membership or executive positions are insufficient to

plead scienter"); *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)[15]

        4.      Defendants' Competing Inference Is More Compelling

        This Court cannot find scienter unless fraud is at least as compelling as any "opposing

inference of nonfraudulent and nonreckless intent."  *South Cherry*, 573 F.3d at 111; *see also PXRE*,

600 F. Supp. 2d at 528.  Here, the most compelling inference is that RJF, like other financial

institutions, was impacted by the severe economic downturn prior to and during the putative Class

Period and reacted accordingly.  *See, e.g., In re Citigroup Inc. Shareholder Deriv. Litig.*, 964 A.2d 106,

134-35 (Del. Ch. 2009).

        Plaintiffs' entire Amended Complaint consists of conclusory, generic allegations that

---

[15]    Plaintiffs' additional arguments regarding recklessness also fail because they all depend on sufficient allegations of material misstatements, which do not exist here.  *See* Opp. at 35-37.  For example, in *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004), the court stated that "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."  Unlike in *Atlas*, where the defendant restated financial results by $281.4 million because of accounting problems, Plaintiffs have not alleged any misstatement about "core" operations.  Allegations regarding the "magnitude of the correction" and GAAP violations also fail to raise any inference of recklessness because Plaintiffs do not (and cannot) provide particularized

RJF's executives, faced with the alleged non-performance at other RJF divisions as result of the worsening economy, did not increase reserves at RJBank fast enough. Again, Plaintiffs do not allege *any* facts supporting this theory. Nor do Plaintiffs allege with any specificity whatsoever why Defendants chose to end the purported scheme by increasing reserves in April 2009.

In fact, the documents relied on by Plaintiffs show that as the economy worsened, RJF gradually increased its reserves. While correctly noting that it was better positioned than institutions which had engaged in subprime lending, RJF nonetheless consistently warned that reserves could increase if economic conditions worsened, that additional charge-offs would occur, and that the stock price would decline. *See* Motion at 7; *see also* § I.A*., supra*. These actions are completely inconsistent with Plaintiffs' claims. *See Gildan*, 2009 WL 1919618, at *7) (no claim where defendant's "public statements are consistent with reasonably available data"). Thus, the more compelling and plausible inference is that RJBank's losses increased as a result of the nationwide economic downturn, which in turn necessitated a larger increase to reserves in April 2009.

> *Plumbers* again is on point. Comparing inferences, the court found that:
>
> The Complaint describes an unprecedented paralysis of the credit market and a global recession. … Looking back, a full turn of the wheel would have been appropriate. The fact that CIBC chose an incremental measured response … is as plausible an explanation for the losses as an inference of fraud.

2010 WL 961596 at *11. The putative Class Period here overlaps with the same "global recession" recognized by the court in *Plumbers*. *See also PXRE*, 600 F.Supp.2d at 546-48 (dismissing complaint where "Plaintiff's factual allegations suggest[ed] an industry, and a company, shocked by a unique and devastating catastrophe"); *Coronel*, 2009 WL 174656, at *20. As in *Plumbers*, the more compelling (indeed, only) inference is that any loss suffered by Plaintiffs is attributable to market-wide

---

facts of any "correction" or any GAAP violations. *See Plumbers*, 2010 WL 961596 at *12 (allegations of magnitude do not alone create an inference of scienter).

phenomena, and ensuing recession, rather than the elaborate and illogical scheme advanced by Plaintiffs.

## II.    PLAINTIFFS' DERIVATIVE ALLEGATIONS FAIL TO STATE A CLAIM

Plaintiffs concede that the alleged misstatements "concerning RJBank's LTV ratios, loan growth and loan concentration, due diligence, and conservative lending practices all stemmed from the necessity to conceal from investors the fact that RJBank's loan loss reserves were inadequate." Opp. at 35, n. 24. Therefore, allegations regarding these statements fail for the same reasons as allegations about the loan loss reserves statements. In addition, each type of statement fails for independent reasons.

### A.    Statements Regarding LTV Ratios Do Not State A Claim

Plaintiffs concede that the LTV ratios reported by RJBank were not false because RJBank disclosed that the ratios were calculated "at origination."[16] *See* Motion at 23. Instead, Plaintiffs now argue that RJBank "should have disclosed that the reported LTV ratios were outdated, unreliable, and/or in no way indicative of the quality of RJBank's home loans." Opp. at 23. Allegations of nondisclosure must include "facts indicating a clear duty to disclose." *Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001). Plaintiffs plead no such duty, authority, or any precedent requiring RJBank to have made this disclosure. Without such a showing, their claim must be dismissed. Moreover, Plaintiffs utterly fail to explain how a reasonable investor, knowing that the residential real estate market was in an unprecedented crash, would believe that ratios calculated "at origination" would indicate an up-to-the minute value.

---

[16]    Plaintiffs do not cite any legal authority for the idea that LTV ratios can be misleading even though they are disclosed to be "at origination." (*See* Opp. at 22). *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576 (2d Cir. 1990) involved debenture holders who claimed that representations regarding the right to tender were misstatements because, in reality, the right was illusory due to a subsequent merger. In *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2006), plaintiffs claimed liability under Section 12(a)(2) (which does not require allegations of scienter) for representations in an offering prospectus that the issuer expected to have its shares "approved for quotation" on the NASDAQ.

**B.    Statements Regarding Loan Concentration Do Not State A Claim**

Plaintiffs' allegation with respect to the so-called "Core CRE" loans (Opp. at 23-26)

fails for several, independent reasons.  First, Plaintiffs do not allege any affirmative duty of RJBank to

have reported any specific level of detail regarding Core CRE earlier than it did.  *See Plumbers*, 2010

WL 961596 at *11 (plaintiff did not "identify any obligation requiring Defendants to make a complete

disclosure of all CIBC's mortgage-backed holdings"); *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456

F.Supp.2d 576, 590 (S.D.N.Y. 2006) (finding that "plaintiffs point to no accounting or reporting

requirements which would require the disaggregation of acquisition costs"); *see also Nolte v. Capital*

*One Fin. Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) (defendant was not required to provide

specificity regarding "the size of its subprime loan portfolio").

Second, Plaintiffs have not alleged any material omission on RJBank's part that would

have altered the "total mix" of available information.  *See In re Novagold Resources Inc. Sec. Litig.*,

629 F. Supp. 2d 272, 291-92 (S.D.N.Y. 2009).[17]  Plaintiffs concede that shareholders were in fact fully

aware that RJBank's "loans included loans to borrowers in the real estate industry."  Opp. at 24.  The

record is replete with numerous instances demonstrating RJBank's disclosure of its exposure to

borrowers in the commercial and residential real estate industry.  *See* Opp. at 24; Motion at § I.A.2.b.

Indeed, RJF repeatedly disclosed its exposure to the very types of so-called "Core CRE" loans

Plaintiffs take issue with.[18]

---

[17]    Plaintiffs' contention that the Motion does not provide any basis for the argument that many of the loan growth and
loan concentration statements are protected by the bespeaks caution doctrine or the PSLRA (Opp. at 26) is plainly incorrect.
*See* Motion at 26 (referring to arguments made elsewhere in the Motion).

[18]    *See, e.g.,* Panarella Decl., Exs. 8, 13, 18 (disclosures that category of Corporate Loans include loans "secured by
mortgages on specific real estate" and "project finance real estate loans."); Panarella Decl., Ex. 13 at 8; (disclosure that the
bank had $110 million total outstanding loans in the residential acquisition and development/homebuilder industry);
Panarella Decl., Ex. 18 at 8 (disclosing $98 million in same industry); Panarella Decl., Ex. 19 at 12 (stating that of the $4.6
billion outstanding in corporate and real estate loans, about $1.6 billion was in commercial real estate and that "of that $1.6
billion, a little bit less than $100 million were the residential acquisition and development in homebuilder space."). *See also*,
Panarella Decl., Ex. 20 at 2 (stating that outstanding loans in the "the residential acquisition and development/ homebuilder
sector" represented just 1 percent of the bank's assets).  Moreover, the alleged corrective disclosure in April 2009,

19

Plaintiffs also concede that the disclosure occurred after the Class Period and had no negative effect on RJF's stock price. Opp. at 24, n. 14; Motion at 24-25. Plaintiffs argue that this disclosure is relevant because exposed the full extent of the Defendants' fraud. That argument is severely misleading. The April 14, 2009 press release which Plaintiffs say reveal the alleged "truth," *did not* attribute the increase in reserves to alleged growth in Core CRE. Instead, it explained that the "abnormally level of provision for loan losses and charge-offs" was due, *inter alia*, to the "dramatic deterioration of commercial real estate values during the March quarter" as well as "credit exposures related to corporate borrowers whose business is highly dependent on consumer spending." Panarella Decl., Ex. 29 [April 14, 2009 Press Release]. RJBank also added to reserves based on "declining residential property values." *Id.*

As Plaintiffs admit, RJF had disclosed its exposure to all of these industries, including to "commercial real estate" loans throughout the putative Class Period. Opp. at 24; Am. Compl., ¶ 82. Importantly, nobody has ever required RJF to restate its disclosures. The fact that RJF *voluntarily* chose to provide more information on its commercial real estate portfolio following the April 14 press release cannot and should not subject it to a securities fraud claim.[19]

## C.    Statements Regarding Due Diligence Do Not State A Claim

Plaintiffs' allegations that RJF misstated its due diligence efforts do not amount to material misstatements. First, the only "alleged" fact supporting Plaintiffs' due diligence claims is an alleged misstatement pertaining to a $28 million charge-off from a single loan in an $18 billion loan portfolio. Plaintiffs should not be able to base an entire securities fraud Complaint on an alleged

---

specifically referred to these prior disclosures as the reasons for the adjustments to the loan loss reserves. *See* Panarella Decl., Ex. 30 at 9.

[19]     For this reason, the cases relied upon by Plaintiffs (Opp. at 24, n. 14) are inapposite. *In re Parmalat Sec. Litig.*, 375 F.Supp. 2d 278, 307 (S.D.N.Y. 2005) concerned the discovery, after the Class Period, that an auditor had been involved in the alleged fraud, and *Cardinal Health*, 426 F.Supp.2d at 761, dealt with the defendant company's issuance of restated financials after the end of the class period.

misstatement over a single loan. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 379

(S.D.N.Y. 2004) ("Even if . . . a particular transaction did violate a Citigroup risk management policy,

it is not a foregone conclusion that such knowledge would alter the 'total mix' of information"); *see*

*also ECA*, 553 F.3d at 203-04.

Second, Plaintiffs still fail to describe the single confidential witness they use to

support this claim "with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged." *PXRE*, 600 F.Supp.2d at 526.

Plaintiffs only allege that CW2 was a Senior Vice President at RJBank (Am. Compl., ¶ 64), who was

one of 84 bank employees. *See* Opp. at 27. Plaintiffs completely fail to allege any facts that CW2 had

knowledge of this particular loan. Nor do Plaintiffs even quote from CW2. Instead, their allegation

appears to be only their own characterization of a CW2 statement. *See* Am. Compl., ¶ 198. Notably,

CW2 does not state that any of the alleged statements by the Defendants were false in any way. *Id.*

This warrants dismissal. *See, e.g., American Express*, 2008 WL 4501928, at *8 (confidential witnesses

did not establish scienter without allegations that the witnesses had contact with individual defendants,

knowledge of their state of mind, or knowledge that any misstatements were made). Plaintiffs' request

for leave to amend the Complaint a second time to "provide additional details" (Opp. at 27, n. 17) is

improper and should be denied since it would not change the result.

Third, Plaintiffs fail to plead facts showing that a single $28 million charge-off was a

material factor to RJF's financial results, much less to RJF's share price. *See* § III, *infra.* The April 14,

2009 press release cites a number of factors, not just a single loan, as the reason to increase reserves.

*See* Panarella Decl., Ex. 29. Moreover, Plaintiffs allege that only one loan (out of RJF's $18 billion in

assets as of April 2009) was not independently underwritten. *See* Panarella Decl., Ex. 30.

### D.    Statements Regarding Conservative Lending Do Not State A Claim

Plaintiffs fail to show how the Defendants statements regarding conservative

21

management practices and loan quality are anything other than non-actionable "statements that are true, or constitute puffery or ordinary expressions of corporate optimism." *In re Bristol-Meyers Squibb Secs. Litig.*, 312 F. Supp. 2d at 549, 557 (S.D.N.Y. 2004).  The cases cited by Plaintiffs (Opp. at 29-30) are inapposite because in those cases, the plaintiff had adequately pled that defendants knew their optimistic statements were incorrect when made.  Moreover, Plaintiffs fail to meaningfully distinguish the Second Circuit's decision in *ECA*, 553 F.3d at 206 (quoting *Lasker v. N.Y. State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir. 1996)), which is controlling and directly on point:

> [These statements] are too general to cause a reasonable investor to rely upon them…   [T]hese statements did not, and could not, amount to a guarantee that [JPMC's] choices would prevent failures in its risk management practices…. JPMC's statements were merely generalizations regarding JPMC's business practices.  Such generalizations are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."

### E.    Plaintiffs' Unsupported Allegations Regarding GAAP Do Not State A Claim

Plaintiffs continue to erroneously rely on alleged GAAP violations, without any particularized facts indicating a departure from those guidelines.  *See* Am. Compl., ¶¶ 190-96, 202. "[V]ague claims of GAAP violations are insufficient to support an inference" of intent because:

> [T]he GAAP is not a lucid or encyclopedic set of pre-existing rules . . . and is far from a single-source accounting rulebook, reasonable disagreements and deference to business judgment is permissible. Given the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of corresponding fraudulent intent.

*Plumbers*, 2010 WL 961596 at *13; *see also ECA*, 555 F.3d at 200; *Coronel*, 2009 WL 174656 at *30 (rejecting "attempts to draw a broad link, with no supportive facts" concerning GAAP allegations and holding that conjecture is not grounds for a finding of scienter).

### III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs must plead facts showing that the Defendants "misstated or omitted risks that did lead to the loss." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).  In their

Opposition, Plaintiffs argue that loss causation is reserved for trial; they have adequately pled loss

causation; and the data relied upon by Defendants is misleading.  These arguments have no merit.

   At the outset, Plaintiffs do not dispute, and thus concede, that RJF's stock price had

already declined 70% (from a high of $38.25 to a low of $11.48) during the putative Class Period

*before* the alleged "truth" was revealed on April 14, 2009.  *See* Opp. at 44; Panarella Decl., Ex. 35.  At

this Court has recognized, "price declines prior to the public disclosure of an omission may not be used

to support a theory of loss causation."  *Coronel*, 2009 WL 174656 at *30.  *Id.*  Nor do plaintiffs

address, and they therefore concede, that on twenty-six (26) days during the putative Class Period, RJF

stock closed below $16.49, and that therefore even without any alleged corrective disclosure, RJF

stock had routinely traded below the new valuation.  *See* Panarella Decl., Ex. 35.  This too invalidates

Plaintiffs' theory of loss causation.

   Plaintiffs' argument that loss causation is reserved for trial is misplaced.  See Opp. at

43-44.  Courts routinely dismiss securities class action claims based on a failure to adequately allege

loss causation.[20]  Moreover, Plaintiffs' back-up argument that they have adequately pled *specific*

fraudulent misrepresentations is nothing more than a rehash of their arguments relating to loan loss

reserves.  As demonstrated *supra*, these arguments are not only conclusory, but meritless.[21]  Nor do

Plaintiffs address the fact that the drop in share price relied on by Plaintiffs could have been caused by

any number of factors.  *Coronel*, 2009 WL 174656, at *31 (declining to find loss causation where "the

---

[20]  *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005); *ATSI Communic'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994); *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992); *Coronel*, 2009 WL 174656; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416 (S.D.N.Y. 2003).

[21]  The cases cited by Plaintiffs on this point are inapposite.  In both *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) and *DeMarco v. Robertson Stephens Inc.*, 318 F.Supp.2d 110 (S.D.N.Y. 2004), the court allowed "pump and dump" claims to proceed where the plaintiffs were able to specifically plead that defendants had publicly recommended purchase of their stock at one valuation, while internal documents revealed either a significantly lower valuation, in the case of *DeMarco* or, in the case of *Emergent,* that the CEO had a history of failed investment projects undertaken in collaboration with individual who was barred from securities industry by National Association of Securities Dealers (NASD).

Company's stock price decline could have been due to any number of reasons contained within the annual report"). Indeed, the April 14, 2009 press release attributes the increased $75 million loan loss provision to several contributing factors, including factors unrelated to any alleged misstatements. *See* Panarella Decl., Ex. 29. The April 29, 2009 press release and subsequent quarterly results include additional news impacting RJBank and other business segments at RJF that could account for any drop in share price. *See generally* Panarella Decl., Exs. 30 and 31.

Finally, while Plaintiffs object to the "data points" provided by Defendants, they do not in fact contest the applicability of the analysis, nor the numbers themselves. Indeed, the Amended Complaint itself thoroughly documents the housing market crash and broader economic decline. *See* Am. Compl., ¶¶ 117, 125-29, 132-41. Such "market chaos" is not chargeable to Defendants and represents an intervening cause – which requires dismissal.

## IV.    PLAINTIFFS DO NOT ADEQUATELY ALLEGE A SECTION 20A CLAIM

Since Plaintiffs fail to plead a primary violation under Section 10b, there can be no control person liability against the Individual Defendants under Section 20(a). *Coronel*, 2010 WL 174656 at *24. Moreover, Plaintiffs fail to adequately plead "culpable participation." *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 246 (S.D.N.Y. 2006) (citations omitted). Plaintiffs first argue that culpable participation is not required (Opp. at 48), but the majority of the courts within this Circuit, including (as Plaintiffs concede) this one, reject that argument. *See, e.g., id.; Coronel*, 2010 WL 174656 at *24; *Kalin v. Xanboo, Inc.,* No. 04 Civ 5931 (RJS), 2009 WL 928279, at *12 (S.D.N.Y. March 30, 2009); *In re Adelphia Communications*, No. 03 MD 1529, 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 10, 2007). Alternatively, Plaintiffs argue that they adequately plead culpable participation "by pleading . . . that the Individual Defendants consciously and/or recklessly ignored" regulators' warnings, analysis, economic data, and reports of RJF's subsidiary." Opp. at 49. These are the same types of generalized reports that, as demonstrated above, do not come state a claim. *See* §

24

I.A., *supra*. Control person liability requires "at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." *Lapin*, 506 F.Supp. 2d at 246 (citing *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005)). Plaintiffs have not met this standard.

## CONCLUSION

For the reasons set forth herein and in the Motion, this Court should dismiss the Amended Complaint in its entirety.

Dated:      New York, New York
            April 19, 2010

                              KELLEY DRYE & WARREN LLP

                              By: _____
                                  John M. Callagy
                                  Nicholas J. Panarella
                                  Joel A. Hankin
                                  Melissa E. Byroade
                              101 Park Avenue
                              New York, NY  10178
                              212-808-7800

                              *Attorneys for Defendants Raymond James*
                              *Financial, Inc., Thomas A. James, Jeffrey P.*
                              *Julien, Steven Raney, and Mark Moody*