UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JOHN WOODWARD, individually and on behalf
of all others similarly situated

                                Plaintiff                            09-CV-5347 (RPP)

            - against -
                                                                     **OPINION AND ORDER**

RAYMOND JAMES FINANCIAL, INC.,
THOMAS A. JAMES, JEFFREY P. JULIEN,
STEVEN RANEY, and MARK MOODY,

                                Defendants.
-----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      Plaintiff John Woodward ("Plaintiff") alleges, in an amended class action

complaint ("Amended Complaint") filed on November 25, 2009, that Defendants

Raymond James Financial, Inc. ("RJF"), Thomas A. James, Jeffrey P. Julien, Steven

Raney, and Mark Moody (collectively, "Defendants") engaged in a scheme to defraud

shareholders by making material misrepresentations about the adequacy of the loss

reserves for the loan portfolio of its subsidiary Raymond James Bank, and the financial

health of the loan portfolio between April 28, 2008 and April 14, 2009.  Defendants filed

a motion to dismiss on January 22, 2010.  For the reasons stated herein, the Defendants'

motion to dismiss is granted.

## I. Facts and Proceedings[1]

      The Amended Complaint is lengthy – 112 pages long, containing 356 paragraphs

– and contains numerous factual allegations.[2]  These allegations boil down to one

---

[1] All facts described herein are, unless otherwise noted, as alleged in the complaint.  See Bell Atlantic Co.
v. Twombly, 550 U.S. 544, 555 (2007).

proposition: that the Defendants purposefully underfunded their loan loss reserves and then made material misrepresentations about the adequacy of those loan loss reserves during the class period, which the Amended Complaint defines as beginning on April 22, 2008 and ending on April 14, 2009.  The allegations center upon the loan portfolio and loan loss reserves at Raymond James Bank ("RJBank"), a subsidiary of RJF that was created by RJF in 1994.[3]  (Amended Complaint ¶ 36.)  Loan loss reserves are set-asides of capital "to account for potential losses stemming from the Bank's loans, specifically the risks of borrowers encountering difficulties in meeting their loan payment obligations."  (Id. ¶ 53.)  A provision for loan losses, which adds to the loan loss reserves, appears as an expense on a company income statement, and "thus, a lower quarterly provision for loan losses results in higher quarterly profit."  (Id. ¶ 54.)

**A. The Alleged Fraudulent Scheme**

Beginning in FY 2008,[4] RJBank is alleged to have "intentionally record[ed] provisions that the Company knew were too low given the deteriorating economy and concomitant risks."  (Id. ¶ 57.)  On April 14, 2009, RJF released its results for the Second Quarter of FY 2009.  (Id. ¶ 168.)  The results were "well below the consensus analysts'

---

[2] The Court notes that the extreme length of the Amended Complaint is an independent ground for dismissal, pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  See Local No. 38 Intern. Bhd. of Elec. Workers Pension Fund v.  American Express Co., No. 09-cv-3016, 2010 WL 2834226, at *1 (S.D.N.Y. Jul. 19, 2010) ("While securities fraud claims must be pled with particularity, a plaintiff need not lard a pleading with streams of consciousness from confidential witnesses and block quotes from analyst calls. Plaintiff's hydra-like complaint sprawls over 243 paragraphs, some silted with more than 500 words.").  The Court notes that this appears to be a trend in complaints filed in securities actions, and emphasizes that the federal rules do not require this sort of kitchen-sink complaint in order to survive a motion to dismiss.

[3] The Amended Complaint does not define the precise legal relationship between RJF and RJBank, except to note that RJBank's operating committee included RJF executives.  (Id. ¶ 64.)  RJBank is not a Defendant in this action.

[4] Although the Amended Complaint does not define RJF's fiscal year, it appears from the complaint that the fiscal year begins October 1.  (See Id. ¶ 83 (noting that the second quarter of fiscal year 2009 ended March 31, 2009).)

estimates." (Id.)  The release made clear that RJBank was expected to incur a loss of $8 million for that quarter because it would have to provide for loan losses and charge-offs and because it would need to add to loan reserves.  (Id. ¶ 169.)  The Amended Complaint alleges that "[t]he allowance for loan losses was expected to reach $142 million, or 1.83% of loans."  (Id.)  The news of this unexpectedly large provision for loan loss reserves "sent RJF shares plummeting."  (Id. ¶ 172.)  The Amended Complaint alleges that RJF "closed at $16.49 per share on April 15, on unusually high volume, down $2.57 per share, or 13.48% from its close the prior day.  Over the next few days, RJF's stock price traded as low as under $15 per share, well below its Class Period highs of over $38 per share."  (Id.)

The Amended Complaint alleges that, during the class period and as a part of their fraudulent scheme to conceal the fact that their loan loss provisions were too low, "Defendants concealed the following: (1) the fact that [RJBank] was increasing risky commercial real estate lending at a time when that industry was contracting in this area; (2) the risk that if one large loan defaulted, [RJBank] could take a substantial hit to its earnings – which risk materialized in April 2009, causing [RJBank's] previously-impressive earnings to fall into the red and causing the Company to miss analysts' forecasts; and (3) the fact that in order to provide meaningful guidance on the likelihood of default, the [loan-to-value ("LTV")] ratios for [RJBank's] residential loans should have been adjusted to account for falling home prices."  (Id. ¶ 67.)  The Amended Complaint also alleges that, as a part of this same scheme, Defendants "misrepresented the extent that RJBank was better positioned than other banks to withstand the economic downturn, through misleading statements regarding (1) [RJBank's] purportedly

conservative underwriting standards and avoidance of subprime residential mortgages;
(2) the extent that the low LTV ratio in [RJBank's] residential mortgages reliably
indicated that [RJBank's] borrowers were unlikely to default; and (3) [RJBank's]
purportedly minimal exposure to the same factors that were decimating the industry –
residential mortgages to borrowers at risk of default and commercial loans to borrowers
suffering as commercial real estate values plummeted and the recession's impact spread
across the economy."  (Id. ¶ 68.)  The Amended Complaint also alleges that "Defendants
misrepresented the likelihood of extensive losses, through misleading statements
regarding (1) the diligence of its risk management efforts; and (2) [RJBank's] purported
practice of independently reviewing all loans on its books, regardless of whether
[RJBank] originated the loans, including syndicated corporate loans in which [RJBank]
was a participant."  (Id. ¶ 69.)

        Separate and apart from concealing the above information, the Amended
Complaint also alleges that "Defendants deliberately and/or recklessly ignored
information they regularly reviewed and evaluated (and were required to review and
evaluate) in determining RJBank's proper loan loss reserve level, including: (1) warnings
and assessments from federal regulators concerning deterioration of commercial real
estate and other commercial loans; (2) information showing both the commercial and
residential real estate markets continuing on steep declines; (3) economic data indicating
that the recession's impact had spread throughout the economy, hitting the retail,
manufacturing, and services sectors – industries to which RJBank was heavily exposed
through its corporate borrowers; and (4) information indicating vast disparities between

RJBank and industry averages, including significant differences between RJBank's loan

growth and its loan loss reserves and those of other banks."  (Id. ¶ 70.)

## B. Misrepresentations and Misleading Statements

The Amended Complaint devotes considerable space to allegations that the

Defendants made material misrepresentations or omissions.  (Id. ¶¶ 173-235.)  The

alleged misrepresentations and omissions in the Amended Complaint can be divided into

four categories: (1) statements about RJBank's loan loss reserves; (2) statements about

the RJBank loan portfolio (including loan-to-value ratios, loan concentrations, and due

diligence); (3) statements about RJF's and RJBank's management styles; and (4)

statements about RJF's SEC filings and compliance with generally accepted accounting

principles ("GAAP").  Rather than reproduce herein each of the alleged misstatements

from the Amended Complaint (of which there are over twenty and which occupy over

sixty paragraphs of the Amended Complaint), the opinion provides a representative

sample of the misrepresentations alleged in the Amended Complaint.

In the first category are statements such as the allegation that on July 23, 2008,

Defendant Thomas James, in answer to a question at an analysts' telephone conference,

stated:

> Most of the questions from our auditors are still dealing with the
> fact that our reserves are too high.  So, our outside auditors who
> should be chastened in their approach to what reserves are
> necessary in the banking industry at the moment, still are not
> convinced that we are not over-reserved.  So, we'll find out, but as
> Steve [Raney] pointed out to you and I hope you got a feel of
> essentially the residential loans are nominal way below industry
> averages in terms, and we do have a lot of history with a lot of
> those loans over a period of time.  The A & D loans, he has tended
> to mark them down the instant that there is any question about any
> problems dealing with them and we do anticipate that a couple of
> other of those loans will have some sort of loss exposure.  But

again they do have good assets.  I mean it isn't like they don't have good assets.  So, it's not like we are going to have any fire sales in those areas.  So, I am, I feel more than confident that without any problems in the corporate sector that we have more reserves than we need.  (Id.  209.)

In the second category are statements such as the allegation that "[i]n an interview on CNBC on April 22, 2008, the Defendant Thomas James stated: 'in our bank subsidiary we avoided subprime lending, so, a lot of the direct losses that have been experienced by the major banks we haven't experienced.'"  (Id. 177.)

In the third category are statements such as the allegation that "[i]n an interview on CNBC on April 22, 2008, the Defendant Thomas James stated: 'I'd express some frustration about [being lumped in with all the other financial services companies] because, you know, we have a very conservative management approach in our business and so we've avoided a lot of the problems, but I don't think we've been recognized for having done that.'"  (Id. 178.)

And in the fourth category are statements such as the allegation that "[i]n RJF's SEC Form 10-Q for the Second Quarter of FY 2008, filed on May 12, 2008, the Company stated: 'RJBank provides for both an allowance for losses in accordance with SFAS No. 5 and a reserve for individually impaired loans in accordance with SFAS No. 114.'"  (Id. ¶ 190.)

## C. Scienter

The Amended Complaint alleges that "the Defendants' intent to deceive and/or their reckless disregard for the truth is demonstrated by direct evidence as well as circumstantial evidence [herein,] supporting a strong inference of scienter."  (Id. ¶ 280.)

The Amended Complaint alleges many facts which, Plaintiff contends, are sufficient to support a finding of scienter.

First, the Amended Complaint alleges that scienter is established because the loan loss reserve decision was discussed extensively by the upper levels of RJF and RJBank management and because the Defendants were aware of regulatory warnings about the commercial and residential real estate market, economic indicators about the real estate market, and RJBank's "recently expanded portfolio of corporate and commercial borrowers." (Id. ¶ 282.) Relatedly, the Amended Complaint alleges that when RJBank increased its loan loss provision in the second quarter of FY2009, the Defendants could not point to "any event that occurred in the preceding quarter" that caused this sudden change; this, the Amended Complaint alleges, is an indication of the Defendants' "conscious and deliberate failure to set aside adequate loan loss reserves." (Id. ¶ 283.)

Next, the Amended Complaint alleges, "[t]he fact that RJF's own subsidiary [Raymond James & Associates] was issuing dire forecasts throughout the Class Period concerning the economy and specific sectors to which RJBank was heavily exposed (residential real estate and consumer spending) creates a strong inference that Defendants knew or was [sic] extremely reckless in not knowing that RJBank's loan loss reserves were too low." (Id. ¶ 288.)

The Amended Complaint next alleges that scienter is established because RJF's non-bank division had "historically provided the lion's share of RJF's quarterly earnings," but had fallen dramatically beginning in FY2008, and therefore manipulating the earnings of RJBank was used to "offset the poor performance of [RJF's] other divisions." (Id. ¶¶ 289-91.)

Next, the Amended Complaint alleges that scienter is established because in April 2008, RJF disclosed on its earnings release that it was holding $1.9 billion worth of illiquid Auction Rate Securities and "[t]his nearly $2 billion liability provide motive for RJF to pad the Company's balance sheet by manipulating RJBank's earnings in order to offset potential losses that Defendants knew were coming from their ARS sales." (Id. ¶¶ 292-99.)

The Amended Complaint also alleges that scienter is established because "recording loan loss provisions large enough to provide RJBank an adequate loan loss reserve would reduce RJBank's Total Capital ratio to levels that could prompt regulatory scrutiny and investor alarm" and in fact that "RJBank operated perilously close to dropping below the 10% ratio throughout the Class Period and, in fact, did briefly fall below the required 10% Total Capital ratio during the Company's fourth fiscal quarter of 2008." (Id. ¶¶ 300-01.)

The Amended Complaint alleges as evidence of scienter that during the class period "RJF deviated from its history of stock repurchases." (Id. ¶ 305.)

Next, the Amended Complaint alleges that RJF insiders sold their stocks "in patterns and circumstances that were suspicious in scope and timing." (Id. ¶ 309.) During the Class Period, RJTrust sold 7.9 million shares of the total 8 million that it held at the outset of the Class Period. (Id. ¶ 310.) Also during the Class Period, Defendant Jeffery Julien sold 20,000 shares at significantly lower prices than the price he had paid for 20,000 shares purchased prior to the Class Period. (Id. ¶ 311.) Also during the Class Period, Dennis Zank, the President of Raymond James & Associates, who is not a party to this action, sold over 50,000 shares at a profit of $1.6 million. (Id. ¶ 312.)

8

Next, the Amended Complaint alleges that scienter can be established because the bonus compensation structure "encourages executives to be conscious of the 'bottom line' and it aligns the Company's total compensation structure with profitability." (Id. ¶ 313.)

Finally, the Amended Complaint alleges that RJF's alleged violations of the GAAP and SEC filing requirements suggest that the individual Defendants, who signed off on the company's financial statements, "knew or were extremely reckless in not knowing that RJF was perpetrating a fraud by concealing mounting losses." (Id. ¶ 317.)

**D. Causes of Action**

The Amended Complaint asserts two causes of action. Count One alleges a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5(b), promulgated thereunder, and is asserted against all Defendants. That count is premised upon allegations that the Defendants made material and false statements intended to defraud and that as a result, "the market price of RJF's securities were [sic] artificially inflated throughout the Class Period." (Id. ¶ 347.) Count Two alleges a violation of Section 20(a) of the Securities Exchange Act. That count is asserted against Defendants Thomas James, Jeffrey Julien, Steven Raney, and Mark Moody ("Individual Defendants"), and is premised upon allegations that the Individual Defendants were "controlling persons" who "had the power and influence to cause [RJF] to engage in the unlawful conduct complained of herein." (Id. ¶ 351.)

**E. Motion to Dismiss**

On January 22, 2010, the Defendants moved to dismiss the Amended Complaint in its entirety.

The Defendants argue that the Section 10(b) Claim must be dismissed because the statements are not material misrepresentations, because the Amended Complaint does not adequately allege scienter, and because the Amended Complaint fails to plead loss causation sufficiently.  The Defendants next argue that the Section 20(a) claims should be dismissed because the Amended Complaint does not make sufficient allegations to extend control person liability against the individual defendants.

## II. Discussion

## A. Section 10(b) Claim

In alleging a Section 10(b) and Rule 10b-5 claim, a plaintiff "must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement of a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.'" Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)). Securities fraud cases are subject to heightened pleading standards as specified by the Private Securities Litigation Reform Act (PSLRA) and Rule 9(b) of the Federal Rules of Civil Procedure.

The plain language of the PSLRA establishes a heightened standard of pleading for securities actions brought in federal court.  First, the PSLRA requires that a complaint, alleging misrepresentations upon which a claim of securities fraud is premised, "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires

that "the complaint shall, with respect to each act or omission alleged to violate [the

Securities Exchange Act], state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud . . . a party

must state with particularity the circumstances constituting fraud." Rule 9(b) applies to

any claim sounding in fraud, including securities fraud claims brought pursuant to

Section 10(b) of the Securities Exchange Act. Rombach v. Chang, 355 F.3d 164, 170 (2d

Cir. 2004). The Second Circuit "has read Rule 9(b) to require that a complaint '(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements

were fraudulent.'" Rombach, 355 F.3d at 170.

### 1. Actionable Misstatements

Under Section 10b and Rule 10b-5, a statement is only actionable if it is a

"statement of material fact." 17 C.F.R. § 240.10b-5. "The materiality of a misstatement

depends on whether 'there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to [act].'" ECA & Local 134 IBEW Joint Pension

Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting

Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988)). An omission is material "whenever

secret information renders prior public statements materially misleading." In re Time

Warner Inc. Secs. Litig., 9 F.3d 259, 268 (2d Cir. 1993). Of note here, statements of

puffery or mere generalizations are not material misstatements. ECA & Local 134 IBEW

<u>Joint Pension Trust of Chicago</u>, 553 F.3d. at 206.  A reasonable investor, by definition, does not rely upon general and vague statements of puffery.  <u>Id</u>.

As noted above, the alleged statements in the Amended Complaint can be divided into four categories: (1) statements about RJBank's loan loss reserves; (2) statements about the RJBank loan portfolio (including loan-to-value ratios, loan concentrations, and due diligence); (3) statements about RJF's and RJBank's management styles; and (4) statements about SEC filings and GAAP.

The statements alleged in the Amended Complaint pertaining to the adequacy of RJBank's loan loss reserves are, without exception, general statements of optimism.  <u>See</u> <u>In re Time Warner Inc. Secs. Litig.</u>, 9 F.3d at 206.  This in and of itself renders these statements inactionable.  <u>Id</u>.  These statements are also inactionable because, although the Amended Complaint alleges that the bank officers knew or should have known that the loan loss reserves were inadequate, the Amended Complaint does not specify what caused the officers to know that the loan loss reserves were insufficient.  (Amended Complaint ¶ 183.)  In other words, the Amended Complaint does not allege any facts from which it can be determined that the loan loss reserves were, in fact, inadequate given the data available to RJBank and RJF officials about the loan portfolio as they were determining proper loan loss reserve amounts.  Indeed, the Amended Complaint makes clear that, as the economic situation worsened through the Fiscal Year 2008 ("FY2008) and Fiscal Year 2009 ("FY2009"), RJBank and RJF officials increased the loan loss reserves.  In the second quarter of FY2008, RJBank had reserves equaling 1.12% of loans without funded commitments; in the third quarter of FY 2008, that percentage was 1.15%; in the fourth quarter of FY 2008, that percentage was 1.23%; and in the first

quarter of FY 2009, that percentage increased to 1.36%.  (Id. ¶ 254.)   Any contention

that these loan loss reserves were inadequate is "essentially a claim that the defendants

mismanaged the company," and is not properly addressed under Section 10(b).  Ciresi v.

Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991).

    Most of the statements about the quality of the Defendants' loan portfolio were,

similarly, very general and not sufficiently detailed to have misled investors.  These

statements, for the most part, are classic puffery.  In re Time Warner Inc. Secs. Litig., 9

F.3d at 206.  The Amended Complaint alleges that the statements about the LTV ratios

were false, because they relayed LTV ratios calculated at the time of origination, but the

Amended Complaint does not allege that they misled investors or the public by

suggesting falsely that the LTV ratios were not from the time of origination, and the

Amended Complaint does not allege a duty to disclose updated LTV ratios.  (Amended

Complaint ¶ 185.)  Similarly, the Amended Complaint does not allege that the

Defendants' statements about avoiding subprime lending and consumer loans were

actually false, or that the Defendants' statements about their commercial loans having

"superior statistics to the industry averages" were actually false.  As a result, all but two

of the statements about the quality of the Defendants' loan portfolio are inactionable,

because the Amended Complaint does not allege with specificity, as is required by the

PSLRA, why these alleged misstatements are false.  Additionally, because the alleged

misstatements are mere puffery, these misstatements are inactionable.  15 U.S.C. § 78u-

4(b)(1).

    The Amended Complaint's allegations about statements made by the Defendants

about the Company's management style are not material misstatements.  Rather, these

statements are the quintessence of non-actionable puffery.  See ECA & Local 134 IBEW

Joint Pension Trust of Chicago, 553 F.3d at 206 ("The statements highlighted by

Plaintiffs are no more than "puffery" which does not give rise to securities violations. . . .

Plaintiffs conflate the importance of a bank's reputation for integrity with the materiality

of a bank's statements regarding its reputation. While a bank's reputation is undeniably

important, that does not render a particular statement by a bank regarding its integrity per

se material.") (citing Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d

Cir.1996)).  For instance: "Raymond James' leadership believes that the managed growth

strategy, commitment to risk management and conservative lending practices that helped

the firm avert the subprime crisis and post solid operating results in 2007 will continue to

serve the company well in the coming year."  (Amended Complaint ¶ 216.)  This sort of

statement is nothing more than a general platitude that accompanies nearly every press

release or public statement issued by a financial institution – it defines the term

"puffery."[5]

As to another category of misrepresentations, the Second Circuit has stated that

"allegations of GAAP violations or accounting irregularities, standing alone, are

insufficient to state a securities fraud claim. Only where such allegations are coupled with

evidence of 'corresponding fraudulent intent,' might they be sufficient."  Novak v.

Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted).  The Amended Complaint

does not allege facts suggesting fraudulent intent specifically as to the GAAP violations

---

[5] And, the Court notes that for the most part, these statements were accompanied by "meaningful cautionary language," so they are also protected by the bespeaks caution doctrine (unless the Amended Complaint were to adequately allege that the Defendants knew their statements were false when made; there is no allegation in the Amended Complaint that the Defendants were in possession of information showing that their statements about loan loss reserves were false).  15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1); see Rombach, 355 F.3d at 173.

(and the alleged GAAP violations are, for the most part, indistinguishable from the other alleged misstatements).  Therefore, the Court concludes that these alleged violations are not actionable misrepresentations, but instead are evidentiary support for the other misrepresentations alleged in the Amended Complaint.

Nevertheless, two paragraphs of the Amended Complaint about the quality of the Defendants' loan portfolio as alleged in the Amended Complaint are actionable. (Amended Complaint ¶¶ 197, 222.)  These paragraphs contain representations that RJF or RJBank "independently underwrote" all loans, including loans "sourced from agent or syndicate bank."  (Id.)  The Amended Complaint alleges that these statements were false at the time they were made because a confidential witness "confirmed that the commercial real estate loan that caused RJBank to record a $28 million charge-off in the Company's second quarter of 2009 was not independently underwritten by RJBank."  (Id. ¶ 198.)  Moreover, on the limited record before the Court, this misrepresentation appears to be material, as is evident from the allegation that publicity about the default on the $28 million loan is purported to have resulted in the decline in price that gave rise to this lawsuit.  See Ganino v. Citizens Utils. Co., 228 F.3d 154, 162-64 (2d Cir. 2000) (holding that materiality is not a fact-specific inquiry and should generally not be the basis for dismissal on a Rule 12(b)(6) motion).

For the reasons stated above, the sole alleged misrepresentations that are actionable are the alleged statements that RJF and RJBank independently underwrote every loan in RJBank's loan portfolio.

**2. Scienter**

The PSLRA requires that a complaint plead scienter, by "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. 78u-4(b)(2).  In Tellabs, Inc. v. Makor Issues & Rights, Ltd., the Supreme Court explained that "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

A complaint survives a motion to dismiss if it alleges "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 198.  To establish the strong inference of scienter through the motive and opportunity prong, the complaint "must allege that [the defendant] or its officers 'benefited in some concrete and personal way from the purported fraud.'  Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  Id. (quoting Novak, 216 F.3d at 307-08).  As for alleging facts giving rise to a strong inference of scienter under the circumstantial evidence prong, the Second Circuit has held that the following four allegations will generally suffice: (1) that the defendants "benefited in a concrete and personal way from the purported fraud," (2) that the defendants "engaged in deliberately illegal behavior," (3) that the defendants "knew facts or had access to information suggesting that their public statements were not accurate," and (4) that the defendants "failed to check information they had a duty to monitor."  Id. at 199 (quoting Novak, 216 F.3d at 311).

Although the Amended Complaint contains many allegations purporting to give rise to a strong inference of scienter, none of those allegations – taken individually or viewed cumulatively – gives rise to a strong inference of scienter.

The first scienter allegation is that the Defendants were aware of information that the real estate market remained unstable and that they did not change the loan loss reserves accordingly.  (Amended Complaint ¶ 282.)  The Amended Complaint does not, however, point to any information about specific loans in the profile; rather, it contains general allegations about "internal reports" and "economic indicators," without specifying the content of those reports or the connection between those reports and the misstatements at issue in this case.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak, 216 F.3d at 308-09.  The failure to provide such information is fatal to this allegation of scienter.

The next scienter allegation is that, during the second quarter of FY2008, an RJF subsidiary forecasted that home prices would continue to decline.  (Amended Complaint ¶¶ 284-88.)  However, market observers in all sectors were aware of increasing foreclosures during the second quarter of FY2008 and the likelihood that the housing market would worsen and impact the general economic outlook.  See, e.g., Floyd Norris, In Parts of U.S., Foreclosures Top Sales, NEW YORK TIMES, Mar. 1, 2008, at C1; Michael Corkery & James R. Hagerty, New Blows Hit Housing Industry – KB's Loss, Worries about Countrywide Spook Ailing Sector, WALL STREET JOURNAL, Jan. 9, 2008, at A3 ("More than two years into the housing downturn, unpleasant surprises and market rumors are continuing to wreak havoc in an industry that may be leading the economy

into a recession.").  The Amended Complaint does not allege that RJF issued an economic report from which RJF or RJBank could determine that certain loans within their loan portfolios were likely to fail.  To the contrary, the economic report described in the Amended Complaint appears only to be a general statement of the economic situation at the time. There is no basis for inferring from this allegation that Defendants had scienter; it is much more likely that Defendants (like many other financial institutions) underestimated the magnitude of the coming economic crisis and believed that they were taking adequate risk management and cautionary measures to account for any future downturn.

The next allegation is that scienter was established because earnings in non-bank divisions of RJF had fallen, creating an incentive to falsely increase RJBank's earnings by under-funding the loan loss reserves.  (Amended Complaint ¶¶ 289-91.)  But this argument fails, on its face, because "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable . . . do not constitute 'motive' for purposes of this inquiry."  ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 198.

The next allegation is that scienter is established because RJF had nearly $2 billion in potential liability due to the failure of auction rate securities marketed by RJF and its subsidiaries, and needed to manipulate RJBank's earnings to offset that liability.  (Amended Complaint ¶¶292-99.)  This allegation of scienter fails because offsetting potential losses is a motive "common to most corporate officers," ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 198.  But it also fails because the Amended Complaint claims that RJF/RJBank understated the loan loss reserves by

roughly $40 million, which would not have come close to offsetting the potential liability of $2 billion associated with the auction rate securities.

Similarly, the allegation that scienter is established because the Defendants sought to avoid reducing the total capital ratio levels is not sufficient, (Amended Complaint ¶¶ 300-04) because "the desire for the corporation to appear profitable" is not evidence of an adequate motive under Second Circuit case law.  ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 198.

The scienter allegation that RJF's deviation in stock repurchasing "provides further evidence of inside knowledge of serious financial problems at RJBank and RJF" is undercut by the factual allegations contained in the Amended Complaint itself. (Amended Complaint ¶ 307.)  The Amended Complaint alleges that in May of 2004, "RJF's board of directors authorized the Company to purchase $75 million of its shares," which the Company did, finishing by purchasing over $56 million worth of shares in March of 2008.  (Id. ¶ 305.)  The Board of Directors authorized an additional $75 million for stock purchase on March 11, 2008.  (Id. ¶ 306.)  In September 2008, RJF purchased $500,000 of its shares but "purchased no Company stock for the remainder of the Class Period."  (Id. ¶ 307.)  This does not, however, appear to be a deviation from RJF's history of stock re-purchases.  The facts, as alleged, do not indicate that RJF had a history of spending money for stock repurchases allotted by the Board immediately; in fact, it appears that RJF waited until March 2008, almost four years after the March 2004 authorization, to use the majority of the money allocated for repurchasing its shares. Consequently, the fact that RJF did not make sizable purchases of its own stock during

the class period is not necessarily a deviation.  This purported allegation of scienter does not give rise to any inference of wrongdoing.

The next allegation of scienter is that RJF insiders made sales of stocks that were suspicious in their scope and timing and that indicated a pattern.  (Id. ¶ 308-12.)  There are three sales alleged in the amended complaint.  The first is an alleged sale of shares held by RJTrust that the Defendants point out was actually not a sale, but instead a transfer of shares to a successor trustee.  (Def. Mem. M. to Dismiss, 40.)  They attach SEC filings which support this contention (Exh. 24 to Panarella Decl.), and the Plaintiffs do not dispute this characterization.  Therefore, the Court concludes that the RJTrust transfer cannot support a finding of scienter.  As for the remaining two alleged stock sales, the inquiry of whether a sale of stocks by a company executive shows scienter is a factual, situation-specific inquiry.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75 (2d Cir. 2001).  In particular, courts should look at the "percentage of shares sold in relation to the number held."  Id.  The Amended Complaint only alleges that, as to the Defendant Julien, he bought at least 20,000 shares before the Class Period and he sold 20,000 shares during the Class period at a loss.  (Amended Complaint ¶ 311.)  The Amended Complaint does not allege Julien's total holdings, so it is impossible to determine whether this sale at a loss was sufficiently significant to create an inference of scienter.  Thus, this allegation is not so specific as to give rise to a strong inference of scienter.  As for Dennis Zank's sale, it was completed roughly seven months before the April 2009 announcement about loan loss reserves.  (Id. ¶ 312.)  The Plaintiffs have not put forward any coherent argument to explain how this sale, over half a year before the stock price dropped in April 2009, had any connection to the alleged misconduct.  Morevoer, Dennis Zank is not

an employee of RJF or RJBank, and he is not a defendant in this action.  (Id.)  The Amended Complaint does not allege facts that show how any of these sales could be evidence of the Defendants' scienter.

The next scienter allegation is that the company's compensation plans "aligns the Company's total compensation structure with profitability."  (Amended Complaint ¶ 313.)  Absent additional allegations that suggest that the compensation structure created a specific motive to underestimate loan loss reserves, this argument fails as a matter of law. See ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F.3d at 201 ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated." (internal quotation marks and citations omitted)).

As for the alleged violations of GAAP and SEC filing requirements (Amended Complaint ¶¶ 316-17), these allegations are not independent evidence of fraudulent intent.  See Novak, 216 F.3d at 209.  Rather, "[o]nly where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient."  Id. (internal quotation marks and citations omitted).  Because none of the other scienter allegations support a strong inference of scienter, these allegations are not sufficient on their own to support such an inference.

The Plaintiffs contend that the scienter allegations should be examined holistically, and that if "taken together . . . these allegations create a cogent and

compelling inference of Defendants' scienter."  (Pl. Mem. Opp. M. to Dismiss, 33.)
But, for the reasons described above, none of the allegations of scienter are sufficiently
specific that they allow the Court to determine whether the Defendants knew (or even
likely knew) that their statements were false when made.  For the most part, the scienter
allegations are of the sort that could be made about nearly any company operating in the
United States, namely that the executives were motivated to create profit, that the
executives received a near-constant stream of information about economic trends, and
that the executives made mistakes in some of their forward-looking projections.  The
Amended Complaint fails to plead "with particularity facts giving rise to a strong
inference of that the defendant acted with the required state of mind."

**B. Section 20(a) Claim**

"To establish a prima facie violation of control person liability, a plaintiff must
show (1) a primary violation by the controlled person, (2) control of the primary violator
by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable
participant in the controlled person's fraud."  ATSI Commc'ns v. The Shaar Fund, Ltd.,
et al., 493 F.3d 87, 108 (2d Cir. 2007); 15 U.S.C. § 78t-(1)(a).  Because the Amended
Complaint fails to plead facts establishing a violation of Section 10(b) of the Securities
Exchange Act, it cannot meet the first element of establish a Section 20(a) violation –
there has been no "primary violation by the controlled person."  Id.  This claim is
therefore without merit.


**III. Conclusion**

For the reasons stated herein, the Defendants' motion to dismiss is granted, and the Amended Complaint is dismissed without prejudice.

IT IS SO ORDERED.

Dated:  New York, New York
       August 14, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

**Counsel for Plaintiffs:**
**Jay W. Eisenhofer, John Charles Kairis, Keith Martin Fleischman**
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue
29th Floor
New York , NY 10017
Fax: (646)-722-8501

**Mark Casser Gardy**
Gardy & Notis, LLP
440 Sylvan Avenue
Suite 110
Englewood Cliffs , NJ 07632
Fax: (201)567-7337

**Nadeem Faruqi**
Faruqi & Faruqi, LLP
369 Lexington Avenue
10th Floor
New York , NY 10017
Fax: (212) 983-9331

**Megan D. McIntyre**
Grant & Eisenhofer, PA (DE)
Chase Manhattan Centre
1201 North Market Street
Wilmington , DE 19801
Fax: (302)-622-7100


**Counsel for Defendants:**
**John Morgan Callagy, Joel Avi Hankin, Melissa Errine Byroade, Nicholas John Panarella**
Kelley Drye & Warren, LLP (NY)
101 Park Avenue
New York , NY 10178
Fax: (212) 808-7897